RICHARD A. JONES (Bar No. 135248)
(rjones@cov.com)
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111
Telephone: (415) 591-6000
Facsimile: (415) 591-6091

*(Additional Counsel on Signature Page)*

Attorneys for Plaintiff
Roots Ready Made Garments Co. W.L.L.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROOTS READY MADE GARMENTS CO. W.L.L., <br><br> Plaintiff, <br><br> v. <br><br> THE GAP, INC., a/k/a, GAP, INC., GAP INTERNATIONAL SALES, INC., BANANA REPUBLIC, LLC, AND OLD NAVY, LLC, <br><br> Defendants. | Case No: C 07 3363 <br><br> **COMPLAINT FOR BREACH OF CONTRACT; VIOLATION OF CAL. B&P CODE §17200; FRAUD; TORTIOUS INTERFERENCE WITH CONTRACT; TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS; BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING; PROMISSORY ESTOPPEL; QUANTUM MERUIT; AND UNJUST ENRICHMENT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Roots Ready Made Garments Co. W.L.L. ("Roots"), by its attorneys, Covington & Burling LLP, alleges for its complaint as follows:

### INTRODUCTION

1. Roots is a Qatari company that agreed to assist the clothing and accessories giant, Defendant The Gap, Inc.[1] in resolving a important issue with

---

[1] The Defendants will be collectively referred to herein as "Gap."

NY: 552028-1

excess inventory by purchasing 1.7 million pieces of outdated Gap excess production, known by the acronym "OP" for overproduction, for $6 million.

2. The OP had limited value and the costs of storing and liquidating it were high. Accordingly, to induce Roots to purchase the OP, Gap promised to give Roots valuable distribution rights for first-line Gap products in all Arabic speaking countries under Gap's International Sales Program ("ISP"). By offering to grant Roots ISP rights, Gap induced Roots to pay an above-market price for the OP inventory.

3. In reasonable reliance upon Gap's representations, Roots went through the time and expense of screening potential Gap retailers in numerous countries, including Saudi Arabia, Kuwait, Egypt, Lebanon, Qatar, the UAE, Turkey, Tunisia, Jordan, Morocco, and Bahrain. The culmination of this costly and time consuming process was that Roots proposed several retailers to Gap for its reasonable approval.

4. At the outset of the parties' relationship, Gap made it appear to Roots that Gap would honor its agreement to allow Roots to develop the ISP business in the region. Initially, Gap approved retailers for Roots to distribute Gap ISP merchandise in the UAE and Qatar.

5. Once the operations in Qatar and the UAE had been successfully established, Gap prevented Roots from properly growing the business by unreasonably refusing to authorize any additional retailers. Gap proceeded to stonewall Roots with respect to any and all of its designated retailers, and refused to authorize additional ISP territories for Roots.

6. After Gap prevented Roots from realizing the benefit of its bargain by repeatedly and unreasonably delaying approval for ISP retailers, Gap wrongfully ended its relationship with Roots by terminating its distribution agreement with Roots' immediate licensor, Gabana Gulf Distribution, Ltd.

7. Gap was well aware that by formally terminating Roots' ability to license ISP – a right that Gap never let Roots fully exercise – it was destroying any

1

COMPLAINT (*By Roots Ready Made Garments*)

1  chance for Roots to sell the OP. Local retailers would only purchase OP inventory in
2  connection with the right to sell first-line Gap merchandise. In fact, to date, Roots
3  has only been able to sell 330,000 out of 1.6 million pieces. Roots is and has been
4  warehousing the remainder of the OP at significant expense.

5    8. Over and above Roots' economic injury, however, Gap's breaches also
6  harmed Roots' reputation. Based upon Gap's promises, Roots represented to local
7  retailers that it would have the ability to distribute first-line Gap merchandise
8  through the ISP program. Gap then prevented Roots from meeting its commitments
9  to its clients. As a result, Roots' reputation in the Middle East, which was
10 impeccable prior to its affiliation with Gap, has been harmed.

## THE PARTIES

12   9. Plaintiff Roots is a Qatari Corporation, with its principal place of
13 business in Doha, Qatar.

14   10. On information and belief, Defendant The Gap, Inc. is a Delaware
15 corporation, with its principal place of business in San Francisco, California.

16   11. On information and belief, Defendant Gap International Sales, Inc. is a
17 Delaware Corporation with its principal place of business in San Francisco,
18 California.

19   12. On information and belief, Defendant Banana Republic, LLC is a
20 Delaware limited liability company with its principal place of business in San
21 Francisco, California.

22   13. On information and belief, Defendant Old Navy, LLC is a Delaware
23 Limited Liability Company with its principal place of business in San Francisco,
24 California.

## JURISDICTION AND INTRADISTRICT ASSIGNMENT

26   14. This Court has subject matter jurisdiction over this action pursuant to 28
27 U.S.C. § 1332(a)(2) because the action is between citizens of a State and a subject of

a foreign state, and the amount in controversy exceeds $75,000, exclusive of interest, costs, and attorneys' fees.

15. Venue is proper in the Northern District of California, San Francisco Division pursuant to 28 U.S.C. § 1391(a).

## BACKGROUND

*Roots Is Approached About Purchasing the OP*

16. In 2003, Gap sought the assistance of Gabana Distribution Ltd. ("Gabana") in finding a buyer to purchase 1.7 pieces of OP inventory stored in Dubai. Gabana was represented by its co-owners, Francoise Larsen and Amin El Sokary.

17. In early 2003, El Sokary approached Roots to propose that Roots buy the Gap OP. Recognizing that additional incentives would be necessary to induce Roots to purchase the OP, El Sokary stated that Gap would grant Roots rights to distribute first-line Gap merchandise in the Middle East through Gap's ISP program in exchange for purchasing the OP. Roots agreed to the idea in concept.

18. Within Roots, overall responsibility for the Gap project fell to Sheikh Faisal Ahmed al-Thani.

19. Roots also brought in a respected retail executive, Ashraf Abu Issa, to manage the Gap opportunity as Chief Executive Officer of Roots.

20. Under Sheikh Faisal, Abu Issa, as CEO, and later Naser Beheiry, another prominent local businessman, as Managing Director, jointly assumed responsibility for Roots' day-to-day operations.

*Roots Agrees to Purchase the OP Inventory In Exchange For ISP Distribution Rights*

21. Larsen informed Gap's Outlet Division Manager, Jim Bell, that Roots had expressed interest in buying the Dubai OP. Larsen also informed Bell that Roots, not Gabana, possessed the contacts in the Middle East necessary to establish ISP retailers and to sell off the OP in the process.

22. Larsen explained that Roots would not purchase the OP without also securing ISP distribution rights for the Arabic speaking countries of the Middle East. In response, upon information and belief, Bell asked Neal Goldberg, then Executive Vice President of Gap's Outlet Division, to authorize an ISP distribution agreement for all Arabic-speaking countries in exchange for Roots' agreement to purchase the OP inventory.

23. On or about March 2003, Gabana informed Bell and Jon Ehlen, Director of Gap's ISP Division, that Roots had agreed to pay the $6 million purchase price for the OP in exchange for the ISP distribution rights.

24. During the subsequent negotiations, Roots executives, particularly Abu Issa, had direct contact with Bell on numerous occasions. Larsen also negotiated with Bell on behalf of Gabana and Roots.

25. On information and belief, Gap knew that the massive OP inventory would likely take 3 to 5 years to liquidate, and would be expensive to warehouse. For this reason, without additional incentives, the large OP purchase would not be a profitable deal for Roots. On multiple occasions, Gap, through Bell and others, acknowledged that the OP purchase would be a sacrifice for Roots, and that the more commercially valuable ISP distribution rights were, therefore, an essential part of the deal.

26. In point of fact, the ISP distribution rights were the key to Roots being able to make any return on its OP investment. As the parties discussed, any retail client of Roots in the Middle East would only purchase OP in exchange for the opportunity to distribute ISP. As one prominent Lebanese retailer put it, purchasing some OP was the "entrance fee" to the valuable ISP rights.

27. Because of the anticipated difficulty of selling the OP merchandise, Roots sought assurances from Gap that it would enjoy flexibility in liquidating the inventory. Gap stated that since the OP inventory was of lesser quality than ISP merchandise, Roots would have significant discretion in distributing the OP to whom

and where it wanted. In or around March or April 2003, Bell advised Roots' representatives and Larsen that Roots would be free to sell the OP anywhere it desired in the Middle East and negotiated territories.

28. Abu Issa specifically inquired whether Roots could sell OP throughout Eastern Europe – a region where Roots thought it might be able to develop a market for the OP. Bell responded that, although certain countries could not be officially included in a written agreement, Roots would be free to do any deal it desired on a case-by-case basis. Bell repeatedly assured Abu Issa that Roots could sell the OP anywhere in the world, including Eastern Europe.

29. Bell further represented and confirmed that Roots would have free rein to sell OP and ISP merchandise in all of the countries that were expressly identified in the written agreements.

30. The above-described representations by Bell were important considerations without which Roots would not have made the significant capital investment associated with purchasing and storing the OP. Roots reasonably relied upon Bell's representations.

31. As a further incentive for Roots to purchase the OP inventory, Bell represented during the course of the negotiations that Gap had never granted distribution rights to two different parties at the same time, for the same region. Therefore, Bell claimed, Roots would in practice enjoy exclusive rights to distribute Gap merchandise in the territory covered by the agreements.

32. As an additional inducement for Roots to purchase the OP immediately, Bell also claimed – falsely, upon information and belief – that Gap had lined-up another buyer for the merchandise and that Roots would lose the deal if it did not act quickly.

***Gap Executes Written Agreements with Gabana***

33. On or about May 13, 2003, Gabana signed two written agreements with Gap B.V., one for OP and one for ISP. The two contracts specifically referred to

each other. The Gabana-Gap ISP agreement expressly authorized distribution of ISP merchandise in twelve separate territories: (i) Bahrain; (ii) Egypt; (iii) Jordan; (iv) Kuwait; (v) Lebanon; (vi) Morocco; (vii) Oman; (viii) Qatar; (ix) Saudi Arabia; (x) Tunisia; (xi) UAE; and (xii) Switzerland.

34. Reflecting the parties' understanding that a distributor would need great flexibility in disposing of the OP, the OP Agreement authorized the sale of the excess inventory in the following 21 territories: (i) Bahrain; (ii) Chile; (iii) Czech Republic; (iv) Cyprus; (v) Egypt; (vi) Israel; (vii) Jordan; (viii) Kuwait; (ix) Lebanon; (x) Morocco; (xi) Oman; (xii) Qatar; (xiii) Russia; (xiv) Saudi Arabia; (xv) Switzerland; (xvi) Tunisia; (xvii) Turkey; (xviii) UAE; (xix) Poland; (xx) Hungary; and (xxi) Bulgaria.

35. Pursuant to an exclusive distribution agreement between Roots and Gabana, Roots became, on paper, Gabana's "sub-distributor" for Gap merchandise in the covered territories. In reality, however, Gap, Roots and Gabana had agreed that Roots would purchase the OP inventory in exchange for the right to distribute first-label ISP merchandise.

36. In or around May through June 2003, Roots paid a total of $6 million to purchase the OP along with ISP distribution rights. In July, Roots took title to the OP inventory.

***Gap Wrongfully Impairs Roots' Ability to Exercise the ISP Distribution Rights***

37. After unloading the OP inventory on Roots at an above-market price, Gap systematically denied Roots the benefit of the bargain by unreasonably and wrongfully impairing Roots' ability to exercise the ISP distribution rights.

38. Gap's written contract with Gabana required Gap's approval for any retailers that were to sell ISP merchandise.

39. For a short time after the $6 million OP purchase, Gap facilitated the development of Roots' ISP business in select countries – specifically Qatar and the UAE – by approving the retailers Roots proposed for those territories.

40. In Qatar, the first ISP sales began in 2004. The first UAE store began selling Gap ISP in the Spring of 2004.

41. Almost immediately after the initial Qatar and UAE locations were established, however, Gap began to stall with respect to new ISP retailers and refused to allow Roots to expand its territories.

42. Initially, Roots believed that Gap would honor its commitment to grant Roots' ISP distribution rights. In reasonable reliance on Gap's representation that Roots would be able to develop the ISP business in the Middle East, Roots expended significant time, money, and resources locating acceptable retailers.

43. For example, representatives of Roots traveled to Egypt and interviewed multiple potential retailers in that country. Based upon its research, Roots then introduced Gap representatives to the selected Egyptian retailer. Gap expressed no objections whatsoever to the Egyptian retailer proposed by Roots.

44. Roots also made proposals to Gap for ISP sales in Lebanon, Bahrain, Kuwait, and Saudi Arabia.

45. At a July 2003 meeting a Gap's headquarters in San Francisco, Roots and Gabana made a presentation about their business plan for Saudi Arabia. Gap expressed approval of the business plan, and asked Roots to expand it. Jon Ehlen, the director of Gap's ISP program, specifically advised Sheikh Faisal that Gap had no objections to the proposed Saudi Arabian retailer, Red Square.

46. Following the July 2003 meeting, Gap suddenly reversed its position, maintaining that Roots could only sell OP, not ISP, in Saudi Arabia and Bahrain. Gap's reversal created major difficulties for Roots, because, *inter alia*, it had already placed large orders for ISP merchandise, which took into account the markets in Saudi Arabia, Kuwait, and Bahrain. Gap initially insisted that Roots take the full ISP order, even though Gap would not allow Roots to distribute ISP in the contemplated markets. Ultimately, after extended negotiations, Gap finally agreed to a partial accommodation, allowing Roots to reduce the ISP orders by 25%.

47. In the fall of 2004, at Gap's urging, Roots and Gabana submitted another major proposal for Saudi Arabia involving two previously-approved retailers. Ehlen assured Roots that the plan was acceptable, subject only to management approval. Consistent with Gap's overall approach, however, the approval never came.

48. During September 2004, Roots also submitted proposals to Gap for Lebanon and Jordan. Once again, without any legitimate justification, Gap withheld its approval to go forward with the proposed retailers in these territories as well.

49. In addition, at Elhen's urging, Roots expended considerable time and resources locating potential retailers and developing a business proposal for Turkey. Gap ultimately rejected this proposal, too, without any good faith basis.

**Gap Attempts To Deal Directly with Roots' Customers**

50. Prior to agreeing to purchase the OP inventory, Roots required assurances that Gap would not seek to contract directly with any of Roots' retailers.

51. Bell gave Roots such assurances, which are likewise reflected in Gap's written agreements with Gabana.

52. Nonetheless, during a trip to Gap's headquarters in the Summer of 2004, Roots' Chairman learned that Gap had been meeting directly with representatives of one of Roots' retailers without Roots' knowledge.

53. Thereafter, on information and belief, in or around July 2005, the retailer, RSH, secretly made arrangements for Ron Young, Gap's Vice President for International Development, to meet with RSH in Dubai without any representatives of Roots being present.

54. Gap is aware that it would breach its agreements with both Roots and Gabana by contracting directly with RSH. For this reason, upon information and belief, Gap and RSH are planning to enter into a business venture via a shell company in order to conceal the fact that RSH is the true party in interest.

*Gap's Wrongful Termination of Roots' Right to Distribute ISP and Sell OP*

55. In or around late 2004, Roots and Gabana were notified that Gap's ISP Division had been transferred to the company's International Department, which reported to Young.

56. In or about January 2005, Young traveled to Qatar and Dubai to meet with representatives of Roots, Gabana, and to view existing and proposed mall sites.

57. During this trip, Young told Abu Issa and Larsen that rather than distributing first line garments in the Middle East through the ISP program, Gap intended to open stand-alone stores in the region. Young stated that Gap would open up the process to bidding by local retailers. Young's statements directly contradicted the promises Gap made to induce Roots to purchase the OP inventory.

58. On May 12, 2005, Gap notified that Gabana that it was terminating the ISP agreement. The agreement was terminated without cause.

59. On June 26, 2005, Gabana gave Roots notice that it would terminates its distribution agreement with Roots, in light of Gap's termination of the Gabana-Gap ISP agreement.

## Count One

### (Breach of Contract)

60. Roots repeats and realleges the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

61. Gap and Roots entered into an oral contract pursuant to which Roots agreed to purchase the OP inventory for $6 million in exchange for the right to distribute first-line Gap merchandise in the Middle East through Gap's International Sales Program, or ISP.

62. Roots fully complied with its obligations under its agreement with Gap.

63. Gap breached its agreement with Roots by, *inter alia*, preventing Roots from exercising the ISP distribution rights by failing to approve the local retailers identified by Roots without justification. In addition, upon information and belief,

9

COMPLAINT (*By Roots Ready Made Garments*)

1   Gap attempted to contract directly with the local retailers identified by Roots in
2   violation of the parties' express agreement that it would not do so.
3       64.   As a result of Gap's material breaches of the contract, Roots has been
4   damaged in an amount to be determined at trial, but believed to exceed $30,000,000.

## Count Two
### (Violations of California's Business & Professions Code § 17200)

65.   Roots repeats and realleges the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

66.   Gap intentionally, unlawfully, unfairly and deceptively encouraged Roots to purchase the OP inventory for $6 million, and to expend time and resources locating potential retailers for Gap merchandise throughout the Middle East based on false assurances that Roots would be permitted to distribute first-line Gap merchandise through the International Sales Program. In fact, Gap never actually intended to allow Roots to exercise the ISP distribution rights. Moreover, after refusing to approve many of the retailers identified by Roots, Gap has established or sought to establish direct relationships with the retailers, in order to reap the return on Roots investment for itself.

67.   Gap's conduct constitutes unlawful, unfair, and fraudulent practices under California's Business & Professions Code § 17200.

68.   As a result of Gap's unlawful, unfair and fraudulent business practices, Roots has been harmed in an amount to be proven at trial, but believed to exceed $6,000,000.

## Count Three
### (Fraud)

69.   Roots repeats and realleges the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

70.   Roots purchased the OP inventory from Gap for $6 million – an amount significantly above the market value of the merchandise.

71. In making the decision to purchase the OP inventory, Roots reasonably relied on Gap's assurances that it would simultaneously grant Roots the right to distribute first-line Gap merchandise in the Middle East through Gap's International Sales Program, or ISP. As Gap was well aware, Roots would never have agreed to purchase the OP merchandise without Gap's promise to grant ISP distribution rights.

72. Upon information and belief, Gap never intended to permit Roots to exercise the full ISP distribution rights that it promised. After unloading the OP inventory on Roots, Gap wrongfully impaired Roots' ability to exercise these rights by, *inter alia*, unreasonably and without justification failing to approve the local retailers Roots proposed, and attempting to contract directly with the local retailers.

73. Gap's misrepresentations induced Roots to agree to purchase the OP inventory.

74. As a directly result of Gap's misrepresentations, Roots has been damaged in an amount to be determined at trial, but believed to exceed $10,000,000.

75. Additionally, Gap's conduct was so gross, wanton, and malicious that punitive damages should be awarded against it in the amount of $30,000,000.

### Count Four

### (Tortious Interference with Contract)

76. Plaintiff repeats and realleges the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

77. The Gabana-Roots contract and Roots' contracts with local retailers are valid contracts.

78. On information and belief, Gap knew of the existence of Roots' contracts with Gabana and the retailers prior to terminating the ISP agreement with Gabana.

79. Gap's ISP contract with Gabana created a franchise relationship between Gap, as franchisor, and Gabana, as franchisee under California's Franchise Relations Act, Cal. Bus. & Prof. Code § 20001, *et seq.*

11

COMPLAINT (*By Roots Ready Made Garments*)

80. Under the Franchise Act, Gap's termination of the agreement without good cause was unlawful.

81. As a direct result of Gap's unlawful termination of the ISP agreement with Gabana, Gap knowingly disrupted the Roots contractual relationships with Gabana and the retailers.

82. Roots has been damaged by Gap's conduct in an amount to be determined at trial, but believed to exceed $30,000,000.

## Count Five

**(Tortious Interference with Prospective Business Relations)**

83. Plaintiff repeats and realleges the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

84. Roots had business relations with, *inter alia*, various local retailers.

85. Gap interfered with those business relations through the use of dishonest, unfair, improper, and wrongful means.

86. In particular, by failing to consider and/or approve the local retailers identified by Roots, and later dealing and/or attempting to deal directly with the retailers, Gap prevented Roots from implementing the ISP program as had been previously agreed upon by the parties. In addition, as a direct result of Gap's unlawful termination of its written agreements with Gabana, Gabana terminated its distribution agreement with Roots, impairing Roots' ability to maintain its business relationships with the local retailers.

87. By reason of the foregoing, Roots has been damaged in an amount to be determined at trial, but believed to exceed $30,000,000.

## Count Six

**(Breach of the Covenant of Good Faith and Fair Dealing)**

88. Plaintiff repeats and realleges the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

89. Under California law, every contract has the implied covenant of good faith and fair dealing, which is breached when one party acts in a manner which prevents the other party from performing his obligations under the agreement or withholds the benefits of the contract from the other party. Included within the Gap's contractual obligations to Roots is the obligation of good faith and fair dealing implied into every contract under applicable law, and which obligates Gap, *inter alia*, to perform under its agreement with Roots in a manner that is not unreasonable, irrational, arbitrary, and/or capricious.

90. As explained above, Gap has willfully prevented Roots from profiting under the parties' agreement by, *inter alia*, failing to approve the retailers identified by Roots, thus preventing Roots from exercising its ISP distribution rights.

91. Gap has thus breached the implied covenant of good faith and fair dealing of its agreements with Roots.

92. By reason of this material breach of contract, Roots has suffered actual damages in an amount to be determined at trial, but which are believed to exceed $30,000,000.

## Count Seven
### (Promissory Estoppel)

93. Plaintiff repeats and realleges the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

94. As alleged above, Gap made clear and unambiguous promises to Roots who then relied on Gap's promises in a manner that was both reasonable and foreseeable.

95. As a direct result of Roots' reasonable reliance on Gap's promises, Roots suffered damages in an amount to be proven at trial, but believed to exceed $15,000,000.

### Count Eight

### (*Quantum Meruit*)

96. Plaintiff repeats and realleges the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

97. As alleged above, Roots performed services for Gap in good faith. Gap accepted the services provided by Roots with an expectation of compensation. Roots is therefore entitled to the reasonable value of the services it provided in an amount to be determined at trial, but believed to exceed $15,000,000.

### Count Nine

### (Unjust Enrichment)

98. Plaintiff repeats and realleges the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

99. Because of the wrongful conduct explained above, Gap has been unjustly enriched at Roots' expense.

100. Gap is therefore entitled to be compensated in an amount to be determined at trial, but believed to exceed $6,000,000.

WHEREFORE, Plaintiff demands judgment as follows:

  A. Compensatory damages in an amount to be determined at trial;

  B. Restitution, disgorgement or other equitable relief under Cal. Bus. & Prof. Code § 17200 in an amount to be determined at trial;

  C. Punitive damages in an amount to be determined at trial; and

  D. Such other and further relief as this Court deems just and proper, including costs and reasonable attorneys' fees.

1
2                              **DEMAND FOR A JURY TRIAL**
3            Roots hereby demands a trial by jury of all issues so triable in this action.
4
5   Dated: June 26, 2007
6
7                                          Respectfully submitted,
                                           COVINGTON & BURLING LLP
8
9                                          By: _____
10                                             Richard A. Jones (Bar No. 135248)
                                               One Front Street
11                                             San Francisco, California 94111
12
13                                         Robert P. Haney* (rhaney@cov.com)
                                           Bradley J. Nash* (bnash@cov.com)
14                                         COVINGTON & BURLING LLP
                                           620 Eighth Avenue
15                                         New York, NY 10018
                                           Telephone: (212) 841-1000
16                                         Facsimile: (212) 841-1010

17                                         (*pro hac vice application to be filed)

18                                         Attorneys for Plaintiff Roots Ready    Made
                                           Garments Co. W.L.L.
19
20
21
22
23
24
25
26
27
28

                                           15
                          COMPLAINT (By Roots Ready Made Garments)