RICHARD A. JONES (Bar No. 135248)
(rjones@cov.com)
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111
Telephone: (415) 591-6000
Facsimile: (415) 591-6091

(*Additional Counsel on Signature Page*)

Attorneys for Plaintiff
Roots Ready Made Garments Co. W.L.L.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROOTS READY MADE GARMENTS CO. W.L.L., <br><br> Plaintiff, <br><br> v. <br><br> THE GAP, INC., a/k/a, GAP, INC., GAP INTERNATIONAL SALES, INC., BANANA REPUBLIC, LLC, AND OLD NAVY, LLC, <br><br> Defendants. | Case No: C 07 3363 CRB <br><br> **FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT; VIOLATION OF CAL. B&P CODE §17200; FRAUD; TORTIOUS INTERFERENCE WITH CONTRACT; TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS; BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING; PROMISSORY ESTOPPEL; QUANTUM MERUIT; AND UNJUST ENRICHMENT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Roots Ready Made Garments Co. W.L.L. ("Roots"), by its attorneys, Covington & Burling LLP, alleges for its First Amended Complaint as follows:

## INTRODUCTION

1. Roots is a Qatari company that agreed to assist the clothing and accessories giant, Defendant The Gap, Inc.[1] in resolving a important issue with

---

[1] The Defendants are collectively referred to herein as "Gap."

1  excess inventory by purchasing 1.7 million pieces of outdated Gap merchandise, known by the acronym "OP" for overproduction, for $6 million.

2.  The OP had limited value and the costs of storing and liquidating it were high. Accordingly, to induce Roots to purchase the OP, Gap promised to give Roots valuable distribution rights for first-line Gap products in all Arabic-speaking countries under Gap's International Sales Program ("ISP"). Upon information and belief, this promise was false when made, and was designed to induce Roots to pay an above-market price for the OP inventory.

3.  In addition, in reasonable reliance upon Gap's representations, Roots went through the time and expense of screening potential Gap retailers in numerous countries, including Saudi Arabia, Kuwait, Egypt, Lebanon, Qatar, the UAE, Tunisia, Jordan, Morocco, and Bahrain. The culmination of this costly and time-consuming process was that Roots proposed several retailers to Gap for its reasonable approval.

4.  At the outset of the parties' relationship, Gap made it appear to Roots that Gap would honor its agreement to allow Roots to develop the ISP business in the region. Initially, Gap approved retailers for Roots to distribute Gap ISP merchandise in the UAE and Qatar.

5.  The ISP business in the UAE and Qatar showed immediate success, and, upon information and belief, Gap was pleased with the profits that were generated.

6.  Once the operations in Qatar and the UAE had been successfully established, however, Gap prevented Roots from properly growing the business by unreasonably refusing to authorize any additional retailers. Gap proceeded to stonewall Roots with respect to any and all of its designated retailers, and refused to authorize additional ISP territories for Roots.

7.  After Gap prevented Roots from realizing the benefit of its bargain by repeatedly and unreasonably delaying approval for ISP retailers, Gap wrongfully

ended its relationship with Roots by terminating the ISP distribution agreement Gap executed with Roots' immediate licensor, Gabana Gulf Distribution, Ltd.

8. Gap was well aware that by formally terminating Roots' ability to license ISP – a right that Gap never let Roots fully exercise – it was destroying any chance for Roots to sell the OP. Local retailers would only purchase OP inventory in connection with the right to sell first-line Gap merchandise. In fact, to date, Roots has only been able to sell 390,000 out of 1.6 million pieces. Roots is and has been warehousing the remainder of the OP at significant expense.

9. Over and above Roots' economic injury, however, Gap's breaches also harmed Roots' reputation. Based upon Gap's promises, Roots represented to local retailers that it would have the ability to distribute first-line Gap merchandise through the ISP program. Gap then prevented Roots from meeting its commitments to its clients. As a result, Roots' reputation in the Middle East, which was impeccable prior to its affiliation with Gap, has been harmed.

## **THE PARTIES**

10. Plaintiff Roots is a Qatari company, with its principal place of business in Doha, Qatar.

11. On information and belief, Defendant The Gap, Inc. is a Delaware corporation, with its principal place of business in San Francisco, California.

12. On information and belief, Defendant Gap International Sales, Inc. is a Delaware Corporation with its principal place of business in San Francisco, California.

13. On information and belief, Defendant Banana Republic, LLC is a Delaware limited liability company with its principal place of business in San Francisco, California.

14. On information and belief, Defendant Old Navy, LLC is a Delaware Limited Liability Company with its principal place of business in San Francisco, California.

**JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT**

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because the action is between citizens of a State and a subject of a foreign state, and the amount in controversy exceeds $75,000, exclusive of interest, costs, and attorneys' fees.

16. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(a).

17. Intradistrict Assignment: Pursuant to Northern District Local Rule 3-2(c) and Northern District General Order 44, venue in this action is proper in the San Francisco Division of the Northern District of California.

**BACKGROUND**

*Roots Is Approached About Purchasing the OP*

18. In 2003, Gap sought the assistance of Gabana Distribution Ltd. ("Gabana") in finding a buyer to purchase 1.7 pieces of OP inventory stored in Dubai. Gabana was represented by its co-owners, Francoise Larsen and Jack Caprice, and by Amin El Sokary.

19. The OP inventory was outdated, and its limited commercial value was diminishing with time. Moreover, the cost of storing the merchandise was significant. Therefore, Gap and Gabana recognized that additional incentives would be necessary to induce a buyer to purchase the OP.

20. In early 2003, the manager of Gap's Outlet Division, Jim Bell, approached Roots with Larsen and El Sokary, to propose that Roots buy the Gap OP inventory. They advised Roots that Gap would grant Roots rights to distribute first-line Gap merchandise in the Middle East through Gap's ISP program in exchange for purchasing the OP.

21. Later, El Sokary and Larsen traveled to Qatar to meet with Roots' principal, Sheikh Faisal Ahmed Al-Thani to discuss the proposed deal.

22. Roots agreed to Bell's proposal in concept.

23. Within Roots, overall responsibility for the Gap project fell to Sheikh Faisal Al-Thani.

24. Roots brought in a respected retail executive, Ashraf Abu Issa, to manage the Gap opportunity as Chief Executive Officer of Roots.

25. Later, Roots hired Naser Beheiry, another prominent local businessman, as Managing Director of the company. Messrs. Abu Issa and Beheiry jointly assumed responsibility for Roots' day-to-day operations.

***Roots Agrees to Purchase the OP Inventory In Exchange For ISP Distribution Rights***

26. Upon information and belief, Larsen and El Sokary informed Jim Bell that Roots had agreed to buy the Dubai OP. Larsen also informed Bell that Roots – not Gabana – possessed the contacts in the Middle East necessary to establish ISP retailers and to sell off the OP in the process.

27. Upon information and belief, Larsen and El Sokary explained that Roots would not purchase the OP without also securing ISP distribution rights for the Arabic-speaking countries of the Middle East. In response, upon information and belief, Bell asked Neal Goldberg, then Executive Vice President of Gap's Outlet Division, to authorize an ISP distribution agreement for all Arabic-speaking countries in exchange for Roots' agreement to purchase the OP inventory.

28. Upon information and belief, in or about March 2003, Gabana informed Bell and Jon Ehlen, Director of Gap's ISP Division, that Roots would agree to pay the $6 million purchase price for the OP in exchange for the ISP distribution rights.

29. Throughout the course of the subsequent negotiations, Roots executives, particularly Abu Issa and Sheikh Faisal, had direct contact with Gap representatives, including Bell and Ehlen. At these meetings, Abu Issa and Sheikh Faisal advised Bell and Ehlen that they represented Roots. Larsen also negotiated with Gap on behalf of Gabana and Roots.

30. On information and belief, Gap knew that the massive OP inventory would likely take 3 to 5 years to liquidate, and would be expensive to warehouse. For this reason, without additional incentives, the large OP purchase would not be a profitable deal for Roots. On multiple occasions, Gap, through Bell and others, acknowledged that the OP purchase would be a sacrifice for Roots, and that the more commercially valuable ISP distribution rights were, therefore, an essential part of the deal.

31. In point of fact, the ISP distribution rights were the key to Roots being able to make any return on its OP investment. As Gap was well aware, Roots' retail customers in the Middle East would only purchase OP in exchange for the opportunity to distribute ISP. As one prominent Lebanese retailer put it, purchasing some of Gap's OP inventory was the "entrance fee" to the valuable ISP rights.

32. Because of the anticipated difficulty of selling the OP merchandise, Roots sought assurances from Gap that it would enjoy flexibility in liquidating the inventory. Gap stated that because the OP inventory was of lesser quality than ISP merchandise, Roots would have significant discretion in distributing the OP to whom and where it wanted. In or around March or April 2003, Bell advised Roots' representatives and Larsen that Roots would be free to sell the OP anywhere it desired in the Middle East and negotiated territories.

33. Abu Issa specifically inquired whether Roots could sell OP throughout Eastern Europe – a region where Roots thought it might be able to develop a market for the OP. Bell responded that, although certain countries could not be officially included in a written agreement, Roots would be free to do any deal it desired on a case-by-case basis. Bell repeatedly assured Abu Issa that Roots could sell the OP anywhere in the world, including Eastern Europe.

34. Bell further represented and confirmed that Gap would allow Roots free rein to sell OP and ISP merchandise in all of the countries that were expressly identified in the written agreements.

35. As a further incentive for Roots to purchase the OP inventory, Bell represented during the course of the negotiations that Gap had never granted distribution rights to two different parties at the same time, for the same region. Therefore, Bell claimed, Roots would in practice enjoy exclusive rights to distribute Gap merchandise in the territory covered by the agreements.

36. As an additional inducement for Roots to purchase the OP immediately, Bell also claimed – falsely, upon information and belief – that Gap had lined-up another buyer for the merchandise and that Roots would lose the deal if it did not act quickly.

37. Finally, Bell falsely promised to assist Roots in liquidating the OP inventory by referring buyers to Roots. Following Roots' purchase of the OP, Bell failed to provide the promised referrals.

38. Bell's representations, described above, were important considerations without which Roots would not have made the significant capital investment associated with purchasing and storing the OP. Roots reasonably relied upon Bell's representations in making the decision to purchase the excess inventory.

*Gap Executes Written Agreements with Gabana*

39. Although the core of the parties' bargain was that Roots would receive ISP distribution rights in exchange for purchasing the OP inventory, Gap insisted that the written agreements be executed by Gap and Gabana.

40. On or about May 13, 2003, Gabana Gulf Distribution Ltd. ("Gabana Gulf") executed two written agreements with Gap, one for OP (the "OP Agreement") and one for ISP (the "ISP Agreement"). The contracts state that the OP and ISP agreements are "tied together," such that the cancellation of one agreement automatically results in the cancellation of the other. The contracts also provide that the purchase of the OP inventory is a condition precedent to the effectiveness of the ISP Agreement.

41. Gabana executed the OP Agreement with Defendant The Gap, Inc., Banana Republic, Inc., and Old Navy, Inc. Upon information and belief, Defendants Banana Republic, LLC, and Old Navy, LLC are the successors in interest and assignees of Banana Republic, Inc., and Old Navy, Inc.

42. Reflecting the parties' understanding that a distributor would need great flexibility in disposing of the OP, the OP Agreement authorized the sale of the excess inventory in 21 territories: (i) Bahrain; (ii) Chile; (iii) Czech Republic; (iv) Cyprus; (v) Egypt; (vi) Israel; (vii) Jordan; (viii) Kuwait; (ix) Lebanon; (x) Morocco; (xi) Oman; (xii) Qatar; (xiii) Russia; (xiv) Saudi Arabia; (xv) Switzerland; (xvi) Tunisia; (xvii) Turkey; (xviii) UAE; (xix) Poland; (xx) Hungary; and (xxi) Bulgaria.

43. Gabana Gulf executed the ISP Agreement with Gap International B.V. – a Gap affiliate that later transferred its rights under the agreement to Defendant Gap International Sales, Inc. ("Gap International").

44. The ISP Agreement expressly authorized distribution of ISP merchandise in twelve separate territories: (i) Bahrain; (ii) Egypt; (iii) Jordan; (iv) Kuwait; (v) Lebanon; (vi) Morocco; (vii) Oman; (viii) Qatar; (ix) Saudi Arabia; (x) Tunisia; (xi) UAE; and (xii) Switzerland.[2]

45. Although Roots was not a party to the ISP Agreement, the ultimate purpose of the agreement, as negotiated by Gap, Gabana, and Roots, was to confer a benefit – the ISP distribution rights – on Roots as consideration for the purchase the OP inventory.

46. Pursuant to a separate agreement between Roots and Gabana, Roots became, on paper, Gabana's "sub-distributor" for Gap merchandise in the covered territories. In reality, however, Gap, Roots and Gabana had agreed that Roots would

---

[2] On or about September 1, 2004, Gap International B.V. and Gabana Gulf executed a new ISP Agreement. The terms of this agreement were largely identical to the original agreement, but the original expiration date, April 30, 2005, was extended until August 31, 2007.

1  purchase the OP inventory in exchange for the right to distribute first-line ISP
2  merchandise in the Middle East.

*Gap Wrongfully Impairs Roots' Ability to Exercise the ISP Distribution Rights*

47. In or around May through June 2003, Roots paid a total of $6 million to purchase the OP along with ISP distribution rights. In July, Roots took possession of the OP inventory.

48. When Roots acquired the OP inventory, it discovered that Gap had delivered approximately 1.6 million pieces, rather than the 1.7 million pieces that were promised. Despite Roots' protests, Gap never explained the shortage.

49. After unloading the OP inventory on Roots at an above-market price, Gap systematically denied Roots the benefit of the bargain by unreasonably and wrongfully impairing Roots' ability to exercise the ISP distribution rights.

50. The ISP Agreement required Gap's approval for any retailers that were to sell ISP merchandise.

51. For a short time after the $6 million OP purchase, Gap facilitated the development of Roots' ISP business in select countries – specifically Qatar and the UAE – by approving the retailers Roots proposed for those territories.

52. In Qatar, where Roots itself served as the retailer, the first ISP sales began in 2004.

53. For UAE, Gap approved a Saudi company, Al Turki, in partnership with RSH (Middle East) L.L.C., as an authorized retailer. The first UAE store began selling Gap ISP in the Spring of 2004.

54. The ISP business in Qatar and UAE was quickly shown to be profitable. Upon information and belief, Gap expressed approval of Roots' performance in these markets.

55. Shortly after the initial Qatar and UAE locations were established, however, Gap began to stall with respect to new ISP retailers and refused to allow Roots to expand its ISP territories.

56. Initially, Roots believed that Gap would honor its commitment to grant Roots' ISP distribution rights. In reasonable reliance on Gap's representation that Roots would be able to develop the ISP business in the Middle East, Roots expended significant time, money, and resources locating acceptable retailers.

57. For example, representatives of Roots traveled to Egypt and interviewed multiple potential retailers in that country. Based upon its research, Roots then introduced Gap representatives to the selected Egyptian retailer. Gap expressed no objections whatsoever to the Egyptian retailer proposed by Roots.

58. Roots also made proposals to Gap for ISP retailers in Lebanon, Bahrain, Kuwait, and Saudi Arabia. However, in each case, Gap stalled and ultimately failed to act on Roots' proposals.

59. At a July 2003 meeting at Gap's headquarters in San Francisco, Roots and Gabana made a presentation about their business plan for Saudi Arabia. Gap expressed approval of the business plan, and asked Roots to expand it. Jon Ehlen, the director of Gap's ISP program, specifically advised Sheikh Faisal that Gap had no objections to the proposed Saudi Arabian retailer, Red Square.

60. Following the July 2003 meeting, Gap suddenly reversed its position, maintaining that Roots could only sell OP, not ISP, in Saudi Arabia and Bahrain. Gap's reversal created major difficulties for Roots, because, *inter alia*, it had already placed large orders for ISP merchandise, which took into account the markets in Saudi Arabia, Kuwait, and Bahrain. Gap initially insisted that Roots take the full ISP order, even though Gap would not allow Roots to distribute ISP in the contemplated markets. Ultimately, after extended negotiations, Gap finally agreed to a partial accommodation, allowing Roots to reduce the ISP orders by 25%.

61. In the Fall of 2004, at Gap's urging, Roots and Gabana submitted another major proposal for Saudi Arabia involving the two retailers Gap had previously approved for ISP sales in the UAE – Al Turki and RSH. Ehlen assured

Roots that the plan was acceptable, subject only to management approval. Consistent with Gap's overall approach, however, the approval was never issued.

62. Even as it repeatedly failed to permit Roots to expand the ISP business, Gap continued to encourage Roots expend time and money exploring new potential markets.

63. In the Summer of 2004, Roots arranged a meeting between Ehlen and Andrew Jarowski, VP of Gap International, and a premier Lebanese retailer, Grand Stores, or GS. At Gap's request, GS had prepared plans for the layout of the proposed Gap sales areas in its stores. Jarowski expressed approval for the plans, but indicated that he needed final approval from Gap's management.

64. Jarowski stated that in order to show Gap's commitment to the GS business proposal, Gap would invite GS's buyer to come to Gap's next collection presentation in San Francisco. In reasonable reliance on Jarowski's invitation, representatives of GS accompanied Roots' representatives on a trip to San Francisco to view the collection.

65. Following the collection presentation, Gap refused to take any ISP orders from GS. Gap's conduct severely damaged Roots' relationship with GS.

***Gap Attempts To Deal Directly with Roots' Customers In Violation of The Parties' Agreements.***

66. Prior to agreeing to purchase the OP inventory, Roots required assurances that Gap would not seek to contract directly with any of Roots' retailers.

67. Bell gave Roots such assurances, which are likewise reflected in Gap's written agreements with Gabana.

68. Nonetheless, during a trip to Gap's headquarters in the Summer of 2004, Roots' General Manager, Naser Beheiry, learned that Gap had been meeting directly with representatives of one of Roots' retailers without Roots' knowledge.

69. On information and belief, in or around July 2005, the retailer, RSH, secretly made arrangements for Ron Young, Gap's Vice President for International

1  Development, to meet with RSH in Dubai without any representatives of Roots being present.

70. Gap is aware that it would breach its agreements with both Roots and Gabana by entering into a distribution agreement directly with RSH. For this reason, upon information and belief, Gap and RSH are planning to enter into a business venture via a shell company in order to conceal the fact that RSH is the true party in interest.

***Gap's Wrongful Termination of Roots' Right to Distribute ISP and Sell OP***

71. In or around late 2004, Roots and Gabana were notified that Gap's ISP Division had been transferred to the company's International Department, which reported to Ron Young.

72. In or about January 2005, Roots hired Gabana's principal, Larsen, as its Chief Executive Officer. Also at that time, Young traveled to Qatar and Dubai to meet with representatives of Roots and Gabana, and to view existing and proposed mall sites.

73. During this trip, Young told Abu Issa and Larsen that Gap planned to change its business model in the Middle East: rather than distributing first-line garments through the ISP program, Gap intended to open stand-alone stores in the region. Young stated that Gap would open up the process to bidding by local retailers. Young's statements directly contradicted the promises Gap made to induce Roots to purchase the OP inventory.

74. On May 12, 2005, Gap notified Gabana that it was terminating the ISP Agreement. The agreement was terminated without cause.

75. On June 26, 2005, Gabana gave Roots notice that it would terminate its distribution agreement with Roots, in light of Gap's termination of the Gabana-Gap ISP agreement.

## Count One

### (Breach of Contract)

76. Plaintiff repeats and realleges the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

77. Gap and Roots entered into an oral contract pursuant to which Roots agreed to purchase the OP inventory for $6 million in exchange for the right to distribute first-line Gap merchandise in the Middle East through Gap's International Sales Program, or ISP.

78. Roots fully complied with its obligations under its agreement with Gap.

79. Gap breached its agreement with Roots by, *inter alia*, failing to give Roots ISP rights, and preventing Roots from exercising the ISP distribution rights by failing to approve the local retailers identified by Roots without justification. In addition, upon information and belief, Gap attempted to contract directly with the local retailers identified by Roots in violation of the parties' express agreement that it would not do so.

80. As a result of Gap's material breaches of the contract, Roots has been damaged in an amount to be determined at trial, but believed to exceed $30,000,000.

## Count Two

### (Breach of Contract)

81. Plaintiff repeats and realleges the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

82. The ISP Agreement created a franchise relationship between Gap, as franchisor, and Gabana, as franchisee under California's Franchise Relations Act, Cal. Bus. & Prof. Code § 20001, *et seq.* The agreement afforded Gabana Gulf the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or system prescribed in substantial part by Gap International. The operation of Gabana Gulf's business pursuant to that plan or system is substantially associated with Gap International's trademarks, service

marks, trade names, logotypes, advertisings and/or other commercial symbols designating Gap International or its affiliates. Gabana Gulf was required to pay a franchise fee, which was paid indirectly by Roots.

83. Under the Franchise Act, Gap's termination of the ISP Agreement without good cause was unlawful, and constitutes a material breach of the agreement.

84. Roots was not a party to the ISP Agreement. However, both Gap and Gabana entered into the agreement with the intent of conveying ISP distribution rights to Roots as consideration for Roots' purchase of Gap's OP inventory.

85. Roots is, therefore, a third-party beneficiary of the ISP Agreement.

86. As a direct result of Gap's material breach of the ISP Agreement, Roots has been damaged in an amount to be proven at trial, but believed to exceed $30,000,000.

## Count Three

**(Violations of California's Business & Professions Code § 17200)**

87. Plaintiff repeats and realleges the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

88. Gap intentionally, unlawfully, unfairly and deceptively encouraged Roots to purchase the OP inventory for $6 million, and to expend time and resources locating potential retailers for Gap merchandise throughout the Middle East based on false assurances that Roots would be permitted to distribute first-line Gap merchandise through the International Sales Program. In fact, Gap never actually intended to allow Roots to exercise the ISP distribution rights. Moreover, after refusing to approve many of the retailers identified by Roots, Gap has established or sought to establish direct relationships with the retailers, in order to reap the return on Roots' investment for itself.

89. Gap's conduct constitutes unlawful, unfair, and fraudulent practices under California's Business & Professions Code § 17200.

90. As a result of Gap's unlawful, unfair and fraudulent business practices, Roots has been harmed in an amount to be proven at trial, but believed to exceed $6,000,000.

## Count Four

### (Fraud)

91. Plaintiff repeats and realleges the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

92. Roots purchased the OP inventory from Gap for $6 million – an amount significantly above the market value of the merchandise.

93. In making the decision to purchase the OP inventory, Roots reasonably relied on Gap's assurances that it would simultaneously grant Roots the right to distribute first-line Gap merchandise in the Middle East through Gap's International Sales Program, or ISP. As Gap was well aware, Roots would never have agreed to purchase the OP merchandise without Gap's promise to grant ISP distribution rights.

94. Upon information and belief, Gap never intended to permit Roots to exercise the full ISP distribution rights that it promised. After unloading the OP inventory on Roots, Gap wrongfully impaired Roots' ability to exercise these rights by, *inter alia*, unreasonably and without justification failing to approve the local retailers Roots proposed, and attempting to contract directly with the local retailers.

95. Gap's misrepresentations induced Roots to agree to purchase the OP inventory.

96. As a directly result of Gap's misrepresentations, Roots has been damaged in an amount to be determined at trial, but believed to exceed $10,000,000.

97. Additionally, Gap's conduct was so gross, wanton, and malicious that punitive damages should be awarded against it in the amount of $30,000,000.

## Count Five

### (Tortious Interference with Contract)

98. Plaintiff repeats and realleges the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

99. Roots' distribution agreement with Gabana and Roots' contracts with local retailers are valid contracts.

100. On information and belief, Gap knew of the existence of Roots' contracts with Gabana and the retailers prior to terminating the ISP Agreement with Gabana.

101. As a direct result of Gap's unlawful termination of the ISP agreement with Gabana, Gap knowingly disrupted Roots' contractual relationships with Gabana and the retailers.

102. Roots has been damaged by Gap's conduct in an amount to be determined at trial, but believed to exceed $30,000,000.

## Count Six

### (Tortious Interference with Prospective Business Relations)

103. Plaintiff repeats and realleges the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

104. Roots had business relations with, *inter alia*, various local retailers.

105. Gap interfered with those business relations through the use of dishonest, unfair, improper, and wrongful means.

106. In particular, by failing to consider and/or approve the local retailers identified by Roots, and later dealing and/or attempting to deal directly with the retailers, Gap prevented Roots from implementing the ISP program as had been previously agreed upon by Gap, Roots, and Gabana. In addition, as a direct result of Gap's unlawful termination of its ISP Agreement with Gabana, Gabana terminated its distribution agreement with Roots, impairing Roots' ability to maintain its business relationships with the local retailers.

107. By reason of the foregoing, Roots has been damaged in an amount to be determined at trial, but believed to exceed $30,000,000.

## Count Seven

### (Breach of the Covenant of Good Faith and Fair Dealing)

108. Plaintiff repeats and realleges the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

109. Under California law, every contract has the implied covenant of good faith and fair dealing, which is breached when one party acts in a manner which prevents the other party from performing his obligations under the agreement or withholds the benefits of the contract from the other party. Included within the Gap's contractual obligations to Roots is the obligation of good faith and fair dealing implied into every contract under applicable law, and which obligates Gap, *inter alia*, to perform under its agreement with Roots in a manner that is not unreasonable, irrational, arbitrary, and/or capricious.

110. As explained above, Gap has willfully prevented Roots from profiting under the parties' agreement by, *inter alia*, failing to approve the retailers identified by Roots, thus preventing Roots from exercising its ISP distribution rights.

111. Gap has thus breached the implied covenant of good faith and fair dealing of its agreements with Roots.

112. By reason of this material breach of contract, Roots has suffered actual damages in an amount to be determined at trial, but which are believed to exceed $30,000,000.

## Count Eight

### (Promissory Estoppel)

113. Plaintiff repeats and realleges the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

114. As alleged above, Gap made clear and unambiguous promises to Roots who then relied on Gap's promises in a manner that was both reasonable and foreseeable.

115. As a direct result of Roots' reasonable reliance on Gap's promises, Roots suffered damages in an amount to be proven at trial, but believed to exceed $15,000,000.

## Count Nine

### (*Quantum Meruit*)

116. Plaintiff repeats and realleges the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

117. As alleged above, Roots performed services for Gap in good faith. Gap accepted the services provided by Roots with an expectation of compensation. Roots is therefore entitled to the reasonable value of the services it provided in an amount to be determined at trial, but believed to exceed $15,000,000.

## Count Ten

### (Unjust Enrichment)

118. Plaintiff repeats and realleges the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

119. Because of the wrongful conduct explained above, Gap has been unjustly enriched at Roots' expense.

120. Gap is therefore entitled to be compensated in an amount to be determined at trial, but believed to exceed $6,000,000.

WHEREFORE, Plaintiff demands judgment as follows:

    A.    Compensatory damages in an amount to be determined at trial;

    B.    Restitution, disgorgement or other equitable relief under Cal. Bus. & Prof. Code § 17200 in an amount to be determined at trial;

    C.    Punitive damages in an amount to be determined at trial; and

D.  Such other and further relief as this Court deems just and proper, including costs and reasonable attorneys' fees.

**DEMAND FOR A JURY TRIAL**

Roots hereby demands a trial by jury of all issues so triable in this action.

Dated:  July 27, 2007

> Respectfully submitted,
>
> COVINGTON & BURLING LLP
>
> By: _____/S/_____
> Richard A. Jones (Bar No. 135248)
> One Front Street
> San Francisco, California  94111
>
> Robert P. Haney* (rhaney@cov.com)
> Bradley J. Nash* (bnash@cov.com)
> COVINGTON & BURLING LLP
> 620 Eighth Avenue
> New York, NY 10018
> Telephone: (212) 841-1000
> Facsimile: (212) 841-1010
>
> (*admitted pro hac vice)
>
> *Attorneys for Plaintiff Roots Ready Made Garments Co. W.L.L.*