1  RICHARD A. JONES (Bar No. 135248)
(rjones@cov.com)
2  COVINGTON & BURLING LLP
One Front Street
3  San Francisco, CA 94111
Telephone: (415) 591-6000
4  Facsimile: (415) 591-6091

5  (*Additional Counsel on Signature Page*)

6  Attorneys for Plaintiff
Roots Ready Made Garments Co. W.L.L.

7

8

9

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROOTS READY MADE GARMENTS CO. W.L.L., | Case No: C 07 3363 CRB |
| Plaintiff, | **SECOND AMENDED COMPLAINT FOR BREACH OF CONTRACT; VIOLATION OF CAL. B&P CODE §17200; FRAUD; TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS; PROMISSORY ESTOPPEL; *QUANTUM MERUIT* AND UNJUST ENRICHMENT** |
| v. | |
| THE GAP, INC., a/k/a, GAP, INC., GAP INTERNATIONAL SALES, INC., BANANA REPUBLIC, LLC, and OLD NAVY, LLC, | |
| Defendants. | **JURY TRIAL DEMANDED** |

Plaintiff Roots Ready Made Garments Co. W.L.L. ("Roots"), by its attorneys, Covington & Burling LLP, alleges for its Second Amended Complaint as follows:

**INTRODUCTION**

1.      Roots is a Qatari company that agreed to assist the clothing and accessories giant, Defendant The Gap, Inc.[1] in resolving a important issue with excess inventory by purchasing 1.7 million pieces of outdated Gap merchandise, known by the acronym "OP" for overproduction, for $6 million.

2.      The OP had limited value and the costs of storing and liquidating it were high.  Accordingly, to induce Roots to purchase the OP, Gap promised to give Roots valuable distribution rights for first-line Gap products in all Arabic-speaking countries in the Middle East and North Africa under Gap's International Sales Program ("ISP").  Upon information and belief, this promise was false when made, and was designed to induce Roots to pay an above-market price for the OP inventory.

3.      Following Roots' purchase of the OP inventory, Gap repeatedly reaffirmed its promise to grant Roots ISP distribution rights.  Gap specifically requested that Roots identify local retailers and prepare detailed proposals for various territories.   In reasonable reliance upon Gap's representations, Roots went through the time and expense of preparing business proposals for numerous countries, including Saudi Arabia, Kuwait,  Lebanon, Qatar, the UAE, Tunisia, Jordan, Morocco, and Bahrain.  Roots' representatives traveled extensively throughout the region, touring various markets, and meeting with scores of retailers.  The culmination of this costly and time-consuming process was that Roots proposed a number of retailers to Gap for its reasonable approval.

4.      At the outset of the parties' relationship, Gap made it appear to Roots that Gap would honor its agreement to allow Roots to develop the ISP business in

---

[1]      The Defendants are collectively referred to herein as "Gap."

the region.  Specifically, Gap approved retailers through which Roots distributed Gap ISP merchandise in the UAE and Qatar.

5.     The ISP business in the UAE and Qatar showed immediate success, and, upon information and belief, Gap was pleased with, and impressed by, the profits that were generated.

6.     After the operations in Qatar and the UAE had been successfully established, Gap prevented Roots from continuing to expand the ISP business by unreasonably refusing to permit Roots to add additional markets to its distribution network.  At the same time, however, Gap continued to solicit additional ISP business proposals from Roots, falsely assuring Roots that Gap intended to develop the parties' long-term business relationship in the Middle East and North Africa.

7.     Gap did not reveal its true intentions until the summer of 2005 when, without warning or justification, Gap ended its relationship with Roots by terminating the ISP distribution agreement Gap executed with Roots' immediate licensor, Gabana Gulf Distribution, Ltd.

8.     Gap was well aware that by formally terminating Roots' ability to distribute ISP merchandise – a right that Gap never let Roots fully exercise – it was also destroying any chance for Roots to sell the OP inventory.  Local retailers would only purchase the outdated OP merchandise in conjunction with the right to sell first-line Gap merchandise through the ISP program.  In fact, to date, Roots has only been able to sell approximately 390,000 out of 1.6 million pieces.  Roots is and has been warehousing the remainder of the OP inventory at significant expense.

9.     Over and above Roots' economic injury, however, Gap's breaches also harmed Roots' reputation.  Based upon Gap's promises, Roots represented to local retailers that it would have the ability to distribute first-line Gap merchandise through the ISP program.  Gap then prevented Roots from meeting its commitments to its customers.  As a result, the business reputations of Roots and

1    its principals in the Mid-Eastern market – which were impeccable prior to their

2    affiliation with Gap – have been harmed.

3        10.    Having denied Roots the benefit of the bargain, Gap proceeded exploit

4    the  distribution network it fraudulently induced Roots to develop by contracting

5    directly with Roots' local retailers.  More recently, Gap has impaired Roots' ability

6    to liquidate the OP inventory by filing (or threatening to file) frivolous trademark

7    infringement lawsuits against Roots' OP retailers in various countries, including

8    India.  Upon information and belief, these actions were taken in bad faith, and have

9    adversely affected Roots' business relationships with its retail partners.

10                            **THE PARTIES**

11        11.    Plaintiff Roots is a Qatari company, with its principal place of

12    business in Doha, Qatar.

13        12.    On information and belief, Defendant The Gap, Inc. is a Delaware

14    corporation, with its principal place of business in San Francisco, California.

15        13.    On information and belief, Defendant Gap International Sales, Inc. is a

16    Delaware Corporation with its principal place of business in San Francisco,

17    California.

18        14.    On information and belief, Defendant Banana Republic, LLC is a

19    Delaware limited liability company with its principal place of business in San

20    Francisco, California.

21        15.    On information and belief, Defendant Old Navy, LLC is a Delaware

22    Limited Liability Company with its principal place of business in San Francisco,

23    California.

24            **JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT**

25        16.    This Court has subject matter jurisdiction over this action pursuant to

26    28 U.S.C. § 1332(a)(2) because the action is between citizens of a State and a

27    subject of a foreign state, and the amount in controversy exceeds $75,000,

28    exclusive of interest, costs, and attorneys' fees.

17.    Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(a).

18.    Intradistrict Assignment: Pursuant to Northern District Local Rule 3-2(c) and Northern District General Order 44, venue in this action is proper in the San Francisco Division of the Northern District of California.

## **BACKGROUND**

### *Roots Is Approached About Purchasing Gap's Excess Inventory*

19.    In 2003, Gap sought the assistance of Gabana Gulf Distribution Ltd. ("Gabana") in finding a buyer to purchase 1.7 pieces of overproduction, or OP, inventory that was stored in Dubai, United Arab Emirates.  Gabana was represented by its co-owners, Francois Larsen and Jacques Fabre, and by Amin El Sokary.

20.    The OP inventory was outdated, and its limited commercial value was diminishing with time.  Moreover, the cost of storing the merchandise was significant.  Therefore, Gap and Gabana recognized that additional incentives would be necessary to induce a buyer to purchase the OP.

21.    In early 2003, the manager of Gap's Outlet Division, Jim Bell, approached Roots with Larsen and El Sokary, to propose that Roots buy the Gap OP inventory.  They advised Roots that Gap would grant Roots rights to distribute first-line Gap merchandise in the Middle East through Gap's ISP program in exchange for purchasing the OP.

22.    Later, El Sokary and Larsen traveled to Qatar to meet with Roots' principal, Sheikh Faisal Ahmed Al-Thani to discuss the proposed deal.

23.    Roots agreed to Bell's proposal in principle.

24.    Roots  brought in a respected retail executive, Ashraf Abu Issa, to manage the Gap opportunity as Chief Executive Officer of Roots.[2]

---

[2]    In or about January 2005, Roots hired Larsen to replace Abu Issa as CEO.

25.    Later, Roots hired Naser Beheiry, another prominent local businessman, as General Manager of the company.  Messrs. Abu Issa and Beheiry jointly assumed responsibility for Roots' day-to-day operations.

26.    Upon information and belief, Larsen and El Sokary informed Jim Bell that Roots expressed interest in purchasing  the Dubai OP.  Larsen also informed Bell that Roots – not Gabana – possessed the contacts in the Middle East necessary to establish ISP retailers and to sell off the OP in the process.

27.    Upon information and belief, Larsen  explained that Roots would not purchase the OP inventory without also securing ISP distribution rights for the Arabic-speaking countries of the Middle East.  In response, upon information and belief, Bell asked Neal Goldberg, then Executive Vice President of Gap's Outlet Division, to authorize an ISP distribution agreement for all Arabic-speaking countries in exchange for Roots' agreement to purchase the OP inventory.

28.    Throughout the course of the subsequent negotiations, Roots executives, particularly Abu Issa and Sheikh Faisal, had direct contact with Gap representatives, including Bell and Jon Ehlen, Director of Gap's ISP Program.  At these meetings, Abu Issa and Sheikh Faisal advised Bell and Ehlen that they represented Roots.  Larsen also negotiated with Gap on behalf of Gabana and Roots.

29.    On information and belief, Gap knew that the massive OP inventory would likely take 3 to 5 years to liquidate, and would be expensive to warehouse. For this reason, without additional incentives, the large OP purchase would not be a profitable deal for Roots.  On multiple occasions, Gap, through Bell and others, acknowledged that the OP purchase would be a sacrifice for Roots, and that the more commercially valuable ISP distribution rights were, therefore, an essential part of the deal.

30.    In point of fact, the ISP distribution rights were the key to Roots being able to make any return on its OP investment.  As Gap was well aware, Roots'

retail customers in the Middle East would only purchase OP in exchange for the opportunity to distribute ISP. As one prominent Lebanese retailer put it, purchasing some of Gap's OP inventory was the "entrance fee" to the valuable ISP rights.

31.    Because of the anticipated difficulty of selling the OP merchandise, Roots sought assurances from Gap that it would enjoy flexibility in liquidating the inventory. Gap stated that because the OP inventory was of lesser quality than ISP merchandise, Roots would have significant discretion in distributing the OP to whom and where it wanted. In or around March or April 2003, Bell advised Roots' representatives and Larsen that Roots would be free to sell the OP anywhere it desired in the Middle East and negotiated territories.

32.    Abu Issa specifically inquired whether Roots could sell OP throughout Eastern Europe – a region where Roots thought it might be able to develop a market for the OP. Bell responded that, although certain countries could not be officially included in a written agreement, Roots would be free to do any deal it desired on a case-by-case basis. Bell repeatedly assured Abu Issa that Roots could sell the OP anywhere in the world, including Eastern Europe.

33.    Bell further represented and confirmed that Gap would allow Roots free rein to sell OP and ISP merchandise in all of the countries that were expressly identified in the written agreements.

34.    As a further incentive for Roots to purchase the OP inventory, Bell represented during the course of the negotiations that Gap had never granted distribution rights to two different parties at the same time, for the same region. Therefore, Bell claimed, Roots would in practice enjoy exclusive rights to distribute Gap merchandise in the territory covered by the agreements.

35.    As an additional inducement for Roots to purchase the OP immediately, Bell also claimed – falsely, upon information and belief – that Gap

1    had lined-up another buyer for the merchandise and that Roots would lose the deal

2    if it did not act quickly.

3        36.    Finally, Bell falsely promised to assist Roots in liquidating the OP

4    inventory by referring buyers to Roots.  Following Roots' purchase of the OP, Bell

5    failed to provide the promised referrals.

6        37.    Bell's representations, described above, were important considerations

7    without which Roots would not have made the significant capital investment

8    associated with purchasing and storing the OP.  Roots reasonably relied upon

9    Bell's representations in making the decision to purchase the excess inventory.

10   *Gap Executes Written Agreements with Gabana*

11       38.    Although the core of the parties' bargain was that Roots would receive

12   ISP distribution rights in exchange for purchasing the OP inventory, Gap insisted

13   that the written agreements be executed by Gap and Gabana.  Gap understood,

14   however, that Roots would be purchasing and managing the OP inventory and

15   would act, in effect, as Gabana's sub-distributor for excess inventory, as well as

16   ISP merchandise.

17       39.    On or about May 13, 2003, Gap executed two written agreements with

18   Gabana, one for distribution of OP merchandise (the "OP Agreement") and one for

19   distribution of first-line Gap products under the International Sales Program (the

20   "ISP Agreement").  The contracts state that the OP and ISP agreements are "tied

21   together," such that the cancellation of one agreement automatically results in the

22   cancellation of the other.  The contracts also provide that the purchase of the OP

23   inventory is a condition precedent to the effectiveness of the ISP Agreement.

24       40.    Gabana executed the OP Agreement with Defendant The Gap, Inc.,

25   Banana Republic, Inc., and Old Navy, Inc.  Upon information and belief,

26   Defendants Banana Republic, LLC, and Old Navy, LLC are the successors in

27   interest and assignees of Banana Republic, Inc., and Old Navy, Inc.

28

7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

41.     Reflecting the parties' understanding that a distributor would need great flexibility in disposing of the OP, the OP Agreement authorized the sale of the excess inventory in 21 territories: (i) Bahrain; (ii) Chile; (iii) Czech Republic; (iv) Cyprus; (v) Egypt; (vi) Israel; (vii) Jordan; (viii) Kuwait; (ix) Lebanon; (x) Morocco; (xi) Oman; (xii) Qatar; (xiii) Russia; (xiv) Saudi Arabia; (xv) Switzerland; (xvi) Tunisia; (xvii) Turkey; (xviii) UAE; (xix) Poland; (xx) Hungary; and (xxi) Bulgaria.

42.     Gabana executed the ISP Agreement with Gap International B.V. – a Gap affiliate that later transferred its rights under the agreement to Defendant Gap International Sales, Inc. ("Gap International").  The ISP Agreement expressly authorized distribution of ISP merchandise in twelve separate territories: (i) Bahrain; (ii) Egypt; (iii) Jordan; (iv) Kuwait; (v) Lebanon; (vi) Morocco; (vii) Oman; (viii) Qatar; (ix) Saudi Arabia; (x) Tunisia; (xi) UAE; and (xii) Switzerland.[3]

### Roots Purchases the OP Inventory

43.     Roots' negotiations with Gap continued after the execution of the Gabana-Gap OP and ISP agreements.  Gap persisted in repeating its assurances that it would compensate Roots for purchasing the OP inventory through a long-term ISP distribution relationship.

44.     In reasonable reliance on these representations, Roots agreed to pay a total of $6 million for the OP inventory.  First, on May 14, 2003 – the day after Gabana and Gap executed their written agreements – Roots transferred $1 million to Gabana as a downpayment for the OP inventory; that same day, Gabana made a simultaneous transfer of $1 million to Gap.  Gap was aware of – and requested – this method of payment.

---

[3]     On or about September 1, 2004, Gap International B.V. and Gabana executed a new ISP Agreement.  The terms of this agreement were largely identical to the original agreement, but the original expiration date, April 30, 2005, was extended until August 31, 2007.

8

1
2
3

45.    After Roots made the downpayment, Gap, Gabana and Roots negotiated the terms of two back-to-back letters of credit through which Roots paid the remaining $5 million of the agreed purchase price for the OP inventory.

4
5
6
7

46.    In or about July 2003, Roots took possession of the inventory.  Since that time, Roots has incurred considerable expenses associated with storing and maintaining the inventory, including the cost of rent and staff salaries for its warehouse facility in the Jebal Ali Free Trade Zone in Dubai.

8
9
10
11
12
13
14

47.     After Roots acquired the OP inventory, Roots discovered that Gap had delivered approximately 1.6 million pieces, rather than the 1.7 million pieces that were promised.  In addition, many of the pieces were damaged.  When Roots' CEO, Ashraf Abu Issa, complained about the shortage and the defects, Jim Bell urged him not to focus on these "small issues."  Bell reiterated the promise that Gap would permit Roots to enter the ISP business "very soon" and that this would be "a very profitable business."

15
16
17
18
19

48.    Bell also suggested that Roots could persuade retailers to purchase the OP inventory by offering these outdated goods in conjunction with seasonal ISP merchandise.  Of course, as explained below, Gap's failure to permit Roots to distribute ISP merchandise outside of Qatar and UAE made it impossible for Roots to do so.

20
21

***Roots Develops a Network of ISP Retailers in Reliance on Gap's Promise to Grant Roots ISP Distribution Rights***

22
23
24
25

49.    In or about June 2003 – following the execution of the Gabana-Gap agreements, and Roots' subsequent purchase of the OP inventory – Roots agreed to develop a network of ISP retailers in the Middle East and North Africa in exchange for Gap's promise to make Roots an ISP distributor in the region.

26
27
28

50.    Early that month, Gap invited Roots and Gabana to attend Gap's ISP collection presentation in San Francisco.  On June 12, 2003, Gap sent Roots letter invitations addressed to representatives of five local retailers identified by Roots.

1    The letters invited the retailers to attend the presentation as part of the "Roots

2    delegation."

3         51.    At Gap's request, Roots made a presentation in San Francisco about

4    its business plan for Saudi Arabia. Gap expressed approval of the plan. Jon Ehlen,

5    the director of Gap's ISP program, specifically advised Sheikh Faisal that Gap had

6    no objections to the proposed Saudi Arabian retailer, Red Square.

7         52.    During the course of the meetings at Gap's headquarters, Gap also

8    requested that Roots and Gabana prepare a proposal for additional ISP retail stores

9    in other territories, including Qatar, UAE, Bahrain, and Lebanon. On June 26,

10    2003, Gap sent Gabana and Roots an email reiterating Gap's request for "the

11    business, country, store proposals we discussed in our meeting."

12         53.    On July 9, 2003, in response to Gap's request, Larsen and Abu Issa

13    sent Jon Ehlen a projected three-year plan for opening approximately 30 ISP retail

14    locations in the twelve countries included in Gabana's ISP Agreement with Gap.

15    For the Spring 2004 season, Roots proposed opening a total of five ISP retail stores

16    – two in Qatar, one Saudi Arabia, one in Kuwait, and one in Bahrain.

17         54.    Later that month, Gap confirmed that it approved Roots' proposals for

18    these ISP locations. Gap then accepted an ISP purchase order based on projected

19    sales in these territories.

20         55.    On July 24, 2003, Abu Issa sought Gap's approval for Roots to

21    proceed with plans to distribute ISP merchandise in Lebanon – another territory

22    where Roots proposed opening a retail location in 2004. Ehlen responded that Gap

23    would not approve additional ISP retailers or territories "at this time." However,

24    he promised that Gap would "continue to review your proposals quarterly."

25         56.    Later in 2003, Gap reversed its position about the Spring 2004 ISP

26    season, and announced that Roots could only sell OP merchandise – not ISP – in

27    Saudi Arabia, Bahrain, and Kuwait.

28

57.    Gap permitted Roots to distribute ISP merchandise in Qatar and UAE, but stated that it would not approve any other locations "until we can see and measure the success these stores."  Jon Ehlen promised that "if these first locations turn out as we expect them to, then the approval and roll out process will go much smoother for future locations within this region."

58.    In the Spring of 2004, Roots commenced distribution of Gap ISP merchandise in Qatar and UAE.

59.    In Qatar, Roots itself served as the retailer.  In reliance on Gap's promise of an on-going business relationship, Roots opened two retail stores at a total start-up cost of approximately $1 million.

60.    For UAE, Gap approved a Saudi company, Abdurahman Ali Al Turki Ready Made Trading Establishment ("Al Turki"), in partnership with RSH (Middle East) L.L.C. ("RSH"), as an authorized ISP retailer.

61.    The ISP business in Qatar and UAE was quickly shown to be profitable.  Upon information and belief, Gap expressed approval of Roots' performance in these markets.

62.    Despite Roots' early success in Qatar and UAE, Gap stalled in approving new retailers and territories for ISP distribution.  However, based on Gap's repeated assurances that it intended to develop a long-term business relationship with Roots, Roots continued to believe that Gap would honor its commitment to expand Roots' ISP territories.  In reasonable reliance on Gap's representations, Roots expended significant time, money, and resources traveling throughout the Middle East and North Africa to investigate potential markets, and vetting a myriad of retailers.

63.    For example, at Gap's request, Roots spent considerable time developing an opportunity to distribute Gap merchandise in Lebanon through a premier Lebanese retailer, Grand Stores, or GS.   Roots and GS prepared a comprehensive proposal for the Lebanese market, which was submitted to Gap in or

11

1    around December 2003.  Initially, Gap failed to act on the proposal, citing its desire

2    to "see and measure the success of the[] stores" in Qatar and UAE.

3        64.    In the Summer of 2004, at Gap's request, Roots arranged for  Jon Ehlen

4    and Andrew Janowski, VP of Gap International to meet with the principal of GS in

5    Lebanon. .  With Roots' assistance, GS  prepared plans for the layout of the proposed

6    Gap sales areas in its stores.  Janowski expressed approval for the plans, but

7    indicated that he needed final approval from Gap's management.

8        65.    When GS's principal expressed concern at yet another delay, Janowski

9    stated that in order to show Gap's commitment to the GS business proposal, he

10   would invite GS's buyer to come to Gap's next collection presentation in San

11   Francisco.  In reasonable reliance on Janowski's invitation, in or about July 2004,

12   representatives of GS accompanied Roots' representatives on a trip to San Francisco

13   to view the collection.

14       66.    Following the collection presentation, however, Gap refused to accept

15   an ISP order from GS.  Gap's conduct damaged Roots' relationship with GS.  Later

16   that Summer, Gap continued to express interest in the GS proposal, and requested

17   additional information.  In response, Roots worked with GS to prepare a revised

18   business plan, which was submitted to Gap in or around September 2004.  Gap

19   expressed approval of the plan, but again failed to act.

20       67.    Gap also encouraged Roots to continue to develop the ISP market in

21   Saudi Arabia.  In or about September 2004, Roots, at Gap's urging, submitted

22   another proposal for Saudi Arabia involving the two retailers Gap had previously

23   approved for ISP sales in the UAE – Al Turki and RSH.  In December 2004, Ehlen

24   assured Roots that the plan was acceptable, subject only to management approval.

25   He promised to "continue to push the approval and opening, sooner rather than

26   later." Consistent with Gap's overall approach, however, the approval was never

27   issued.

28

12

68.     Gap continued to assure Roots that, despite these delays, it intended to develop a long-term relationship with Roots.  On or about January 16-18, 2005, Gap representatives traveled to Dubai to meet with Roots representatives and to tour existing and proposed mall sites.  The agenda for the trip also included a meeting at RSH's office to discuss the ISP proposal for Saudi Arabia.

***Gap's Wrongful Termination of Roots' ISP Distribution Rights***

69.     In or about late 2004, Roots and Gabana were notified that Gap's ISP Division had been transferred to the company's International Department, which reported to Ron Young.

70.     Young advised Abu Issa and Larsen that Gap was considering changing its business model in the Middle East: rather than distributing first-line garments through the ISP program, under the new strategy under consideration, Gap would open stand-alone stores in the region.  Young stated that Gap would open up the process to bidding by local retailers.  Young's statements directly contradicted the promises Gap made to induce Roots to purchase the OP inventory and to develop an ISP retail network.

71.     On May 12, 2005, Young sent a letter to Larsen, notifying him that Gap intended to terminate the ISP Agreement in 90 days.  Pursuant to Young's letter, Gap terminated the ISP Agreement without cause on August 10, 2005.

72.     On June 26, 2005, Larsen sent a letter to Roots stating that Gabana would terminate its distribution agreement with Roots on July 27, 2005, in light of Gap's termination of the Gabana-Gap ISP agreement.

73.     Following the termination of Gabana's ISP Agreement, Gap's International Vice President, Ron Young, repeatedly assured Roots representatives, including Sheikh Faisal Al-Thani, that Gap would attempt to find a way to continue to do business directly with Roots..  In reasonable reliance on these representations, Roots engaged in numerous discussions and email exchanges concerning a possible business arrangement between the companies.

13

74.     Although Roots negotiated in good faith, it ultimately became clear that Gap has no intention of compensating Roots.

***Gap Wrongfully Interferes With Roots' Business Relationships With Its Local Retailers***

75.     Prior to agreeing to purchase the OP inventory, Roots required assurances that Gap would not seek to contract directly with any of Roots' retailers.  Bell gave Roots such assurances, which are likewise reflected in Gap's written agreements with Gabana.

76.     Gap violated this commitment by wrongfully seeking to contract directly with Roots' retailers.

77.     In or about July 11-13, 2004, Roots' General Manager, Naser Beheiry, traveled to San Francisco to attend a Gap collection presentation.  During the trip, Beheiry participated in a meeting with Jon Ehlen, and David Reilly CEO of Roots' retailer, RSH.  During the meeting, Mr. Beheiry learned that Ehlen had previously had a lunch meeting with the principal of RSH, Mohammed Al-Abbar, without Roots' presence.

78.     In 2005, Roots and Gabana were negotiating a possible merger of their operations with RSH and Al Turki to streamline the distribution process in the UAE.  On information and belief, in or around June or July 2005, Gap executives secretly made arrangements to meet with Roots' retailers, including RSH and Al Turki, without the presence of any representatives of Roots.  As a result of these meetings, RSH and Al Turki placed orders for Gap Spring 2006 ISP merchandise directly with Gap.  By terminating Roots' ISP rights and dealing directly with RSH and Al Turki, Gap wrongfully interfered with Roots' actual and prospective business relationships with its retailers.

79.     More recently, Gap has sought to disrupt Roots' business relationship with its OP retailers.  In 2007, Gap has filed and/or threatened to file trademark infringement lawsuits against retailers in various territories, including India.

14

80.     On information and belief, these lawsuit are frivolous and were filed in bad faith with the intent of interfering with Roots' legitimate business activities.[4]

81.     Gap's actions have adversely affected Roots' business relationships with its retailers, and have impaired Roots' ability to liquidate the OP inventory.

## Count One

### (Breach of Contract)

82.     Plaintiff repeats and realleges the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

83.     Gap and Roots entered into an oral contract pursuant to which Roots agreed to purchase the OP inventory for $6 million in exchange for the right to distribute first-line Gap merchandise in the Middle East through Gap's International Sales Program, or ISP.

84.     Roots fully complied with its obligations under its agreement with Gap.

85.     Gap breached its agreement with Roots by, *inter alia*, failing to grant Roots ISP distribution rights in the territories contemplated by the parties' agreement, failing to consider in good faith and/or to approve local ISP retailers identified by Roots, and by terminating Roots' ISP distribution rights without cause.  In addition, upon information and belief, Gap contracted, or attempted to contract, directly with the local retailers identified by Roots, or their affiliates, in violation of the parties' express agreement that it would not do so.

86.     As a result of Gap's material breaches of the contract, Roots has been damaged in an amount to be determined at trial, but believed to exceed $40,000,000.

## Count Two

### (Breach of Contract)

---

[4]     On information and belief, in an order issued on or around October 25, 2007, the Indian High Cout of Dehli rejected Gap's request for an injunction against Roots' retailers. The court found that Gap's complaint wrongfully failed to disclose material facts.

87.    Plaintiff repeats and realleges the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

88.    In or about June 2003, Roots and Gap entered into an oral contract pursuant to which Roots agreed to establish a retail distribution network in the Middle East for Gap's ISP merchandise.  In exchange, Gap promised to grant Roots the right to distribute ISP in the Middle East by purchasing the goods from Gabana and reselling them to local retailers.

89.    Roots fully complied with its obligations under its oral agreement with Gap by expending considerable time and resources locating retailers and preparing business plans in various countries, including Saudi Arabia, Kuwait, Lebanon, Qatar, the UAE and Bahrain.

90.    Gap breached its agreement with Roots by, *inter alia*, failing to grant Roots ISP distribution rights in the territories contemplated by the parties' agreement, failing to consider in good faith and/or to approve local ISP retailers identified by Roots, and by terminating Roots' ISP distribution rights without cause.  In addition, upon information and belief, Gap contracted, or attempted to contract, directly with the local retailers identified by Roots, or their affiliates, in violation of the parties' express agreement that it would not do so.

91.    As a result of Gap's material breaches of the contract, Roots has been damaged in an amount to be determined at trial, but believed to exceed $40,000,000.

## Count Three

### (Violations of California's Business & Professions Code § 17200)

92.    Plaintiff repeats and realleges the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

93.    Gap intentionally, unlawfully, unfairly and deceptively encouraged Roots to purchase the OP inventory for $6 million, and to expend time and resources locating potential retailers for Gap merchandise throughout the Middle

16

1    East based on false assurances that Roots would be permitted to distribute first-line

2    Gap merchandise through the International Sales Program.  In fact, Gap never

3    actually intended to allow Roots to exercise the ISP distribution rights.

4            94.    After refusing to approve many of the retailers identified by Roots,

5    Gap has established or sought to establish direct relationships with the retailers or

6    their affiliates, in order to reap the return on Roots' investment for itself.  In

7    addition, Gap has sought to disrupt Roots' legitimate business relationships with its

8    local OP retailers by filing and/or threatening to file lawsuits against the retailers

9    for trademark infringement.

10           95.    Gap's conduct constitutes unlawful and unfair practices under

11   California's Business & Professions Code § 17200.

12           96.    As a result of Gap's unlawful and unfair business practices, Roots is

13   entitled to (i) restitution an amount to be proven at trial, but believed to exceed

14   $6,000,000, and (ii) injunctive relief to prevent Gap from unlawfully and unfairly

15   interfering with Roots' business relationships with its local retailers.

16                                   **Count Four**

17                                    **(Fraud)**

18           97.    Plaintiff repeats and realleges the allegations contained in all

19   preceding Paragraphs as if fully and completely set forth herein.

20           98.    Roots purchased the OP inventory from Gap for $6 million – an

21   amount significantly above the market value of the merchandise.

22   In making the decision to purchase the OP inventory, and to expend considerable

23   time and resources developing a network of retailers for Gap merchandise in the

24   Middle East, Roots reasonably relied on Gap's repeated assurances that it would

25   grant Roots the right to distribute first-line Gap merchandise through Gap's

26   International Sales Program, or ISP.  As Gap was well aware, Roots would never

27   have agreed to purchase the OP inventory or to develop the retail distribution

28   network without Gap's promise to grant Roots ISP distribution rights.

99.    Upon information and belief, Gap never intended to permit Roots to exercise the full ISP distribution rights that it promised.  After unloading the OP inventory on Roots, and inducing Roots to develop a distribution network, Gap wrongfully impaired Roots' ability to exercise the ISP rights by, *inter alia*, unreasonably and without justification failing to approve the local retailers Roots proposed; terminating Roots' ISP distribution rights without case; and  contracting and/or attempting to contract directly with Roots' local retailers.

100.    Gap's misrepresentations induced Roots to agree to purchase the OP inventory, and to expend considerable resources identifying local retailers and preparing business proposals to develop a distribution network.

101.    As a direct result of Gap's misrepresentations, Roots has been damaged in an amount to be determined at trial, but believed to exceed $15,000,000.

102.    Additionally, Gap's conduct was so gross, wanton, and malicious that punitive damages should be awarded against it in the amount of $30,000,000.

### Count Five

### (Tortious Interference with Prospective Business Relations)

103.    Plaintiff repeats and realleges the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

104.    Roots had business relations with various local retailers.

105.    Gap was aware of Roots' business relations with the local retailers.

106.    Gap intentionally acted in a manner designed to disrupt Roots' business relationships with local retailers.

107.    For example, Gap induced Roots to establish business relationships with local retailers, including RSH and Al Turki, by repeatedly promising that Gap intended to develop a long-term business relationship with Roots in the Middle East.  After wrongfully terminating Roots' right to distribute ISP merchandise, Gap proceeded to exploit the retail network it induced Gap to develop, by, *inter alia*,

1    contracting and/or attempting to contract directly with Roots' local retailers, or

2    their affiliates.

3       108.   Gap has also tortiously interfered with Roots' prospective business

4    relationships by filing (or threatening to file) trademark infringement lawsuits

5    against Roots' OP retailers.

6       109.   Upon information and belief, Gap has filed (or threatened to file) these

7    lawsuits in bad faith, and with the intent of adversely affecting Roots' legitimate

8    business relationships with its retailers.

9       110.   Gap's actions have adversely affected Roots' business relationships.;

10      111.   Gap's conduct was wrongful, unfair, and immoral.

11      112.   By reason of the foregoing, Roots is entitled to (i) damages in an

12   amount to be determined at trial, but believed to exceed $30,000,000, and (2)

13   injunctive relief to prevent Gap from interfering with Roots' prospective business

14   relations.

15                          **Count Six**

16                      **(Promissory Estoppel)**

17      113.   Plaintiff repeats and realleges the allegations contained in all

18   preceding Paragraphs as if fully and completely set forth herein.

19      114.   As alleged above, Gap made clear and unambiguous promises to

20   Roots, and Roots detrimentally relied on Gap's promises in a manner that was both

21   reasonable and foreseeable.

22      115.   In particular, Gap induced Roots to purchase the OP merchandise and

23   establish relationships with local retailers by falsely promising to grant Roots ISP

24   distribution rights in the Middle East.

25      116.   Over the course of the parties' relationship, Gap made repeated

26   assurances to Roots that Roots would make a return on its investment through a

27   long-term business relationship with Gap.  As a result of these repeated assurances,

28

1   Roots expended more time, effort, and expense to establish relationships with local

2   retailers, and to maintain the OP inventory.

3       117.   On August 10, 2005, however, Gap severed its business relationship

4   with Roots, by terminating Gap's written distribution agreement with Gabana, thus

5   denying Roots the benefit of the bargain.

6       118.   As a direct result of Roots' reasonable reliance on Gap's promises,

7   Roots is entitled to damages in an amount to be proven at trial, but believed to

8   exceed $15,000,000.

9                           **Count Seven**

10                          (***Quantum Meruit***)

11      119.   Plaintiff repeats and realleges the allegations contained in all

12  preceding Paragraphs as if fully and completely set forth herein.

13      120.   Roots performed services for Gap in good faith.  Gap accepted the

14  services provided by Roots with an expectation of compensation.  Roots is

15  therefore entitled to the reasonable value of the services it provided in an amount to

16  be determined at trial, but believed to exceed $15,000,000.

17      121.   In particular, Roots developed a network of local retailers in reliance

18  on Gap's representations that Roots that would make a return on its investment

19  through a long-term business relationship with Gap.  As a result of these repeated

20  assurances, Roots expended significant time and resources to establish relationships

21  with local retailers, and to purchase and maintain the OP inventory.

22      122.   On August 10, 2005, however, Gap severed its business relationship

23  with Roots, by terminating Gap's written distribution agreement with Gabana, thus

24  denying Roots the benefit of the bargain.

25      123.   Roots has not received the benefit of its bargain with Gap, nor any

26  compensation from Gap, for the time, effort, and money it has expended in reliance

27  on Gap's representations.

28

1     124.   As a direct result of Roots' reasonable reliance on Gap's promises,

2  Roots is entitled to damages in an amount to be proven at trial, but believed to

3  exceed $15,000,000.

4  **Count Eight**

5  **(Unjust Enrichment)**

6     125.   Plaintiff repeats and realleges the allegations contained in all

7  preceding Paragraphs as if fully and completely set forth herein.

8     126.   Gap, in an effort to rid itself of the rapidly depreciating OP inventory,

9  induced Roots to purchase and maintain the OP merchandise and to establish

10  relationships with local retailers by representing to Roots that it would make a

11  return on its investment through a long-term business relationship with Gap.  As a

12  result of these repeated assurances, Roots expended significant time and resources

13  to establish relationships with local retailers, and to purchase and maintain the OP

14  inventory.

15     127.   Gap benefited from Roots' significant expenditures of time, effort, and

16  money, including the $6,000,000.00 Roots paid to purchase of the OP inventory,

17  Roots maintenance of the rapidly depreciating and cumbersome inventory, and

18  Roots' establishment of relationships with local retailers that would be willing to

19  sell Gap's merchandise.

20     128.   On August 10, 2005, however, Gap severed its business relationship

21  with Roots, by terminating Gap's written distribution agreement with Gabana.

22  Thus denying Roots the benefit of the bargain.

23     129.   Roots has not received the benefit of its bargain with Gap, nor any

24  compensation from Gap, for the time, effort, and money it has expended in reliance

25  on Gap's representations.

26     130.   Because of the foregoing, Gap benefited at Roots expenses under

27  circumstances in which equity and good conscience require restitution.

28

131.   Roots is, therefore, entitled to restitution in an amount to be proven at trial, but believed to exceed $15,000,000.

WHEREFORE, Plaintiff demands judgment as follows:

A.    Compensatory damages in an amount to be determined at trial;

B.    Restitution, disgorgement, injunctive relief or other equitable relief, in an amount to be determined at trial;

C.    Punitive damages in an amount to be determined at trial; and

D.    Such other and further relief as this Court deems just and proper, including costs and reasonable attorneys' fees.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DEMAND FOR A JURY TRIAL

Roots hereby demands a trial by jury of all issues so triable in this action.

Dated:  November 16, 2007

Respectfully submitted,

COVINGTON & BURLING LLP

By:     /s/ Richard A. Jones
         Richard A. Jones (Bar No. 135248)
         One Front Street
         San Francisco, California  94111

Robert P. Haney* (rhaney@cov.com)
Bradley J. Nash* (bnash@cov.com)
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018
Telephone: (212) 841-1000
Facsimile: (212) 841-1010

(*admitted pro hac vice)

*Attorneys for Plaintiff Roots Ready Made Garments Co. W.L.L.*

23