# EXHIBIT 1

1   RICHARD A. JONES (Bar No. 135248)
    (rjones@cov.com)
2   COVINGTON & BURLING LLP
    One Front Street
3   San Francisco, CA 94111
    Telephone: (415) 591-6000
4   Facsimile: (415) 591-6091

5   (*Additional Counsel on Signature Page*)

6   Attorneys for Plaintiff
    Roots Ready Made Garments Co. W.L.L.
7

8

9

10                      **IN THE UNITED STATES DISTRICT COURT**
                       **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

11

12                                      )
                                        )
13  ROOTS READY MADE GARMENTS           )      Case No: C 07 3363 CRB
    CO. W.L.L.,                         )
14                                      )      **THIRD AMENDED COMPLAINT**
                 Plaintiff,             )      **FOR BREACH OF CONTRACT;**
15                                      )      **BREACH OF COVENANT OF**
            v.                          )      **GOOD FAITH AND FAIR**
16                                      )      **DEALING; VIOLATION OF CAL.**
    THE GAP, INC., a/k/a, GAP, INC., GAP )     **B&P CODE §17200; FRAUD;**
17  INTERNATIONAL SALES, INC.,          )      **PROMISSORY ESTOPPEL;**
    BANANA REPUBLIC, LLC, and OLD       )      ***QUANTUM MERUIT*; AND QUASI-**
18  NAVY, LLC,                          )      **CONTRACT/RESTITUTION**
                                        )
19               Defendants.            )
                                        )      **JURY TRIAL DEMANDED**
20                                      )
                                        )
21

22

23

24

25

26

27

28

1    Plaintiff Roots Ready Made Garments Co. W.L.L. ("Roots"), by its attorneys,

2    Covington & Burling LLP, alleges for its Third Amended Complaint as follows:

3                              **INTRODUCTION**

4        1.    Roots is a Qatari company that agreed to assist the clothing and

5    accessories giant, Defendant The Gap, Inc.[1] in resolving a important problem with

6    excess inventory by purchasing 1.7 million pieces of outdated Gap merchandise,

7    known by the acronym "OP" for overproduction, for $6 million.

8        2.    The OP had limited commercial value and the costs of storing and

9    liquidating it were high.  Upon information and belief, Gap viewed the OP

10   inventory as a significant liability that it was eager to remove it from its financial

11   statements.

12       3.    Accordingly, to induce Roots to purchase the OP at an above-market

13   price, Gap promised to give Roots more valuable rights to sell first-line Gap

14   products in multi-brand retail stores under Gap's International Sales Program

15   ("ISP").

16       4.    Gap assured Roots that it would be able to recoup its substantial

17   investment in the OP inventory by selling ISP merchandise in Roots' own retail

18   stores in Qatar, and through a network of retail partners in other territories

19   throughout the Middle East and North Africa.  Upon information and belief, Gap's

20   promises were false when made, and were designed to induce Roots to pay an

21   inflated price for the OP inventory.

22       5.    In reasonable reliance on Gap's representations, Roots obtained a

23   significant loan from QIB (a Qatari bank) to finance the purchase of the OP

24   inventory, and Roots' anticipated operations in the ISP business.  Roots invested

25   significant capital to establish a state-of-the-art warehouse in Dubai.  The

26   warehouse was to serve as a storage facility for the OP inventory, and as a

27

28   _____

[1]    The Defendants are collectively referred to herein as "Gap."

1

1    distribution hub for the first-line ISP merchandise Gap promised to provide to

2    Roots for resale throughout the Arabic-speaking countries of the Middle East and

3    North Africa.

4         6.    Following Roots' purchase of the OP inventory, Gap repeatedly

5    reaffirmed its promise to grant Roots the right to sell ISP merchandise. Gap

6    specifically requested that Roots identify local retail partners and prepare detailed

7    proposals for various countries. Accordingly, Roots went through the time and

8    expense of preparing business proposals for numerous territories, including Saudi

9    Arabia, Kuwait, Lebanon, Qatar, the UAE, Tunisia, Jordan, Morocco, and Bahrain.

10    Roots' representatives traveled extensively throughout the region, touring various

11    markets, and meeting with scores of local retailers. The culmination of this costly

12    and time-consuming process was that Roots proposed a number of retailers to Gap

13    for its reasonable approval.

14         7.    At the outset of the parties' relationship, Gap made it appear to Roots

15    that Gap would honor its agreement to allow Roots to develop the ISP business. In

16    or about the Spring of 2004, Gap permitted Roots to begin selling ISP merchandise

17    in two small markets in the region, Qatar and the UAE. Specifically, Gap approved

18    Roots' plan to sell ISP merchandise in two multi-brand retail stores that Roots

19    opened in Qatar, and in separate stores in Dubai owned by local retail partners

20    based in the UAE.

21         8.    The ISP business in Dubai and Qatar showed immediate success. Gap

22    stated that it was pleased with, and impressed by, the sales revenue Roots

23    generated.

24         9.    After Roots successfully established its operations in Qatar and Dubai,

25    Gap prevented Roots from continuing to expand the ISP business by failing to act

26    on Roots' proposals to sell ISP merchandise in other larger markets within the

27    agreed territory. At the same time, however, Gap continued to solicit additional

28

2

1    ISP business proposals from Roots, falsely assuring Roots that Gap intended to

2    honor the agreement by developing a long-term ISP relationship with Roots

3    throughout the Middle East and North Africa.

4         10.    Contrary to these repeated assurances, Gap terminated Roots' ISP

5    rights in the Summer of 2005.

6         11.    Gap was well aware that terminating Roots' ability to sell ISP

7    merchandise – a right that Gap never let Roots fully exercise – would make it

8    nearly impossible for Roots to sell the OP inventory.  Roots' local retail partners

9    would only purchase the outdated OP merchandise in conjunction with the first-line

10   Gap merchandise available through the ISP program.  In fact, to date, Roots has

11   only been able to sell approximately 390,000 out of the 1.6 million pieces of OP

12   merchandise it received.  Roots continues to store the remainder of the inventory in

13   its warehouse in Dubai at significant expense.

14        12.    As a direct result of Gap's breach of its promise to permit Roots to sell

15   first-line ISP merchandise throughout the Middle East and North Africa, Roots was

16   unable to make sufficient sales to cover its costs and to repay its bank loan.

17   Ultimately, Roots defaulted on the loan, impairing Roots' ability to obtain

18   financing for any future operations.

19        13.    Over and above Roots' economic injury, however, Gap's conduct also

20   harmed Roots' reputation.  Based upon Gap's promises, Roots represented to its

21   local retailer partners that it would have the ability to sell first-line Gap

22   merchandise through the ISP program.  Gap then prevented Roots from meeting its

23   commitments to the retailers.  As a result, the business reputations of Roots and its

24   principals in the Middle East – which were impeccable prior to their affiliation with

25   Gap – have been harmed.

26

27

28

THIRD AMENDED COMPLAINT
C 07 3363 CRB

14.    Having denied Roots the benefit of the bargain, Gap proceeded exploit the retail network it fraudulently induced Roots to develop by contracting directly with Roots' local retail partners.

### THE PARTIES

15.    Plaintiff Roots is a Qatari company, with its principal place of business in Doha, Qatar.

16.    On information and belief, Defendant The Gap, Inc. is a Delaware corporation, with its principal place of business in San Francisco, California.

17.    On information and belief, Defendant Gap International Sales, Inc. is a Delaware corporation with its principal place of business in San Francisco, California.

18.    On information and belief, Defendant Banana Republic, LLC is a Delaware limited liability company with its principal place of business in San Francisco, California.

19.    On information and belief, Defendant Old Navy, LLC is a Delaware limited liability company with its principal place of business in San Francisco, California.

### JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

20.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because the action is between citizens of a State and a subject of a foreign state, and the amount in controversy exceeds $75,000, exclusive of interest, costs, and attorneys' fees.

21.    Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(a).

22.    Intradistrict Assignment: Pursuant to Northern District Local Rule 3-2(c) and Northern District General Order 44, venue in this action is proper in the San Francisco Division of the Northern District of California.

4

# BACKGROUND

### Gap's Efforts to Transfer Title to Outdated Merchandise

23.    In the mid-1990s, Gap entered into a distribution agreement with a French company, Solka S.A. ("Solka"). The agreement authorized Solka to sell first-line Gap merchandise through multi-brand retail stores in regions outside the United States where Gap did not sell Gap products through its own stand-alone stores.

24.    In late 2001, Gap sought to dispose of a large quantity of Gap OP inventory. The OP inventory was outdated and its limited commercial value was diminishing over time. Upon information and belief, Gap was anxious to liquidate this inventory quickly and remove it from the company's books.

25.    To accomplish this end, Gap entered into a new agreement with Solka, granting Solka the right to distribute Gap OP inventory. Pursuant to the new agreement, Gap sold over two million units of excess inventory to Solka on an open account basis.

26.    In or around March to April 2002, following a turnover in Gap's management, Gap demanded that Solka immediately satisfy its open account.

27.    At that time, Solka had not yet resold the vast majority of the Gap OP merchandise, which was warehoused in Belgium, Montevideo, and Dubai. Solka was unable to meet Gap's payment demand.

28.    Solka and Gap negotiated a compromise whereby Solka paid approximately $1 million to Gap and returned the remaining inventory that it held on account.

29.    Notwithstanding this agreement, the manager of Gap's Outlet Division, Jim Bell, insisted that Solka retain title to the OP inventory warehoused in Dubai, which consisted of some 1.7 million pieces of outdated Gap merchandise.

5

1    Gap directed Solka to sign a transfer letter in blank until such time as Gap

2    instructed Solka where it should transfer title to the Dubai OP.

3        30.    Gap's insistence that title to the Dubai OP remain with Solka was not

4    standard in the industry. Upon information and belief, the purpose of this

5    arrangement was to prevent the OP inventory from appearing as a liability in Gap's

6    financial statements.

7        31.    Solka's co-owners, Jacques Fabre and Jean-Louis Doumeng, retained

8    Francois Larsen ("Larsen"), a Swiss national with an accounting and finance

9    background, to assist with the transactions relating to the OP merchandise.

10   Together with Amin El-Sokary ("El Sokary"), Larsen is the principal of Gabana

11   Gulf Distribution Ltd. ("Gabana"), a British company, with its principal place of

12   business in Geneva, Switzerland.

13       32.    In late 2002, Bell advised Solka that Grupo Uno, a company based in

14   the Dominican Republic, had agreed to purchase the Dubai OP inventory.

15   Accordingly, at Gap's direction, Solka transferred title to the inventory to Grupo

16   Uno.

17       33.    In early 2003, however, Bell advised Solka that Grupo Uno had failed

18   to obtain the necessary financing for the deal. Gap requested that Solka and Larsen

19   locate another buyer for the Dubai OP inventory, again insisting that Gap could not

20   take title to the merchandise.

21   ***Roots Is Asked To Assist Gap In Liquidating The Dubai OP Inventory***

22       34.    Larsen and El Sokary identified Roots as a potential purchaser for the

23   Dubai OP inventory. Roots was formed in 2002 for the purpose of distributing Gap

24   merchandise in the Middle East. In or about May 2002, Roots purchased a small

25   quantity of the Gap OP inventory held by Solka. Although it was difficult to sell

26   this outdated merchandise, Roots was successful in liquidating some of the OP

27   inventory it purchased.

28

6

35.    Larsen informed Bell that Roots possessed the garment-industry expertise and the contacts necessary to establish ISP retail stores in the Middle East and North Africa and sell off the Dubai OP inventory in the process.

36.    In early 2003, El Sokary and Larsen traveled to Doha, Qatar, together with representatives of Solka, to discuss the proposed deal with Roots. Roots was represented at the meeting by its principal, Sheikh Faisal Ahmed Al-Thani ("Sheikh Faisal"), who is a member of the ruling family of Qatar, and by Ashraf Abu Issa ("Abu Issa"), a respected retail executive whom Sheikh Faisal selected to serve as Chief Executive Officer of Roots.

37.    Jim Bell participated in the meeting by telephone on behalf of Gap. Bell explained that it was imperative for Gap to transfer title to the Dubai OP to another entity that could liquidate the inventory. Gap needed a business partner that could obtain the financing needed to purchase the inventory immediately.

38.    Bell proposed that Roots purchase the OP inventory for $6 million. Bell represented that the inventory consisted of some 1.7 million pieces, and that the merchandise was outdated by, at most, one or two seasons. Roots responded that Bell's proposal would not be a profitable deal for Roots: it would be difficult to liquidate such a large volume of outdated merchandise, and the proposed purchase price was too high.

39.    Bell acknowledged that purchasing the OP inventory would not be a profitable deal, on its own. Accordingly, Bell promised in exchange to grant Roots the right to sell first-line Gap merchandise in the Arabic-speaking countries of the Middle East and North Africa through the ISP program.

40.    Roots agreed to Bell's proposal in principle.

**Roots Negotiates An Oral Agreement With Gap**

41.    Roots' executives, particularly Abu Issa and Sheikh Faisal, continued to negotiate the proposed transaction directly with Gap's representatives, including

7

1   Bell and Jon Ehlen, Director of Gap's ISP Program.  At these meetings, Abu Issa

2   and Sheikh Faisal advised Bell and Ehlen that they represented Roots.

3       42.    On information and belief, Gap knew that the massive OP inventory

4   would likely at least take 3 to 5 years to liquidate, and would be expensive to

5   warehouse.  On multiple occasions, Gap, through Bell and others, acknowledged

6   that the OP purchase would be a sacrifice for Roots, and that the commercially

7   valuable ISP rights were, therefore, an essential part of the deal.

8       43.    In point of fact, the ISP rights were the key to Roots being able to

9   make any return on its investment in the OP inventory.  As Gap was well aware,

10  retailers in the Middle East would only purchase OP inventory if they would also

11  be able to sell first-line ISP products.  As one prominent Lebanese retailer put it,

12  purchasing some of Gap's OP inventory was the "entrance fee" to the valuable  ISP

13  merchandise.

14      44.    Because of the anticipated difficulty of selling the OP merchandise,

15  Roots sought assurances from Gap that it would enjoy flexibility in liquidating the

16  inventory.  Gap stated that because the OP inventory was of lesser quality than ISP

17  merchandise, Roots would have significant discretion in reselling the OP

18  merchandise to whom and where it wanted.

19      45.    Abu Issa specifically inquired whether Roots could sell OP throughout

20  Eastern Europe – a region where Roots thought it might be able to develop a

21  market for the OP.  Bell responded that Roots would be free to sell the OP

22  inventory anywhere in the world with the exception of six territories where Gap

23  operated its own stores, and any territories where another party might have

24  registered the GAP trademark.

25      46.    As a further incentive for Roots to purchase the OP inventory, Bell

26  represented during the course of the negotiations that Gap never entered into an ISP

27  relationship with more than one party at the same time, for the same region.

28

8

1    Therefore, Bell claimed, Roots would in practice enjoy exclusive rights to sell Gap

2    merchandise in the Arabic-speaking countries of the Middle East and North Africa.

3        47.    Bell stated that he needed to consummate the transaction immediately,

4    as Gap needed to transfer title to the OP inventory in order to keep this liability off

5    the company's books. As an additional inducement for Roots to purchase the OP

6    without delay, Bell also claimed – falsely, upon information and belief – that Gap

7    had lined-up another buyer for the merchandise and that Roots would lose the deal

8    if it did not act quickly.

9        48.    Finally, Bell promised to assist Roots in liquidating the OP inventory

10   by referring buyers to Roots.  Gap ultimately failed to provide the promised

11   referrals and, upon information and belief, it never intended to provide them; the

12   promise of referrals was false when made.

13       49.    Bell's promises and representations were important considerations

14   without which the significant capital investment associated with purchasing and

15   storing the OP would not have made economic sense for Roots.  Roots reasonably

16   relied on Bell's promises and representations in continuing to negotiate with Gap

17   and ultimately reaching an agreement with the company.

18       50.    In or about May 2003, in reliance on (among other things) Bell's

19   promises and representations, Roots and Gap reached an oral agreement pursuant

20   to which Roots agreed to pay a total of $6 million for the OP inventory in exchange

21   for the right to sell ISP merchandise both through its own stores in Qatar, and,

22   through approved local retailers in the other Arabic-speaking countries of the

23   Middle East and North Africa.

24   **_Gap-Gabana Agreements_**

25       51.    Upon information and belief, in the wake of September 11, Gap did

26   not for public relations reasons wish to be seen making sales directly to a company

27   based in the Middle East.   In addition, Gap wanted to compensate Gabana for its

28

9

assistance in brokering the OP transaction by giving it a margin on all ISP sales to Roots. To address these concerns, Gap proposed that Gabana serve as an intermediary such that Gap would on paper sell the OP inventory (and later the ISP merchandise) to Gabana, which would then simultaneously resell the merchandise to Roots.

52.    Roots consented to this proposal on the understanding that its purpose was primarily cosmetic and that it would not in any way deprive Roots of any of the benefits of the bargain it had negotiated with Gap. Gap would continue to be obligated to provide all of the consideration it agreed to provide in exchange for Roots' purchase of OP inventory, including the critical right to distribute ISP inventory in the future. All merchandise would be shipped from Gap directly to Roots' warehouse for distribution in accordance with the parties' agreement.

53.    Upon information and belief, on or about May 13, 2003, Gap executed two written agreements with Gabana to document its role as intermediary. The agreements (collectively, the "Gap-Gabana Agreements") appointed Gabana – a British company based in Switzerland – as a non-exclusive distributor for OP merchandise (the "OP Agreement") and first-line ISP merchandise (the "ISP Agreement").

54.    Gabana executed the OP Agreement with Defendant The Gap, Inc., Banana Republic, Inc., and Old Navy, Inc. Gabana executed the ISP Agreement with Gap International B.V. – a Gap affiliate that later transferred its rights under the agreement to Defendant Gap International Sales, Inc. ("Gap International").

55.    Roots was not a party to either of Gabana's written agreements with Gap. It was not shown copies of the agreements before they were executed.

56.    Neither Gap nor Gabana had any authority, express or implied, to bind Roots to any agreement that would have the effect of superseding, limiting, or otherwise prejudicing the rights Roots obtained under its own contract with Gap.

10

57.     Prior to this litigation, Gap never suggested to Roots that the Gap-Gabana Agreements had the effect of extinguishing or in any way limiting Gap's contractual obligations to Roots.  To the contrary, the provisions of the agreements, as interpreted by Gap, were consistent with Gap's contract with Roots and allowed Gap to perform its contractual obligations to Roots.

58.     The OP Agreement authorized the sale of the excess inventory in 21 territories: (i) Bahrain; (ii) Chile; (iii) Czech Republic; (iv) Cyprus; (v) Egypt; (vi) Israel; (vii) Jordan; (viii) Kuwait; (ix) Lebanon; (x) Morocco; (xi) Oman; (xii) Qatar; (xiii) Russia; (xiv) Saudi Arabia; (xv) Switzerland; (xvi) Tunisia; (xvii) Turkey; (xviii) UAE; (xix) Poland; (xx) Hungary; and (xxi) Bulgaria.

59.     Similarly, the ISP Agreement expressly authorized distribution of ISP merchandise in twelve separate territories: (i) Bahrain; (ii) Egypt; (iii) Jordan; (iv) Kuwait; (v) Lebanon; (vi) Morocco; (vii) Oman; (viii) Qatar; (ix) Saudi Arabia; (x) Tunisia; (xi) UAE; and (xii) Switzerland.

60.     Upon information and belief, on or about September 1, 2004, Gap International B.V. and Gabana  executed an extension of the ISP Agreement.  The terms of this agreement were largely identical to the original agreement, but the original expiration date, April 30, 2005, was extended until August 31, 2007. Roots had no role in the negotiation of this agreement, was never shown a copy of the agreement, and was never informed that the agreement had been executed.

61.     Gap understood that Gabana could not, without Roots, sell OP or ISP merchandise in any of the territories covered by the Gabana-Gap Agreements.  Gap was aware that Gabana had no wholesale or retail distribution capabilities, much less the ability to sell significant volumes of Gap merchandise throughout the Middle East, North Africa, and Eastern Europe.  The parties intended that Roots would sell OP and ISP merchandise in these geographic areas, with Gabana serving as a middleman for cosmetic purposes.

11

62.     The Gap-Gabana Agreements provided that "all Authorized Goods purchased pursuant to this Agreement must be sold directly and exclusively by [Gabana] to Authorized Retailers for sale in Authorized Stores with the Territory." Although Gap now asserts that this provision barred Roots from acquiring Gap merchandise from Gabana and reselling it to other retailers, Gap never took this position at the time.  To the contrary, Gap interpreted the Gap-Gabana agreements to permit Roots to resell merchandise acquired from Gabana to other retailers, and never suggested that Roots would be limited to making sales in retail stores of its own.

63.     The contracts authorized Gabana to purchase OP and ISP goods from Gap "and resell them for its own account, in its own name, to retail companies within each of the countries in the Territory."  Gap approved Roots as an authorized retailer of OP and ISP merchandise under the Gap-Gabana Agreements and confirmed that, as an authorized retailer, it would have the right to resell any merchandise it acquired to approved retailer partners in other territories in the Middle East and North Africa.

64.     In an email to Larsen from May 2005, Jon Ehlen, the director of Gap's ISP program, expressly acknowledged that Roots' role as an OP retailer included reselling the merchandise to other Gap-approved retail partners, as well as selling directly to consumers in Roots' own retail stores in Qatar.  In that exchange, Larsen inquired whether a recently-issued approval for a new OP retailer in Egypt "allows Roots to sell directly to the authorized retailer or if it has to go through Gabana." Ehlen responded that Gap "understand[s] that as an approved retailer of excess inventory, [Roots] will be re-selling said inventory."

65.     Gap took the same position with respect to Roots' role as an authorized ISP retailer.  Under the ISP Agreement, Gap sold first-line ISP merchandise directly to Gabana, its non-exclusive ISP distributor.  Pursuant to an

12

1   arrangement devised by Gap, Gabana simultaneously re-sold all the merchandise –

2   whether intended for distribution in Qatar or elsewhere – to Roots by means of a

3   back-to-back letter of credit.  Gap then shipped all the ISP merchandise directly to

4   Roots' warehouse facility in Dubai from which Gap understood it would be

5   shipped to local retailers.  Clearly, in Gap's view, nothing in the Gap-Gabana

6   Agreements precluded Roots from reselling Gap ISP merchandise to other

7   approved retail partners for sale in authorized stores.

8           66.     If and to the extent that any provision of the Gap-Gabana Agreements

9   can be interpreted to prohibit Roots' resale of Gap merchandise to other retailers,

10  Gap's entry into the agreements and subsequent decision to enforce them in a

11  manner prejudicing Roots' distribution rights constitute breaches of (a) Gap's

12  express oral agreement to allow Roots to sell OP and ISP merchandise, and (b) the

13  covenant of good faith and fair dealing implied in Gap's agreement with Roots,

14  which bars Gap from taking any action to deprive Roots of the benefits of the

15  agreement.

16          67.     As noted above, however, Gap did not contemporaneously interpret

17  the Gap-Gabana Agreements as inconsistent with its separate contractual

18  obligations to Roots.  Indeed, as discussed in detail below, Gap continued to act in

19  all respects as if its oral agreement with Roots was valid and binding by, *inter alia*,

20  reaching agreement on payment details, accepting payment in the amount

21  originally agreed, delivering the OP merchandise to Roots, reconfirming its

22  promise to allow Gap to sell ISP merchandise in its own stores in Qatar and to local

23  retail partners in other territories, and otherwise performing as if the contract

24  remained in full force and effect.

25  ***Roots Makes Payment and Gap Confirms and Performs under the Oral Agreement***

26          68.     In reliance on Gap's promise of a long-term ISP relationship, Roots

27  obtained a bank loan of approximately $8 million to finance the purchase of the OP

28

                                              13

1    inventory and Roots' anticipated operations. Under the terms of the loan, Roots
2    was to pay back the principal, plus interest, in monthly installments over a period
3    of 5 years.

4         69.    On May 14, 2003, Roots transferred $1 million from its account to
5    Gabana's account as a down payment for the OP inventory; that same day, Gabana
6    made a simultaneous transfer of $1 million from its account to Gap. Gap requested
7    this method of payment. Upon information and belief, Bell did not wish to receive
8    payment directly from Roots' Qatari-based bank.

9         70.    After Roots made the down payment, Gap, Gabana and Roots
10   negotiated the terms of two back-to-back letters of credit through which Roots paid
11   the remaining $5 million of the agreed purchase price for the OP inventory.
12   Gabana did not make any profit for its role as intermediary in the sale of the OP
13   inventory to Roots. As Gap was fully aware, Gabana's role was purely to appear
14   on the paperwork for the sale and had no economic substance.

15        71.    In or about July 2003, Roots took possession of the inventory. Since
16   that time, Roots has incurred considerable expenses associated with storing and
17   maintaining the inventory, including the cost of rent and staff salaries for its Dubai
18   warehouse.

19        72.    After Roots acquired the OP inventory, Roots discovered that Gap
20   had delivered approximately 1.6 million pieces, rather than the 1.7 million pieces
21   that were promised. Much of the inventory was significantly older than Bell had
22   represented – outdated by four to six seasons. In addition, many of the pieces had
23   not been properly stored and were badly damaged. When Roots' CEO, Ashraf Abu
24   Issa, complained about the shortage and the defects, Jim Bell urged him not to
25   focus on these "small issues." Bell reconfirmed Gap's agreement to allow Roots to
26   sell ISP merchandise, asserting that Roots would enter the ISP business "very
27   soon" and that this would be "a very profitable business."

28
                                        14

73.    Bell also suggested that Roots could persuade retailers to purchase the OP inventory by offering these outdated goods in conjunction with seasonal ISP merchandise. As explained below, however, Gap's failure to permit Roots to sell ISP merchandise outside of Qatar and UAE made it impossible for Roots to do so.

***Roots Develops an ISP Retail Network in the Middle East and North Africa***

74.    In or about June 2003, Roots agreed to develop an ISP retail network in the Middle East and North Africa in exchange for Gap's promise to permit Roots to sell ISP merchandise through its own stores in Qatar and through local retailers in other countries in the region.

75.    Early that month, Gap invited Roots and Gabana to attend Gap's ISP collection presentation in San Francisco. On June 12, 2003, Gap sent Roots letter invitations addressed to representatives of five local retailers identified by Roots. The letters invited the retailers to attend the presentation as part of the "Roots delegation."

76.    At Gap's request, Roots made a presentation in San Francisco about its business plan for Saudi Arabia. Gap expressed approval of the plan. Jon Ehlen, the director of Gap's ISP program, specifically advised Sheikh Faisal that Gap had no objections to Roots' proposed Saudi Arabian retail partner, Red Square, thereby confirming Roots' right to resell Gap merchandise to other retailers.

77.    During the course of the meetings at Gap's headquarters, Gap also requested that Roots prepare a proposal for additional ISP retail stores in other territories, including Qatar, UAE, Bahrain, and Lebanon. On June 26, 2003, Gap sent Gabana and Roots an email reiterating Gap's request for "the business, country, store proposals we discussed in our meeting."

78.    On July 9, 2003, in response to Gap's request, Larsen and Abu Issa sent Jon Ehlen a projected three-year plan for opening approximately 30 ISP retail locations in the twelve countries included in Gabana's ISP Agreement with Gap.

15

1    For the Spring 2004 season, Roots proposed opening a total of five ISP retail stores

2    – two in Qatar, one in Saudi Arabia, one in Kuwait, and one in Bahrain.

3        79.    Later that month, Gap confirmed that it approved Roots' proposals for

4    these ISP locations.  Gap then accepted an ISP purchase order based on projected

5    sales in these territories.

6        80.    On July 24, 2003, Abu Issa sought Gap's approval for Roots to

7    proceed with plans to sell ISP merchandise in Lebanon – another territory where

8    Roots proposed opening a retail location in 2004.  Ehlen stalled, responding that

9    Gap would not approve additional ISP retailers or territories "at this time," but

10   promised that Gap would "continue to review your proposals quarterly."

11       81.    Later in 2003, Gap reversed its position about the Spring 2004 ISP

12   season, and announced that Roots could only sell OP merchandise – not ISP – in

13   Saudi Arabia, Bahrain, and Kuwait.  Gap permitted Roots to sell ISP merchandise

14   in Qatar and UAE, but stated that it would not approve any other locations "until

15   we can see and measure the success of these stores."  Gap led Roots to believe that

16   it was not repudiating Roots' right to sell ISP merchandise, but rather managing the

17   pace at which Roots expanded its operations in light of sales results.  Jon Ehlen

18   promised that "if these first locations turn out as we expect them to, then the

19   approval and roll out process will go much smoother for future locations within this

20   region."

21   ***Roots Establishes ISP Retail Stores in Qatar and the UAE***

22       82.    In or about the Spring of 2004, Roots commenced selling Gap ISP

23   merchandise in Qatar and the UAE.

24       83.    In Qatar, Roots opened its own multi-brand retail stores to sell Gap

25   ISP and OP merchandise.  In reliance on Gap's promise of an on-going business

26   relationship, Roots expended approximately $1 million in start-up costs to open

27   these stores.

28

16

THIRD AMENDED COMPLAINT
C 07 3363 CRB

1    84.    For UAE, Roots worked through a joint venture between a Saudi

2    company, Abdurahman Ali Al Turki Ready Made Trading Establishment ("Al

3    Turki") and RSH (Middle East) L.L.C. ("RSH") that Gap approved as a local

4    retailer (together, "Al Turki/RSH").

5    85.    Roots was actively involved, at its own expense, in establishing and

6    operating the retail stores owned by Al Turki/RSH in the UAE.  For example,

7    Roots sent its retail staff to Dubai to assist Al Turki/RSH with setting up Gap-

8    approved methods of marketing and merchandising.  Roots assisted the UAE

9    retailer with a host of other issues, from preparing advertisements to arranging

10   window dressings.  Roots hired a former Gap executive from France, Alain

11   Moreaux ("Moreaux"), as its Vice President for Retail.  Moreaux had special

12   expertise in Gap's retail practices, including its preferred methods for marketing

13   and advertising.

14   86.    Roots placed the ISP purchase orders for the UAE and Qatar with

15   Gap; purchased all the merchandise from Gap, through Gabana; and resold the

16   UAE merchandise to Al Turki/RSH.  Gap shipped all the goods directly to Roots'

17   warehouse in Dubai.

18   87.    Roots' ISP business in Qatar and UAE was quickly shown to be

19   profitable.  Gap expressed approval of Roots' performance in these markets.

20   88.    Despite Roots' early success in Qatar and UAE, however, Gap began

21   to stall in approving new retailers and territories for ISP sales.

22   89.    Based on Gap's repeated assurances that it would perform its

23   contractual obligations, Roots continued to believe that Gap would honor its

24   commitment to expand Roots' ISP territories.  In reasonable reliance on Gap's

25   representations, Roots expended significant time, money, and resources traveling

26   throughout the Middle East and North Africa to investigate potential markets, and

27   vetting a myriad of local retailers.

28

1    90.    For example, Gap represented that it would permit Roots to expand

2    the ISP business to Lebanon.  At Gap's request, Roots spent considerable time

3    developing an opportunity to sell Gap merchandise through a premier Lebanese

4    retailer, Grand Stores, or GS.   Roots and GS prepared a comprehensive proposal

5    for the Lebanese market, the first draft of which was submitted to Gap in or around

6    December 2003.  Initially, Gap failed to act on the proposal, citing its desire to "see

7    and measure the success of the[] stores" in Qatar and UAE.

8    91.    In the Summer of 2004, at Gap's request, Roots arranged for Jon

9    Ehlen and Andrew Janowski, Vice President of Gap International to meet with the

10   principal of GS in Lebanon.  With Roots' assistance, GS prepared plans for the

11   layout of the proposed Gap sales areas in its stores.  Janowski approved the plans.

12   He represented that Roots would be permitted to enter the Lebanese market as soon

13   as he could obtain final approval from Gap's management.

14   92.    When GS's principal expressed concern at yet another delay, Janowski

15   stated that in order to show Gap's commitment to the GS business proposal, he

16   would invite GS's buyer to come to Gap's next collection presentation in San

17   Francisco to place an order.  In reasonable reliance on Janowski's invitation, in or

18   about July 2004, representatives of GS accompanied Roots representatives on a trip

19   to San Francisco to view the collection.

20   93.    Following the collection presentation, however, Gap refused to accept

21   an ISP order from GS.  Gap's conduct damaged Roots' relationship with GS.  Later

22   that Summer, Gap continued to express interest in the GS proposal, and requested

23   additional information.  In response, Roots worked with GS to prepare a revised

24   business plan, which was submitted to Gap in or around September 2004.  Gap

25   approved this plan, too, but once again failed to act.

26   94.    Gap also continued to promise that it would permit Roots to sell ISP

27   merchandise in the large Saudi Arabian market.  After September 1, 2004, Gap

28                                     18

1    requested that Roots submit another proposal for Saudi Arabia involving the two
2    retailers Gap had previously approved for ISP sales in the UAE – Al Turki and
3    RSH.  In December 2004, Ehlen assured Roots that the plan was acceptable,
4    subject only to formal management approval.  He promised to "continue to push
5    the approval and opening, sooner rather than later."  Consistent with Gap's overall
6    approach, however, the approval was never issued.
7          95.    Gap assured Roots that, despite these delays, it would perform its
8    contractual obligations by permitting Roots to expand the ISP business.  As late as
9    January, 2005, Gap representatives traveled to Dubai to meet with Roots
10    representatives and to tour existing and proposed mall sites in the UAE.  The
11    agenda for the trip also included a meeting at RSH's office to discuss Roots'
12    proposal for Saudi Arabia.
13          96.    In or about early 2005, Roots and Gabana were notified that Gap's ISP
14    Division had been transferred to the company's International Department, which
15    reported to Ron Young.
16          97.    In early 2005, Young traveled to Doha and Dubai to meet with Roots
17    representatives and to tour Roots' retail operations and warehouse facility.
18          98.    During the visit, Young stated that he was impressed with the
19    organization and sophistication of Roots' warehouse in Dubai.  Young was also
20    impressed with the sales revenue Roots generated in the retail stores in Qatar and
21    UAE.  In Young's view this was a remarkable accomplishment because in his
22    experience ISP operations in other territories outside the Middle East had not been
23    profitable.
24          99.    Young advised Roots that Gap was considering changing its business
25    model outside the United States.  Under the new strategy under consideration, Gap
26    would set up franchises through a local company in the region rather than
27    distributing first-line merchandise through multi-brand ISP stores.
28

19

100.   Young represented that if Gap chose to follow this course, it would fulfill its contractual obligations to Roots by making Roots its franchisee in the Arabic-speaking countries of the Middle East and North Africa, and in other negotiated territories.

101.   Roots, in turn, agreed to prepare a detailed business plan for the franchise relationship with Gap. Roots sent its representatives to numerous countries, including Morocco, Tunisia, Egypt, and Saudi Arabia to investigate the market for a Gap franchise in these territories.

**Gap Wrongfully Terminates Roots' Right to Sell First-Line Gap Merchandise**

102.   On May 12, 2005, Young sent a letter to Larsen, notifying him that Gap intended to terminate the ISP Agreement in 90 days. Pursuant to Young's letter, Gap terminated the ISP Agreement without cause on August 10, 2005.

103.   Because Gap provided the ISP merchandise for Roots' retail stores and those of its retail partners in UAE, exclusively through Gabana, the termination of the ISP agreement threatened to cut off Roots' access to first-line ISP merchandise.

104.   Gap's breach of its promise to permit Roots to sell first-line merchandise prevented Roots from generating sufficient sales revenue, despite the success of the retail stores in Qatar and the UAE. As a result, Roots defaulted on its loan from QIB. The default has injured Roots reputation and has impaired its ability to obtain financing for future business projects.

**Gap Promises to Cure The Breaches of Its Contractual Obligations**

105.   Following the termination of Gabana's ISP Agreement, Roots and Gap attempted to negotiate a business resolution. At the same time, Roots informed Gap that it had retained a U.S. law firm to assess Roots' potential claims against Gap. In response, Young urged Roots to refrain from filing a lawsuit. Young assured Roots' representatives, including Sheikh Faisal, that a lawsuit was

20

Case 3:07-cv-03363-CRB     Document 131     Filed 02/29/2008     Page 22 of 36

1  unnecessary, as Gap would continue to do business directly with Roots – without

2  Gabana.

3      106.   Young reiterated his promise to make Roots a Gap franchisee, stating

4  that at a minimum, Gap would allow Roots to operate a franchise in Qatar where it

5  already operated retail stores.  Young also promised to assist Roots in liquidating

6  the OP inventory by approving additional territories where Roots could sell the

7  merchandise.

8      107.   In reasonable reliance on these representations, Roots refrained from

9  commencing a lawsuit, and instead engaged in numerous discussions and email

10  exchanges concerning Young's proposal.

11      108.   These discussions continued until June 2007, when it became clear

12  that Gap had no intention of fulfilling its contractual obligation to compensate

13  Roots for its investment in the OP.

14  ***Gap Wrongfully Seeks to Exploit Roots' Retail Network For Its Own Profit***

15      109.   Prior to the sale of the OP inventory, Roots required assurances that

16  Gap would not seek to contract directly with any of Roots' local retail partners.

17  Bell gave Roots such assurances.

18      110.   Gap violated this commitment by wrongfully seeking to contract

19  directly with Roots' retailers.

20      111.   In or about July 11-13, 2004, Roots' General Manager, Naser Beheiry,

21  traveled to San Francisco to attend a Gap collection presentation.  During the trip,

22  Beheiry participated in a meeting with Jon Ehlen, and David Reilly CEO of Roots'

23  retailer, RSH.  During the meeting, Mr. Beheiry learned that Ehlen had previously

24  had a lunch meeting with the principal of RSH, Mohammed Al-Abbar, without

25  Roots' presence.

26      112.   On information and belief, in or around June or July 2005, Gap

27  executives secretly made arrangements to meet with Roots' retailers, including

28

21

1  RSH and Al Turki, without the presence of any representatives of Roots.  As a

2  result of these meetings, RSH and Al Turki placed orders for Gap Spring 2006 ISP

3  merchandise directly with Gap.

### Count One

### (Breach of Contract)

6  113.   Plaintiff repeats and realleges the allegations contained in all

7  preceding Paragraphs as if fully and completely set forth herein.

8  114.   Gap and Roots entered into an oral contract pursuant to which Roots

9  agreed to purchase the OP inventory for $6 million in exchange for the right to sell

10  first-line Gap merchandise (i) in its own stores in Qatar and (ii) through local

11  retailers in other territories in the Middle East and North Africa through Gap's

12  International Sales Program, or ISP.

13  115.   Roots fully complied with its obligations under its oral agreement with

14  Gap.

15  116.   Gap breached its agreement with Roots by, *inter alia*, (i) failing to

16  permit Roots to sell ISP merchandise in its own stores in Qatar; (ii) failing to allow

17  Roots to resell ISP merchandise to other approved retailers in the Arabic-speaking

18  countries of the Middle East and North Africa; (iii) failing to consider in good faith

19  and/or to approve local ISP retailer partners identified by Roots; and (iv)

20  terminating Roots' right to sell ISP merchandise in its own stores and to other

21  authorized retailers prematurely and without cause.  In addition, upon information

22  and belief, Gap contracted, or attempted to contract, directly with the local retailers

23  identified by Roots, or their affiliates, in violation of the parties' express agreement

24  that it would not do so.

25  117.   At no time did Roots agree that Gap or Gabana could in any way

26  extinguish, modify, limit, or otherwise prejudice any of its contractual rights by

27  entering into the Gap-Gabana Agreements or otherwise.  As interpreted by Gap, the

28

22

1  Gap-Gabana Agreements did not preclude Roots from reselling Gap merchandise

2  to other approved retailers in the territories identified in the ISP Agreement, or

3  otherwise availing itself of the benefits of its oral contract with Gap.

4      118.  If and to the extent that the Gap-Gabana Agreements can be

5  interpreted to prohibit Roots' resale of Gap merchandise to other retailers, Gap's

6  entry into the agreements and subsequent decision to enforce them in a manner

7  prejudicial to Roots' rights constitute separate and independent breaches of Gap's

8  contractual obligations, including (a) a breach of Gap's express oral agreement to

9  allow Roots to sell OP and ISP merchandise, and (b) a breach of the implied

10  covenant of good faith and fair dealing, which bars Gap from taking any action to

11  deprive Roots of the benefits of the agreement.

12      119.  As a result of Gap's material breaches of the contract, Roots has been

13  damaged in an amount to be determined at trial, but believed to exceed

14  $40,000,000.

15  **Count Two**

16  **(Breach of Contract)**

17      120.  Plaintiff repeats and realleges the allegations contained in all

18  preceding Paragraphs as if fully and completely set forth herein.

19      121.  In or about June 2003, Roots and Gap entered into an oral contract

20  pursuant to which Roots agreed to establish an ISP retail network in the Middle

21  East and North Africa for Gap's ISP merchandise.  In exchange, Gap promised to

22  grant Roots the right to sell ISP merchandise in the region (i) in Roots' own multi-

23  brand stores in Qatar, and (ii) through multi-brand stores operated by local retailers

24  in other countries in the region.

25      122.  Roots fully complied with its obligations under its oral agreement with

26  Gap by expending considerable time and resources locating retailers and preparing

27

28

23

THIRD AMENDED COMPLAINT
C 07 3363 CRB

1    business plans in various countries, including Saudi Arabia, Kuwait, Lebanon,

2    Qatar, the UAE and Bahrain.

3        123.   Gap breached its agreement with Roots by, *inter alia*, (i) failing to

4    permit Roots to sell ISP merchandise in its own stores in Qatar; (ii) failing to allow

5    Roots to resell ISP merchandise to other approved retailers in the Arabic-speaking

6    countries of the Middle East and North Africa; (iii) failing to consider in good faith

7    and/or to approve local ISP retailer partners identified by Roots; and (iv)

8    terminating Roots' right to sell ISP merchandise in its own stores and to other

9    authorized retailers prematurely and without cause.  In addition, upon information

10   and belief, Gap contracted, or attempted to contract, directly with the local retailers

11   identified by Roots, or their affiliates, in violation of the parties' express agreement

12   that it would not do so.

13       124.   At no time did Roots agree that Gap or Gabana could in any way

14   extinguish, modify, limit, or otherwise prejudice any of its contractual rights,

15   whether by entering into the new ISP agreement with Gabana dated September 1,

16   2004 or otherwise.  As interpreted by Gap, the Gap-Gabana Agreements did not

17   preclude Roots from reselling Gap merchandise to other approved retailers in the

18   territories identified in the ISP Agreement, or otherwise availing itself of the

19   benefits of its oral contract with Gap.

20       125.   If and to the extent that the Gap-Gabana Agreements can be

21   interpreted to prohibit Roots' resale of Gap merchandise to other retailers, Gap's

22   entry into the agreements and subsequent decision to enforce them in a manner

23   prejudicial to Roots' rights constitute separate and independent breaches of Gap's

24   contractual obligations, including (a) a breach of Gap's express oral agreement to

25   allow Roots to sell OP and ISP merchandise, and (b) a breach of the implied

26   covenant of good faith and fair dealing, which bars Gap from taking any action to

27   deprive Roots of the benefits of the agreement.  As a result of Gap's material

28

24

1    breaches of the contract, Roots has been damaged in an amount to be determined at

2    trial, but believed to exceed $40,000,000.

3                                    **Count Three**

4              **(Breach of the Covenant of Good Faith and Fair Dealing)**

5        126.   Plaintiff repeats and realleges the allegations contained in all preceding

6    Paragraphs as if fully and completely set forth herein.

7        127.   California law implies a covenant of good faith and fair dealing in

8    every contract, which requires that contracting parties discharge their contractual

9    obligations fairly and in good faith.

10       128.   Gap and Roots entered into valid oral contracts.

11       129.   Roots performed all its obligations under the oral contracts with Gap,

12   including, *inter alia*, (i) purchasing the OP inventory for $6 million; (ii) opening its

13   own retail stores in Qatar; and (iii) developing an ISP retail network in the Arabic-

14   speaking countries of the Middle East and North Africa, including a retail operation

15   in the UAE to which, with Gap's express approval, Roots resold ISP merchandise.

16       130.   Gap wrongfully prevented Roots from obtaining the benefit of the oral

17   contracts.

18       131.   First, Gap knew that Roots could only recoup its investment in the OP

19   inventory through a long-term ISP relationship.  Gap prevented Roots from

20   realizing the benefit of the contract by terminating its relationship with Roots before

21   Roots could reasonably have made any return on its investment.

22       132.   Second, Gap was obligated to review Roots' ISP business proposals in

23   good faith and approve (or disapprove) them on the merits.  Instead, Gap frustrated

24   the purpose of the contract by arbitrarily refusing to approve new local retailers and

25   territories without offering any objections to the merits of the proposals.

26       133.   By reason of the foregoing, Gap breached the covenant of good faith

27   and fair dealing implied by law in its agreements with Roots.  Roots is, accordingly,

28

THIRD AMENDED COMPLAINT
C 07 3363 CRB

1    entitled to damages in an amount to be determined at trial but believed to exceed

2    $30,000,000.

3                                **Count Four**

4    **("Unfair" Business Practices Under California Bus. & Prof. Code § 17200)**

5        134.   Plaintiff repeats and realleges the allegations contained in all

6    preceding Paragraphs as if fully and completely set forth herein.

7        135.   Gap induced Roots (i) to purchase the OP inventory for an above

8    market price, (ii) to pay the costs of storing the OP; and (iii) to expend time and

9    resources opening its own retail stores in Qatar and developing a retail network for

10   Gap merchandise in other countries, by falsely promising that Gap would permit

11   Roots to recoup its substantial investment by selling first-line Gap merchandise

12   throughout the Arabic-speaking countries of the Middle East and North Africa.

13   In fact, Gap never intended to allow Roots to develop its retail business for first-

14   line Gap merchandise in the region.

15       136.   Despite the fact that Roots did everything that Gap asked, Gap (i)

16   unreasonably refused to act on Roots' proposals to expand the ISP business outside

17   of two small markets (Qatar and UAE); (ii) terminated Roots ability to sell Gap ISP

18   merchandise before Roots could reasonably have made a return on its substantial

19   investment; and (iii) established or sought to establish direct relationships with the

20   retailers or their affiliates, in order to reap the return on Roots' investment for

21   itself.

22       137.   Gap's conduct has injured, and continues to injure Roots.

23       138.   Gap had no legitimate justification for its conduct.

24       139.   Gap has, therefore, engaged in "unfair" business practices under

25   California's Business & Professions Code § 17200.  The statute provides a remedy

26   for such "unfair" practices, whether or not they are forbidden by another statute or

27   by the common law.

28
                                        26

140.   As a result of Gap's unfair business practices, Roots is entitled to (i) restitution an amount to be proven at trial, but believed to exceed $6,000,000.

<u>**Count Five**</u>

**("Unlawful" Business Practices Under California Bus. & Prof. Code § 17200)**

141.   Plaintiff repeats and realleges the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

142.   Gap engaged in unlawful business practices by fraudulently inducing Roots to purchase the OP inventory for $6 million, and to expend time and resources developing a retail network for Gap merchandise throughout the Arabic-speaking countries of the Middle East and North Africa based on false assurances that Roots would be permitted to sell first-line Gap merchandise throughout the region. In fact, Gap never intended to allow Roots to develop its retail business for first-line Gap merchandise in the region.

143.   After refusing to approve many of the retailers identified by Roots, Gap has established or sought to establish direct relationships with the retailers or their affiliates, in order to reap the return on Roots' investment for itself.

144.   Gap's conduct constitutes "unlawful" business practices under California's Business & Professions Code § 17200.

145.   As a result of Gap's unlawful business practices, Roots is entitled to restitution an amount to be proven at trial, but believed to exceed $6,000,000.

<u>**Count Six**</u>

**(Fraud)**

146.   Plaintiff repeats and realleges the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

147.   As alleged above, Gap made numerous knowing misrepresentations to Roots, including without limitation the following:

27

- In or about May 2003, Gap falsely represented that it would grant Roots the right to sell first-line Gap merchandise in the Arabic-speaking countries of the Middle East and North Africa.

- In or about June 2003, Gap reiterated its false promise to grant Roots the right to sell ISP merchandise in the region.

- In or about the Spring of 2004, Gap falsely stated that it would permit Roots to sell ISP merchandise in Roots own Gap-approved retail stores in Qatar.

- After September 1, 2004, Gap falsely stated that it would allow Roots to expand the ISP business in additional territories, including Lebanon and Saudi Arabia.

- In or about January 2005, Gap again falsely stated that it would allow Roots to expand the ISP business to Saudi Arabia.

- In early 2005, Gap, falsely stated it would make Roots a franchisee in the Arabic-speaking countries of the Middle East and North Africa and in other negotiated territories.

- Following the termination of Roots' ISP rights, Gap reiterated its false promise to make Roots a franchisee in Qatar, and also promised to expand the territories in which Roots could sell the remaining OP inventory.

148.   Upon information and belief, Gap never intended to fulfill these promises. After unloading the OP inventory on Roots, and inducing Roots to develop an ISP retail network throughout the Middle East and North Africa, Gap wrongfully impaired Roots' ability to exercise the ISP rights by, *inter alia*, unreasonably and without justification failing to approve the local retailers Roots proposed; terminating Roots' ISP rights without case; and contracting and/or attempting to contract directly with Roots' local retailers.

149.   As Gap was well aware, Roots reasonably relied on these and other misrepresentations by Gap in making its decisions (i) to purchase the OP inventory;

28

1    (ii) open its own retail stores in Qatar; (iii) to develop a retail network in the

2    Arabic-speaking countries of the Middle East and North Africa; and (iv) to invest

3    in its own warehouse facility and staff in Dubai.

4        150.   As a direct result of Gap's misrepresentations, Roots has been

5    damaged in an amount to be determined at trial, but believed to exceed

6    $15,000,000.

7        151.   Additionally, Gap's conduct was so wanton, and malicious that

8    punitive damages should be awarded against it in the amount of $30,000,000.

9                            **Count Seven**

10                       **(Promissory Estoppel)**

11       152.   Plaintiff repeats and realleges the allegations contained in all

12   preceding Paragraphs as if fully and completely set forth herein.

13       153.   As alleged above, Gap made clear and unambiguous promises to

14   Roots, including without limitation the following:

- In or about May 2003, Gap promised to grant Roots the right to sell
  first-line Gap merchandise in the Arabic-speaking countries of the
  Middle East and North Africa.

- In or about June 2003, Gap reiterated its promised to grant Roots the
  right to sell ISP merchandise in the region.

- In or about the Spring of 2004, Gap promise to permit Roots to sell
  ISP merchandise in Roots own Gap-approved retail stores in Qatar.

- After September 1, 2004, Gap promised to permit Roots to expand
  the ISP business in additional territories, including Lebanon and
  Saudi Arabia.

- In or about January 2005, Gap again promised to permit Roots to
  expand the ISP business to Saudi Arabia.

- In early 2005, Gap promised that it would make Roots a franchisee
  in the Arabic-speaking countries of the Middle East and North Africa
  and in other negotiated territories.

29

- Following the termination of Roots' ISP rights, Gap reiterated its promise to make Roots a franchisee in Qatar, and also promised to expand the territories in which Roots could sell the remaining OP inventory.

154.  Roots detrimentally relied on these and other promises made by Gap in a manner that was both reasonable and foreseeable.

155.  In August 2005, Gap breached these promises by terminating Gap's written ISP Agreement with Gabana, thus cutting off Roots' existing access to the first-line Gap ISP merchandise, and failing to otherwise deliver first-line Gap merchandise to Roots for resale.

156.  Following the termination of the ISP Agreement, Gap's International Vice President, Ron Young repeatedly assured Roots' representatives, including Sheikh Faisal, that Gap would continue to do business directly with Roots – without Gabana.  Gap made these repeated assurances with the intent of persuading Roots to refrain from filing suit against Gap.  Although Roots initially refrained from filing suit in reliance on these assurances, it ultimately became clear that Gap had no intention of honoring its commitment to allow Roots to continue selling first-line Gap merchandise.

157.  As a result of Roots' reasonable reliance on Gap's promises, Roots is entitled to damages in an amount to be proven at trial, but believed to exceed $15,000,000.

## Count Eight

### (*Quantum Meruit*)

158.  Plaintiff repeats and realleges the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

1    159.   Roots performed services for Gap in good faith.  Gap accepted the

2    services provided by Roots with an expectation of compensation.  Roots is

3    therefore entitled to the reasonable value of the services it provided.

4    160.   In particular, Roots developed a network of local retailers in reliance

5    on Gap's representations that it would grant Roots the right to resell first-line Gap

6    merchandise to local retailer partners through the Arabic-speaking countries of the

7    Middle East and North Africa.  As a result of these repeated assurances, Roots

8    expended significant time and resources to establish relationships with local

9    retailers, and to purchase and maintain the OP inventory.

10   161.   In August 2005, Gap breached its promises by terminating Gap's

11   written ISP Agreement with Gabana, thus cutting off Roots' existing access to the

12   first-line Gap ISP merchandise, and failing to otherwise deliver first-line Gap

13   merchandise to Roots for resale.

14   162.   Following the termination of the ISP Agreement, Gap's International

15   Vice President, Ron Young repeatedly assured Roots' representatives, including

16   Sheikh Faisal, that Gap would continue to do business directly with Roots –

17   without Gabana.  Gap made these repeated assurances with the intent of persuading

18   Roots to refrain from filing suit against Gap.  Although Roots initially refrained

19   from filing suit in reliance on these assurances, it ultimately became clear that Gap

20   had no intention of honoring its commitment to allow Roots to continue selling

21   first-line Gap merchandise.

22   163.   As a result of Roots' reasonable reliance on Gap's promises, Roots is

23   entitled to damages in an amount to be proven at trial, but believed to exceed

24   $15,000,000.

25

26

27

28

## Count Nine

## (Quasi-Contract/Restitution)

164.   Plaintiff repeats and realleges the allegations contained in all preceding Paragraphs as if fully and completely set forth herein.

165.   Gap, in an effort to rid itself of the rapidly depreciating OP inventory, induced Roots to purchase, store, and attempt to liquidate the OP inventory and to establish relationships with local retailers by representing to Roots that it would make a return on its investment through a long-term business relationship with Gap.  As a result of these repeated assurances, Roots expended significant time and resources to purchase, store and liquidate the OP inventory, and to develop a retail network for Gap merchandise.

166.   Gap benefited from Roots' significant expenditures of time, effort, and money, including but not limited to the $6 million Roots paid to purchase of the OP inventory, and Roots' establishment of relationships with local retailers that would be willing and able to sell Gap merchandise.

167.   In August 2005, Gap breached its promises to Roots by terminating Gap's written ISP Agreement with Gabana, thus cutting off Roots' existing access to the first-line Gap ISP merchandise, and failing to otherwise deliver first-line Gap merchandise to Roots for resale.

168.   Following the termination of the ISP Agreement, Gap's International Vice President, Ron Young repeatedly assured Roots' representatives, including Sheikh Faisal, that Gap would continue to do business directly with Roots – without Gabana.  Gap made these repeated assurances with the intent of persuading Roots to refrain from filing suit against Gap.  Although Roots initially refrained from filing suit in reliance on these assurances, it ultimately became clear that Gap had no intention of honoring its commitment to allow Roots to continue selling ISP merchandise.

32

1    169.   As a result of Roots' reasonable reliance on Gap's promises, Roots is

2  entitled to damages in an amount to be proven at trial, but believed to exceed

3  $15,000,000.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THIRD AMENDED COMPLAINT
C 07 3363 CRB

1    WHEREFORE, Plaintiff demands judgment as follows:

2         A.    Compensatory damages in an amount to be determined at trial;

3         B.    Restitution, disgorgement, or other equitable relief, in an amount

4    to be determined at trial;

5         C.    Punitive damages in an amount to be determined at trial; and

6         D.    Such other and further relief as this Court deems just and proper,

7    including costs and reasonable attorneys' fees.

8

9    Dated:  February 29, 2008

10

11                              Respectfully submitted,

12                              COVINGTON & BURLING LLP

13                              By:   /s/ Richard A. Jones
                                      Richard A. Jones (Bar No. 135248)
14                                    One Front Street
                                      San Francisco, California  94111
15

16                              Robert P. Haney* (rhaney@cov.com)
                                Bradley J. Nash* (bnash@cov.com)
17                              COVINGTON & BURLING LLP
                                620 Eighth Avenue
18                              New York, NY 10018
                                Telephone: (212) 841-1000
19                              Facsimile: (212) 841-1010

20
                                (*admitted pro hac vice)
21

22

23

24

25

26

27

28                                    34

1

## DEMAND FOR A JURY TRIAL

2    Roots hereby demands a trial by jury of all issues so triable in this action.

3

4    Dated:  February 29, 2008

5

6                                    Respectfully submitted,

                                     COVINGTON & BURLING LLP
7

8                                    By:    /s/ Richard A. Jones
                                            Richard A. Jones (Bar No. 135248)
9                                           One Front Street
                                            San Francisco, California  94111
10

11                                   Robert P. Haney* (rhaney@cov.com)
                                     Bradley J. Nash* (bnash@cov.com)
12                                   COVINGTON & BURLING LLP
                                     620 Eighth Avenue
13                                   New York, NY 10018
                                     Telephone: (212) 841-1000
14                                   Facsimile: (212) 841-1010

15                                   (*admitted pro hac vice)

16

17                                   Attorneys for Plaintiff Roots Ready Made
                                     Garments Co. W.L.L.

18

19

20

21

22

23

24

25

26

27

28
                                        35

# EXHIBIT 2

PUBLIC VERSION

[REDACTED]

# EXHIBIT 3

PUBLIC VERSION

[REDACTED]