# EXHIBIT 2

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION


ROOTS READY MADE GARMENTS CO.
W.L.L.,

        Plaintiff,

vs.                                    No. C 07-03363 CRB

THE GAP, INC., a/k/a, GAP, INC.,
GAP INTERNATIONAL SALES, INC.,
BANANA REPUBLIC, LLC, AND OLD
NAVY, LLC,

        Defendants.


_CERTIFIED COPY_


30(b)(6) DEPOSITION OF ROOTS READY MADE GARMENTS CO.

DEPONENT:  SHEIKH FAISAL AHMED AL-THANI

Wednesday, June 4, 2008


SHEILA CHASE & ASSOCIATES
REPORTING FOR:
West Court Reporting Services
221 Main Street, Suite 1250
San Francisco, California  94105
Phone:  (415) 321-2300
Fax:  (415) 618-0743


Reported by:
JANIS JENNINGS, CSR, CRP, CLR

```
 1   become a franchisee?

 2            THE INTERPRETER:  The answer is "in Dubai"

 3   without interpretation.

 4   BY MS. DURIE:

 5       Q.   Okay.  You say the promise was made in

 6   Dubai; is that right?

 7       A.   Yes.

 8       Q.   When was the promise made?

 9       A.   I don't remember the exact month but maybe

10   the end of 2004 or the beginning of 2005.

11       Q.   Who made that promise?

12       A.   Ron Young.

13       Q.   Okay.  Is it your testimony that this

14   promise was made once or more than one time?

15       A.   I don't remember if this was more than

16   once, but it took a long discussion in the same

17   time.

18       Q.   Okay.  Who was present for this long

19   discussion?

20       A.   I don't remember.  But he and I were

21   walking together.

22       Q.   Do you remember whether anyone else was

23   walking with you?

24       A.   There were other people, but I want to

25   remember who was there.  I remember Naser Beheiry,
```

1  who used to be the president of Roots.  (In English)

2  He was with us at the time.

3      Q.   Other than yourself, Mr. Young and Nasser

4  Beheiry --

5      A.   (In English) And Kifah Ballawi.

6      Q.   -- and Kifah Ballawi, was anyone else

7  present for this discussion about Gap agreeing to

8  make Roots a franchisee in the future?

9      A.   I don't remember.

10     Q.   You said that you were walking during this

11 conversation.  Where were you walking?

12     A.   He was doing a survey for the store in

13 Dubai.  He was very impressed with the numbers.  He

14 said, "If your ISP is successful, then the Gap store

15 will be more successful."  That's when -- that's

16 when the subject of promising started.

17     Q.   Where were you during this discussion?

18     A.   He was returning from the stores and I met

19 with him.  We went, he and I, to Qatar from Dubai.

20 We went to the airport.  We took the plane.

21     Q.   Okay.  Do you remember whether this

22 conversation took place on the plane, on the way to

23 the plane or somewhere else?

24     A.   It was an extended discussion on the way

25 to the airport, on the plane, leaving -- after

1    is that he did recite some specific words in the

2    last question.  You can ask him if he -- if there

3    was anything more.  But I think it mischaracterizes

4    the testimony.

5          THE WITNESS:  It was a lengthy discussion.

6    When he start talking about the subject, he offered

7    it to me.  And I ask him, would we -- will we be the

8    franchisee?  He said yes.

9    BY MS. DURIE:

10         Q.    When you say he offered it, do you

11    remember exactly what he said?

12         A.    At that time, there was no franchise.  He

13    talked about the idea of establishing franchise, and

14    he said he will start the procedures to accomplish

15    that because of our success with the ISP.  I ask

16    him, will we obtain the franchise rights?  He said

17    yes.

18         Q.    Is there any way that you can place this

19    conversation more specifically in time relative to

20    any other events?

21         A.    I don't understand.

22         Q.    Okay.  You said the conversation took

23    place in either late 2004 or early 2005.  Is there

24    anything that you could look at or anyone that you

25    could talk to that would help you be able to be more

```
 1            MS. DURIE:  Roots.

 2            MR. HANEY:  Okay.  Anybody at Roots or

 3    representing ISP.

 4            THE WITNESS:  I'm not sure about anyone.

 5            THE INTERPRETER:  The answer is, without

 6    interpretation, "I'm not sure about anyone."

 7    BY MS. DURIE:

 8       Q.  Did you personally have any discussions

 9    with Ron Young about franchise rights other than the

10    one conversation we discussed in late 2004 or early

11    2005 before Roots filed the lawsuit?

12       A.  It happened about -- I don't remember

13    exactly, maybe nine months, a year before filing the

14    suit.

15       Q.  Is this a different conversation from the

16    conversation that we've described -- that we've

17    discussed in late 2004 or early 2005?

18       A.  Yes, it's different, but it -- what is

19    connected to it is discussing the subject.

20       Q.  Okay.  Do you have any more specific

21    recollection of when in time the second conversation

22    took place?

23            MR. HANEY:  More specific than nine months

24    before the lawsuit?

25            MS. DURIE:  Nine months to a year before
```

1    the lawsuit.

2         THE WITNESS:  I don't remember.  Maybe

3    approximately a year.

4    BY MS. DURIE:

5         Q.   Do you remember whether your second

6    conversation with Mr. Young took place before or

7    after Gabana had sued Gap?

8         A.   Gabana filed the suit during that period.

9    At the beginning, I think.

10        Q.   Okay.  So your -- it's your testimony that

11   your second conversation with Mr. Young about

12   franchise rights took place around the same time

13   that Gabana sued Gap; is that right?

14        MR. HANEY:  Objection as to form and

15   foundation.

16        THE WITNESS:  What I understood from the

17   question is that we discussed the franchise subject.

18   BY MS. DURIE:

19        Q.   Okay.  Where did this second conversation

20   take place?

21        A.   By phone.

22        Q.   Was anyone on the phone other than

23   yourself and Mr. Young?

24        A.   No.  But I contacted Gap's number.

25        Q.   Okay.  So you called Mr. Young; is that

1   not.  I didn't ask them.

2       Q.   Okay.  Were they physically present?

3       A.   They were together with us.  They traveled

4   with us.

5       Q.   Okay.  During any of your discussions with

6   Mr. Young about a possible franchise arrangement,

7   did you ever discuss a franchise fee?

8       A.   I don't understand what you mean by "fee."

9       Q.   Did you ever discuss whether Roots would

10  have to pay a franchise fee in order to get the

11  franchise rights?

12      A.   Roots has already paid a lot of money to

13  bring Gap to the region, basically.

14      Q.   Okay.  That's not my question.

15           My question is:  Did you and Mr. Young

16  ever talk about whether Roots would be required to

17  pay a franchise fee in order to get franchise

18  rights?

19      A.   No, I didn't discuss it.

20      Q.   Okay.  Did you ever discuss with Mr. Young

21  how many stores Roots would be required to open as a

22  franchisee in any particular region?

23      A.   I think there was a person in charge.

24  Ashraf Abu Issa was discussing this subject.

25      Q.   Okay.  Did you ever have any discussions

 b)(6) Deposition of Al-Thani, Sheikh Fais  med                6/4/2008

1    with Mr. Young about how many stores Roots would be

2    required to open as a franchisee?

3        A.   We discussed in general, but I don't

4    remember now the numbers of franchisees.

5        Q.   Okay.  Did you actually discuss a

6    particular number of stores with Mr. Young?

7        A.   No.  He was telling us, based on

8    assumption that we were successful with the ISPs,

9    that we would be successful with the franchise.

10       Q.   Okay.  So you did not have any discussions

11   with Mr. Young about the number of stores that Roots

12   would be required to open as a franchisee; is that

13   right?

14           MR. HANEY:  Again, "you" meaning

15   Mr. Al-Thani?

16           MS. DURIE:  Correct.  Yes.

17           THE WITNESS:  (In English) Myself?

18           MS. DURIE:  Yes.

19           THE WITNESS:  The answer, without

20   interpretation, "We were discussing that in general

21   terms."

22   BY MS. DURIE:

23       Q.   Okay.  So what was the discussion about

24   the number of stores?

25       A.   We were talking in general terms.

```
 1        Q.   Okay.  Did you have a discussion about the

 2   number of stores that Roots would be required to

 3   open as a Gap franchisee?

 4        A.   We knew that we would obtain it, so there

 5   was no need to discuss the numbers because we knew

 6   that we would fulfill all the requirements because

 7   we have always answered the requests.

 8        Q.   Did you --

 9        MR. HANEY:  Mr. Al-Thani, try to listen to

10   her exact question, which was:  Did you discuss the

11   number of stores or not?  And you can answer that

12   yes or no.

13        THE WITNESS:  No, we didn't discuss exact

14   numbers.

15   BY MS. DURIE:

16        Q.   Did you discuss where any particular

17   franchise stores would be located?

18        A.   Personally?

19        Q.   Yes.

20        A.   No.

21        Q.   Did you discuss any of the financial

22   arrangements of a potential franchise business?

23        A.   I personally don't interfere with this

24   subject unless we're talking general terms.

25        Q.   Do you have a recollection of any
```

1    discussion that you had with Mr. Young about the

2    financial terms of a franchise arrangement?

3        A.    No.

4        Q.    Would it be fair to characterize the

5    comment that Mr. Young made to you as being along

6    the lines of, "If everything goes well with the ISP

7    program, then I would expect Roots to become our

8    franchisee if we move to a franchise model"?

9            MR. HANEY:   Objection as to form and

10   mischaracterizes the testimony.

11           THE WITNESS:   What are you inquiring now?

12   BY MS. DURIE:

13       Q.    Okay.  My question is:  Is your memory of

14   this conversation with Mr. Young consistent with him

15   having said, basically, "If everything goes well

16   with the ISP business and if Roots performs well,

17   then we would expect that Roots would become our

18   franchisee if we move to a franchise model"?

19           MR. HANEY:   Objection as to form and

20   mischaracterizes the prior testimony.

21           THE WITNESS:   He was basically happy with

22   the success of ISP, and that's when the idea of

23   franchisee was created.

24   BY MS. DURIE:

25       Q.    Okay.  But was what Mr. Young said to you

```
 1    agreement?

 2              MR. HANEY:  Objection.  Argumentative and

 3    asked and answered.

 4              THE WITNESS:  The ISP agreement is

 5    complementary to the franchise because we agreed

 6    with them.  We paid money, and the business did not

 7    complete because the franchise entered as a

 8    substitute, as a development for it.

 9    BY MS. DURIE:

10        Q.   Okay.  My question -- that's not the

11    answer to my question.

12              So Roots was required to do certain things

13    under the ISP agreement; right?

14              MR. HANEY:  Object to the preamble to the

15    question because I think it may have been the answer

16    to your question.  He may not have understood it.

17              But you can answer the substance of the

18    question, but I object to the preamble.

19              THE WITNESS:  What is the question?

20    BY MS. DURIE:

21        Q.   The question is:  Roots was required to do

22    certain things under the ISP agreement; right?

23        A.   And it was done.

24        Q.   Okay.  And did Roots do anything extra

25    because of the statement that Mr. Young made about
```

1    franchise rights that it wouldn't have done anyway

2    under the ISP agreement?

3         MR. HANEY:  Objection.  Asked and

4    answered.

5         You can answer.

6         THE WITNESS:  No.  What happened is that

7    the study has expanded to include more stores, and

8    the stores would change from the format of ISPs to

9    franchise stores.

10   BY MS. DURIE:

11        Q.  Okay.  Other than the study, is there

12   anything else that Roots did because of the

13   statement that Mr. Young made about future franchise

14   rights that Roots wouldn't have done anyway under

15   the ISP agreement?

16        MR. HANEY:  Objection.  That was asked and

17   answered earlier in the deposition.

18        THE WITNESS:  Certain trips were added to

19   certain countries to explore the possibility of

20   having franchisee -- franchise stores.

21   BY MS. DURIE:

22        Q.  Okay.  Anything else?

23        A.  No.  I don't remember.

24        Q.  Okay.  Who prepared the study that you're

25   talking about?

1    the study, but I don't know if Issa provided this

2    document or not.

3         Q.   Do you know whether there is a written

4    document that reflects the study you're talking

5    about?

6         A.   I -- all I know is that this subject was

7    discussed with Gap.

8         Q.   Okay.  But you don't know whether any

9    written study relating to a potential franchise

10   business was ever prepared; is that right?

11        A.   I was informed that a study has been done.

12        Q.   And Mr. Abu Issa told you that?

13        A.   Yes.

14        Q.   And that's all you know about the study;

15   is that right?

16        A.   I know the discussion about the subject in

17   general, but I don't have the details.

18        Q.   You said that certain trips were added to

19   certain countries relating to a possible franchise

20   arrangement.  Which countries?

21        A.   I'm talking about, of course, the

22   franchise Lebanon, Egypt, because this was very fast

23   to transfer the franchise business from the Gulf

24   region to the Middle East and North Africa.

25        Q.   Okay.  So did representatives from Roots


1    actually travel to Lebanon to discuss a possible

2    franchise business there?

3        A.    Yes.

4        Q.    Okay.  When?

5        A.    Approximately during the same period when

6    Ron came to visit us.

7        Q.    How many times did representatives from

8    Roots travel to Lebanon about the possibility of

9    selling Gap clothing in Lebanon?

10       A.    Only Lebanon or in general related to the

11   Middle East?

12       Q.    Lebanon.

13       A.    I expect more than four times.

14       Q.    Do you know how many of those trips

15   involved ISP versus franchise?

16       A.    Before Ron's visit, they were related to

17   ISPs.  After Ron's visit, they were related to

18   franchise rights.

19       Q.    Who in Lebanon did you talk to about a

20   possible franchise business?

21       A.    I didn't travel in this trip.  It was

22   Ashraf and Roots who conducted this contents.

23       Q.    So is it correct that you don't have any

24   firsthand knowledge of any discussions with anyone

25   in Lebanon about a possible franchise business?

```
 1        Q.   Okay.  So as far as you knew, at the time

 2   that Gap was meeting with people in Lebanon about a

 3   possible franchise deal, there were also still

 4   discussions going on about a possible ISP deal; is

 5   that right?

 6            MR. HANEY:  Can you read the question

 7   back, please.

 8            (Record read as follows:

 9            "Q.  So as far as you knew, at the

10            time that Gap was meeting --")

11            MS. DURIE:  You know what?  I'll re-ask

12   the question because I understand what his issue

13   with it is.

14   BY MS. DURIE:

15        Q.   At the time that Mr. Abu Issa had these

16   discussions with folks in Lebanon about a possible

17   franchise deal, was Gap still considering an ISP

18   business in Lebanon?

19        A.   I was not involved with them in any

20   details.

21        Q.   So you don't know?

22        A.   I don't know the details.

23        Q.   Okay.  You mentioned trips to Egypt and

24   North Africa as well as the trip to Lebanon.  Do you

25   know whether there were ongoing discussions about a
```

1          A.    (In English) Yes, yes.

2          Q.    Okay.   Do you know whether anyone from

3    Roots saw this complaint before it was filed?

4          A.    (In English) I don't know.   I don't know.

5          Q.    Okay.   Turn to the second page of the

6    document.   Somewhat confusingly, it has the

7    page "No. 1" at the bottom.   And I'd like you to

8    read paragraph 6 to yourself.

9          A.    (In English) Okay.

10         Q.    Have you had a chance to read paragraph 6?

11         A.    No.   I read it.

12         Q.    Do you need to have paragraph 6

13   translated?

14         A.    I understood it, but if I want to make

15   sure --

16         Q.    Please.

17         A.    Okay.

18         Q.    Is there anything in paragraph 6 of Roots'

19   complaint, Exhibit 3, that is not true?

20         A.    No.

21         Q.    Turn now to page 4, paragraph 22.   Please

22   read that to yourself.

23         A.    (In English) Yes.

24         Q.    Have you had a chance to read paragraph

25   22?

1              THE WITNESS:  My understanding is this was

2    a period of transferring the business to Gabana.

3    BY MS. DURIE:

4         Q.   Okay.  So Solka was transferring its

5    relationship with Gap to Gabana; is that right?

6              MR. HANEY:  Objection as to form.

7              THE WITNESS:  I cannot determine this

8    relationship.

9    BY MS. DURIE:

10        Q.   Isn't it in fact the case that Roots

11   didn't enter into a contract directly with Gap

12   because it didn't want to jump over the party who

13   had made the introduction?

14        A.   At the beginning, we didn't jump over

15   anybody.  We received OP.  As to the project of ISP,

16   this was offered by Gap to us.

17        Q.   Gabana -- strike that.

18             Gap and Roots did not enter into a written

19   ISP distribution agreement; right?

20        A.   Correct.

21        Q.   Gap entered into a written ISP

22   distribution agreement with Gabana; right?

23        A.   Correct.

24        Q.   And when you paid the $6 million to

25   purchase the 1.7 million units of excess inventory,

1    you knew that Gap was entering into a written ISP

2    distribution agreement with Gabana; right?

3        A.    It will enter into agreement.

4        Q.    Okay.  And at that point in time, the idea

5    was that Gabana and Roots were then going to enter

6    into a written ISP distribution agreement; right?

7        A.    Yes.

8        Q.    Okay.  Did you understand at the time that

9    Gabana and Gap entered into the written ISP

10    distribution agreement that the rights that Gabana

11    were receiving from Gap were exclusive?

12        A.    With regards to ISP?

13        Q.    Correct.

14        A.    With regards to the daily transactions

15    with ISP, we were dealing with Gap.  And during the

16    time at the beginning about this contractual -- or

17    these negotiations, we were receiving direct

18    instructions from Gap and having direct discussions

19    with Gap.

20        Q.    Okay.  But my question is:  Did you

21    understand that the ISP distribution agreement

22    between Gap and Gabana was exclusive?

23            MR. HANEY:  This is at what point in time?

24            THE WITNESS:  Do you mean exclusive for

25    Gabana?

1    agreement with Gap and then passed those rights on

2    to Roots; is that right?

3            MR. HANEY:  Objection as to form and calls

4    for a legal conclusion.

5            THE WITNESS:  How did it transfer the

6    rights?

7    BY MS. DURIE:

8        Q.   Did Gabana -- did Gabana's rights under

9    the contract between Gap and Gabana really belong to

10   Roots?

11           MR. HANEY:  Objection to form and calls

12   for a legal conclusion.

13           THE WITNESS:  I'm not an expert on the

14   legal issues.  But I am saying what rights Gabana

15   obtained, they are the same rights that Roots had.

16   BY MS. DURIE:

17       Q.   Can you take a look at paragraph 24 in

18   Exhibit 3.

19       A.   Is this the one you are referring to on

20   page 4 (indicating)?

21       Q.   Yes.

22           THE INTERPRETER:  Mr. Al-Thani would like

23   the interpreter to read it to him.

24           MS. DURIE:  Please.

25           THE WITNESS:  (In English) Okay.

```
1   BY MS. DURIE:

2        Q.   Is paragraph 24 true?

3        A.   Yeah.  It happened.

4            MS. DURIE:  Do you want to break for

5   lunch?

6            MR. HANEY:  Sure.

7            THE VIDEOGRAPHER:  Off the record.  The

8   time is 12:36 p.m.

9                (Whereupon, lunch recess taken from

10               12:36 p.m. until 1:51 p.m.)

11           THE VIDEOGRAPHER:  On the record.  The

12   time is 1:51 p.m.  Please continue.

13           MS. DURIE:  Let me have marked as

14   Exhibit 5 a copy of the Gap, Inc. Excess Inventory

15   Program Distributor License Agreement dated May 28,

16   2003.

17               (Whereupon Exhibit 5 was marked for

18               identification.)

19           MR. HANEY:  Just for the record, this says

20   Gap, Inc. Excess Inventory Program Distributor

21   License Agreement?

22           MS. DURIE:  Correct.

23   BY MS. DURIE:

24        Q.   Mr. Al-Thani, have you ever seen what has

25   been marked as Exhibit 5 before?
```

```
1    calls about the negotiation of the ISP agreement?

2              MR. HANEY:  The ISP agreement between

3    whom?

4              MS. DURIE:  Any ISP agreement.

5              THE WITNESS:  I don't understand.

6    BY MS. DURIE:

7         Q.   Okay.  Before the May 13th, 2003 ISP

8    agreement was signed, did you have any telephone

9    calls with anyone about an ISP agreement relating to

10   Roots?

11             THE INTERPRETER:  Relating to what?

12             MS. DURIE:  Roots.

13             MR. HANEY:  Objection as to form.

14             THE WITNESS:  It happened only at the

15   meeting with Gap.

16   BY MS. DURIE:

17        Q.   When you say "the meeting with Gap," are

18   you referring to the meeting in June of 2003?

19        A.   No.  The meeting that happened in Qatar

20   regarding the communication with Gap.

21        Q.   And the meeting that happened in Qatar is

22   the one with yourself, Mr. Abu Issa, Mr. Fabre and

23   Mr. Larsen; is that right?

24        A.   (In English) And Mr. El Sokary.

25        Q.   And Mr. El Sokary.  Sorry.
```

```
 1            Prior to May 13th, 2003, had you spoken
 2     directly to anyone at Gap?
 3         A.    After?
 4         Q.    Before.
 5         A.    It happened with Jim Bell.
 6         Q.    Okay.  When did you speak with Mr. Bell?
 7         A.    On the same day the conference happened.
 8         Q.    Okay.  Was Mr. Bell on the speaker phone,
 9     or were you the only one having a conversation with
10     him?
11         A.    At the beginning, it was a personal
12     conversation.  Then after that, he was on the
13     speaker.
14         Q.    And this conversation with Mr. Bell took
15     place before the May 13th, 2003 agreement was
16     signed; right?
17            MR. HANEY:  Objection.  That's what he's
18     testified.  Asked and answered.
19            THE WITNESS:  Yes.
20     BY MS. DURIE:
21         Q.    What did Mr. Bell say during that
22     telephone call?
23         A.    He agreed to give us that territory for
24     the ISP in exchange for 1,700,000 pieces.
25         Q.    Do you remember anything else that
```

 1   Mr. Bell said during that telephone call?

 2        A.    We discussed the price per piece.

 3        Q.    What was discussed about the price per

 4   piece?

 5        A.    To try to reduce the price because it was

 6   invalid.

 7        Q.    Did you succeed in reducing the price?

 8        A.    We paid the required amount in exchange

 9   for the ISP so that we can cover our profits later.

10        Q.    Do you remember anything else about

11   anything Mr. Bell said during this telephone call?

12        A.    No.

13        Q.    At the end of that telephone call, did you

14   think that you had a binding contract with Gap for

15   ISP distribution rights?

16        A.    I don't understand.

17        Q.    What don't you understand?

18        A.    What do you mean by "binding contract"?

19        Q.    At the end of the telephone conversation

20   with Mr. Bell, did you think that you had a legally

21   enforceable contract with Gap regarding ISP

22   distribution rights?

23             MR. HANEY:   Objection.  Calls for a legal

24   conclusion.

25             You can answer.

1    discussions he was involved with.

2        Q.    Okay.  Now, when you refer to the

3    negotiations between yourself and Mr. Bell, are you

4    referring to the telephone call that took place

5    during the meeting in Qatar in which yourself,

6    Mr. Larsen, Mr. Fabre, Mr. El Sokary and Mr. Abu

7    Issa were present?

8        A.    Discussion with whom?  I don't understand.

9    What's the idea behind the subject?

10        Q.    Okay.  I'm asking you about the contract

11    negotiation that you say took place between yourself

12    and Mr. Bell.

13        A.    I told you about what happened exactly.

14        Q.    Okay.  So the only discussion that you had

15    with Mr. Bell in which you think you negotiated this

16    contract between Gap and Roots was the one telephone

17    conversation that took place when you were in Qatar

18    at this meeting with Mr. Larsen, Mr. Fabre, Mr. Abu

19    Issa and Mr. El Sokary; is that right?

20        MR. HANEY:  Objection.  Lacks foundation.

21    Asked and answered.

22        THE INTERPRETER:  Without interpretation,

23    "This was the basic, but the other issues were

24    completed through Ashraf."

25    BY MS. DURIE:

1      Q.   Okay.  Tell me all of the terms of the

2  contract that you and Mr. Bell negotiated.

3      A.   I told her.

4      Q.   Okay.  Go ahead.  You can tell me again.

5          THE INTERPRETER:  Without interpretation,

6  "This is exactly what happened regarding the main

7  issues.  I told her about them."

8  BY MS. DURIE:

9      Q.   You can tell me again.

10          MR. HANEY:  Objection.  Asked and

11  answered.

12          THE WITNESS:  As I said at the beginning,

13  there was an agreement.  There was an offer to give

14  us all the territories of the Arab-speaking world in

15  exchange for 1.7 million pieces with the ISP

16  contract.

17  BY MS. DURIE:

18      Q.   Did you discuss during this conversation

19  with Mr. Bell how long the agreement would last?

20      A.   Of course, at the beginning, the subject

21  was difficult because the amount was big.  The

22  amount of the merchandise was big, 1.7 million

23  pieces.  We couldn't take 1.7 million pieces because

24  the region couldn't handle such a huge amount.  He

25  told us he would give us the whole Arab-speaking

1    countries as the territories, so that would be in

2    return for the ISP.  Of course, this would have

3    required a long time to be able to cover the whole

4    region.

5         Q.   Did you discuss with Mr. Bell what the

6    duration of the ISP agreement would be?

7         A.   The conversation that happened was related

8    to the big volume, and that volume would require a

9    long period of time.

10        Q.   Did you and Mr. Bell reach an agreement on

11   what the duration of the ISP contract would be?

12             MR. HANEY:  And this is still in the

13   initial conversation about ISP?

14             THE WITNESS:  No.

15   BY MS. DURIE:

16        Q.   Okay.  Did you and Mr. Bell ever reach

17   agreement on what the duration of the ISP contract

18   would be?

19        A.   I didn't continue the discussion with him

20   about that subject.

21        Q.   Okay.  Did you and Mr. Bell discuss the

22   situations under which the ISP agreement could be

23   terminated?

24        A.   No.

25        Q.   Did you and Mr. Bell discuss whether Gap

1  would have the right to approve proposed retail

2  locations for ISP merchandise?

3      A.   No.

4      Q.  Did you and Mr. Bell discuss whether Roots

5  would be subject to any restrictions on how it could

6  advertise Gap merchandise?

7      A.   No.

8      Q.  Did you and Mr. Bell discuss how prices

9  for Gap ISP merchandise be set?

10      A.   No.

11      Q.  Did you and Mr. Bell discuss whether there

12  would be any restrictions on Roots' use of the Gap

13  trademark?

14      A.   No.

15      Q.  Did you and Mr. Bell discuss whether there

16  would be any minimum quantity of sales under the ISP

17  agreement?

18      A.   No.

19      Q.  Did you and Mr. Bell discuss how Roots

20  would pay for ISP merchandise?

21      A.   No.

22      Q.  How many conversations did you have with

23  Mr. Bell about an ISP contract?

24      A.   The first time regarding this agreement

25  was done by phone, a conference call.  After that I

1    territories that we had regarding the franchise, and

2    we could reach an agreement regarding less

3    territory, but because of the then-existing problem

4    with Gabana, we need time.

5               And after that, there was a contact to the

6    attorney.

7    BY MS. DURIE:

8         Q.   At the time of this telephone conversation

9    with Mr. Young, was Mr. Larsen still the CEO of

10   Roots?

11        A.   In actuality, no.  But there were

12   problems, and the relationship has terminated.

13        Q.   Did Mr. Young ask you not to sue Gap?

14        A.   There was a communication with the

15   attorney regarding the subject.

16        Q.   Were you -- did you participate in that

17   communication?

18        A.   There was an initial discussion with me

19   about the subject of having less territory, and that

20   discussion was continued with the attorney.

21        Q.   So you yourself didn't have any discussion

22   with Mr. Young about whether or not Roots would sue

23   Gap; is that right?

24        A.   At the beginning, we discussed the issue

25   that Francois was going to file the suit and that

1    the problem was with Francois, not with us.  With

2    Gabana, not with Roots.  And he said because Roots

3    didn't file a suit against Gap, we could reach an

4    agreement about the territory.

5        Q.   Did Mr. Young ask you for an explanation

6    of the relationship between Roots and Gabana?

7        A.   Yes.

8        Q.   What did you tell him?

9        THE INTERPRETER:  Interpreter's

10   clarification.  Excuse me.  There is a confusion

11   about the statements.  I would like the deponent to

12   repeat what he said from the beginning.

13       THE WITNESS:  Gap requested to reduce the

14   number of the companies, Roots and Gabana and RSH.

15   And based on that, Gabana and Roots agreed to merge.

16   And as a third step, RSH would enter.  And based on

17   that, we started the merging operation.  And Ron

18   knew about that because this was his request to

19   Francois.

20   BY MS. DURIE:

21       Q.   So at some point in time, Gabana, Roots

22   and RSH all agreed to merge; is that right?

23       A.   Yes, they agreed to merge.

24       Q.   Did Gabana, Roots and RSH merge?

25       A.   The steps to merge started, but then there

1
2                    CERTIFICATE OF REPORTER

3        I, JANIS L. JENNINGS, a Certified Shorthand
4    Reporter of the State of California, do hereby certify:
5        That the foregoing proceedings were taken
6    before me at the time and place herein set forth; that
7    any witnesses in the foregoing proceedings, prior to
8    testifying, were placed under oath; that a verbatim
9    record of the proceedings was made by me using machine
10   shorthand which was thereafter transcribed under my
11   direction; further, that the foregoing is an accurate
12   transcription thereof.
13       I further certify that I am neither
14   financially interested in the action nor a relative or
15   employee of any attorney of any of the parties.
16       IN WITNESS WHEREOF, I have this date
17   subscribed my name.

18
19   Dated: June 16th, 2008
20
21
22                              JANIS JENNINGS
                                CSR NO. 3942
23
24
25