# EXHIBIT 4

 Issa, Ashraf Abu     6/6/2008

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ROOTS READY MADE GARMENTS CO.
W.L.L.,

        Plaintiff,

vs.                      No. C 07-03363 CRB

THE GAP, INC., a/k/a, GAP, INC.,
GAP INTERNATIONAL SALES, INC.,
BANANA REPUBLIC, LLC, AND OLD
NAVY, LLC,

        Defendants.

CERTIFIED COPY

DEPOSITION OF ROOTS READY MADE GARMENTS CO.

DEPONENT:  ASHRAF ABU ISSA

Friday, June 6, 2008

SHEILA CHASE & ASSOCIATES
REPORTING FOR:
West Court Reporting Services
221 Main Street, Suite 1250
San Francisco, California  94105
Phone:  (415) 321-2300
Fax:  (415) 618-0743

Reported by:
JANIS JENNINGS, CSR, CRP, CLR

 Issa, Ashraf Abu                     6/6/2008

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                  SAN FRANCISCO DIVISION

4

5    ROOTS READY MADE GARMENTS CO.
     W.L.L.,
6
              Plaintiff,
7
     vs.                        No. C 07-03363 CRB
8
     THE GAP, INC., a/k/a, GAP, INC.,
9    GAP INTERNATIONAL SALES, INC.,
     BANANA REPUBLIC, LLC, AND OLD
10   NAVY, LLC,

11            Defendants.

12

13

14        Deposition of ASHRAF ABU ISSA, taken on

15    behalf of the Defendant, at KEKER & VAN NEST LLP,

16    710 Sansome Street, San Francisco, California,

17    beginning at 9:36 A.M. on Friday, June 6, 2008,

18    before JANIS L. JENNINGS, Certified Shorthand

19    Reporter CSR No. 3942, CRP, CLR

20

21

22

23

24

25

 Issa, Ashraf Abu     6/6/2008

1       A.    Yes.

2       Q.    And Roots' lawyers also represented you at

3  the deposition that you gave in the Gabana case;

4  correct?

5       A.    Yes.

6            MS. DURIE:  Let me have marked as the next

7  exhibit in order a copy of the transcript of

8  Mr. Abu Issa's deposition from the Gabana

9  litigation.

10            (Whereupon, Exhibit 43 was marked for

11            identification.)

12            DEPOSITION REPORTER:  I am numbering this

13  No. 43.

14            (Ms. Veeder enters deposition room.)

15  BY MS. DURIE:

16       Q.    Mr. Abu Issa, what's been marked as

17  Exhibit 43 is the transcript of the deposition that

18  you gave in the Gabana litigation.  And I have

19  questions for you about certain specific portions of

20  your testimony.  You'll see that each page contains

21  four pages from the transcript.  I'm going to refer

22  to the page numbers that appear in the upper

23  right-hand portion of each of the --

24       A.    Okay.

25       Q.    -- small pages.  And I'd like to start by

 Issa, Ashraf Abu  6/6/2008

1    directing your attention to page 17 of your

2    testimony --

3        A.    Uh-huh.

4        Q.    -- from line 5 to line 13.  Can you please

5    read that to yourself.

6        A.    From line 5 to where?

7        Q.    To line 13.

8        A.    13.  Yes.

9        Q.    Was that testimony truthful?

10            MR. HANEY:  Okay.  I just want to point

11   out that line 14 is an objection from Miss Durie.

12            DEPOSITION REPORTER:  I'm sorry?

13            MR. HANEY:  There's an objection to that

14   question from Miss Durie.  Actually, strike that.

15   Strike that.

16            Go ahead.

17   BY MS. DURIE:

18       Q.    Mr. Abu Issa, was that testimony truthful?

19       A.    Yes.

20       Q.    I'd like you to turn now to page 26 and

21   ask you to read to yourself lines 5 through 12.

22       A.    Yes.

23       Q.    Was that testimony truthful?

24       A.    Yes.

25       Q.    Please turn to page 34 and read from

company with Gabana.  And if this had went through,

yes, then this -- you know, this was the condition

that we would pay -- we would get $8.5 million from

the bank and finance the new venture between Gabana

5  and Roots.  But since this did not happen, then we

6  did not get the full amount.

7  BY MS. DURIE:

8      Q.   I'd like you to turn in the pile of

9  documents that you have in front of you to what is

10  marked as Exhibit 7.

11          Actually, hang on.  Wait, wait.  I take it

12  back.  It's the wrong one.  Flip through to what's

13  been marked as Exhibit 10.

14      A.   10?

15      Q.   Yeah.  Do you recognize what's been marked

16  as Exhibit 10?

17      A.   Yes.

18      Q.   If you turn to the third page of

19  Exhibit 10, under Roots Ready Made Garments Company

20  there is a signature.  Do you see that?

21      A.   Yes.

22      Q.   Did you sign it?

23      A.   Yes.

24      Q.   And who signed this agreement for Gabana

25  Gulf Distribution?

 Issa, Ashraf Abu  6/6/2008

1    legally enforceable agreement?

2         A.    No.

3         Q.    What was your understanding as to the

4    enforceability of Exhibit 10?

5         A.    It's just a letter of understanding.

6    That's what it's titled.

7         Q.    Okay.  In your view, are letters of

8    understanding not legally enforceable?

9              MR. HANEY:  Objection.  Calls for a legal

10   conclusion.

11             THE WITNESS:  No.  To me -- sorry.

12             MR. HANEY:  Go ahead.

13             THE WITNESS:  To me, it's like minutes of

14   meetings.

15   BY MS. DURIE:

16        Q.    Do you typically include in minutes of

17   meetings that they will be governed by the law of a

18   particular country?

19        A.    I'm not particularly sure if this can be

20   done or not.  I'm not a legal person, but why not?

21        Q.    And when it says the parties have signed

22   this agreement and two original copies on May 12th,

23   2003, and then you executed it, what did you think

24   was the purpose of signing this document?

25        A.    The purpose of signing this document was

 Issa, Ashraf Abu  6/6/2008

```
 1    to reorganize the relationship we had with Gabana.
 2         Q.    But if this was just like the minutes of a
 3    meeting, why would you sign it?
 4         A.    In our part of the world, it's common to
 5    sign minutes of meetings to say that you agree on
 6    them.
 7         Q.    When you say "you agree on them," what do
 8    you mean?
 9         A.    You agree that this was discussed.
10         Q.    So at the top of page 2 where it says,
11    "Now, therefore, the parties agree as follows," in
12    your view, that didn't actually reflect something
13    the parties had agreed to; is that right?
14         A.    Say it again.
15         Q.    Sure.  At the top of page 2 it says, "Now
16    therefore, the parties agree as follows."
17              Is it your testimony that that's not
18    something you thought the parties had actually
19    agreed to?
20              MR. HANEY:  Objection as to form.
21              THE WITNESS:  No.  Everything -- no.  It
22    was discussed and agreed on, yes.
23    BY MS. DURIE:
24         Q.    It was in fact agreed that these things
25    would happen; right?
```

 Issa, Ashraf Abu  6/6/2008

1          MR. HANEY:  Objection as to form.

2          THE WITNESS:  Yes, in total.

3    BY MS. DURIE:

4      Q.   And the parties signed this document in

5    order to reflect that agreement that they had

6    entered into; right?

7      A.   Yes.

8      Q.   And the parties included a choice of law

9    provision so that if there were any disputes about

10   that agreement, there would be a mechanism for

11   resolving those disputes; right?

12     A.   Yes.

13     Q.   Now, if you turn to the first page of

14   Exhibit 10, it says, "Gabana has been offered by Gap

15   Inc. to enter into a new distribution agreement for

16   ISP."

17          Do you see that?

18     A.   Yes.

19     Q.   Why did Exhibit 10 state that Gabana and

20   not Roots had been offered to enter into a new

21   distribution agreement?

22     A.   Because officially, that's what happened.

23     Q.   If you turn to the second page, at the top

24   it says, "Gabana and Roots will negotiate and sign

25   in good faith two new distribution agreements, being

 Issa, Ashraf Abu                 6/6/2008

1   in connection with those two distribution agreements

2   is that they would go from Gap to Gabana to Roots;

3   right?

4       A.   Yes.

5       Q.   Okay.  Now, it's your testimony that as of

6   May 12th, 2003, Roots already had a contract with

7   Gap for the distribution of ISP merchandise; is that

8   right?

9       A.   Yes.

10      Q.   Okay.  If Roots could get the ISP

11  merchandise directly from Gap, why did it need to

12  enter into an agreement with Gabana?

13           MR. HANEY:  Objection as to foundation.

14           THE WITNESS:  That's what Gap wanted from

15  us is to go through one European entity to be able

16  to conduct this business.

17  BY MS. DURIE:

18      Q.   So Roots' agreement with Gap required the

19  execution of a contract between Gap and Gabana;

20  right?

21           MR. HANEY:  Objection as to form and calls

22  for a legal conclusion.

23           THE WITNESS:  Say it again.

24  BY MS. DURIE:

25      Q.   Sure.  Roots' understanding with Gap

 

Issa, Ashraf Abu                                    6/6/2008

1    required the execution of a contract between Gap and

2    Gabana; right?

3        A.    Yes.

4        Q.    Okay.  And it then also required the

5    execution of a contract between Gabana and Roots;

6    right?

7        A.    Yes.

8        Q.    And the written contract that was entered

9    into between Gap and Gabana was in furtherance of

10   the understanding that Roots had based on its direct

11   conversations with Gap; right?

12           MR. HANEY:  Objection to form.

13           THE WITNESS:  Can you repeat that again,

14   please.

15   BY MS. DURIE:

16       Q.    Sure.  The written contract that Gap

17   entered into with Gabana was in furtherance of the

18   understanding that Roots had based on its

19   discussions directly with Gap; right?

20           MR. HANEY:  Objection as to form.

21           THE WITNESS:  Yes.

22   BY MS. DURIE:

23       Q.    Did anyone from Gap ever tell you that it

24   would not be necessary for Gap and Gabana to enter

25   into a written agreement?

 

Issa, Ashraf Abu                                        6/6/2008

1          A.    No.

2          Q.    Can you turn back to your prior deposition

3    testimony, page 91.  Actually -- I'm sorry --

4    page 89, and read to yourself from line 6 to

5    line 24.

6          A.    From 6 to when?

7          Q.    24.

8          A.    24.  Yes.

9          Q.    Was that testimony truthful?

10         A.    Yes.

11         Q.    Did you ask to participate in the

12   negotiation between Gap and Gabana of the May 2003

13   contracts on issues other than exclusivity and

14   advertising?

15         A.    Yes.

16         Q.    To whom did you make that request?

17         A.    To Francois.

18         Q.    What did Mr. Larsen tell you?

19         A.    He would -- like everything else, that he

20   would convey my request or my -- yeah, my request to

21   Gap.

22         Q.    So you relied on Mr. Larsen to convey

23   information from you to Gap?

24         A.    Yes.  My participation was not direct.  It

25   was indirect.

  Issa, Ashraf Abu                                    6/6/2008

```
 1          Q.    So the negotiation of the contract between
 2   Gap and Gabana took place between Gap and
 3   Mr. Larsen; is that right?
 4          A.    Yes.
 5          Q.    And you conveyed to Mr. Larsen your
 6   concerns with respect to that negotiation; is that
 7   right?
 8          A.    Yes.
 9          Q.    And then you relied on him to pass them on
10   to Gap; is that right?
11          A.    Yes.
12          Q.    And was he acting on your behalf in
13   passing that information on to Gap?
14              MR. HANEY:  Objection as to form and calls
15   for a legal conclusion.
16              THE WITNESS:  I am not sure if he did act
17   the way I wanted him to because the outcome is not
18   according to what we wanted.
19   BY MS. DURIE:
20          Q.    Okay.  But regardless of whether he did
21   what you wanted, you authorized him to convey
22   information from you to Gap; right?
23              MR. HANEY:  Objection as to form and calls
24   for a legal conclusion.
25              THE WITNESS:  It was not really an
```



```
 1    authorization.  It was the only way that Gap wanted

 2    it to be.

 3    BY MS. DURIE:

 4        Q.    Did you ask to participate personally in

 5    the negotiations of the contract between Gap and

 6    Gabana?

 7        A.    No.

 8        Q.    Why not?

 9        A.    I knew from Gap that they wanted only one

10    point of contact.

11        Q.    And you knew from Gap that the point of

12    contact that they wanted was Mr. Larsen; right?

13        A.    Not necessarily.  They just wanted one

14    person.

15        Q.    Okay.  And you agreed that Mr. Larsen

16    would be that one person; correct?

17        A.    Yes.

18              MR. HANEY:  I need to use the facility.

19              MS. DURIE:  Sure.  We can take a break.

20              THE VIDEOGRAPHER:  Off the record.  The

21    time is 10:22 a.m.

22              (Off the record.)

23              THE VIDEOGRAPHER:  We are back on the

24    record.  The time is 10:34 a.m.

25    BY MS. DURIE:
```

 Issa, Ashraf Abu  6/6/2008

```
 1        Q.    Turn now, please, to page 98.  And I'd
 2   like to direct your attention to page 98, beginning
 3   at line 10, through 99, ending at line 13.
 4        A.    Say it again.
 5        Q.    Page 98, line 10 through page 99, line 13.
 6        A.    Yes.
 7        Q.    That was truthful?
 8        A.    Yes.
 9        Q.    Turn to page 152, please, and read from
10   line 9 to line 23.
11        A.    From which line?
12        Q.    9 to 23.
13        A.    Okay.
14        Q.    Was that truthful?
15        A.    Yes.  With a clarification.  It might be,
16   you know, in line number 13, I think I was referring
17   when first started negotiating this contract.  I
18   think I meant the contract between us and Gabana.
19        Q.    Right.  So you learned from the time that
20   Roots first started negotiating its contract with
21   Gabana that Gabana's contract with Gap had a
22   90-day-without-cause termination provision?
23        A.    Yes.
24        Q.    Has Roots made any claim against Gabana
25   with respect to any Gap products?
```

 Issa, Ashraf Abu  6/6/2008

1    A.   Yes.

2    Q.   What was the nature of that claim?

3    A.   Just normal business, you know, claims.

4  But the one I remember was when we received the

5  1.7 million pieces, there were a lot of shortages

6  and a lot of damages and a lot of tagged products,

7  you know, tagged products.  So this is one of the

8  claims, for example.  But every time we had a

9  problem with the shipping, shortages, things like

10  this, yes.

11    Q.   And in each of those instances, Roots made

12  a claim against Gabana; right?

13    A.   Against Gap through Gabana.

14    Q.   But the claim was sent to Gabana; right?

15    A.   Yes.

16    Q.   Has Gabana ever resolved that claim?

17    A.   I knew of some of the discussions between

18  Gabana and Gap.  So I knew that Gap did not resolve

19  them, so Gabana could not.

20    Q.   Well, has Gabana resolved that claim to

21  Roots' satisfaction?

22    A.   It was not their job to resolve it.  It

23  was Gap's job to resolve it.

24          MS. DURIE:  Let me have marked as the next

25  exhibit RRMG00008189 to 90.



Issa, Ashraf Abu                                    6/6/2008

```
 1        Q.    Were all of those telephone conversations?

 2        A.    Yes.

 3        Q.    Did you meet with Mr. Bell in person prior

 4   to the execution of the 2003 ISP agreement?

 5        A.    No.

 6        Q.    When was the first time that you spoke

 7   with Mr. Bell?

 8        A.    I don't remember the date, but it was when

 9   they offered the 1.7 million pieces against the ISP

10   program.

11        Q.    Were you the only person on the phone

12   other than Mr. Bell, or were there other people on

13   the phone as well?

14        A.    In some discussions there was Sheikh

15   Faisal and Francois on the phone, too.

16        Q.    Can you separate out who was present for

17   each of the different telephone conversations?

18        A.    Of course, not each one, but I can tell

19   you from what I remember.

20              The initial contact when we first -- when

21   we were first offered the 1.7 million pieces, he was

22   put on a speaker phone, and there were Sheikh Faisal

23   and Francois Larsen present.

24              And after that there was discussion about

25   the financial transaction, and most of the time it
```

 

1    was just me and Mr. Bell.

2        Q.    So the discussion that took place on the

3    speaker phone when Sheikh Faisal and Francois Larsen

4    were present, that was the conversation that took

5    place where you were in Doha, Qatar; is that right?

6        A.    Yes.

7        Q.    And can you place that telephone call in

8    time?

9        A.    "Time" means --

10       Q.    Time.

11       A.    -- date?

12       Q.    When.

13       A.    Date?

14       Q.    Well, what information can you provide to

15   try to figure out when that telephone call took

16   place?

17       A.    I was in my office and it was at

18   nighttime.  I don't remember the date exactly.

19       Q.    Okay.  The telephone call took place

20   before Gap and Gabana entered into the written

21   contract; right?

22       A.    Yes.

23       Q.    What do you recall being discussed during

24   that telephone call?

25       A.    A discussion about the 1.7 million pieces,



Issa, Ashraf Abu                                    6/6/2008

```
 1    the condition and the age of these items, plus what

 2    exactly we would get in return in terms of ISP

 3    program and what countries are covered with that

 4    agreement.

 5         Q.   Okay.  When you say "what exactly we would

 6    get in return" with respect to the ISP program, do

 7    you remember any more details about what was

 8    discussed on that subject?

 9         A.   Yes.  I remember the details of the

10    countries that we were allowed to sell ISP and

11    details of -- maybe the way it's done.  Do we come

12    to San Francisco to place our orders or -- the

13    mechanism of that.

14         Q.   Do you remember any other details that

15    were discussed during that conversation?

16         A.   No.

17         Q.   How long did that conversation last?

18         A.   I can't remember exactly, but it's

19    probably, like, between half an hour to an hour.

20         Q.   And the only person from Gap who was on

21    that call was Jim Bell; right?

22         A.   Yes.

23         Q.   And you understood that Mr. Bell was

24    responsible for excess inventory; right?

25              MR. HANEY:  At that point in time?
```

1      A.    Yes.

2      Q.    Are you now changing that testimony?

3            MR. HANEY:  Objection.  Lacks foundation.

4            THE WITNESS:  I don't see the connection.

5    You said 98 and 99?

6            Okay.  I'm reading 99.  Okay.  98, 99.

7    Okay.

8            Yes.  At the time of the discussion

9    regarding the 1.7 million pieces, I have no idea who

10   is who.  I had not met anybody and just talked to

11   Mr. Bell on the phone.  When I went to San Francisco

12   and I met people in person, then I got all their

13   business cards.  So on their business cards, it said

14   all their titles.

15   BY MS. DURIE:

16     Q.    Okay.  Are there any other details that

17   you can remember of the conversation with Mr. Bell

18   that took place on the speaker phone with Sheikh

19   Faisal and Francois Larsen?

20           MR. HANEY:  You want him to testify to

21   everything that he remembers being said?

22   BY MS. DURIE:

23     Q.    Everything you can remember that was said

24   during that call.

25           MR. HANEY:  Just start from the beginning

 Issa, Ashraf Abu                 6/6/2008

1    and tell her everything you remember from that call.

2            THE WITNESS:  I remember Francois came to

3    us first saying that, "Gap has a proposal for you."

4    And the proposal was if you buy the 1.7 million

5    pieces, then you get some ISP -- the ISP program for

6    the Arabic-speaking countries.

7            Then I said, "Okay."

8            And he said, "I would like you to speak

9    to, you know, Jim directly and understand from him

10   exactly what is the deal."

11           And so we got on the phone.  It was the

12   first time with Jim.  And Jim explained that he has

13   this merchandise of 1.7 million pieces laying in

14   Dubai and that he wants us to buy them for a price.

15   I remember it was over $4, maybe 5.  I can't

16   remember.  He proposed first a price, and then we

17   negotiated that later.  And he said that these goods

18   are recent goods.  They're not very old; two or

19   three seasons behind.  And he said that, you know,

20   he would like to do this transaction very quickly

21   because of financial issue -- because of financial

22   needs, that he needed to get this out of his books

23   quickly.  So his main concern in this conversation

24   was, "How quick can you do it?"

25           I said, "Okay.  What do I get in return,

 Issa, Ashraf Abu                                6/6/2008

```
 1   you know, ISP countries and everything?"
 2              And he told me all the Arabic-speaking
 3   countries are included, plus maybe we can add some
 4   other countries like Switzerland, Israel, Turkey.
 5   And he said, you know, we had to see about these
 6   countries, but for sure the Arabic-speaking
 7   countries were included.  And he said that he wants
 8   me to -- I can't remember if it's this conversation
 9   or another one, but he wants me to show some
10   commitment towards buying this.
11   BY MS. DURIE:
12        Q.   Is there anything else that you can
13   remember about that conversation?
14        A.   No.
15        Q.   When Mr. Bell asked you "to show some
16   commitment," what did you understand that to mean?
17        A.   Either opening LC, letter of credit,
18   quickly or sending a down payment.
19        Q.   Was a final price for the 1.7 million
20   units of excess inventory agreed to during this
21   conversation?
22        A.   Not the final price, no.
23        Q.   At the conclusion of this telephone
24   conversation, did you think that you had a legally
25   enforceable contract with Gap regarding ISP
```

1    distribution rights?

2        A.    Not at the end of it until I -- no, not

3    the end of it.

4        Q.    Now, you've said that you had subsequent

5    telephone conversations with Mr. Bell prior to the

6    execution of the written contract between Gap and

7    Gabana; is that right?

8        A.    Yes.

9        Q.    How many conversations did you have?

10       A.    I said maybe three or four, five.

11       Q.    Okay.  Can you separate out those

12   conversations in your mind --

13       A.    No.

14       Q.    -- or do they all run together?

15       A.    No.

16       Q.    Okay.  Then taking those conversations as

17   a group, please tell me everything that you can

18   remember about what you and Mr. Bell discussed in

19   that second set of conversations.

20       A.    Okay.  We negotiated the price.  And for

21   us to enter into this agreement, we had to show him

22   some commitment, which is -- it ended up to paying

23   $1 million as a down payment.  And always in these

24   conversations we also negotiated the terms of the

25   LC, the terms of the letter of credit, and the

Issa, Ashraf Abu                                    6/6/2008

1   conditions that we would like to have for the ISP in

2   general, not in specific.  We want all three brands,

3   and they have to be in the -- Jim asked they have to

4   be in the multi-brand environment, and that we would

5   use -- and Jim Bell suggested that we would use --

6   this quantity is so big for our area, so we were

7   discussing getting another big area.  Instead of

8   only Arabic-speaking countries, maybe Turkey or

9   Switzerland or somewhere like that.  And to be able

10  to dispose of these ISP --

11       Q.   ISP or excess?

12       A.   Sorry.  Excess.

13            To use ISP to dispose of these OP

14  products.

15       Q.   Okay.  When you said that there was

16  discussion about the conditions for ISP, can you

17  remember anything that was discussed about what

18  you've just testified to?

19       A.   No.  It was just the brands that we would

20  buy in ISP.  And mainly -- his main point was not to

21  have a store that could be called Gap store, so it

22  has to be always with other merchandise.

23       Q.   Was there ever any understanding reached

24  about whether the ISP agreement would include any

25  territories other than the Arabic-speaking

1      A.    Yes.

2      Q.    And that was $6 million?

3      A.    Yes.

4      Q.    Okay.  Now, at the conclusion of the last

5   of these telephone conversations that you had with

6   Mr. Bell, did you understand that there would need

7   to be a written contract executed with Gap?

8          MR. HANEY:   Between which parties?

9   BY MS. DURIE:

10     Q.    Between anyone in Gap.

11     A.    Yes.  The normal practice, yes, is to

12  have -- you know, after you discuss things verbally,

13  you agree on things verbally, to put it in writing.

14  And that's what we wanted, you know.  We always had

15  this verbal agreement and verbal contract with

16  Gabana, and that's what we wanted to always

17  document.  And that's how we always ask Mr. Francois

18  to negotiate the contract with Gap.

19     Q.    Did Gap ever tell you that they were

20  willing to do business without a written contract?

21     A.    Yes.

22     Q.    Who told you that?

23     A.    No.  Sorry.  Not that they were willing to

24  do business, but they were doing business with us

25  without a written contract.

1        Q.    When did Gap do business with you without

2   a written contract?

3        A.    All through this time.  I mean all the

4   relationship from the beginning to the end, it was

5   without any written contract between us and them.

6             MR. HANEY:  When you say "us and them" --

7             THE WITNESS:  I'm sorry.  Between Roots

8   and Gap.

9   BY MS. DURIE:

10        Q.    Okay.  But prior to May 12th, 2003, Roots

11   did not distribute any ISP merchandise for Gap;

12   right?

13        A.    Prior to --

14        Q.    Prior to May 12th, 2003.

15        A.    Yes.

16        Q.    That's correct?

17        A.    Correct.

18        Q.    And prior to that time, Roots had in place

19   a written agreement with Gabana relating to the sale

20   of excess inventory; right?

21        A.    Yes.

22        Q.    Did you have an understanding as to

23   whether Gabana, either directly or indirectly, had a

24   written agreement with Gap relating to the sale of

25   excess inventory?

1       A.   At that time, I knew that they should be

2    negotiating a contract, a written contract.  So that

3    will protect us as the main beneficiary of that

4    transaction.

5            MS. DURIE:  Okay.  Let me have marked as

6    the next exhibit GGD_0016658 [sic] through 79.

7            (Whereupon, Exhibit 45 was marked for

8            identification.)

9            (Discussion off the record.)

10           MS. DURIE:  45?

11           DEPOSITION REPORTER:  Correct.

12           MS. DURIE:  I'm sorry.  The exhibit should

13   go through 0016497.  If you can actually hand me

14   your copy, Mr. Abu Issa.  I'm going to remove the

15   stray copies.

16           MR. HANEY:  497 is the last page?

17           MS. DURIE:  Correct.

18           MR. HANEY:  That's the GGD number?

19           MS. DURIE:  Yes.

20   BY MS. DURIE:

21       Q.   Have you ever seen before what's been

22   marked as Exhibit 45?

23       A.   No.

24       Q.   Are you aware that Gap entered into a

25   written distributor license agreement with Solka on



1    Solka, copied to you.  Do you see that?

2        A.    Yes.

3        Q.    Who wrote the text that appears in the

4    email?

5        A.    It was Roots staff, one of the staff or

6    myself.  You know, it's Roots that did that.

7        Q.    Okay.  You can set that aside for a

8    moment.  And look in your pile of exhibits and take

9    out Exhibit 9, please.

10            Exhibit 9 is a letter dated four days

11   later from yourself to Mr. Larsen; correct?

12       A.    Four days later?  Yes.

13       Q.    Why was it that you first sent an email

14   and then followed it up with a more formal signed

15   letter?

16       A.    Maybe this could have been the other way.

17   Maybe this could have been the wording of Francois,

18   and he wanted us to -- you know, to put whatever we

19   wanted from Gap, to put it in writing in our

20   letterhead so he can convey to Gap.

21       Q.    Okay.

22       A.    So this is my understanding.

23       Q.    Now, at the end of the letter it says, "We

24   hereby authorize you to communicate our present

25   offer to Gap Inc. and look forward to them agreeing

1    to our terms."

2            Did Roots authorize Mr. Larsen to

3    communicate its offer to Gap Inc.?

4        A.    Yes.

5        Q.    And was Mr. Larsen also authorized to

6    serve as the intermediary between Roots and Gap in

7    the subsequent negotiations?

8            MR. HANEY:  Objection as to form.

9    Negotiations of what?

10           THE WITNESS:  Exactly.

11   BY MS. DURIE:

12       Q.    Of ISP distribution rights.

13       A.    In this deal --

14           MR. HANEY:  I didn't hear.  ISP --

15           MS. DURIE:  Distribution rights.

16           MR. HANEY:  Objection as to form.

17           THE WITNESS:  No.  In this particular

18   deal, yes, he was authorized to communicate on our

19   behalf.

20           MR. HANEY:  And you're pointing to the

21   document?

22           THE WITNESS:  Yes.  Exhibit 9.

23   BY MS. DURIE:

24       Q.    And at the beginning -- at the top of the

25   document it says, "Following our various discussions

1    we herewith confirm our intention to enter into an

2    ISP program for Gap Inc. brands in the Arabic

3    speaking countries."

4            Right?

5        A.    Yes.

6        Q.    Now, is it your position that as of the

7    date of this letter, you already had a binding

8    contract with Gap for an ISP program for Gap Inc.

9    brands in Arabic-speaking countries?

10       A.    Yes.

11       Q.    If you already had a binding contract, why

12   did you need to confirm your intention to enter into

13   that program?

14       A.    Because it was always communicated with

15   Gap, and they wanted a written confirmation from us

16   to buy -- to buy these quantities.

17       Q.    Gap insisted that the parties enter into a

18   written contract; right?

19       A.    No.

20       Q.    Well, again, if you already had a binding

21   contract, why would you need to confirm your

22   intention to enter into the program?

23       A.    Gap asked us to put this in writing

24   probably because financially, it was -- it had more

25   of a financial need to Jim Bell than anything else.

1    understanding.  On the second page, you see under

2    No. 2 there's a discussion of how Roots is going to

3    pay Gabana for the excess inventory.

4          A.    Yes.

5          Q.    Is it safe to say that as of May 12th,

6    2003, Roots had not yet opened the letter of credit

7    in favor of Gabana for the purchase of the excess

8    inventory?

9          A.    Yes.

10               MS. DURIE:  Okay.  Let's take a short

11   break.

12               THE VIDEOGRAPHER:  Off the record.  The

13   time is 11:27 a.m.  Here marks the end of videotape

14   No. 1 in the deposition of Ashraf Abu Issa.

15               (Off the record.)

16               THE VIDEOGRAPHER:  We are back on the

17   record.  The time is 11:46 a.m.  Here marks the

18   beginning of videotape No. 2 in the deposition of

19   Ashraf Abu Issa.

20   BY MS. DURIE:

21         Q.    Mr. Abu Issa, I'd like to direct your

22   attention to what was previously marked as

23   Exhibit 12.

24               Do you recognize the first page of

25   Exhibit 12 as an email from Mr. Larsen to yourself



1  dated May 20th, 2003?

2      A.   Yes.

3      Q.   Did you receive that email?

4      A.   Yes.

5      Q.   And do you recognize the remainder of

6  Exhibit 12 as the attachments to that email?

7      A.   Yes.

8      Q.   So on May 20th, 2003, Mr. Larsen sent you

9  a draft of a new excess inventory contract to be

10 entered into between Gabana and Roots; is that

11 right?

12     A.   Yes.

13     Q.   And he also sent you a copy of the excess

14 inventory agreement that Gap had entered into with

15 Gabana; right?

16     A.   Yes.

17     Q.   And Mr. Larsen told you that he was

18 sending you the Gap/Gabana contract for comparison;

19 right?

20     A.   Uh-huh.

21     Q.   Did you have an understanding as to why

22 Mr. Larsen was sending you the Gap/Gabana contract

23 for comparison?

24     A.   Yes.

25     Q.   What was your understanding?

Issa, Ashraf Abu                                      6/6/2008

1        A.    Because when he told me about the terms in

2    the -- the terms that this written contract had, I

3    was not happy with them because that's not what we

4    were looking for and that's not what we had in

5    contract with Gap.

6              But, you know, because of the speed that

7    they wanted this to happen -- so they said that we

8    have to sign this quickly, and this is a standard

9    contract from our legal department.  This is what

10   Jim told me.  He said that this is a standard

11   contract from our legal department and nothing could

12   be changed now.  Okay.  But this is just to

13   execute -- you know, this is just to speed up the

14   process and to -- for you to open this LC, and later

15   on we can maybe improve some of those terms.  So

16   this is, like, a temporary contract, and we can

17   always go back to change some of those terms.

18             I did not like the contract, so I did not

19   sign back one to Gabana.  I said, "I'll wait until

20   we get the proper, not temporary contract, and then

21   do it."

22        Q.    Okay.  Did you ask to see the written

23   contract that had been entered into between Gap and

24   Gabana before Roots opened the letter of credit?

25        A.    Yes.



1    Q.    To whom did you make that request?

2    A.    To both Jim and Francois.

3    Q.    Okay.  Were you provided a copy of the

4    written contract?

5         MR. HANEY:  As what point in time?

6    BY MS. DURIE:

7    Q.    When you asked for it.

8    A.    Not immediately.  It took some time for

9    them to provide it for me.  And right after -- it

10   was not immediately shown, I remember.  They were

11   trying maybe to implement some of the terms that I

12   wanted to have, I insisted on.

13        But, finally, they said, "Okay.  Let's

14   sign this one first, some written contract, and then

15   we will improve it.  Once people know you're here in

16   San Francisco when you come here for the buying,

17   then maybe they can trust you more and know you

18   more, and then maybe we can improve some of those

19   terms."

20        He was always referring to the legal

21   department as someone who is not used to this kind

22   of agreements because Gap owned and run all their

23   stores.  And because they are not used to

24   distributors and resellers, they had a standard one

25   for us, and then that we could negotiate another one



1  when we go to San Francisco.

2      Q.   The "him" that you were referring to in

3  that sentence was Jim Bell?

4      A.   Yes.

5      Q.   And the standard contract that you were

6  referring to was the written contract that got

7  entered into between Gap and Gabana; right?

8      A.   Yes.

9      Q.   Let me direct your attention to

10  Exhibit 13.

11      A.   Yes.

12      Q.   Is Exhibit 13 an email that was sent to

13  you from Mr. Larsen also on May 20th, 2003?

14      A.   I don't remember the first part, but I've

15  seen the second part.  This timetable is familiar to

16  me.

17      Q.   Right.  The document is a little bit

18  confusing because the first few -- I'm producing it

19  to you in the order in which it was produced.

20      A.   Okay.

21      Q.   The first few pages of tables you can skip

22  over.

23           And you see then after the exhibits,

24  there's an International Sales Program ISP

25  Distributor License Agreement?

Issa, Ashraf Abu                                              6/6/2008

1       A.   Yes.

2       Q.   That was a draft of an ISP license

3   agreement between Gabana and Roots that Mr. Larsen

4   sent to you; right?

5       A.   Uh-huh.

6       Q.   This was the agreement that Mr. Larsen was

7   proposing should be entered into between Roots and

8   Gabana?

9       A.   Yes.

10      Q.   And one of the recitals under B -- this is

11  on page -- the page Bates stamped 51095 in the lower

12  right-hand corner -- it says, "Gabana manages the

13  right granted by Gap Inc. (hereinafter referred to

14  as the manufacturer) to sell and/or distribute ISP

15  merchandise labelled; 'Gap, Banana Republic and Old

16  Navy,' hereafter referred to as the Products and as

17  defined in exhibit E, in certain territories."

18           Did you ever take exception to that

19  recital?

20           MR. HANEY:   Objection as to form and vague

21  as to time frame.

22           THE WITNESS:   I don't understand this.

23  This page here (indicating)?

24  BY MS. DURIE:

25      Q.   Yes.



1    required the payment of a down payment on ISP

2    orders?

3        A.    No.

4        Q.    At this time, you had a copy of that

5    contract in your possession; right?

6        A.    Yes.

7        Q.    When you received the copy of the

8    Gap/Gabana agreement in May of 2003, did you read

9    it?

10       A.    No.

11       Q.    Why not?

12       A.    Because it was told to me that it was a

13   standard contract, and it was not according to what

14   he wanted.

15       Q.    So when Mr. Larsen forwarded you a copy of

16   the contract that Gabana had entered into with Gap,

17   he told you that it didn't contain all the

18   provisions that you had hoped for; is that right?

19       A.    Yes.

20           MR. HANEY:   Objection as to foundation.

21           THE WITNESS:   Yes.

22   BY MS. DURIE:

23       Q.    And he also told you that it was a

24   standard form contract that Gap's legal department

25   had required be executed in that form; is that



Issa, Ashraf Abu                                        6/6/2008

```
 1   right?

 2        A.   Yes.

 3             MS. DURIE:  Let me have marked as the next

 4   exhibit RRMG00010662.

 5             (Whereupon, Exhibit 55 was marked for

 6             identification.)

 7             DEPOSITION REPORTER:  This is No. 55.

 8   BY MS. DURIE:

 9        Q.   Do you recognize what's been marked as

10   Exhibit 55 as an email from Mr. Ehlen to Mr. Beheiry

11   dated May 12th, 2004?

12        A.   Yes.

13        Q.   Below there is handwritten text on the

14   document.  Do you recognize the handwriting?

15        A.   No.

16        Q.   Do you recognize Mr. Beheiry's

17   handwriting?

18        A.   No.

19        Q.   You see in the email from Mr. Ehlen a

20   couple of lines up from the bottom it says,

21   "Regardless, no one has the exclusive rights to

22   distribute Gap Inc. products."

23             Do you see that?

24        A.   Yes.  Yes.

25        Q.   Did Mr. Beheiry tell you that Mr. Ehlen
```



1    that the countries needed to be approved under the

2    distributor contract with Gabana?

3        A.    Yes.

4        Q.    And how so?

5        A.    In all the visits we had to Gap here, I

6    was with Naser and Sheikh Faisal.  I was discussing

7    opening new countries and always complaining about

8    how slow it is.

9        Q.    Okay.  Understood.

10            But did anyone from Roots respond to

11    Mr. Bell that the countries should be approved not

12    under the distributor contract with Gabana but under

13    a different contract with Roots?

14            MR. HANEY:  Objection.  Asked and

15    answered.

16            THE WITNESS:  I think here he's referring

17    to the countries listed under Gabana.  Right?  He's

18    talking about the countries which are listed under

19    the distribution.  So it's the names of these

20    countries that are here but that needs to be opened.

21    It's not referring to the contract itself.  It's

22    referring to the names in the contract.

23    BY MS. DURIE:

24        Q.    Okay.  So the distributor contract between

25    Gap and Gabana included a list of countries in which

1    goods could be sold; right?

2        A.    Yes.

3        Q.    And Roots wanted to be able to sell

4    product in additional countries; right?

5        A.    Yes.

6        Q.    And Mr. Bell responded that he could work

7    "to approve these countries under our Distributor

8    Contract with Gabana.  However, it is necessary that

9    we follow the process within that contract."

10           Did anyone from Roots ask Mr. Bell why

11   they couldn't be approved under a different

12   contractual arrangement that existed directly with

13   Roots?

14           MR. HANEY:  Objection.  Asked and

15   answered.

16           THE WITNESS:  No.

17   BY MS. DURIE:

18       Q.    Why not?

19       A.    We always ask -- I mean not in that

20   context.  We ask why -- I mean we always ask them to

21   approve new countries.  Okay.  But nothing referring

22   to -- because we know that we have a contract with

23   Gap, and that contract is very clear that if you buy

24   this merchandise, you will get these countries.

25   Okay.  And it was just a matter of details, a matter

1    of just approving the retailers in that agreement.

2         Q.    When you say "you will get these

3    countries," you're referring to the Arabic-speaking

4    countries?

5         A.    Yes.

6         Q.    Okay.

7         A.    And some additional ones upon request.

8         Q.    When you say "additional ones upon

9    request," what do you mean?

10        A.    Like, if we find a good opportunity

11   somewhere in the country other than Arabic-speaking

12   countries, we'll have to propose it to Gap.

13        Q.    Okay.  Did Gap have to accept that

14   proposal?

15        A.    No.

16        Q.    Now, here again, though, did you have an

17   understanding as to why Mr. Bell was referring at

18   all to the distributor contract with Gabana?

19             MR. HANEY:  Objection.  Lacks foundation.

20             THE WITNESS:  Yes.  Because it listed the

21   Arabic-speaking countries.

22   BY MS. DURIE:

23        Q.    And the proposal that Roots was making was

24   that that contract should be amended to add these

25   additional countries in which it wanted to sell



1  goods; right?

2        MR. HANEY:  Objection.  Lacks foundation.

3  Misstates the document.

4        THE WITNESS:  Yes.

5        MS. DURIE:  Let me have marked as the next

6  exhibit GAB_001337.

7              (Whereupon, Exhibit 57 was marked for

8              identification.)

9        DEPOSITION REPORTER:  This is No. 57.

10        THE WITNESS:  Okay.

11  BY MS. DURIE:

12     Q.    Did you participate in discussions in the

13  November 2003 time frame about missing merchandise

14  in the Dubai inventory?

15     A.    I don't remember particularly at this

16  time, but we always filed complaints regarding the

17  missing inventory, the missing merchandise.

18     Q.    And did Mr. Larsen communicate with Gap on

19  behalf of Roots regarding that missing inventory?

20     A.    Yes.

21     Q.    Do you recognize the email that's been

22  marked as Exhibit 57?

23     A.    I see it now, but I never saw it before.

24     Q.    Okay.  In this email Mr. Larsen says to

25  Mr. Bell, "It being understood by Solka, Roots and



1    completed; I have already passed it to Gabana to

2    seek Gap's approval according to the proper

3    procedure."

4           The business plan being discussed was a

5    business plan for Lebanon; correct?

6        A.    Yes.

7        Q.    And Roots had completed a business plan

8    regarding the possibility of selling product to

9    Lebanon; right?

10       A.    Yes.

11       Q.    And when that business plan was completed,

12   Roots sent the business plan to Gabana; right?

13       A.    Yes.

14       Q.    And the intent was that Gabana would then

15   send the business plan on to Gap in order to seek

16   approval with respect to selling goods in Lebanon;

17   right?

18       A.    Yes.

19       Q.    And Roots sent the business plan to Gabana

20   rather than sending it directly to Gap because that

21   was part of the proper procedure; right?

22           MR. HANEY:  Objection.  Vague.  Lack of

23   foundation.

24           THE WITNESS:  It was the procedure that

25   Gap asked for.

A.    No.

MS. DURIE:  Let me have marked as the next

exhibit RRMG00052007 through 15.

(Whereupon, Exhibit 62 was marked for

identification.)

DEPOSITION REPORTER:  This is No. 62.

THE WITNESS:  Yes.

BY MS. DURIE:

Q.    Do you recognize what's been marked as

Exhibit 62?

A.    Yes.

Q.    Have you seen it before?

A.    Yes.

Q.    When did you see it for the first time?

A.    When it was sent to us.  I'm not sure when

the date is.

Q.    Do you recognize the handwriting that

appears on Exhibit 62?

A.    No.

Q.    No?

A.    No.

Q.    Was Exhibit 62 sent by Gabana to Roots?

A.    Yes.

Q.    Who from Roots participated in the

negotiations relating to Exhibit 62?

1     A.    Naser Beheiry.

2     Q.    Anyone else?

3     A.    Myself also.  He was asking me about

4  certain issues, and I would answer him.

5     Q.    Do you recognize Mr. Beheiry's

6  handwriting?

7     A.    No.  But this could have been very well

8  his writing.

9     Q.    It could very well be his writing?

10    A.    Yeah.

11    Q.    If you take a look at the page of the

12  document that has No. 4 on the bottom, the fourth

13  page, Article 9, it says in the typewritten text,

14  "Either directly or indirectly, work and/or try to

15  work with any company that is a competitor of Gabana

16  or any company affiliated to Gabana."  And next to

17  that you see the handwritten notation, "No, this is

18  not fair."

19    A.    Uh-huh.

20          MR. HANEY:  You should probably give the

21  context.  That's a prohibition in the proposed

22  agreement.  I don't think that's clear from the

23  record.

24          MS. DURIE:  Fair enough.  I'll withdraw

25  the question.



1    proposal?

2            MR. HANEY:  Objection.  Lacks foundation.

3            THE WITNESS:  I want to differentiate here

4    between the written agreement and the oral

5    agreement.  Okay.  The written agreement -- the oral

6    agreement was directly between Gap and Roots, and

7    it's always very clear.  If you buy this 1.7 million

8    pieces, you get all Arabic-speaking countries.

9            Now, they wanted to have this in writing,

10    okay, and they wanted to do it through Gabana.  Gap

11    wanted to do it through Gabana.  They wanted to do

12    it through a European entity instead of going

13    directly to the Middle East.

14            Now, some of these could have been legally

15    okay because this is the way Gap wanted it.  Okay.

16    But from a business point of view, we were always

17    Gap and Roots, and Gabana was the messenger.

18    BY MS. DURIE:

19      Q.    Did anyone from Roots ever propose any

20    changes to the language in the second and third

21    "whereas" clauses?

22            MR. HANEY:  Objection.  Lacks foundation.

23            In this agreement, you're asking?

24            MS. DURIE:  Yes.

25            THE WITNESS:  I'm not aware of any.  I



```
 1            THE WITNESS:  No.

 2   BY MS. DURIE:

 3       Q.    If you turn to the next page, at the

 4   bottom it says, "Switzerland and Qatar situation."

 5            Do you know what that's a reference to?

 6       A.    No.

 7            MS. DURIE:  Bob, this document was

 8   produced to us yesterday.  It is difficult to read.

 9   I would ask that the original be made available for

10   inspection when we're in Dubai for the depositions

11   so that we can use the original with witnesses.

12            MR. HANEY:  Okay.  Would you mind having

13   somebody just send me an email to that effect or to

14   Brad to remind me.  Thank you.

15            MS. DURIE:  Let me have marked as the next

16   exhibit ABU ISSA 1 through 12.

17            (Whereupon, Exhibit 64 was marked for

18            identification.)

19   BY MS. DURIE:

20       Q.    Mr. Abu Issa, Exhibit 64 is the documents

21   that you've personally produced in connection with

22   this deposition; is that right?

23       A.    Yes.

24       Q.    What is the first page?

25       A.    It's a letter from the bank stating the
```



```
 1    conditions of the LC -- or some of the conditions.

 2         Q.   This is a letter from the bank relating to

 3    a letter of credit from Roots to Gabana --

 4         A.   Yes.

 5         Q.   -- correct?

 6              What is the date of this letter?

 7         A.   18 June.

 8         Q.   2003?

 9         A.   Yes.

10         Q.   Was this the second -- did this letter of

11    credit relate to the purchase of the excess

12    inventory?

13         A.   Yes.

14         Q.   Was this the first letter of credit that

15    was opened in connection with the purchase of the

16    excess inventory?

17         A.   Yes.

18         Q.   What was the amount of this letter of

19    credit?

20         A.   $5 million.

21         Q.   At the time that this letter of credit was

22    opened, Roots already had in its possession the

23    contracts that had been entered into between Gap and

24    Gabana; correct?

25         A.   Yes.
```



1  you think that Roots had the right to decide that it

2  did not want to buy the 1.7 million units of excess

3  inventory?

4       MR. HANEY:  Can you repeat the question,

5  please.

6       THE WITNESS:  Can you repeat the question

7  again.

8  BY MS. DURIE:

9    Q.   Sure.  I'll ask the question again.  After

10  you had that series of telephone conversations with

11  Mr. Bell and before May 12th of 2003, did you think

12  that Roots had the right to decide that it did not

13  want to purchase the 1.7 million units of excess

14  inventory?

15    A.   Yes.

16       .MS. DURIE:  Okay.  Let me have marked as

17  the next exhibit RRMG00010946 through 59.

18       (Whereupon, Exhibit 68 was marked for

19       identification.)

20       DEPOSITION REPORTER:  This is 68.

21  BY MS. DURIE:

22    Q.   Okay.  Mr. Abu Issa, I've handed you

23  what's been marked as 68.  Do you recognize the top

24  of the first page as an email from Naser Beheiry to

25  a Sanaa Sobh --

A.    Yes.

Q.    -- dated December 7th, 2004?

A.    Yes.

Q.    Who is Mr. Sobh?

A.    She is a miss.

Q.    Miss.  Who is Miss Sobh?

A.    She is my secretary.

Q.    Okay.  So Mr. Beheiry was attempting to
forward this document on to you; is that right?

A.    Yes.

Q.    Below that there is an email from
Mr. Larsen to Mr. Beheiry dated December 7th, 2004;
right?

A.    Yes.

Q.    And below that on the second page, there
is an email from Mr. Beheiry to Mr. Larsen dated
December 6th, 2004.  Do you see that?  It's on the
second page.

A.    Yeah.  Okay.

Q.    Okay.  And then if you flip two pages
forward, you will see that there's a document
called "Sub-Distribution Agreement."

A.    Yes.

Q.    Now, if you look through that document, do
you see there is some text that has been stricken



```
 1            MS. DURIE:  You know what?  I don't have
 2   any questions about this.  I don't have any
 3   questions about that.  You can set it aside.
 4            DEPOSITION REPORTER:  Do you want to
 5   withdraw the exhibit?
 6            MS. DURIE:  Oh, sure.  Why don't I?
 7            MR. HANEY:  No 69?
 8            MS. DURIE:  Yeah.  Get rid of 69.
 9   BY MS. DURIE:
10       Q.   The reason I'm getting rid of it,
11   Mr. Abu Issa, is because I realize that it has all
12   the same information that's already in --
13       A.   Okay.
14       Q.   -- 68.
15            MS. DURIE:  Let me have marked as
16   Exhibit 69 GAB_011893 through 896.
17            (Whereupon, Exhibit 69 was marked for
18            identification.)
19            THE WITNESS:  Yes.
20   BY MS. DURIE:
21       Q.   Do you recognize what's been marked as
22   Exhibit 69?
23       A.   Yes.
24       Q.   This is a memorandum of understanding that
25   was entered into between Roots and A.A. Turki
```

1    Corporation?

2        A.    Yes.

3        Q.    And it was a memorandum of understanding

4    regarding the right to distribute Gap ISP product;

5    correct?

6        A.    Yes.

7        Q.    Did Roots provide a copy of this

8    memorandum of understanding to Gap?

9        A.    I don't think so.

10       Q.    Why not?

11       A.    Because it's only a memorandum of

12   understanding.

13       Q.    Was there any reason for not providing a

14   copy of this document to Gap other than that it was

15   only a memorandum of understanding?

16       A.    Maybe some -- I don't know.  No.  I mean I

17   don't know if it was even in the first place, but

18   normally memorandum of understanding are just

19   preliminary discussions and put into points and then

20   discussed or confirmed later, depending on what's in

21   there.

22       Q.    If you turn to the last page of

23   Exhibit 69, you see your signature?

24       A.    Uh-huh.

25       Q.    You read this document before you signed

1   it; right?

2       A.   Yes.

3       Q.   If you turn to the second page of the

4   exhibit, the first page of the memorandum of

5   understanding --

6       A.   Yes.

7       Q.   -- you see about a third of the way down

8   it says, "Whereas, Roots manages rights granted to

9   Gabana Gulf Distribution Limited with its principal

10  place of business at" -- an address in London -- "by

11  Gap Inc. to sell and/or distribute ISP merchandise."

12          See where it says that?

13      A.   Yes.

14      Q.   Roots wrote that language; right?

15      A.   Yes.

16      Q.   And that was true?

17      A.   Yes.

18      Q.   And the rights granted to Gabana Gulf

19  Distribution by Gap were reflected in the written

20  contract that was signed between Gap and Gabana;

21  right?

22      A.   Not necessarily only that but also the

23  other agreements we had.

24      Q.   Well, is it now your testimony that Gap

25  and Gabana also had some separate oral agreement?

 Issa, Ashraf Abu  6/6/2008

1    we had to implement them.  But the major points were

2    still in place.  So there were, like, little things

3    that come up every once in a while and we have to

4    change accordingly.

5        Q.    Can you remember any fine tuning of the

6    oral agreement other than the restrictions on

7    advertising?

8        A.    Yes.  For example, after making the first

9    order of ISP, they said that you cannot -- we

10   ordered for a few countries, for more than one

11   country, and, like, we included many other

12   countries.  And then they said it's better if we

13   visit the stores before you can sell to them.  This

14   was not agreed in the beginning, but we said, "Okay.

15   You can visit them."

16           Another thing is that -- yes.  They said,

17   for example, cancellation of products.  If you place

18   an order, you can only add or subtract 10 percent of

19   that order.  These are the fine tuning of things

20   that I meant.

21       Q.    Anything else?

22       A.    Not that -- I mean I'm sure there are

23   others, but this is what I remember now.

24       Q.    And other than the alleged oral agreement

25   whereby Roots would obtain ISP distribution rights



1    in exchange for the purchase of the 1.7 million

2    units of excess inventory fine tuned as you have

3    just described, did Gap and Roots enter into any

4    other oral contract?

5         A.   No.

6         Q.   You should have in front of you what's

7    been marked as Exhibit 3.

8              MS. DURIE:   Where did it go?  I had it.

9    It's right here, but I'm wondering if that's -- is

10   that the copy I had for the witness?

11   BY MS. DURIE:

12        Q.   I'm showing you, Mr. Abu Issa, what's been

13   marked as Exhibit 3, which is a copy of Roots'

14   complaint for breach of contract, et cetera, against

15   Gap.  And if you turn to the last page of the

16   document, you'll see that it's signed by the law

17   firm of Covington & Burling.

18        A.   Uh-huh.

19        Q.   That's Roots' lawyers; right?

20        A.   Yes.

21        Q.   I'd like you to turn to the second page of

22   the document, paragraph 6.

23        A.   Yes.

24        Q.   Read that to yourself.

25        A.   Yes.

1    answered.

2            THE WITNESS:  Again, it's a correct

3    statement from Gap's point of view, not from ours.

4    BY MS. DURIE:

5        Q.   Was Gabana Gulf Distribution Limited

6    Roots' immediate licensor?

7        A.   Yeah.  On paper and legally, yes.

8        Q.   Can you turn to paragraph 24 on page 4.

9        A.   Paragraph --

10       Q.   Paragraph 24 on page 4.

11       A.   Yes.

12       Q.   You see it says, "During the subsequent

13   negotiations, Roots executives, particularly

14   Abu Issa, had direct contact with Bell on numerous

15   occasions.  Larsen also negotiated with Bell on

16   behalf of Gabana and Roots."

17            True statement?

18       A.   Yes.

19       Q.   Turn to the next page, paragraph 29.  It

20   says, "Bell further represented and confirmed that

21   Roots would have free rein to sell OP and ISP

22   merchandise in all of the countries that were

23   expressly identified in the written agreements."

24            What written agreements does that refer

25   to?



1    statements to Roots that were fraudulent?

2        A.    What is "fraudulent"?

3        Q.    That were a fraud.

4            MR. HANEY:  Objection.  Calls for a legal

5    conclusion.

6            THE WITNESS:  We felt that -- okay.

7    Defining fraud is -- maybe it's a perception between

8    one person and another.

9            But when somebody promises you something

10   and they don't do it, or when they say that you have

11   all these ISP countries, and then from the first

12   order it's been cancelled, you know, I think it

13   was -- the intention was just to get rid of these

14   1.7 million pieces, and then that's all that they

15   were worried about at that time.  And maybe they

16   could have said anything just to get rid of them and

17   leave us with the problem until today.

18   BY MS. DURIE:

19       Q.    Did anyone from Gap ever lie to anyone

20   from Roots?

21           MR. HANEY:  Objection.  Asked and

22   answered.

23           THE WITNESS:  I don't know if not telling

24   is lying, but when he --

25   BY MS. DURIE:



1     Q.    Let me split it up.  Did anyone --

2            MR. HANEY:  Let him finish his answer.

3            THE WITNESS:  Not telling is lying because

4     we found out later from some of our clients that the

5     whole point of selling us OP and ISP was to protect

6     the brand name and the intellectual property of

7     Gap Inc.  And this was never conveyed to us.  And we

8     feel that we have been not treated fairly or there

9     was another intention of doing this business with us

10    other than the one that we originally entered into.

11           MR. HANEY:  Let him finish.

12           THE WITNESS:  So, you know, they said that

13    in order for Gap to maintain its registration of

14    trademarks, it has to be used in these countries.

15    And they have told this to two of our clients,

16    namely, Red Square in Saudi Arabia and A.A. Turki.

17           And when we asked about it, they said,

18    "No, no, there is nothing like that."

19           But we were confirmed again by these two

20    clients that this had been told to them.

21    BY MS. DURIE:

22    Q.    Who told you from Gap --

23           MR. HANEY:  I don't think he finished --

24    BY MS. DURIE:

25    Q.    Are you done?



Issa, Ashraf Abu                          6/6/2008

1    multinational companies the size of Gap, smaller and

2    bigger.  Okay.  So I've always had no issues

3    whatsoever.  I never had a court case against any of

4    them.  And my family has been dealing with these

5    companies for the past 50 years.  And always when we

6    get promises from big companies like this, it's

7    always fulfilled, and if they're not fulfilled, then

8    they are compensated somehow.

9            And, accordingly, I just worked and

10   worked, and I really put aside so many projects,

11   okay, just to make sure that we do the Gap thing,

12   the Gap project in a good and organized manner.

13   BY MS. DURIE:

14       Q.   But my question is:  The various things

15   that you identified, the trips to locate retailers,

16   isn't that all work that Roots was doing as part of

17   the contractual relationship among Gap, Gabana and

18   Roots?

19       A.   Yes.

20       Q.   Okay.

21       A.   Sorry.  Again, you said Gap, Gabana and

22   Roots.  It's Gap/Roots.

23       Q.   With Gabana as an intermediary?

24       A.   Yes.

25       Q.   Okay.  Did Roots build special stores to



```
 1        A.    Not that I'm aware of.

 2        Q.    Has Gap asked Roots to provide any

 3   services after June 25th, 2005?

 4        A.    No.

 5              MS. DURIE:  Okay.  I don't have any

 6   further questions.

 7              MR. HANEY:  Let's take a two-minute break,

 8   and then I may have one or two questions.

 9              MS. DURIE:  Okay.

10              THE VIDEOGRAPHER:  Off the record.  The

11   time is 4:39 p.m.

12              (Off the record.)

13              THE VIDEOGRAPHER:  We are back on the

14   record.  The time is 4:48 p.m.

15              MR. HANEY:  Mr. Abu Issa, I just have a

16   few follow-up questions.

17

18                       EXAMINATION

19   BY MR. HANEY:

20        Q.    Did you have meetings in San Francisco

21   with Gap in June of 2003?

22        A.    Yes.

23        Q.    And at those meetings, did Gap

24   representatives make any statements to you about

25   putting together an ISP network?
```

Issa, Ashraf Abu  6/6/2008

```
 1            MS. DURIE:  Objection.  Leading.
 2            THE WITNESS:  Yes.
 3   BY MR. HANEY:
 4       Q.   Who was that?
 5       A.   It was the whole team, the ISP team, Jon
 6   Ellen.  Also Jim Bell was present, Andy and a young
 7   lady called Marcie.  I forget her last name.
 8       Q.   And what did they say on that topic?
 9       A.   They said that in order for us to be able
10   to -- in order for us to be sufficient -- efficient,
11   we have to build -- we have to have a big warehouse,
12   plus we have to have more specialized people to be
13   able to handle the logistics of this matter, and
14   please visit more countries to build this network so
15   it will be worthwhile doing the business.
16       Q.   And did Roots do anything in reliance on
17   that?
18       A.   Yes.
19       Q.   What was that?
20       A.   We visited many countries, and we almost
21   made -- we made permanent agreements with a lot of
22   retailers, and also we've rented a big warehouse in
23   Jebel Ali and we've hired many, many staff.
24       Q.   Now, was one of the countries you visited
25   Lebanon?
```

CERTIFICATE OF REPORTER

1

2

3        I, JANIS L. JENNINGS, a Certified Shorthand

4 Reporter of the State of California, do hereby certify:

5        That the foregoing proceedings were taken

6 before me at the time and place herein set forth; that

7 any witnesses in the foregoing proceedings, prior to

8 testifying, were placed under oath; that a verbatim

9 record of the proceedings was made by me using machine

10 shorthand which was thereafter transcribed under my

11 direction; further, that the foregoing is an accurate

12 transcription thereof.

13        I further certify that I am neither

14 financially interested in the action nor a relative or

15 employee of any attorney of any of the parties.

16        IN WITNESS WHEREOF, I have this date

17 subscribed my name.

18

19 Dated: _June 18th, 2008_

20

21

22 JANIS JENNINGS
CSR NO. 3942

23

24

25