# EXHIBIT 18

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

- - - - - - - - - - - - - - - - - -

ROOTS READY MADE GARMENTS CO.      )
W.L.L.                             )
                                   )
                    Plaintiff,     )
          v.                       ) Case No.
                                   ) C 07 3363 CRB
                                   )
THE GAP, INC., a/k/a, GAP, INC.,   )
GAP INTERNATIONAL SALES, INC.,     )
BANANA REPUBLIC, LLC, AND OLD      )        **CERTIFIED COPY**
NAVY, LLC,                         )
                                   )
                    Defendants.    )

- - - - - - - - - - - - - - - - - -


VIDEOTAPED DEPOSITION OF NASER BEHEIRY

VOLUME I

Tuesday, June 24, 2008

AT:  10:16 a.m.


Taken at:

Hotel Shangri-La
Sheikh Zayed Road
P.O. Box 75880
Dubai
UNITED ARAB EMIRATES

1    U.S.$5 million."

2              Do you know who it was that came up with the

3    valuation for the inventory of $5 million?

4              MR. HANEY:  Objection, lacks foundation.

5              A.  Shall I answer?

6              MR. HANEY:  Yes.

7              BY MS. DURIE:

8              Q.  You can still answer.

9              A.  I don't know.  I wasn't involved in that.

10             Q.  Okay.

11             Can you turn to exhibit 17, please?

12                 (Exhibit 17, previously marked)

13             Q.  Do you recognize exhibit 17?

14             A.  Yes, I do.

15             Q.  What is it?

16             A.  It is a termination notice.

17             Q.  Is exhibit 17 a letter that you received from

18   Mr. Larsen on or around June 26, 2005?

19             A.  Yes.

20             Q.  Can you please turn to exhibit 18.

21                 (Exhibit 18, previously marked)

22             Q.  Do you recognize what has been marked as

23   exhibit 18?

24             MR. HANEY:  Are you asking if he has seen it

25   before?

1       A.  Yes, yes.

2       Q.  It says:

3       "Sheikh Faisal will take suitable actions to

4 . dismiss Mr. Ashraf and Nabil Abou Essa from their actual

5 position as manager of Roots."

6       Do you know whether that happened?

7       MR. HANEY:  Objection as to form.  It's compound.

8       A.  I don't believe it happened.

9       BY MS. DURIE:

10       Q.  And is it your testimony that from your

11 perspective, Mr. Abu Issa's role in the company was

12 unchanged throughout the time that you were General Manager?

13       A.  I believe so, yes.

14       Q.  Can you turn to exhibit 53.

15       (Exhibit 53, previously marked)

16       Q.  Is exhibit 53 an e-mail exchange between

17 yourself and Mr. Larsen from May of 2004?

18       A.  Yes.

19       Q.  Now, in your response to Mr. Larsen, you say:

20       "Our position stay the same, we in favour for 0

21 downpayment and 125 percent stand by LC for one season for

22 an average value of the last three orders.  Kindly maintain

23 this position with Gap."

24       Was Mr. Larsen negotiating with Gap on behalf of

Gabana -- strike that.

 

1  surprised to hear that something has -- has changed, and

2  this is what -- and what I am asking him is to maintain what

3  we have agreed -- negotiated and agreed during our joint

4  meeting with Gap in San Francisco.

5      Q.  Why did you ask Mr. Larsen to maintain that

6  position, rather than communicating directly with Gap

7  yourself?

8      A.  If I remember correctly, during our visits to

9  San Francisco to place the orders and attend meetings with

10 Gap, Francois sometimes used to stay a little bit longer.

11 We just, you know, finished our meetings and leave.  So

12 I believe he might -- he was still there and was still

13 negotiating or talking with them.  Usually he stayed there

14 a couple of days more and he would carry out any -- any

15 issues with them.

16     Q.  But why in this particular case, in May of

17 2004, did you ask Mr. Larsen to maintain your position with

18 Gap, rather than simply calling Gap directly yourself?

19     MR. HANEY:  Objection, asked and answered.

20     A.  I believe because he was the one that came up

21 with the changes in the terms and the conditions that we

22 agreed upon in San Francisco.

23     BY MS. DURIE:

24     Q.  Okay.

25     Wasn't it the case that you understood that the

1    proper channel of communications was from Roots to Gabana,

2    and then from Gabana to Gap?

3              MR. HANEY:  Objection as to form.

4              A.  In certain -- in certain items, yes.  In

5    certain issues, yes.  On other issues, I used to speak

6    directly to Gap.  For example, retailer approval was always

7    sent through Gabana.

8              BY MS. DURIE:

9              Q.  And in this case, issues with respect to the

10   terms of the letter of credit were also sent through Gabana;

11   right?

12             MR. HANEY:  Objection, lacks foundation.

13             A.  No -- I do not agree on that, as I previously

14   explained to you.  We had an agreement with Gap and we went

15   back home with an agreement, and then he changed it.

16             BY MS. DURIE:

17             Q.  Why didn't you just pick up the phone and call

18   whoever you spoke to at Gap and say, "Hey, this isn't what

19   we agreed to"?

20             A.  He made a mistake, he had to fix it.  For us,

21   we started working, based upon our agreement, and he came

22   and he changed things and that wasn't acceptable to us.  He

23   is responsible to fix the situation.

24             MR. HANEY:  Shall we take a --

25             MS. DURIE:  If you turn to --

1          MR. HANEY:  Can you read that back, please?

2          A.  Yes, because it is not clear.

3          MR. HANEY:  I think you may have made a mistake.

4          BY MS. DURIE:

5          Q.  I will just ask it again.

6          Do you recognize what has been marked as

7  exhibit 54 as an e-mail from Mr. Ehlen to yourself, dated

8  April 6, 2004, below which is an e-mail from yourself to

9  Mr. Ehlen, dated April 5th, 2004?

10          A.  Yes.

11          Q.  And you see at the end of the e-mail from

12  Mr. Ehlen to you, he says:

13          "We remain dedicated to provide you support

14  through our distributor, Gabana Ltd."

15          MR. HANEY:  Sorry, which paragraph is that?

16          MS. DURIE:  At the very end of Mr. Ehlen's e-mail.

17          A.  Okay.

18          MR. HANEY:  You -- what do you want?  Is there

19  a question?

20          BY MS. DURIE:

21          Q.  The question was: do you see that?

22          MR. HANEY:  Do you see it?

23          A.  It's -- the question is not clear.

24          BY MS. DURIE:

25          Q.  Do you see Mr. Ehlen's e-mail to you says at

1    the end:

2            "We remain dedicated to provide you support

3    through our distributor, Gabana Ltd."

4            A.  I see it, yes.

5            Q.  Did you ever ask Mr. Ehlen why he told you

6    that Gap was providing support to Roots through its

7    distributor, Gabana Ltd?

8            A.  No.

9            Q.  Did you write back to him and tell him that

10   was inconsistent with your understanding of the parties'

11   agreement?

12           A.  No.

13           Q.  Did you understand Roots' relationship with

14   Gap to be exclusive or non-exclusive?

15           MR. HANEY:  Objection as to form.

16           A.  Roots' relationship with?

17   BY MS. DURIE:

18           Q.  Gap.

19           A.  Gap.  I don't understand the term "exclusive".

20   What does "exclusive" mean?

21           Q.  Have you ever heard of anyone referring to

22   a Distribution Agreement as being "exclusive" or

23   "non-exclusive"?

24           A.  In general, yes.

25           Q.  What do you understand "exclusive" to mean in

1          Do you know whether Solka, Roots and Gabana agreed

2    that Gap would only provide compensation for issues having

3    to do with the 1.7 million units of inventory if it received

4    compensation from Solka?

5          A.   I wasn't aware of that.

6          Q.   You don't know?

7          A.   No.

8          Q.   Can you turn to exhibit 58?

9               (Exhibit 58, previously marked)

10         Q.   Do you recognize exhibit 58 as an e-mail from

11   yourself to Mr. Ehlen, dated August 9, 2004?

12         A.   Yes.

13         Q.   If you look at the fourth paragraph of your

14   e-mail, you say:

15         "Now, the business plan is completed.  I have

16   already passed it to Gabana to seek Gap's approval,

17   according to the proper procedure."

18         What was the proper procedure that you were

19   referring to?

20         A.   I am referring to the -- the retailer approval

21   procedure only.

22         Q.   And you understood that requests to approve

23   retailers to sell Gap clothing had to go through Gabana;

24   right?

25         A.   Yes.

1          Q.   Did you have an understanding as to why those

2    requests had to go through Gabana?

3          A.   That was the proper channel.

4          Q.   Why was it the proper channel?

5          A.   I never asked myself that question.

6          Q.   Below that, there are some numbered points.

7    The second one says:

8          "GS reservations have been virtually eliminated,

9    as a result of viewing the Spring collection in San

10   Francisco."

11         GS was a potential retailer in Lebanon; correct?

12         A.   Correct.

13         Q.   What were GS's reservations?

14         A.   GS raised issues about the ISP collection, if

15   it is -- if it is limited or it's complete, in terms of

16   models, stuff like that.

17         Q.   When GS was initially approached about serving

18   as a retailer for Gap merchandise, did GS express concerns

19   about the ISP collection?

20         A.   I believe it wasn't immediately, but when the

21   ISP program was explained to them, then they started having

22   the concerns.

23         Q.   And those concerns were expressed to Gap;

24   correct?

25         MR. HANEY:   Objection as to form.

A.  They were expressed to Roots first, then they were conveyed to Gap.

BY MS. DURIE:

Q.  Please turn to exhibit 59.

(Exhibit 59, previously marked)

Q.  Do you recognize exhibit 59 as an e-mail from Mr. Larsen to yourself, dated May 25th, 2004; below which is an e-mail from Isabelle Richard to yourself, dated May 25th, 2004?

10    A.  Yes.

11    Q.  In May of 2004, was there an issue with RSH

12  advertising in newspapers?

13    A.  I believe we -- the approval for the ads was

14  pending.

15    Q.  What were the Dubai ads that are referenced in

16  Mr. Larsen's e-mail to you?

17    A.  The Dubai ads are -- to the best of my

18  recollection, are sales ads.

19    Q.  The Dubai ads were ads that had been placed by

20  RSH, advertising the sale of Gap product; correct?

21    A.  I believe so, yes.

22    Q.  And those ads had not been approved by Gap;

23  correct?

24    A.  Eventually they were.

25    Q.  At the time that Mr. Larsen sent you this

1           BY MS. DURIE:

2           Q.  So is it your testimony that you copied the

3    language, but didn't think about what it meant?

4           A.  Yes.

5           Q.  Let me have marked as the next exhibit

6    RRMG00051329 through 338.

7              (Exhibit 94 marked for identification)

8           Q.  Do you recognize what has been marked as

9    exhibit 94?

10          A.  Yes.

11          Q.  Do you recognize the first page as an e-mail

12    from Mr. Larsen to yourself --

13          A.  Yes.

14          Q.  -- dated November 28, 2004?

15          A.  Yes.

16          Q.  And the handwriting at the top of the page is

17    your handwriting; right?

18          A.  Yes.

19          Q.  And it says:

20          "Mr. Ashraf, my comments are indicated for your

21    review and instructions.  Naser."

22          A.  Yes.

23          Q.  If you turn to the next page, the attachment

24    is a Sub-Distribution Agreement between Gabana and Roots;

25    right?



1       A.  Yes.

2       Q.  This was a document that Mr. Larsen had

3   forwarded to you?

4       A.  Yes.

5       Q.  And you made handwritten comments on that

6   document; right?

7       A.  Yes.

8       Q.  Okay.

9       Now, if we turn to the third page of the exhibit

10  ending in Bates stamp number 331.  Do you see where I am?

11  It says at the top "Whereas".

12      A.  Yes.

13      Q.  And it says:

14      "Whereas Gabana is an authorized ISP distributor

15  of goods produced by Gap International B.V. in the countries

16  mentioned in Exhibit A of the Distributor License Agreement

17  signed on September 1st, 2004 between Gabana and Gap

18  B.V."

19      You didn't make any comments on that paragraph,

20  did you?

21      A.  No.

22      Q.  And that's because, to the best of your

23  knowledge, that was accurate; right?

24      A.  My main comments were revolving on trying as

25  much as possible, without being a lawyer, to preserve the

Beheiry, Naser    6/24/2008



1    rights of Roots, and that was what was my main concern.

2    I didn't look at, you know, the contractual statements here

3    because I was sure that Ashraf will take care of that.

4        Q.  Well, you did make a number of comments on

5    this document, didn't you?

6        A.  Yes, I did.

7        Q.  In fact, you made comments at the end of the

8    section of the "Whereas" clauses on the first page; right?

9    On the first page of the contract?

10        A.  Yes.

11        Q.  Did you think that the statement that "Gabana

12    was an authorized ISP distributor of goods produced by Gap"

13    was wrong?

14        A.  I didn't comment on that.

15        Q.  I understand.  Did you think it was wrong?

16        A.  I don't know.

17        Q.  The second recital says:

18        "Gabana wishes that Roots acts as its ISP

19    sub-distributor for all Countries mentioned in Exhibit A."

20        You didn't comment on that paragraph either, did

21    you?

22        A.  "Gabana wishes ..."  No, I didn't.

23        Q.  Did you think that was wrong?

24        A.  As I told you, I left all these issues to

25    Ashraf because he is the right person to negotiate on these



1    things.   I was just focussing on the particulars of

2    defending the interests of Roots in day-to-day.

3    Strategically what they are agreeing on, it's above my head.

4         Q.  Okay.

5         Well, you didn't comment on paragraph 3 under the

6    "Whereas" clauses either, did you?

7         A.  No.

8         Q.  But you did comment on the fourth "Whereas"

9    clause?

10         A.  Yes.

11         Q.  You added a comment that:

12         "Roots and Gabana wishes that the management of

13    all the administrative activities related to the

14    distribution of goods is performed by Gabana."

15         And you added "Dubai branch"?

16         A.  Yes, I did.

17         Q.  And then you added a whole new "Whereas"

18    clause underneath that; right?

19         A.  Yes.

20         Q.  Can you read it, please?

21         A.  It's not very clear.

22         "Roots purchased a big stock of overproduction

23    from Gap Inc. to have the ISP ..."

24         Q.  Let me stop you there.

25         MR. HANEY:  He didn't finish.

1          MR. HANEY:  This set of comments or --

2          MS. DURIE:  A set of comments.

3          MR. HANEY:  -- any set of comments?

4     Before he answers that, do you want him to read 68

5 or --

6          BY MS. DURIE:

7          Q.  No.  So before -- this question doesn't relate

8 specifically to exhibit 68.

9          Did you send Mr. Larsen a set of comments on his

10 draft Sub-Distribution Agreement?

11         A.  I believe so, yes.

12         Q.  And did Mr. Larsen then send a set of comments

13 back to you?

14         A.  I believe so, yes.

15         Q.  And if you turn to exhibit 68, do you

16 recognize exhibit 68 as an e-mail exchange between yourself

17 and Mr. Larsen on December 7th, 2004 that you then

18 forwarded to -- can you pronounce that name for me?

19         A.  Sanaa.

20         Q.  Sanaa Sobh?

21         A.  Sanaa Sobh.

22         Q.  Do you recognize that?

23         A.  Yes.

24         Q.  So you -- Mr. Larsen says:

25         "Thanks for your comments on the sub-distribution

1    something.

2              MS. DURIE:  8362.

3              MR. HANEY:  Thanks, got it.

4              BY MS. DURIE:

5         Q.   You were the one who prepared the ISP

6    Distributor License Agreement that's part of exhibit 95,

7    working from the draft Gabana-Roots Distributor License

8    Agreement as a template; right?

9         A.   Right, correct.

10        Q.   Now, if you turn to the first page of that ISP

11   Distributor License Agreement, Bates number 8362.  Do you

12   see under the recitals, it says --

13        A.   What is ...

14        Q.   Under the recitals, it says:

15        "Roots manages the right on behalf of Gabana Gulf

16   Distribution Ltd, granted by Gap (hereinafter referred to as

17   'the manufacturer') to sell and/or distribute ISP

18   merchandise."

19             Who wrote that language?

20        A.   I believe I replaced the word that was after

21   point A, which was most probably "Gabana-Roots", and I put

22   "Roots" on the -- yes, sorry.  I misunderstood.  Most

23   probably I did that, yes.

24        Q.   You wrote that paragraph?

25        A.   Yes.

1      Q.   Why did you say that "Roots manages the right

2  on behalf of Gabana Gulf Distribution Ltd"?

3      A.   Because Roots does that.

4      Q.   What does it mean "to manage the right on

5  behalf of Gabana"?

6      A.   That means that Gabana gives Roots the right

7  to manage the ISP program that has been granted by Gap.

8      Q.   And that's because Gap had granted the ISP

9  rights to Gabana; right?

10     MR. HANEY:   Objection as to form.  It calls for

11  a legal conclusion.

12     A.   It could be interpreted in this way.

13     BY MS. DURIE:

14     Q.   If you can turn to the page numbered 5.  The

15  ending Bates number is 8366.  Article 10, "Authorized

16  Retailer Approval".

17     A.   Okay.

18     Q.   You see that it says:

19     "Roots shall have the right, in its sole

20  discretion, disapprove or cancel at any time any HSTCO (GS)

21  retail store where HSTCO (GS)'s propose to sell or have sold

22  Authorized Goods."

23     Why was that provision included?

24     A.   Because it is part of the template that has

25  been used and the names just have been plugged in.



1          Q.  The way the ISP deal worked, Gap would sell

2    product to Gabana; right?

3          MR. HANEY:  Objection as to form.

4          A.  How I see it, it's -- Roots place their orders

5    at Gap Inc. in San Francisco.  The orders get consolidated

6    and shipped to Gabana.

7          BY MS. DURIE:

8          Q.  Well, the purchase order would come from

9    Gabana; right?

10         A.  I believe so, yes.

11         Q.  And Gap would send the product to Gabana;

12   right?

13         A.  Gap sends the product to Dubai, Jebel Ali.  We

14   receive it.

15         Q.  Okay.

16         But the name of the entity that's listed as

17   receiving that product in the first instance is Gabana;

18   right?

19         MR. HANEY:  Objection as to form.

20         A.  I have no access to such documents.

21         BY MS. DURIE:

22         Q.  Well, isn't it the case that Gabana was

23   charging a mark-up on product that Roots was receiving?

24         A.  Yes.

25         Q.  Why was Roots -- why was Gabana charging

1    a mark-up?

2          A.    I believe because that was the agreement with

3    Gabana.

4          Q.    The agreement was that the deal went from Gap

5    to Gabana.   Gabana would then add on its margin and turn

6    around and resell the product to Roots; right?

7          MR. HANEY:   Objection as to form.

8          A.    I didn't witness such agreement and I have no

9    document to that effect.

10         BY MS. DURIE:

11         Q.    Well, you do know that Gabana was charging

12   a margin --

13         A.    Yes.

14         Q.    -- on sales?

15         A.    Yes.

16         Q.    Did Gabana fail to live up to its commitment

17   to help Roots sell the excess inventory?

18         A.    Yes.

19         Q.    Let me have marked as the next exhibit

20   RRMG00009348 through 53.

21              (Exhibit 98 marked for identification)

22         Q.    Do you recognize what has been marked as

23   exhibit 98 as an e-mail exchange among yourself and

24   Mr. Larsen in May of 2004?

25         A.    Correct.

Beheiry, Naser                                    6/24/2008

1   an offer to purchase some portion of the excess inventory

2   was made and rejected?

3           A.  Yes.

4           Q.  Were you ever present for any discussions

5   about the possibility of Roots obtaining any franchise

6   rights?

7           A.  No.

8           Q.  Did anyone from Roots ever tell you that Roots

9   had been promised any franchise rights?

10          A.  Once I recall that we were in San Francisco.

11  Mr. Ashraf, Ellen Monroe and myself during one of the buying

12  sessions.  And we were having lunch and they were talking

13  about that possibility, and they were just, you know,

14  discussing it.

15          Q.  Other than that one discussion over lunch

16  about the possibility, did anyone from Roots tell you about

17  any conversations or representations that had been made

18  about the franchise rights?

19          A.  No, not to my knowledge.

20          Q.  Was part of your job responsibilities as

21  General Manager of Roots to go on trips to meet with

22  potential retailers?

23          A.  Yes.

24          Q.  How many such trips did you go on?

25          A.  Quite a few.  I went twice to Panama.  I went

1          **CERTIFICATE OF COURT REPORTER**

2

3      I, ROSE HELEN CLAIRE KAY, an Accredited LiveNote Reporter,
       hereby certify that the testimony of the witness NASER
4      BEHEIRY in the foregoing transcript, numbered pages 1
       through 123, taken on Tuesday, June 24, 2008 was recorded by
5      me in machine shorthand and was thereafter transcribed by
       me; and that the foregoing transcript is a true and accurate
6      verbatim record of the said testimony.

7

8      I further certify that I am not a relative, employee,
       counsel or financially involved with any of the parties to
9      the within cause, nor am I an employee or relative of any
       counsel for the parties, nor am I in any way interested in
10     the outcome of the within cause.

11

12

13

14

15     Signed:  ...........

16     ROSE HELEN CLAIRE KAY

17     Dated:    Tuesday, June 24, 2008

18

19

20

21

22

23

24

25