1  KEKER & VAN NEST, LLP
   DARALYN J. DURIE - #169825
2  CHRISTA M. ANDERSON - #184325
   DAN JACKSON - #216091
3  ROSE DARLING - #243893
   REBEKAH PUNAK - #248588
4  710 Sansome Street
   San Francisco, CA  94111-1704
5  Telephone:  (415) 391-5400
   Facsimile:  (415) 397-7188
6
   Attorneys for Defendants
7  THE GAP, INC., a/k/a, GAP, INC., GAP INTERNATIONAL
   SALES, INC., BANANA REPUBLIC, LLC, AND OLD NAVY,
8  LLC

9                    UNITED STATES DISTRICT COURT

10                  NORTHERN DISTRICT OF CALIFORNIA

11                     SAN FRANCISCO DIVISION

12

13  ROOTS READY MADE GARMENTS CO.        Case No. C 07-03363 CRB
    W.L.L.,
14                                        **[CORRECTED] DEFENDANTS' NOTICE
                          Plaintiff,      OF MOTION AND MOTION FOR
15                                        SUMMARY JUDGMENT, OR, IN THE
          v.                              ALTERNATIVE, SUMMARY
16                                        ADJUDICATION; MEMORANDUM OF
    THE GAP, INC., a/k/a, GAP, INC., GAP  POINTS AND AUTHORITIES IN
17  INTERNATIONAL SALES, INC., BANANA     SUPPORT THEREOF**
    REPUBLIC, LLC, AND OLD NAVY, LLC
18                                        Date:      August 29, 2008
                          Defendants.     Time:      10:00 a.m.
19                                        Dept:      8
                                          Judge:     Honorable Charles R. Breyer
20
                                          **Trial Date: October 6, 2008**
21

22

23

24                        **PUBLIC REDACTED**

25

26

27

28

422007.01

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... iv

NOTICE OF MOTION AND STATEMENT OF RELIEF SOUGHT ........................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................ 1

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

II.     FACTUAL BACKGROUND ......................................................................................... 3

    A.    Roots begins to distribute Gap merchandise through an unauthorized
        distribution agreement with Gabana. ...................................................................... 3

    B.    Gap, Gabana and Roots discuss possible contracts relating to the sale
        of excess inventory and a grant of ISP distribution rights—all three
        companies understand that Gap and Gabana will negotiate written
        agreements covering these transactions. ................................................................... 3

    C.    Roots authorizes Francois Larsen of Gabana to represent Roots'
        interests in the negotiation of two written agreements with Gap ............................ 5

    D.    ████████████████████████████████████████████████████
        ████████████████████████████████████████████████
        █████████. .............................................................................................. 6

    E.    Gap enters into two written and fully integrated agreements with
        Gabana for the sale of the excess inventory and ISP distribution rights. ............... 6

    F.    Roots performs in a manner consistent with the fact that any rights it
        had with respect to ISP merchandise were derivative of the rights Gap
        granted to Gabana. ................................................................................................... 7

    G.    Gap informs Roots that the approval of any new locations requires the
        approval of senior Gap personnel and discusses the future of the
        business in general terms. ........................................................................................ 8

    H.    Gap exercises its contractual right to terminate the ISP Agreement
        with Gabana, thereby automatically terminating Roots' rights as an
        authorized retailer. .................................................................................................. 9

III.    ARGUMENT ................................................................................................................. 9

    A.    The Court should dismiss Roots' May 2003 oral contract claim (Count
        1) because it is barred by the parol evidence rule, barred by the statute
        of frauds, and lacks evidentiary support. ................................................................ 9

        1.    Roots is bound by the terms of the written contracts. ................................. 9

               a.    As Gabana's immediate licensee, Roots' rights to sell
                  Gap merchandise depended on the rights Gap granted to
                  Gabana in their written agreements. ............................................... 10

i

[CORRECTED] DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR,
IN THE ALTERNATIVE, SUMMARY ADJUDICATION; MPAS IN SUPPORT THEREOF
Case No. C 07-03363 CRB

422007.01

b.    Even if there had been an independent oral agreement between Roots and Gap (there was not), Roots authorized Larsen to modify the terms of that agreement by negotiating and executing the written Excess Inventory and ISP Agreements. ..........................10

2.    Evidence relating to the alleged May 2003 oral agreement is inadmissible under the parol evidence rule.................................12

3.    Even if parol evidence were admissible (it is not), the undisputed evidence establishes that no oral contract was ever formed between Roots and Gap...........................................................13

a.    Neither Roots nor Gap viewed the conversations prior to the May 2003 written Gap-Gabana agreements as constituting a binding contract........................................13

b.    The alleged May 2003 oral agreement lacks key material terms and is fatally uncertain. ..........................15

4.    The statute of frauds bars Roots' oral contract claims..............................16

B.    The alleged June 2003 oral contract (Count 2) fails because it is barred by the parol evidence rule, barred by the statute of frauds, and lacks evidentiary support..............................................................................17

1.    Like the alleged May 2003 agreement, the alleged June 2003 agreement is barred by the statute of frauds, barred by the parol evidence rule, and fatally vague.................................................17

2.    The alleged June 2003 agreement also fails because Roots concedes that it did not enter into *any* oral contract with Gap after May 2003, and because the alleged agreement lacks consideration. ..................................................................18

C.    Because there was no contract between Roots and Gap, Roots' claim for the breach of the implied covenant of good faith and fair dealing (Count 3) must be dismissed................................................................19

D.    Roots' fraud claim (Count 6) lacks evidentiary support and any reliance on the alleged misrepresentations was unreasonable as a matter of law. ..........................................................................19

E.    Roots cannot prove any facts to establish a violation of California's Unfair Competition Law (Counts 4-5)................................................22

F.    Roots' quasi-contractual claims (Counts 7-9) fail as a matter of law ...................23

1.    There is no evidence that Gap made any "clear and ambiguous" promise upon which Roots could reasonable rely. ....................23

2.    All three claims are time barred........................................23

3.    All three claims are precluded by the existence of written agreements covering the same subject matter..........................25

[CORRECTED] DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION; MPAS IN SUPPORT THEREOF
Case No. C 07-03363 CRB

IV.    CONCLUSION...................................................................................................25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

[CORRECTED] DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR,
IN THE ALTERNATIVE, SUMMARY ADJUDICATION; MPAS IN SUPPORT THEREOF
Case No. C 07-03363 CRB

422007.01

# TABLE OF AUTHORITIES

## FEDERAL CASES

Page(s)

*4 Hour Wireless v. Smith*,
  No. 01 Civ 9133 (RO), 2002 U.S. Dist. LEXIS 22680,
  (S.D.N.Y. 2002)............................................................................................................25

*Aguilar v. Int'l Longshoremen's Union Local # 10*,
  966 F.2d 443 (9th Cir. 1992) ......................................................................................23

*Artman v. Int'l Harvester Co.*,
  355 F.Supp. 482 (W.D. Pa. 1973)................................................................................16

*B & O Mfg., Inc. v. Home Depo U.S.A., Inc.*,
  No. C 07-02864-JSW, 2007 U.S.Dist. LEXIS 83998
  (N.D. Cal. Nov. 1, 2007)..............................................................................................23

*Babst v. FMC Corp.*,
  661 F.Supp. 82 (S.D. Miss. 1986) ..........................................................................16, 17

*C.A.R. Transport Brokerage Co. v. Darden Rests., Inc.*,
  213 F.3d 474 (9th Cir. 2000) ..................................................................................11, 12

*Chang v. McKesson HBOC, Inc.*,
  C07-03981 MJJ, 2007 U.S.Dist. LEXIS 95088
  (N.D. Cal. Dec. 17, 2007)............................................................................................24

*City of Oakland v. Comcast Corp.*,
  No. C 06-5380 CW, 2007 U.S.Dist. LEXIS 14512
  (N.D. Cal. Feb. 14, 2007) ............................................................................................25

*Clay v. Koch*,
  No. C 95-1289-FMS, 1996 U.S.Dist. LEXIS 10677
  (N.D. Cal. July 22, 1996)..............................................................................................21

*Cray Commc'ns v. Novatel Computer Sys.*,
  33 F.3d 390 (4th Cir. 1994) .........................................................................................20

*Daly v. Viacom, Inc.*,
  238 F. Supp. 2d 1118 (N.D. Cal. 2002).....................................................................22, 23

iv

[CORRECTED] DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION; MPAS IN SUPPORT THEREOF
Case No. C 07-03363 CRB

422007.01

*Gen. Am. Life Ins. Co. v. Castonguay,*
   984 F.2d 1518 (9th Cir. 1993) ....................................................................20

*Glen Holly Entm't, Inc. v. Tektronix Inc.,*
   352 F.3d 367 (9th Cir. 2003) .....................................................................22

*GoEngineer, Inc. v. Autodesk, Inc.,*
   No. C 00-4595-SI, 2002 U.S.Dist. LEXIS 2540
   (N.D. Cal. Feb. 14, 2002) ..........................................................................21

*Guerrero v. Gates,*
   442 F.3d 697 (9th Cir. 2006) .....................................................................24

*Joaquin v. Geico Gen. Ins. Co.,* No. C 07-3259 JSW, 2008 WL 53150
   (N.D. Cal. Jan. 2, 2008) .............................................................................19

*Northwest Acceptance Corp. v. Lynnwood Equip., Inc.,*
   841 F.2d 918 (9th Cir. 1988) .....................................................................11

*Scott v. Harris,*
   127 S.Ct. 1769 (2007) ..................................................................................9

*Weisberg v. U.S. Dep't of Justice,*
   745 F.2d 1476 (D.C. Cir. 1984) .................................................................15

**STATE CASES**

*Avalon Products, Inc. v. Lentini,*
   98 Cal. App. 2d 177 (1950) ........................................................................15

*Beck v. Amer. Health Group In'l, Inc.,*
   211 Cal. App. 3d 1555 (1989) ....................................................................14

*Behniwal v. Mix,*
   133 Cal. App. 4th 1027 (2005) ...................................................................11

*Borders Online v. State Bd. of Equalization,*
   29 Cal. App. 4th 1179 (2005) .....................................................................11

*Bustamante v. Intui, Inc,*
   141 Cal. App. 4th 199 (2006) .........................................................14, 15, 17

v

*Cal. Medical Ass'n, Inc. v. Aetna U.S. Healthcare of Cal.,*
    94 Cal. App. 4th 151 (2001) ..................................................................................................25

*Casa Herrera, Inc. v. Beydoun,*
    32 Cal.4th 336 (Cal. 2004)................................................................................12, 16, 20

*Edwards v. Fresno Cmty. Hosp.,*
    38 Cal. App. 3d 702 (1974) ................................................................................................23

*Feduniak v. Cal. Coastal Comm'n,*
    148 Cal. App. 4th 1346 (2007) ..........................................................................................24

*Fladeboe v. America Isuzu Motors Inc.,*
    150 Cal. App. 4th 42 (2007) ..............................................................................................22

*Gulf Ins. Co. v. TIG Ins. Co.,*
    86 Cal. App. 4th 422 (2001) ..............................................................................................19

*Guz v. Bechtel Nat'l, Inc.,*
    24 Cal. 4th 317 (2000) ........................................................................................................19

*Kelley v. R. F. Jones Co.,*
    272 Cal. App. 2d 113 (2969) ....................................................................................11, 18

*Kern County Water Agency v. Belridge Water Storage District,*
    18 Cal. App. 4th 77 (1993) ................................................................................................13

*Lantzy v. Centex Homes,*
    31 Cal. 4th 363 (2003) ........................................................................................................24

*Lobrovich v. Georgison,*
    144 Cal. App. 2d 567 (Cal. App. 1st Dist. 1956)............................................................24

*Munoz v. Kaiser Steel Corp.,*
    156 Cal. App. 3d 965 (1984) ..............................................................................................16

*Pac. Sw. Dev. Corp. v. W. Pac. R.R. Co.,*
    47 Cal. 2d 62 (1956) ..................................................................................................16, 17

*Pacesetter Homes, Inc. v. Brodkin,*
    5 Cal. App. 3d 206 (1970) ..................................................................................................21

vi

422007.01

*Passante v. McWilliam,*
    53 Cal. App. 4th 1240 (1997) .................................................................................19

*Ripani v. Liberty Loan Corp. of San Jose,*
    95 Cal. App. 3d 603 (1979) ...................................................................................11

*Seaman's Direct Buying Serv. v. Std. Oil Co. of Cal.,*
    36 Cal. 3d 752 (1984) .....................................................................................16, 17

*Skyways Aircraft Ferrying Service, Inc. v. Stanton,*
    242 Cal. App. 2d 272 (1966) .................................................................................11

*Steiner v. Thexton,*
    163 Cal. App. 4th 359 (2008) ...............................................................................19

*Weddington Prods. v. Flick,*
    60 Cal.App. 4th 793 (1998) ..................................................................................15

*Wilson v. Houston Funeral Home,*
    42 Cal. App. 4th 1124 (1996) ...............................................................................20

## FEDERAL STATUTES

Fed. R. Civ. P. 56 .................................................................................................1, 9

## STATE STATUTES

Cal. Bus. & Prof. Code § 17200 .................................................................................2

Cal. Civ. Code § 1550 .........................................................................................14, 19

Cal. Civ. Code § 1565 ...............................................................................................14

Cal. Civ. Code § 1710 ...............................................................................................20

Cal. Civ. Code § 2234 ...............................................................................................11

Cal. Civ. Code § 2295 ...............................................................................................11

[CORRECTED] DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION; MPAS IN SUPPORT THEREOF
Case No. C 07-03363 CRB

422007.01

Cal. Civ. Code § 2310 ............................................................................................11

Cal. Civ. Code § 2315 ............................................................................................11

Cal. Code Civ. Proc. § 339 .....................................................................................23

Cal. Code Civ. Proc. § 1856 ...................................................................................12

Cal. U.C.C. § 2201 ............................................................................................16, 17

## OTHER AUTHORITIES

1 Arthur Linton Corbin, Corbin on Contracts § 2.9
    (Joseph M. Perillo ed., rev. ed. 1993) ................................................................14

2 Witkin, Cal. Evid. (4th ed. 2000) ........................................................................13

Witkin, Cal. Procedure Actions, § 508 (4th ed. 1996); ...........................................23

[CORRECTED] DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION; MPAS IN SUPPORT THEREOF
Case No. C 07-03363 CRB

422007.01

## NOTICE OF MOTION AND STATEMENT OF RELIEF SOUGHT

**PLEASE TAKE NOTICE**, that on August 29, 2008, at 10:00 a.m., before the Honorable Charles R. Breyer, United States District Court, 450 Golden Gate Ave, Courtroom 8, San Francisco, California, defendants THE GAP, INC., a/k/a, GAP, INC., GAP INTERNATIONAL SALES, INC., BANANA REPUBLIC, LLC, and OLD NAVY, LLC (collectively "Gap") will, and hereby do, move the Court pursuant to Fed. R. Civ. Proc. 56 for entry of an order granting summary judgment for Gap and against plaintiff Roots Ready Made Garments Co. W.L.L. ("Roots"), or, alternatively, for summary adjudication against Roots on its individual claims. This motion is based on this Notice of Motion, the Memorandum of Points and Authorities below, the Declaration of Rebekah Punak in Support of Motion for Summary Judgment, and such other and further papers, evidence and argument as may be submitted to the Court at or before the hearing on this motion.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION AND SUMMARY OF ARGUMENT

In the spring of 2003, Gap and Gabana discussed a potential business deal. The stakes were substantial—Gap proposed to sell hundreds of thousands of units of excess inventory for millions of dollars, and proposed to grant distribution rights for first-quality Gap merchandise in multiple countries through its International Sales Program ("ISP"). Roots, one of Gabana's retail partners, participated in some of the discussions. Based on its conversations with Gap and Gabana, Roots understood that Gap wanted to negotiate two written agreements covering the transactions and that it would negotiate and execute those agreements with Gabana. Roots also understood that it would enter into separate written agreements with Gabana to repurchase the excess inventory and obtain access to the ISP merchandise.

And that is what happened. Gap negotiated and entered into two written and fully integrated contracts with Gabana for the sale of the excess inventory and for ISP distribution rights. Roots and Gabana signed a "Letter of Understanding" in which Roots agreed to purchase the excess inventory from Gabana, and Gabana—contrary to its agreement with Gap—agreed to make Roots its "exclusive distributor" for the ISP merchandise. From 2003 through the present,

1

1    Roots repeatedly represented to others, including to this Court, that its rights to distribute Gap

2    merchandise stemmed from the rights Gabana had received from Gap. And, in June 2007, Roots

3    sued to enforce the written agreements between Gap and Gabana as an alleged third-party

4    beneficiary.

5         Having tried and failed to assert rights directly under the Gap-Gabana contracts—and

6    having waived its right to assert damages under its own agreement with Gabana—Roots now

7    alleges that the real contract for the sale of the excess inventory and ISP distribution rights had

8    nothing to do with the written agreements. Instead, it claims that Gap orally agreed to sell the

9    excess inventory directly to Roots and to grant Roots ISP distribution rights on terms

10   inconsistent with the parties' contemporaneous written agreements. Roots asserts claims against

11   Gap for breach of contract, breach of the covenant of good faith and fair dealing, fraud,

12   promissory estoppel, quantum meruit, quasi-contract, and for recovery under California's Unfair

13   Competition Law, § 17200 ("UCL").

14        Each of these claims lacks legal and factual foundation. Roots' contract claims are

15   barred by the parol evidence rule and the statute of frauds, and contradicted by the sworn

16   testimony of Roots' own 30(b)(6) witness. Because Roots did not have a contractual relationship

17   with Gap, its breach of the covenant claim also cannot stand. The fraud and promissory estoppel

18   claims fail because there is no evidence that Gap intentionally misled Roots, the alleged

19   promises amount—at most—to mere puffery, and any reliance on the alleged promises was

20   unreasonable as a matter of law because they conflicted with the known terms of the written

21   agreements. Roots' claims under the UCL are premised entirely on its fraud and breach of

22   contract claims. They fail because Roots cannot establish that it had a contract with Gap, much

23   less that Gap breached the contract, and cannot prove fraud. Finally, as this Court has already

24   found, Roots' quasi-contractual claims are time-barred and contradict the express terms of

25   written agreements covering the same subject matter. In sum, all of Roots' claims fail and Gap's

26   motion for summary judgment should be granted.

27

28

## II.     FACTUAL BACKGROUND

**A.    Roots begins to distribute Gap merchandise through an unauthorized distribution agreement with Gabana.**

Roots began distributing Gap merchandise months before it allegedly entered into any agreement with Gap. ████████████ Exh. 4, 53:10-21.[1] ████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████. Roots concedes that its only agreement with respect to Gap merchandise during this period was with Gabana, not with Gap. Exh. 4, 53:10-21.  Gabana, however, did not possess the rights it claimed to bestow upon Roots.  Rather, under a contract with another Gap distributor, Solka, Gabana had received a *non-exclusive, non-transferable* right to sell Gap excess inventory to approved *retailers*.  Exhs. 5, 6; Exh. 7, 141:2-142:11.

**B.    Gap, Gabana and Roots discuss possible contracts relating to the sale of excess inventory and a grant of ISP distribution rights—all three companies understand that Gap and Gabana will negotiate written agreements covering these transactions.**

Unaware that Gabana was breaching its distribution agreement, Gap discussed the possibility of entering into two new contracts with Gabana in early 2003.  Exh. 7, 215:18-216:24; Exh. 33.  Gap was interested in selling 1.7 million units of excess inventory (surplus Gap inventory, typically not from the current season), and was willing to consider granting ISP distribution rights.  *Id.*  Two Roots executives, Ashraf Abu Issa and Sheik Faisal Al-Thani, participated in some of the discussions.  Exh. 4, 42:6-15; Exh. 2, 130:1-13; ████████████

During the first conversation among Bell, Larsen, Abu Issa, and Al-Thani, Bell described

---

[1] All Exhibits cited herein are exhibits to the accompanying Declaration of Rebekah Punak unless otherwise stated.

[CORRECTED] DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR,
IN THE ALTERNATIVE, SUMMARY ADJUDICATION; MPAS IN SUPPORT THEREOF
Case No. C 07-03363 CRB

422007.01

1  a proposal for the sale of the excess inventory and for ISP distribution rights. Exh. 4, 42:6-15;

2  Exh. 2, 130:21-131:12.  Key terms of the proposal were either not discussed or not resolved

3  during that discussion, including the price of the excess inventory, the territories where the

4  merchandise could be sold, the duration of the ISP distribution rights, the terms of payment,

5  whether Gap would have the right to approve proposed retailers, whether there would be any

6  advertising restrictions imposed, whether there would be any restrictions on the use of Gap's

7  trademarks, and whether there would be any minimum quantity of sales for the ISP merchandise.

8  Exh. 4, 46:16-49:3; Exh. 2, 142:18-144:21.  At the end of this conversation, Roots did not

9  believe that it had an enforceable contract with Gap.  Exh. 4, 48:19-49:3.

10  Abu Issa, Roots' 30(b)(6) witness on the alleged oral agreements, testified that he then

11  had between three and five subsequent conversations with Bell before the execution of the

12  written agreements.  *Id.*, 49:4-13.  While Abu Issa was unable to separate out the content of any

13  one of these conversations in his mind, he generally recalled that over the course of these

14  conversations he and Bell discussed the price that would be paid for the excess inventory,

15  whether a deposit would be provided, the terms of a letter of credit, the "general" but not

16  "specific" conditions for the sale of the ISP merchandise, and the possibility of "getting another

17  big area" for the excess inventory, "maybe Turkey or Switzerland or somewhere like that." *Id.*,

18  49:9-50:14.  At the end of these conversations, Abu Issa still believed that Roots *had not*

19  committed to purchasing the excess inventory.  *Id.*, 141:9-15.

20  Rather, Abu Issa testified that, based on his conversations with Gap, he understood that

21  written contracts would need to be executed for the sale of the excess inventory and for the ISP

22  distribution rights.  *Id.*, 52:4-18, 127:3-13; *see also* Exh. 2, 91:18-92:7.  He understood that these

23  written contracts would be between Gap and Gabana on the one hand and Gabana and Roots on

24  the other.  Exh. 4, 33:25-34:21.  And, when asked whether "[t]he written contract that Gap

25  entered into with Gabana was in furtherance of the understanding that Roots had based on its

26  discussions directly with Gap," he answered "yes." *Id.*, 34:16-21.

27

28

---

4

422007.01

1  **C.    Roots authorizes Francois Larsen of Gabana to represent Roots' interests in the negotiation of two written agreements with Gap.**



Exh. 4, 37:4-17.[2]

Because Roots understood that it would not be a party to the written agreements between Gap and Gabana, it authorized Francois Larsen—Gabana's CEO—to represent its interests in the negotiation of those agreements.  Exh. 4, 35:22-36:11, 37:4-17, 52:4-18, 171:12-18.  Abu Issa testified that he participated in the negotiations by conveying requests to Larsen for Larsen to convey in turn to Gap.  *Id.*; Roots' First Am. Compl. ("FAC") (Doc. 22), ¶¶ 29, 45.

*see also*, Roots' Compl. (Doc. 1), ¶ 24; Exh. 2, 96:17-97:3.

Roots understood that the agreement Larsen negotiated with Gap would have a substantive impact on the rights of Gabana, and on any rights Roots obtained as a result.  For example, Abu Issa testified that he knew, prior to May 12th, 2003, that Gap and Gabana "should be negotiating a contract, a written contract.  So that will protect us [Roots] as the main beneficiary of that transaction."  Exh. 4, 53:22-54:4.

2

Exh. 11; Exh. 10.

5

422007.01



**E.    Gap enters into two written and fully integrated agreements with Gabana for the sale of the excess inventory and ISP distribution rights.**

The next day, May 13, 2003, Gap and Gabana entered into two written and fully integrated agreements for the sale of the excess inventory and for ISP distribution rights (collectively the "Gap-Gabana agreements").  One agreement, the Excess Inventory Agreement, provided that Gabana (not Roots) would purchase 1.7 million units of excess inventory from Gap for $6 million.  Exh. 14, ¶ 1(a).  The other agreement, the ISP Agreement, provided that Gabana (again, not Roots) would have the non-transferable right to distribute ISP merchandise to retailers (not distributors) in approved territories, and that Gap could approve, disapprove, or cancel those retailers at any time in its sole discretion.  Exh. 15, ¶¶ 1(a)-(f), 11(g)-(h).  On

6

[CORRECTED] DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION; MPAS IN SUPPORT THEREOF
Case No. C 07-03363 CRB

422007.01

1    September 1, 2004, Gap and Gabana entered into a second ISP Agreement with essentially

2    identical terms.  Exh. 16.

3         All of the agreements were terminable without cause.  Exh. 14, ¶ 9(c); Exh. 15, ¶ 9(d);

4    Exh. 16, ¶ 9(d).  All of the agreements provided that they may be "amended or supplemented

5    only by a writing that is signed by duly authorized representatives" of Gap and Gabana.  Exhs.

6    14-16, ¶ 11(b).  And all of the agreements provide that they "are the only agreements between

7    the parties hereto and their affiliated companies with respect to the subject matter hereof."  *Id.*

8         Roots admits that it received a copy of the May 13, 2003 Gap-Gabana agreements from

9    Larsen no more than a week after they were signed.  Exh. 4, 67:24-68:16; Exhs. 31-32.  Even

10   before Abu Issa received a copy, Larsen informed him of the terms of the written agreements.

11   Exh. 4, 68:21-69:5. ████████████████████████████████████

12   ████████████████████████████████████████████████

13   ████████████████████████████████████████████████

14   ████████████████████████████████████████████████

15   ████████████████████████████████████

16   **F.    Roots performs in a manner consistent with the fact that any rights it had with
        respect to ISP merchandise were derivative of the rights Gap granted to Gabana.**

17   ████████████████████████████████████████████████

18   ████████████████████████████████████████████████

19   ████████████████████████████████████████████████

20   ████████████████████████████████ Exh. 18, 104:22-105:15. ██████████

21   ████████████████████████████████████████████████

22   ████████████████████████████████████████████

23   ████████████████████████████████████████████████

24   ██████████ Exh. 18, 38:5-22; Exh. 34.  For example, any complaints Roots had with respect to

     the excess or ISP merchandise were made by Roots through Gabana.  Exh. 4, 39:24-40:15.

25   ████████████████████████████████████████████████ Exh.

26   35.  When Roots wanted to propose a new business plan or open a new store, it sent the proposal

27   to Gabana.  Exh. 4, 108:11-25; Exh. 18, 51:13-52:5.

28

                                                7

422007.01

1    Indeed, prior to filing this lawsuit, neither Roots nor Gap gave any indication that they

2    viewed Roots' rights to distribute ISP merchandise as deriving from an independent contract

3    between Roots and Gap.  Rather, Roots repeatedly represented to third parties—as well as to this

4    Court—that its rights to sell and distribute ISP merchandise were derivative of Gabana's rights

5    under the Gap-Gabana agreements.  *See*, *e.g.*, FAC, ¶ 6; Roots' Second Am. Compl. ("SAC")

6    (Doc. 82), ¶ 38; Exh. 4, 171:5-7; Exh. 18, 89:1-12; ████████████████ Exh. 20, at RTS

7    11905.  In its agreements with purported subdistributors, Roots represented that it "manage[d]

8    **rights granted to Gabana Gulf Distribution Ltd. . . .** by GAP, Inc." to sell and/or distribute ISP

9    merchandise.  Exh. 4, 155:7-17; Exh. 20, at RTS 11905.

10   **G.    Gap informs Roots that the approval of any new locations requires the approval of**
**senior Gap personnel and discusses the future of the business in general terms.**

11

12   Gap's performance under the Gap-Gabana agreements was also consistent with the fact

13   that its contractual relationship was with Gabana, not Roots.  Following the execution of the

Excess Inventory and ISP Agreements, Gabana submitted, and Gap approved, several retail

14   locations for the sale of ISP merchandise.  Exh. 21; Exh. 9, 54:23-55:21.  Other locations that

15   were proposed by Gabana were not ultimately approved.  *Id.*, 58:11-16.  ███████████████

16   ████████████████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████████████

19   ███████ Exh. 4, 100:24-101:16.  ████████████████████████████████████████

20   ███████████████████████████████████████████████████████████████

21   In or around 2005, Gap decided that it would move to a franchise model in some foreign

territories.  Roots alleges that Gap representative Ron Young discussed the possibility of Roots

22   obtaining franchise rights.  Roots' Third Am. Compl. ("TAC") (Doc. 131), ¶ 100.  Specifically,

23   Al-Thani testified that in late 2004 or early 2005, Gap representative Ron Young "talked about

24   the idea of establishing franchise" and said he would "start the procedures" so that Roots could

25   obtain franchise rights.  Exh. 2, 44:8-10, 47:10-17.  █████████████████████████████

26   ████████████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████

28

8

422007.01

1    ██████████████████████████████████████████████████████████████

2    ███████████████████████████ Exh. 2, 57:15-60:3; ██████████████████

3    **H.    Gap exercises its contractual right to terminate the ISP Agreement with Gabana, thereby automatically terminating Roots' rights as an authorized retailer.**

4    ████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████

6    ███████████████████████████    This unauthorized sub-distributor arrangement—which turned out to

7    be just one of many—resulted in inflated margins such that approved Gap retailers could not

8    achieve reasonable profits on their sales of Gap merchandise to the public.  Accordingly, on May

9    12, 2005, Gap sent Gabana notice of termination of the ISP Agreement.  Exh. 24.  ███████████

10   ██████████████████████████████████████████████████████████

11   ██████████████████████████████████

12

13                                    **III.    ARGUMENT**

14          Summary judgment is appropriate where "there is no genuine issue as to any material fact

15   and . . . the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

16   "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more

17   than simply show that there is some metaphysical doubt as to the materials facts.  Where the

18   record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,

19   there is no 'genuine issue of fact for trial.'"  *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007)

20   (internal quotations and ellipses omitted).  Because of the lack of any genuine, triable issue of

21   fact here, Gap's motion for summary judgment should be granted.

22   **A.    The Court should dismiss Roots' May 2003 oral contract claim (Count 1) because it is barred by the parol evidence rule, barred by the statute of frauds, and lacks evidentiary support.**

23          **1.    Roots is bound by the terms of the written contracts.**

24          Three written agreements were executed in May 2003 relating to the sale of the excess

25   inventory and ISP distribution rights:  ███████████████████████ and the two Gap-

26   Gabana agreements.  Roots negotiated and signed one of the agreements; it authorized Larsen to

27   represent its interests in the negotiation of the other two.  The undisputed evidence shows that

28

                                              9

1   these agreements control any rights Roots had with respect to Gap merchandise.

2       **a.      As Gabana's immediate licensee, Roots' rights to sell Gap
             merchandise depended on the rights Gap granted to Gabana in their
3            written agreements.**

4           The central theory of the TAC is that Roots' alleged rights to distribute Gap merchandise

5   are independent, rather than derivative, of Gap's written contracts with Gabana.  TAC, ¶ 52.  But

6   the testimony of Roots' own executives and the documentary evidence conclusively contradicts

7   that theory.  Rather, it is clear that Roots understood and agreed that any rights it had with

8   respect to Gap merchandise were entirely derivative of the written agreements between Gap and

9   Gabana.

10          From its discussions with Gap prior to the purchase of the excess inventory, Roots

11  understood that the agreements would run between Gap and Gabana on the one hand and

12  between Gabana and Roots on the other.  Exh. 4, 33:25-34:21; Exh. 2, 91:18-92:7.  ███████

13  ██████████████████████████████████████████████████████████████

14  ████████████████████████████████  Exh. 4, 37:4-17.  Roots' conduct

15  was consistent with this arrangement.  ████████████████████████

16  ████████████████████████████████████████████████

17  ██████████████████████████████████████████████████████████

18  ██████████████████████████████████████████████████████████

19  ██████████████████████████████████████████████████████████

20  ████████████████████  Exh. 20, at GAB_01184 (emphasis added); ████████████

21  ████  And, in its pleadings before this Court, Roots has admitted that Gabana was its

22  "immediate licensor."  Compl. (Doc. 1), ¶ 6; Exh. 4, 171:5-7.  Roots still stands by these

23  statements as true.  Exh. 4, 154:22-155:17; Exh. 2, 78:12-20, 96:8-15; Exh. 18, 89:1-89:12.

24      **b.      Even if there had been an independent oral agreement between Roots
             and Gap (there was not), Roots authorized Larsen to modify the terms
25           of that agreement by negotiating and executing the written Excess
             Inventory and ISP Agreements.**
26
27          Roots is also estopped from attempting to vary the terms of the Gap-Gabana agreements

28  because the undisputed evidence establishes that Roots bestowed Larsen with actual and

---

10

1  apparent authority to negotiate the written contracts with Gap. *See* Cal. Civ. Code § 2234;

2  *Skyways Aircraft Ferrying Service, Inc. v. Stanton*, 242 Cal. App. 2d 272, 281 (1966).[3]  An

3  agency exists when a principal confers actual or ostensible authority on another to represent it in

4  dealings with third parties, or when it accepts the benefits of otherwise unauthorized actions

5  taken on its behalf. Cal. Civ. Code §§ 2295, 2310, 2315; *Behniwal v. Mix*, 133 Cal. App. 4th

6  1027, 1039 (2005). The principal's consent need not be express, but can be implied. *See*

7  *Borders Online v. State Bd. of Equalization*, 129 Cal. App. 4th 1179, 1189-1191 (2005); *see also*

8  *Ripani v. Liberty Loan Corp. of San Jose*, 95 Cal. App. 3d 603 (1979) (finding manager had

9  actual and ostensible authority to bind loan company because, *inter alia*, company had

10  historically communicated through manager and paid rent with a check signed by the manager);

11  *Kelley v. R. F. Jones Co.*, 272 Cal. App. 2d 113, 120 (1969). Where the essential facts are

12  undisputed, the existence of an agency relationship is a question of law. *See, e.g., C.A.R. Transp.*

13  *Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000); *Borders*, 129 Cal. App.

14  4th 1179, 1189-1191.

15        By its own admission, Roots gave Larsen actual authority to negotiate and execute

16  written agreements with Gap that would delineate the terms of the sale of the excess inventory

17  and the grant of ISP distribution rights. Abu Issa—Roots' 30(b)(6) representative on the alleged

18  oral agreements—testified that:

19        •    Roots authorized Larsen to communicate to Gap its offer to purchase the excess
             inventory (Exh. 4, 59:23-60:4);
20

21        •    Roots authorized Larsen to serve as its intermediary in the subsequent
             negotiations with Gap and relied on him to negotiate the written agreements in
             accordance with its wishes (*id.*, 35:11-37:17, 59:23-60:10);
22

23        •    Larsen did, in fact, negotiate the Gap-Gabana agreements on behalf of both
             Gabana and Roots (*id.*, 171:8-18; Compl. (Doc. 1), ¶ 24);

24        •    Roots understood that the written agreements between Gap and Gabana would
             substantively affect its rights with respect to the excess and ISP merchandise
25           (Exh. 4, 53:22-54:4).

26  When asked whether Larsen was "authorized to serve as the intermediary between Roots and

27  _____

28  [3] Under diversity jurisdiction, California law governs Roots contract claims. *See Northwest Acceptance Corp. v. Lynnwood Equip., Inc.* 841 F.2d 918, 920 (9th Cir. 1988).

11

422007.01

1    Gap" in the negotiation of the written agreements, Abu Issa answered "exactly." *Id.*, 59:23-

2    60:10. █████████████████████████████████████████████████████

3    ██████████████████████████████████████████████████

4         Larsen was also imbued with ostensible authority to negotiate on Roots' behalf.

5    Ostensible authority can be established by, among other things, evidence of the principal

6    transacting business through the agent, the principal "knowing that the agent holds himself out as

7    clothed with certain authority but remaining silent," and the principal's representations to third

8    parties. *C.A.R. Transp. Brokerage Co.*, 213 F.3d at 480 (affirming district court's determination

9    on summary judgment that drivers had ostensible authority to bind carrier in waiver agreements).

10   ████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████

12   █████████████████████████████████████████████████████████

13   ██████████████████████████████████████████ Exh. 4, 37:4-10;

14   ████████████████████████████████████████████████████

15   ████████████████████████████████████████████████████

16   ████ Exh. 10; *see also*, Exh. 11.  Gap thus had no reason to believe that Larsen lacked

17   authority to enter into written agreements that would affect Roots' alleged rights.

18        **2.    Evidence relating to the alleged May 2003 oral agreement is inadmissible
             under the parol evidence rule.**

19

20        Because the agreements between Gap and Gabana are written and fully integrated, the

21   parol evidence rule bars Roots from introducing any extrinsic evidence, whether oral or written,

22   to vary, alter or add to the terms of those written agreements.  Cal. Code Civ. Proc. § 1856; *Casa*

23   *Herrera, Inc. v. Beydoun*, 32 Cal. 4th 336, 345 (Cal. 2004) (noting that the parol evidence rule

24   "determines the enforceable and incontrovertible terms of an integrated written agreement").

25   The parol evidence rule in California is embodied in section 1856 of the Code of Civil

26   Procedure.  Under that provision, evidence of "any prior or of a contemporaneous oral

27   agreement" cannot be introduced to vary the written terms of an agreement.  Cal. Code of Civ.

28   Proc. § 1856.  The rule applies with equal force regardless of whether the one attempting to

12

[CORRECTED] DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR,
IN THE ALTERNATIVE, SUMMARY ADJUDICATION; MPAS IN SUPPORT THEREOF
Case No. C 07-03363 CRB

1  introduce the extrinsic evidence was a party or "a stranger to the contract." 2 Witkin, Cal. Evid.

2  (4th ed. 2000) Documentary Evidence, § 112, p. 230; *Kern County Water Agency v. Belridge*

3  *Water Storage Dist.*, 18 Cal. App. 4th 77 (1993).

4          The alleged May 2003 oral agreement arose prior to and contradicts the terms of the

5  Excess Inventory and ISP Agreements.  While Roots has variously maintained that its

6  contractual relationship with Gap arose before, simultaneous with, and after the Gap-Gabana

7  agreements, in deposition Roots' executives have consistently testified that the conversations

8  allegedly constituting the May 2003 oral agreement occurred **before** the written agreements were

9  executed.  Al-Thani testified that the only conversation he had with anyone from Gap relating to

10  the alleged oral agreement occurred before May 13, 2003.  Exh. 2., 130:1-130:19, 141:14-24.

11  Abu Issa testified that he believed that the oral agreement with Gap was formed before ▮▮▮▮

12  ▮▮▮▮  Exh. 4, 60:20-61:10; ▮▮▮▮

13          And, as this Court has already found, the terms of the alleged oral agreement contradict

14  the Gap-Gabana agreements.  Oct. 18, 2007 Order (Doc. 80), 2:28-3:3; Jan. 28, 2008 Order

15  (Doc. 125), 6:11-7:10.  The Gap-Gabana agreements provide that Gabana (not Roots), would

16  purchase and sell the excess inventory from Gap; that Gabana (not Roots), would receive ISP

17  distribution rights from Gap; and that Gabana's ISP distribution rights were non-exclusive, non-

18  transferable, and could be cancelled by either party without cause upon 90-days notice.  Exhs.

19  14-16, ¶¶ 1(a), 9, 11(h).  Each of these terms is incompatible with the alleged oral agreement.

20      **3.      Even if parol evidence were admissible (it is not), the undisputed evidence
              establishes that no oral contract was ever formed between Roots and Gap.**

21

22          **a.      Neither Roots nor Gap viewed the conversations prior to the May
                      2003 written Gap-Gabana agreements as constituting a binding
                      contract.**

23

24          Under the parol evidence rule, evidence of Roots' alleged oral agreement with Gap is

25  inadmissible.  But even if such evidence were admissible, there simply isn't evidence of any

26  enforceable oral contract.  Rather, the testimony of Abu Issa—who purportedly negotiated the

27  oral agreement—establishes that neither Roots nor Gap viewed any of the conversations prior to

28  execution of the Gap-Gabana agreements as constituting a binding agreement.

---

13

1    It is a fundamental precept of contract law that no binding agreement can be formed

2    unless the parties manifest consent to be bound. Cal. Civ. Code §§ 1550, 1565. The parties'

3    intentions are determinative of the question of contract formation. *Bustamante v. Intuit, Inc.*, 141

4    Cal. App. 4th 199, 208 (2006). Thus, a "manifestation of willingness to enter into a bargain is

5    not an offer if the person to whom it is addressed knows or has reason to know that the person

6    making it does not intend to conclude a bargain until he has made a further manifestation of

7    assent." *Beck v. Amer. Health Group Int'l, Inc.*, 211 Cal. App. 3d 1555, 1562 (1989).

8    Abu Issa's testimony establishes that Roots did not view its conversations with Gap as

9    constituting a binding agreement. At the end of his first conversation with Gap, Abu Issa admits

10    he did not think that Roots had a legally enforceable contract for the ISP distribution rights. Exh.

11    4, 48:23-49:3. At the conclusion of his conversations with Gap prior to the execution of the

12    written agreements, Abu Issa *still* did not think that Roots had committed to purchasing the

13    excess inventory and believed that a written agreement would be necessary. *Id.*, 52:4-18, 141:9-

14    15. Moreover, he understood from these conversations that Gap would be entering into a

15    contract with Gabana, and that Gabana would enter into a contract with Roots. *Id.*, 33:25-34:21,

16    53:22-54:4.

17    In determining whether parties intended to create an oral contract, courts are mindful of

18    the general rule that "the greater the complexity and importance of the transaction, the more

19    likely it is that the informal communications are intended to be preliminary only." *See* 1 Arthur

20    Linton Corbin, Corbin on Contracts § 2.9 (Joseph M. Perillo ed., rev. ed. 1993*)*. Here, Roots

21    admits that after its discussions with Gap it expected that a written agreement would be executed

22    because that was the "normal practice." Exh. 4, 52:4-18. Indeed, Roots testified that it

23    frequently did not view its own written and signed agreements as constituting binding contracts,

24    even when they included specific provisions like choice of law terms. *See, e.g., id.*, 25:3-20,

25    153:15-155:1. Any argument that Gap and Roots intended to enter into an agreement involving

26    millions of dollars, distribution rights of indefinite duration, and territory spanning multiple

27    hemispheres without any writing at all, is untenable and cannot be supported by the evidence.

28

[CORRECTED] DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR,
IN THE ALTERNATIVE, SUMMARY ADJUDICATION; MPAS IN SUPPORT THEREOF
Case No. C 07-03363 CRB

**b.    The alleged May 2003 oral agreement lacks key material terms and is fatally uncertain.**

Not only did neither Gap nor Roots view the conversations preceding the Gap-Gabana agreements as binding, the alleged oral May 2003 agreement failed to address and/or resolve material terms. The indefiniteness of the agreement is fatal to Roots' contract claim, not only because it strongly indicates that there was no intent to be bound by these conversations, but also because any resulting agreement would be impossible to enforce.

An offer must be sufficiently definite, or must call for such definite terms in the acceptance, that the performance promised is reasonably certain. *Weddington Prods. v. Flick*, 60 Cal. App. 4th 793, 811 (1998). No contract can be formed until agreement is reached on all material terms. *Avalon Products, Inc. v. Lentini*, 98 Cal. App. 2d 177, 179 (1950); *see also*, *Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1493 (D.C. Cir. 1984) (finding that absence of duration term indicated lack of intent to contract and rendered contract fatally uncertain). In *Bustamante*, for example, the California Court of Appeal held that an agreement was fatally uncertain because the parties never agreed on the form and amount of an employee's compensation, the nature of his management role, the amount of the company's royalty, or the equity percentages held by parties and outside investors. *Bustamante*, 141 Cal. App. 4th at 209.

The alleged May 2003 oral agreement between Gap and Roots is far more uncertain that that rejected by the court in *Bustamante*. The only conversation relating to the May 2003 oral agreement that Abu Issa could recall in any detail was the first conversation, joined by Larsen and Al-Thani. Exh. 4, 42:6-44:16, 49:4-50:12. But numerous material terms were either not discussed or not resolved during that conversation, including the price that would be paid for the excess inventory, the term of the ISP distribution rights, or the territories that those rights would apply to. *Id.*, 48:19-22; Exh. 2, 143:10-144:4-18. In subsequent conversations, Abu Issa testified that the conditions for the ISP were discussed "in general, not in specific," and that the possibility of getting another big territory for the excess inventory was "discuss[ed]," including "maybe Turkey or Switzerland or somewhere like that." Exh. 4, 49:16-50:14. Abu Issa's testimony—the sole evidence that any oral contract was formed subsequent to the initial

1  discussion between Gap, Gabana, and Roots—is too indefinite an expression to allow any

2  determination of its terms.

3     **4.    The statute of frauds bars Roots' oral contract claims.**

4        The statute of frauds also bars Roots' oral contract claims.  Any contract for the sale of

5  goods for the price of five hundred dollars or more must be embodied in a writing.  Cal. U.C.C. §

6  2201(1).  The statute of frauds "demands that every material term of an agreement within its

7  provisions be reduced to written form, whether the parties desire to do so or not." *Casa Herrera,*

8  *Inc. v. Beydoun*, 32 Cal. 4th 336, 345 (Cal. 2004).  Courts in California and elsewhere have held

9  that the statute of frauds applies to distribution agreements.  *See Seaman's Direct Buying Serv. v.*

10  *Std. Oil Co. of Cal.*, 36 Cal. 3d 752, 764 (1984) (overruled on other grounds) (statute of frauds

11  applied to dealership agreement); *Babst v. FMC Corp.*, 661 F. Supp. 82, 87 (S.D. Miss. 1986)

12  (finding franchise/distributorship agreement governed by U.C.C. statute of frauds); *Artman v.*

13  *Int'l Harvester Co.*, 355 F. Supp. 482, 486 (W.D. Pa. 1973) (same).  Roots' alleged oral

14  agreement with Gap involves the sale of goods for millions, not hundreds, of dollars and thus

15  comes squarely within the scope of the statute.

16        While Roots has previously argued that Gap is equitably estopped from asserting the

17  statute, it is now clear that there are no facts supporting that assertion.  There can be no estoppel

18  unless either (1) Roots suffered unconscionable injury or (2) Gap would be unjustly enriched if

19  the oral contract is not enforced.  *Munoz v. Kaiser Steel Corp.*, 156 Cal. App. 3d 965, 972

20  (1984); *Pac. Sw. Dev. Corp. v. W. Pac. R.R. Co.*, 47 Cal. 2d 62, 70 (1956).  Roots cannot show

21  that it was unconscionably injured by the alleged oral agreements because Abu Issa testified that

22  virtually *all* of the alleged acts of reliance on Roots' part occurred *after* it had received a copy of

23  the Gap-Gabana agreements and had been informed that the agreement did not include all of the

24  terms it had hoped for. Exh. 4, 67:21-69:5, 94:7-95:2; Exhs. 31-32.  ████████████████

25  ████████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████████

27  ████████ Exh. 4, 131:20-132:25; 67:5-9; ████████ Before Roots paid for the excess inventory

28  and before it expended any resources researching markets or retailers, Roots was aware that Gap

16

1    had not agreed to all of the terms that it had wanted in the Gap-Gabana agreements. It

2    nonetheless chose to proceed with the purchase of the excess inventory from Gabana, and to

3    expend resources relating to the ISP merchandise, in the hope that a better agreement with Gap

4    might be negotiated at some point in the future. Exh. 4, 70:3-71:8. Any injury Roots sustained

5    as a result of that decision is not unconscionable. *See Pac. Sw. Dev. Corp.*, 47 Cal. 2d at 70

6    (finding no estoppel as a matter of law because "plaintiff failed to secure proper written

7    authorization to protect itself in the transaction," and "assumed the risk of relying upon claimed

8    oral promises of defendant . . ."). Roots also cannot show that Gap was unjustly enriched by the

9    acceptance of benefits under the alleged oral agreement. Any benefits Gap received instead ran

10   from the parties' written contractual obligations.

11   **B.      The alleged June 2003 oral contract (Count 2) fails because it is barred by the parol
             evidence rule, barred by the statute of frauds, and lacks evidentiary support.**

12

13   **1.      Like the alleged May 2003 agreement, the alleged June 2003 agreement is
                 barred by the statute of frauds, barred by the parol evidence rule, and fatally
                 vague.**

14

15   In the TAC, Roots alleges that it entered into a second oral agreement with Gap in June

16   2003 in which it agreed to "develop an ISP retail network in the Middle East and North Africa in

17   exchange for Gap's promise to permit Roots to sell ISP merchandise through its own stores in

18   Qatar and through local retailers in other countries in the region." TAC, ¶ 74. But the second

19   alleged oral agreement suffers from all of the same infirmities as the first. It is barred by the

20   statute of frauds because it involves the sale of goods for a price in excess of five hundred

21   dollars. *See supra*, at 16-17; Cal. U.C.C. § 2201(1); *Seaman's Direct Buying Serv.*, 36 Cal. 3d at

22   764; *Babst*, 661 F. Supp. at 87. It is fatally vague because it fails to address key terms, including

23   what the "ISP retail network" would consist of or how long the ISP distribution rights would last.

24   *See supra*, at 15-16; *Bustamante*, 141 Cal. App. 4th at 209. And it is barred by the parol

25   evidence evidence rule because "there is a subsequent contract between Gabana and Gap, signed

26   on September 1, 2004, that contradicts the purported agreement that Roots claims existed

27   between Roots and Gap." *See* Jan. 28, 2008 Order (Doc. 125), 6:16-18; *supra*, at 9-13.

28   Like the initial ISP Agreement, the September 2004 ISP Agreement controlled any rights

[CORRECTED] DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR,
IN THE ALTERNATIVE, SUMMARY ADJUDICATION; MPAS IN SUPPORT THEREOF
Case No. C 07-03363 CRB

1   Roots had with respect to Gap merchandise during the period it was in effect. ████████



10   Roots also continued to imbue Larsen with actual and apparent authority to interact with

11   Gap on its behalf. ████████████████████████████████████████████████

12   ████████████████████████████████████████████████████

13   ████████████████████ Exh. 4, 108:11-25; ███████████ Exh. 18,

14   38:25-39:7, 51:22-52:5. ██████████████████████████████████

15   ████████████████████████████████████████████████████

16   ██████████ And Roots ratified Larsen's agency by continuing to take advantage of the

17   access to the ISP merchandise that it obtained through Gabana's written agreements with Gap.

18   Having allowed Larsen to act as its agent to gain access to the ISP merchandise and having

19   purchased that inventory from Gabana under the Gap-Gabana ISP Agreements, Roots cannot

20   retrospectively repudiate that agency because it has become dissatisfied with the deal he

21   negotiated. "A principle cannot split an agency transaction and accept the benefits thereof

22   without the burdens." *Kelley*, 272 Cal. App. 2d at 121.

23          **2.    The alleged June 2003 agreement also fails because Roots concedes that it did**
              **not enter into *any* oral contract with Gap after May 2003, and because the**
24            **alleged agreement lacks consideration.**

25          The alleged June 2003 agreement fails for two additional reasons. First, the Roots

26   executive who purportedly negotiated the contract testified that it did not happen. When asked

27   whether Roots had any oral contracts with Gap other than the alleged May 2003 agreement to

28   purchase the excess inventory, Abu Issa, Roots' 30(b)(6) representative on the alleged oral

422007.01

1    agreement, answered "no." Exh. 4, 168:24-169:5.

2          Second, there is no evidence that Gap offered Roots any consideration for its alleged

3    promise to "develop an ISP retail network in the Middle East and North Africa." TAC, ¶ 174.

4    Exh. 4, 196:20-197:15. Essential to the formation of a contract is the existence of adequate

5    consideration, for a "promise unsupported by consideration has no binding force." *Steiner v.*

6    *Thexton*, 163 Cal. App. 4th 359, 371-372 (2008); Cal. Civ. Code § 1550. Here, the only

7    consideration Roots even alleges Gap offered was to "permit Roots to sell ISP merchandise

8    through its own stores in Qatar and through local retailers in other countries in the region."

9    TAC, ¶ 74. But these are the same rights Roots claims it obtained a month earlier in exchange

10   for the purchase of the excess inventory. *Id.* ¶ 50. "Past consideration cannot support a

11   contract." *Passante v. McWilliam*, 53 Cal. App. 4th 1240, 1247 (1997). The alleged June 2003

12   oral contract thus also fails for lack of evidentiary support and lack of consideration.

13   **C.    Because there was no contract between Roots and Gap, Roots' claim for the breach
         of the implied covenant of good faith and fair dealing (Count 3) must be dismissed.**
14

15          Roots' claim for breach of the implied covenant of good faith and fair dealing must fail

16   along with its oral contract claims. The implied covenant of good faith "exists merely to prevent

     one contracting party from unfairly frustrating the other party's right to receive the *benefits of the*
17
     *agreement actually made.*" *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 349 (2000) (emphasis in
18
     original). Absent any contractual relationship, there cannot be a breach of the implied covenant.
19
     *See Gulf Ins. Co. v. TIG Ins. Co.*, 86 Cal. App. 4th 422, 430 (2001) ("In the absence of a
20
     contractual relationship, no implied covenant claims may be stated."); *see also Joaquin v. Geico*
21
     *Gen. Ins. Co.*, No. C 07-3259 JSW, 2008 WL 53150, at *3 (N.D. Cal. Jan. 2, 2008) (same).
22

23   **D.    Roots' fraud claim (Count 6) lacks evidentiary support and any reliance on the
         alleged misrepresentations was unreasonable as a matter of law.**

24          Roots cannot avoid application of the parol evidence rule by recasting its allegations as

25   claims of fraud. To prevail on its cause of action for fraud, Roots must show the following

26   elements: (1) a false representation, concealment, or nondisclosure; (2) knowledge of the falsity;

27   (3) intent to induce reliance on the falsity; (4) justifiable reliance; and (5) resulting damage. *See*

28   *Wilson v. Houston Funeral Home*, 42 Cal. App. 4th 1124, 1139 (1996). Because Roots cannot

1    produce evidence for each of these elements, its fraud claim must be dismissed. *See Gen. Am.*

2    *Life Ins. Co. v. Castonguay*, 984 F.2d 1518, 1520-21 (9th Cir. 1993) (affirming grant of summary

3    judgment on fraud claim where plaintiff made no showing of reasonable reliance); *Cray*

4    *Commc'ns v. Novatel Computer Sys.*, 33 F.3d 390, 394 (4th Cir. 1994).

5            Any alleged misrepresentations prior to the September 1, 2004 ISP Agreement cannot, as

6    a matter of law, support Roots' fraud claim because they contradict the terms of the second ISP

7    Agreement.  Just as the parol evidence rule precludes Roots from altering the terms of that

8    agreement through allegations of prior oral agreements, so it also precludes Roots from altering

9    those agreements through allegations of fraud.  *See Casa Herrera*, 32 Cal. 4th at 346 (noting that

10   California courts have "consistently rejected promissory fraud claims premised on prior or

11   contemporaneous statements at variance with the terms of a written integrated agreement.").

12   This is because "[b]y failing to push back against Gap's request to form written agreements only

13   with Gabana—agreements that expressly contradicted promises made to Roots—Roots waived

14   its right to rely on any allegedly fraudulent promises made before the September 2004 ISP

15   Agreement." Jan. 28, 2008 Order (Doc. 125), 8:3-6.

16           There is no evidence indicating that Gap made any fraudulent statements to Roots after

17   September 2004.  Rather, when asked whether Gap had ever lied to Roots, Abu Issa was able to

18   recall only one instance when he believed that Gap failed to disclose, and later denied, that one

19   of the purposes of the ISP program was to protect Gap trademarks.  Exh. 4, 178:19-179:20.  But

20   there is no evidence or even an allegation that this statement was intended to induce any reliance

21   on Roots' part.  Moreover, the failure to disclose a fact does not constitute fraud unless the

22   defendant is legally bound to disclose it, for example as a result of a fiduciary relationship.  Cal.

23   Civ. Code § 1710(3); 5 Witkin, Summary 10th (2005) Torts, § 793, p. 1148 ("Although material

24   facts are known to one party and not the other, failure to disclose them is ordinarily not

25   actionable fraud unless there is some *fiduciary relationship* giving rise to a duty to disclose.").

26           To the extent Roots' fraud claim rests on the vague representations alleged in the TAC—

27   that Gap would approve new locations and grant Roots franchise rights at some unspecified time

28   in the future—any reliance on these statements was unreasonable as a matter of law.  A plaintiff

20

1    cannot, as a matter of law, justifiably rely on statements "hedged with significant qualifications."

2    *Pacesetter Homes, Inc. v. Brodkin*, 5 Cal. App. 3d 206, 213 (1970).  Nor can fraud claims be

3    based on "vague, generalized" statements, or mere "puffery," such as "assurances that the two

4    companies would have an ongoing relationship."  *GoEngineer, Inc. v. Autodesk, Inc.*, No. C 00-

5    4595-SI, 2002 U.S. Dist. LEXIS 2540 (N.D. Cal. Feb. 14, 2002); *see also, Clay v. Koch*, No. C

6    95-1289-FMS, 1996 U.S. Dist. LEXIS 10677, at *7 (N.D. Cal. July 22, 1996) (holding that the

7    defendant's statement that he was "committed" to a company was "so vague that it cannot

8    support a finding of fraud.").

9        Here, Gap's alleged misrepresentations relating to the approval of new locations are

10    vague and contingent even as pled in the TAC.  The Saudi Arabia plan was acceptable "*subject

11    only to* formal management approval;" Roots would be permitted to enter the Lebanese market

12    when the proposal had obtained "*final approval* from Gap's management." TAC, ¶¶ 91, 94.

13    ████████████████████████████████████████████████████████████████████

14    ████████████████████████████████████████████████████████████████████

15    ████████████  Having received express notice that any approval was contingent on the

16    authorization of senior Gap management, Roots could not have reasonably relied on the alleged

17    statements as promises for approval.  This is particularly true where, as here, Gap's written

18    agreements with Gabana—which Roots admits it possessed—explicitly provided that the right to

19    approve or disapprove retailers was placed squarely in Gap's "sole discretion."

20        The alleged representations relating to franchise rights also consist of vague, qualified

21    statements entirely unable to support a fraud claim.  Al-Thani testified that Gap representative

22    Ron Young "talked about the idea of establishing franchise" and said he would "start the

23    procedures" so that Roots could obtain franchise rights. Exh. 2, 47:10-17.  Notably absent was

24    any discussion of what the alleged franchise rights would consist of, when they would begin,

25    how many stores would be required, where those stores would be located, or *any* of the financial

26    terms of the arrangement. *Id.* 57:15-60:3.  Young's alleged statement, conditioned upon

27    unspecified "procedures," is simply not the type of representation that can underlie a claim for

28    fraud. *See Glen Holly Entm't, Inc. v. Tektronix Inc.*, 352 F.3d 367, 379 (9th Cir. 2003) (holding

21

1    that statements describing the "high priority" the defendant placed on product development and

2    its plans to develop an aggressive marketing campaign were not actionable as fraud).  Rather, it

3    is the type of "generalized, vague and unspecific assertion[]" that courts have consistently held

4    constitutes "mere 'puffery.'"  *Id.*

5          Not only would any reliance have been unreasonable, but the evidence shows that there

6    was no actual reliance.  In a claim for fraud, a plaintiff can only recover "out-of-pocket"

7    damages.  *See Fladeboe v. Am. Isuzu Motors Inc.*, 150 Cal. App. 4th 42, 66 (2007).  The only

8    reliance described by Al-Thani was a study related to the franchise and several trips to explore

9    locations for franchise stores.  Exh. 2, 68:24-69:20.  But Al-Thani was unsure whether the study

10   was ever actually conducted and he did not personally participate in some of the alleged

11   franchise trips.  *Id.*, 71:8-17; 72:19-22; 74:15-22.  ███████████████████████████

12   ████████████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████████████

15   ███████████████████████████████  Exh. 18, 115:4-19 (testifying that Roots' general

16   manager only participated in one discussion in San Francisco where the "possibility" of franchise

17   was discussed); Exh. 30, 91:13-18, 94:23-95:9; Exh. 2, 44:22-45:9.  Indeed, Abu Issa testified

18   that *all* of the acts Roots took in reliance on the alleged promises would have been taken anyway

19   as part of the contractual relationship between Gap, Gabana, and Roots.  Exh. 4, 192:14-24.  The

20   overwhelming evidence thus indicates that Roots understood Gap had not committed to making

21   it a franchisee, and that Roots undertook no meaningful steps in reliance on any alleged promise.

22   **E.    Roots cannot prove any facts to establish a violation of California's Unfair
            Competition Law (Counts 4-5).**

23

24         Roots' claims under the UCL rely upon the same facts underlying its breach of contract

25   and fraud claims.  TAC, ¶¶ 134-45.  Because those causes of action fail, any derivative UCL

26   claims fail as well.  *See Daly v. Viacom, Inc.*, 238 F. Supp. 2d 1118, 1126 (N.D. Cal. 2002).

27   Plaintiffs cannot use the UCL to "plead around the absolute bars to relief contained in other

28   possible causes of action by recasting those causes of action as ones for unfair competition."  *Id.*

[CORRECTED] DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR,
IN THE ALTERNATIVE, SUMMARY ADJUDICATION; MPAS IN SUPPORT THEREOF
Case No. C 07-03363 CRB

422007.01

F.    **Roots' quasi-contractual claims (Counts7-9) fail as a matter of law**

1.    **There is no evidence that Gap made any "clear and ambiguous" promise upon which Roots could reasonable rely.**

The alleged "promises" underlying Roots' promissory estoppel claim are identical to the misrepresentations underlying its fraud claim. *Compare* TAC, ¶ 147 *to* ¶ 153. For the same reason that vague generalized statements cannot underlie a fraud claim, those same statements cannot underlie a promissory estoppel claim. *See Aguilar v. Int'l Longshoremen's Union Local # 10*, 966 F.2d 443, 446 (9th Cir. 1992); *B & O Mfg., Inc. v. Home Depo U.S.A., Inc.*, No. C 07-02864-JSW, 2007 U.S. Dist. LEXIS 83998, at *16-17 (N.D. Cal. Nov. 1, 2007) (dismissing promissory estoppel claim without leave to amend where plaintiff failed to plead essential terms of defendant's alleged promise to "provide substantial quantities of future business" to plaintiff).

2.    **All three claims are time barred.**

All three of Roots' quasi-contractual claims against Gap (Promissory Estoppel, Quantum Meruit, and Quasi-Contractual restitution) are subject to a two-year statute of limitations, which begins to run "immediately upon performance of the service at issue." Oct. 18, 2007 Order (Doc. 80), at 7:13-8:7 (citing Witkin, Cal. Procedure Actions, § 508 (4th ed. 1996)); Cal. Code Civ. Proc. § 339(1); *Edwards v. Fresno Cmty. Hosp.*, 38 Cal. App. 3d 702, 706 (1974). To the extent Roots' quasi-contractual claims relate to services it performed for Gap prior to June 25, 2005, those claims are therefore time barred. Jan. 28, 2008 Order (Doc. 125), 10:19-21. And the unconstested evidence is that Gap did not request Roots to provide any services to Gap after June 25, 2005. When asked whether Gap asked Roots to provide any services after June 25th, 2005, Roots' 30(b)(6) witness answered "no." Exh. 4, 196:2-4.

There is also no evidence to support Roots' previously expressed theory that Gap is equitably estopped from asserting the statute of limitations. "Equitable estoppel, also termed fraudulent concealment, halts the statute of limitations when there is active conduct by a defendant, above and beyond the wrongdoing upon which the plaintiff's claim is filed, to prevent the plaintiff from suing in time." *Guerrero v. Gates*, 442 F.3d 697, 706 (9th Cir. 2006) (quotations omitted). The "essence" of an equitable estoppel argument is "[a]ffirmative

23

1   misconduct which would prevent a plaintiff from filing their claims." *Chang v. McKesson*

2   *HBOC, Inc.*, C07-03981 MJJ, 2007 U.S. Dist. LEXIS 95088, at *9 (N.D. Cal. Dec. 17, 2007).

3   For example, in *Lantzy v. Centex Homes*, 31 Cal. 4th 363 (2003), the California Supreme Court

4   held that the allegation "that at various times Defendants have attempted to make repairs … or

5   advised Plaintiffs that the defective windows were not defective and not to file a lawsuit," was

6   legally insufficient to support a finding of estoppel. *Id.* at 383-85. In reaching this

7   determination, the court noted that there was no suggestion repair attempts "would have obviated

8   the need for suit" and no facts "indicating that defendants' conduct directly prevented them from

9   filing their suit on time." *Id.* at 385.

10          As in *Lantzy*, there isn't any basis for finding that Gap engaged in affirmative misconduct

11   that directly prevented Roots from filing a timely suit. Roots' 30(b)(6) witness on this topic, Al-

12   Thani, testified that he only had one conversation with Gap after the termination of the Gap-

13   Gabana agreement. Exh. 2, 50:8-51:9. During that conversation, he testified: "[w]e discussed

14   the issue that Francois [Larsen of Gabana] was going to file the suit and that the problem was

15   with Francois, not with us. With Gabana, not with Roots. And he said because Roots didn't file

16   a suit against Gap, we could reach an agreement about the territory." *Id.*, 161:21-162:4. This

17   testimony—the sole evidence supporting Roots' claim of estoppel—is legally insufficient to

18   prevent Gap from asserting the statute of limitations. *See Feduniak v. Cal. Coastal Comm'n*, 148

19   Cal. App. 4th 1346, 1360 (2007) ("[W]here the facts are undisputed and only one reasonable

20   conclusion can be drawn from them, whether estoppel applies is a question of law"). Gap's

21   alleged representation that it "could reach an agreement" was not a statement that could

22   reasonably cause Roots to think there was no longer any need to file suit. Nor is there any

23   evidence that this single conversation, which Al-Thani testified occurred approximately at the

24   time Gabana filed its suit in April 2006, directly caused Roots to delay filing suit *for over a year*.

25   Exh. 2, 50:8-51:9. Where, as here, there is no evidence that a statement actually and reasonably

26   induced a plaintiff not to file suit, estoppel cannot be found. *See Lobrovich v. Georgison*, 144

27   Cal. App. 2d 567, 573 (Cal. App. 1st Dist. 1956) ("Clearly, an estoppel to plead the statute does

28   not arise in every case in which there are negotiations for a settlement of the controversy.").

**3.    All three claims are precluded by the existence of written agreements covering the same subject matter.**

To the extent Roots' quasi-contract claims rely on promises allegedly made before September 1, 2004, those claims are also barred by the parol evidence rule. A party cannot recover under a quasi-contract theory where express agreements exist and govern the parties' rights. *City of Oakland v. Comcast Corp.*, No. C 06-5380 CW, 2007 U.S. Dist. LEXIS 14512, at *12 (N.D. Cal. Feb. 14, 2007). This rule applies even where the parties are not in privity together but instead are connected by contracts running through a third party. *See Cal. Medical Ass'n, Inc. v. Aetna U.S. Healthcare of Cal.*, 94 Cal. App. 4th 151, 172 (2001); *4 Hour Wireless v. Smith*, No. 01 Civ 9133 (RO), 2002 U.S. Dist. LEXIS 22680, at *5 (S.D.N.Y. 2002). As discussed above, valid agreements existed between the Gap and Gabana and between Gabana and Roots relating to the same subject matter of Roost quasi-contract claims. *See supra*, at 9-13, 17-18. The parol evidence rule precludes Roots from renegotiating the terms of those agreements through claims in quasi-contract.

## IV.    CONCLUSION

For the foregoing reasons, Gap respectfully requests an order granting summary judgment and dismissing Roots' claims against it.

Respectfully submitted,

Dated:  July 25, 2008                    KEKER & VAN NEST, LLP


By:  *s/Daralyn Durie*
     DARALYN DURIE
     Attorneys for Defendants
     GAP INTERNATIONAL SALES, INC.,
     THE GAP, INC., BANANA REPUBLIC,
     LLC, and OLD NAVY, LLC

[CORRECTED] DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION; MPAS IN SUPPORT THEREOF
Case No. C 07-03363 CRB

422007.01