1  RICHARD A. JONES (Bar No. 135248)
   (rjones@cov.com)
2  COVINGTON & BURLING LLP
   One Front Street
3  San Francisco, CA 94111
   Telephone: (415) 591-6000
4  Facsimile: (415) 591-6091

6  **Attorneys for Plaintiff**
   **Roots Ready Made Garments Co. W.L.L.**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROOTS READY MADE GARMENTS CO. W.L.L., | Case No: C 07 3363 CRB |
| Plaintiff, | **DECLARATION OF ASHRAF ABU ISSA IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | Date: August 29, 2008 |
| THE GAP, INC., a/k/a, GAP, INC., GAP INTERNATIONAL SALES, INC., BANANA REPUBLIC, LLC, AND OLD NAVY, LLC, | Time: 10 o'clock a.m.<br>Place: Courtroom 8, 19th Floor<br>Judge: Charles R. Breyer |
| Defendants. | Trial Date: October 6, 2008 |

Ashraf Abu Issa declares the following under penalty of perjury:

1. From the company's founding until in or around December 2004, I served as the Chief Executive Officer of Roots Ready Made Garments Co. W.L.L. ("Roots"). I make this declaration in opposition to the motion for summary judgment filed by Gap, Inc., Gap International Sales, Inc., Banana Republic, LLC, and Old Navy, LLC (collectively, "Gap").

2. In early 2003, Francois Larsen and Jacques Fabre, the principals of Gabana Gulf Distribution Company ("Gabana"), approached me with an offer from Gap to buy approximately 1.7 million pieces of outdated Gap overproduction inventory ("OP").

3. I explained that Roots was not interested in purchasing such a large volume of outdated merchandise. On its own, the stock would be difficult to sell, and the deal would not be profitable for Roots. Mr. Larsen indicated that, in return for Roots' purchase of the OP, Gap would grant Roots the right to sell first-line Gap merchandise in the Arabic-speaking countries of the Middle East and North Africa under Gap's International Sales Program ("ISP"). Roots was interested in the opportunity to sell in-season Gap products in the region

4. Larsen arranged for Roots' principal, Sheikh Faisal Al-Thani and me to speak by telephone with a Gap executive named Jim Bell. During the call, Bell offered to grant Roots the right to sell first-line ISP merchandise in the Arabic-speaking countries in exchange for Roots' purchase of the OP.

5. Subsequently, I had several other direct conversations with Bell during which we negotiated the terms of Gap's offer, including (i) a price for the OP inventory; (ii) the terms of the letter of credit by which Roots would pay for the merchandise; (iii) the brands Roots would sell under the ISP program (*i.e.*, Gap, Banana Republic, and Old Navy); and (iv) the environment in which Roots would sell the ISP merchandise (*i.e.*, in multi-brand stores). The negotiated price, $6 million, exceeded the market value of the OP. Bell confirmed that if Roots accepted Gap's offer by tendering payment, Gap would compensate Roots by granting it the right to sell first-line merchandise in Roots' own stores in Qatar and in the other Arabic-speaking countries of the Middle East and North Africa, subject only to Gap's approval of specific retailers in those countries.

6. Bell represented that the ISP rights would also assist Roots to liquidate the OP inventory, since retailers could be persuaded to purchase the outdated good if they were also offered in-season merchandise. In general, Bell presented the ISP program as a tremendous opportunity for Roots to establish and grow a profitable retail network for Gap products in the Arabic-speaking world. Bell promised that the ISP program would be rolled out quickly to all the Arabic-speaking countries.

DECL. OF ASHRAF ABU ISSA
Case No.: C 07 3363 CRB.

7.  Roots later learned that the ISP program was not designed to generate profit, but rather to protect Gap's international trademarks by providing a minimal volume of sales in certain countries that require a trademark owner to use the mark in commerce in order to preserve its rights. Had Roots known the true nature of the ISP program, it would never have agreed to pay $6 million for the OP inventory in exchange for ISP rights.

8.  Following my negotiations with Bell, Roots was not obligated to purchase the OP inventory. Rather, my understanding was that if Roots accepted Gap's offer by making the payment for the OP inventory, Gap would be obligated to grant Roots the ISP rights.

9.  Bell informed Roots that Gap did not wish to be seen making sales directly to a company based in the Middle East, but instead preferred to use a European company as an intermediary. To address this concern, Gap proposed that it perform its obligations through an intermediary, Gabana. Gap would sell the OP (and later ISP) merchandise to Gabana, which would then simultaneously re-sell the merchandise to Roots. Roots consented to this arrangement, but only on the understanding that it would not in any way extinguish or modify Gap's outstanding offer to Roots. To implement its plan to perform through an intermediary, Gap planned to enter into a written agreement with Gabana, Roots would then enter into a back-to-back written agreement with Gabana that reflected the terms of the Gap-Gabana agreement. Roots had no objection to this proposal, provided that the agreements were consistent with, and did not in any way modify or extinguish, Gap's outstanding offer to Roots.

10. On May 12, 2003, Roots and Gabana executed a letter of understanding ("LOU"). The LOU discussed the parties' plan to enter into distribution agreements for OP and ISP, which would reflect the content of the agreements to be signed between Gap and Gabana. The LOU was contingent upon (1) Roots being satisfied that the Gap-Gabana agreements reflected the agreement between Gap and Roots, and (2) the merger of Gabana and Roots. Neither contingency occurred, and the written agreements between Gabana and Roots were never executed.

DECL. OF ASHRAF ABU ISSA
Case No.: C 07 3363 CRB.

11. Roots and Gabana never proceeded with the contemplated merger. Although I was aware that Larsen informed Gap of the plan to merge Roots and Gabana, Roots never represented to Gap that the merger had occurred. Throughout the parties' relationship, Gap dealt independently with Roots and Gabana, and clearly recognized that they were two separate companies.

12. Roots did not participate in the negotiation of the written agreement between Gap and Gabana. On or about May 13, 2003, Gap executed two written agreements with Gabana to document its role as intermediary between Gap and Roots. The agreements appointed Gabana as a non-exclusive distributor for OP merchandise ("OP Agreement") and ISP merchandise ("ISP Agreement"). Roots was not a party to either of these agreements, and was not shown a copy of either agreement before they were executed. Gap and Gabana entered into a new ISP agreement in September 2004. Roots had no role whatsoever in the negotiation of this agreement.

13. Larsen informed me about his negotiation with Gap of certain terms of the May 2003 Gap-Gabana agreements, including the provisions relating to exclusivity and advertising. I also requested that Larsen convey Roots' requests concerning the content of the written agreements, but I do no know if Larsen complied with these requests. At most, Larsen served as a "messenger" between Gap and Roots. He was not subject to Roots' control and had no express or implied authority to bind Roots to any agreement. We never agreed that he would act as an agent of Roots.

14. After Bell reconfirmed the terms of the deal between Gap and Roots – that Roots would get ISP rights in the Middle East if it purchased the OP inventory for $6 million – Roots accepted Bell's offer by tendering a $1 million down payment toward the purchase of the OP inventory on May 14, 2003. Roots made the payment by means of a wire transfer to Gabana, which simultaneously transferred the same amount to Gap. Gap was aware of, and requested, this method of payment. As Gap was aware, Gabana made no profit from the sale of the OP

DECL. OF ASHRAF ABU ISSA
Case No.: C 07 3363 CRB.

inventory; its role was merely to transfer the money to Gap and pass title to the goods to Roots. All three parties were aware that Gabana had no economic interest in Gap's sale of the OP to Roots. It would, however, received a margin on all ISP sales.

15. Several days after Roots made the down payment, on May 20, 2003, Larsen forwarded to me copies of the Gap-Gabana Agreements, together with proposed Roots-Gabana Agreements. When I reviewed the agreements, I noted that certain terms of the agreements differed from the terms Roots negotiated with Gap. For example, the rights Gap granted to Gabana were non-exclusive; the agreement contained severe advertising restrictions that I believed would make it difficult to sell the merchandise; and the agreement was terminable without cause on 90-days notice.

16. I conveyed my concerns to Bell who explained to me that because of the need to execute the transaction immediately, Gap and Gabana had entered into a standard form contract that could be approved quickly by Gap's legal department. Bell represented that the Gap-Gabana agreements were only "temporary" and the terms could be improved in the future. For this reason, I did not execute the back-to-back agreements with Gabana, choosing instead to rely on my direct contract with Gap.

17. In the meantime, Bell confirmed that Gap's oral agreement with Roots remained in place, and was in no way modified or extinguished by the written agreements between Gap and Gabana. He further stated that Roots was not bound by the terms of the written agreement, and could rely instead on Gap's oral offer. Bell said the he was the "one in charge of the deal" at Gap, and he would make sure that Roots received what it was promised.

18. In reliance on Bell's representations, Roots paid the remaining $5 million balance of the purchase price for the OP inventory by means of back-to-back letters of credit from Roots to Gabana and from Gabana to Gap. Roots' bank issued the first of the back-to-back letters of credit in favor of Gabana on June 18, 2003. The next day, Gabana's bank issued a letter of credit in favor of Gap for the same amount and on the same terms as the Roots-

DECL. OF ASHRAF ABU ISSA
Case No.: C 07 3363 CRB.

Gabana letter of credit. Again, Gabana merely served as a conduit for Roots' payment to Gap. Gabana made no profit from the transaction.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this __ day of August 2008 in the Republic of the Maldives.

Ashraf Abu Issa

DECL. OF ASHRAF ABU ISSA
Case No.: C 07 3363 CRB.