1   RICHARD A. JONES (Bar No. 135248)
    (rjones@cov.com)
2   COVINGTON & BURLING LLP
    One Front Street
3   San Francisco, CA 94111
    Telephone: (415) 591-6000
4   Facsimile: (415) 591-6091

5   (*Additional Counsel on Signature Page*)

6   Attorneys for Plaintiff
    Roots Ready Made Garments Co. W.L.L.
7

8

9

10                  **IN THE UNITED STATES DISTRICT COURT**
                  **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
11

12                                              )
                                                )
13  ROOTS READY MADE GARMENTS CO.               )   Case No. C 07 3363 CRB
    W.L.L.,                                     )
                                                )   PLAINTIFF'S OPPOSITION TO
14                Plaintiff,                     )   DEFENDANTS' MOTION FOR
                                                )   SUMMARY JUDGMENT
15          v.                                   )
                                                )
16  THE GAP, INC., a/k/a, GAP, INC., GAP        )   Date: August 29, 2008
    INTERNATIONAL SALES, INC., BANANA           )   Time: 10:00 a.m.
17  REPUBLIC, LLC, and OLD NAVY, LLC,           )   Place: Courtroom 8, 19th Floor
                                                )   Judge: Charles R. Breyer
18                Defendants.                    )
                                                )   **Trial Date: October 6, 2008**
19                                              )
                                                )
20  _____         )

21

22

23

24

25                          **PUBLIC VERSION**

26

27

28
_____

1

**TABLE OF CONTENTS**

2

SUMMARY OF ARGUMENT.................................................................................... VII

3

FACTUAL BACKGROUND ..................................................................................... 1

4

I.    GAP SEEKS TO LIQUIDATE 1.7 MILLION PIECES OF EXCESS
      INVENTORY........................................................................................................ 1

5

6         A.    Solka and Gabana Identify Roots As A Potential Purchaser of the
                Dubai OP Inventory................................................................................. 1

7

8         B.    Gap Offers to Grant Roots The Right to Sell First-Line Gap
                Merchandise If Roots Purchases the Dubai OP Inventory For $6
                Million. ..................................................................................................... 2

9

10        C.    Gap Proposes That Gabana Serve As An Intermediary, And Executes
                Written Agreements With Gabana To Document Gabana's Role.......... 3

11

12        D.    Roots Accepts Gap's Offer – And Establishes A Binding Oral
                Contract – By Making A Payment Toward The OP Inventory, and
                Bell Reaffirms the Oral Agreement......................................................... 4

13

14        E.    In June 2003, Roots Agrees to Develop a ISP Retail Network in the
                Middle East In Exchange For Gap's Promise To Grant Roots ISP
                Rights........................................................................................................ 5

15

16        F.    Gap and Roots Perform In A Manner Consistent With The Terms of
                the Oral Agreements. ............................................................................... 6

17              1.    *Gap Ships The OP Inventory Directly To Roots With
                      Knowledge That Roots Would Re-Sell The Inventory To
                      Retailers in Other Territories.* ................................................... 6

18

19              2.    *Gap Routinely Discusses ISP Distribution Outside Qatar with
                      Roots.* ........................................................................................... 7

20              3.    *Gap Is Aware of And Approves Roots' Resale of ISP
                      Merchandise to The Approved Retailer in UAE.* ..................... 8

21

22        G.    Gap Stalls In Approving New ISP Territories and Retailers, But
                Continues to Assure Roots That It Will Fulfill Its Contractual
                Obligation to Permit Roots to Sell First-Line Merchandise................... 8

23

24        H.    Gap Changes Its Business Model in the Middle East and Promises to
                Make Roots Its Frachisee. ....................................................................... 9

25        I.    Gap Wrongfully Terminates Roots' Right to Sell First-Line Gap
                Merchandise, And Falsely Promises To Cure The Breaches of Its
                Contractual Obligations To Roots. ........................................................ 10

26

27

28

ARGUMENT ................................................................................................................ 10

I.    THE RECORD SUPPORTS ROOTS' FIRST CONTRACT CLAIM............................ 10

      A.    The Evidence Establishes That Roots and Gap Entered Into A
            Binding Contract on May 13, 2003. ....................................................... 10

            1.    *The Parties Manifested Their Intent To Be Bound When Gap
                  Accepted Roots' Down Payment for the OP Inventory.* ............... 10

            2.    *The Material Terms of the May 2003 Oral Contract Are
                  Clear.* ...................................................................................... 11

      B.    Roots Is Not Bound By the Written Agreements Between Gap and
            Gabana. ................................................................................................ 12

            1.    *Roots' Rights Are Not Derivative of the Gap-Gabana
                  Agreements.* ............................................................................. 12

            2.    *Larsen Had No Authority To Modify The Terms of Gap's
                  Agreement with Roots.* ............................................................. 13

      C.    The Evidence Shows That Parol Evidence Rule Has No Application
            In This Case. ......................................................................................... 14

            1.    *The Parole Evidence Does Not Apply Because Roots Is Not A
                  Party to the Gap-Gabana Agreements.* ..................................... 14

      A.    The Parol Evidence Rule Has No Application In This Case. ................... 16

            2.    *The Parol Evidence Rule Is Inapposite Because The Gap-
                  Gabana Agreements Do Not Contradict Gap's Oral
                  Agreement With Roots.* ............................................................. 16

            3.    *Gap Is Estopped From Asserting An Interpretation Of The
                  Gap-Gabana Agreements that Prejudices Roots' Rights.* .......... 16

      C.    Gap Is Estopped From Asserting An Interpretation Of The Gap-
            Gabana Agreements that Prejudices Roots' Rights. ............................... 16

      D.    The Statute of Frauds Does Not Bar Roots Oral Contract Claims. ........ 17

II.   THE RECORD SUPPORTS ROOTS' SECOND CONTRACT CLAIM. ..................... 18

III.  THE RECORD SUPPORTS ROOTS' CLAIM FOR BREACH OF THE
      COVENANT OF GOOD FAITH AND FAIR DEALING. .......................................... 18

IV.   THE RECORD SUPPORTS TWO SEPARATE CLAIMS FOR "UNFAIR"
      AND "UNLAWFUL" PRACTICES UNDER CAL. BUS. & PROF. CODE
      § 17200. ........................................................................................................ 19

V.    THE RECORD SUPPORTS ROOTS' COMMON LAW FRAUD (COUNT
      SIX) .............................................................................................................. 19

iii

VI.   THE RECORD SUPPORTS ROOTS' EQUITABLE CLAIMS (COUNTS SEVEN, EIGHT, AND NINE). ...................................................................21

A.   Roots' Equitable Claims Were Timely Filed. ...........................................21

B.   Gap Is Equitably Estopped From Invoking The Statute of Limitations Because It Induced Roots To Refrain From Filing Suit. ...............................22

C.   Roots' Promissory Estoppel Claim is Supported by the Record. ..............23

D.   There Are No Written Agreements Covering The Same Subject Matter As Roots' Quasi-Contract and Promissory Estoppel Claims ..................23

CONCLUSION ....................................................................................................24

iv

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130 (9th Cir. 2000) ................................................ 10

*Aguilar v. International Longshoremen's Union*, 966 F.2d 443 (9th Cir. 1992) .............. 23

*American Casualty Co. of Reading, Pennsylvania v. Krieger*, 181 F.3d 1113 (9th
  Cir. 1999) ................................................................................................................ 14

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................... 10

*B&O Manufacturing, Inc. v. Home Depot U.S.A., Inc.*, No. C 07-08264 JSW, 2007
  U.S. Dist. LEXIS 83998 (N.D. Cal. Nov. 1, 2007) .................................................. 23

*Mundy v. Household Finance Corp.*, 885 F.2d 542 (9th Cir. 1989) ................................. 18

*Nanakuli Paving & Rock Co. v. Shell Oil Co.*, 664 F.2d 772 (9th Cir. 1981) ................... 16

*Snider v. Roadway Packaging Systems*, No. C-99-02728 CRB, 2000 U.S. Dist.
  LEXIS 4688 (N.D. Cal. Apr. 11, 2000) ...................................................................... 11

*Weisberg v. U.S. Department of Justice*, 745 F.2d 1476 (D.C. Cir. 1984) ....................... 11

## STATE CASES

*Allied Grape Growers v. Bronco Wine Co.*, 203 Cal. App. 3d 432 (1988) ....................... 17

*Avalon Products, Inc. v. Lentini*, 98 Cal. App. 2d 177 (1950) .......................................... 11

*Blennis v. Hewlett-Packard Co.*, No. C 07-00333 JF, 2008 WL. 818526 (N.D. Cal.
  Mar. 25, 2008) ............................................................................................................ 19

*Bohman v. Berg*, 54 Cal. 2d 787 (1960) .......................................................................... 12

*Chambers v. Kay*, 106 Cal. Rptr. 2d 702,719 ............................................................ 21, 22

*DeSuza v. Andersack*, 63 Cal. App. 3d 694, 699 (1976) ................................................ 14

*Hess v. Ford Motor  Co.*, 27 Cal. 4th 516 (2002) ............................................................ 15

*Howell v. Courtesy Chevrolet, Inc.*, 94 Cal. Rptr. 33 (1971) .......................................... 14

*J.W.  Van Hook v. Southern California Workers Alliance, Local 17, *, 158 Cal. App.
  2d 556 .......................................................................................................................... 21

*Kern County Water Agency v. Belridge Water Storage District*, 18 Cal. App. 4th 77
  (1993) .......................................................................................................................... 15

*Kramer v. Thomas*, No. CV 05-8381 AG, 2006 WL. 4729242 (C.D. Cal. Sept. 28,
  2006) ............................................................................................................................ 22

*Lantzy v. Centex Homes*, 31 Cal. 4th 363 (2003) ............................................................ 22

v

*Lazar v. Superior Court*, 12 Cal. 4th 631 (1996) ...........................................................20

*LiMandri v. Judkins*, 52 Cal. App. 4th 326 (1997)........................................................21

*Los Angeles Traction Co v. Wilshire*, 135 Cal. 654 (1902)..............................................11

*McBride v. Boughton*, 123 Cal. App. 4th 379 (2004).......................................................22

*Monarco v. Lo Greco*, 35 Cal. 2d 621 (1950) ................................................................17

*Mosesian v. Bagdasarian*, 260 Cal. App. 2d 361 (1968) ................................................14

*Motors, Inc. v. Times Mirror Co.*, 102 Cal. App. 3d 735 (1980) ......................................19

*Oculus Innovative Sciences, Inc. v. Nofil Corp.*, No. C 06-01686 SI, 2007 WL.
    2600746 (N.D. Cal. Sept. 10, 2007) ..........................................................................19

*Progressive W. Insurance Co. v. Yolo County Superior Court*, 135 Cal. App. 4th
    263 (2005) ...............................................................................................................19

*Van't Rood v. County of Santa Clara*, 113 Cal. App. 4th 549 (2003) ...............................13

*Vega v. Jones, Day, Reavis & Pogue*, 121 Cal. App. 4th 282 (2004) ................................21

*Wagner v. Glendale Adventist Medical Ctr.*, 216 Cal. App. 3d 1379 (1989)......................17

*Weddington Products v. Flick*, 60 Cal. App. 4th 793 (1998) ............................................11

## FEDERAL STATUTES

Fed. R. Civ. P. 56(c) ....................................................................................................10

## STATE STATUTES

Cal. Civ. Code § 1584 ..................................................................................................11

Cal. Evid. Code § 623...................................................................................................16

Cal. Bus. & Prof. Code § 17200 ........................................................................... iii, iv, 19

# SUMMARY OF ARGUMENT

In an attempt to avoid responsibility for breaching its obligations under a clear oral contract supported by the actual payment of $6 million, Gap distorts the factual record and advances a series of legal arguments that ask the court to blind itself to the underlying business and economic reality. Three witnesses (one of whom was the president of Gabana at the time of the deal) testified to the exact same business deal between Gap and Roots: Roots would pay $6 million for out-of-date and defective Gap merchandise and receive in return the right to sell first-line Gap merchandise in the Arabic-speaking countries of the Middle East and North Africa.

Gap chose to implement the deal through Gabana, a British shell company with no garment industry experience, no presence in the Middle East, no assets, no distribution network, and only one professional employee, a former banker based in a small office in Switzerland. Gap itself called Gabana a "mom and pop operation," and no one involved in the deal seriously believed that Gabana was anything more than a pass through entity for the transaction between Gap and Roots. Roots accepted Gap's offer, by making a required $1 million down payment.

Gap's main excuse for avoiding its bargained for responsibilities to Roots is to argue that the written agreements Gap entered with Gabana to document its role as an intermediary – contracts Roots did not negotiate, and never even saw before performing under its agreement with Gap – bars Roots claims. But the fact record shows that Francois Larsen and Gabana did not act as the agents of Roots in the negotiation of Gabana's agreement with Gap, and that Roots knowledge of the negotiation was limited to a few conversations. When Roots actually saw the Gabana contract, it immediately recognized that it did not capture its agreement with Gap and refused to sign a mirror agreement. Over a two-year period, all the parties performed precisely in accordance with the oral agreement. Under these circumstances, the effort to avoid the oral contract by virtue of the parol evidence rule is simply contradicted by the facts. Moreover, the evidence shows Gap itself interpreted the Gabana contract to permit Roots to resell merchandise, contradicting the basic premise of Gap's parol evidence analysis that Roots acting as a distributor was inconsistent with the Gabana agreement.

1    Gap's other attempts to overcome Roots' contract claims also fail.  The record demonstrates
2  that the essential elements of both contracts at issue were agreed to by the parties or supplied by
3  subsequent performance.  Gap is estopped from asserting a statute of frauds defense because it
4  induced Roots "seriously to change its position" in reliance on the existence of the oral agreements.
5  The record also establishes a claim for fraud because Gap's promises to grant Roots ISP – and later
6  franchise – rights were false when made, and because Gap mislead Roots concerning the purpose
7  of the ISP program.  Gap offers no serious argument for dismissal of Roots' statutory claim for
8  "unfair" business practices.  Contrary to Gap's argument, this broad equitable claim is not
9  derivative of Roots' tort and contract claims, and should be sustained even if the other claims are
10  dismissed.
11    For all of these reasons, and others discussed below, Gap's Motion for Summary Judgment
12  should be denied.

viii

# FACTUAL BACKGROUND

I.    **Gap Seeks To Liquidate 1.7 Million Pieces of Excess Inventory.**

This action arises from Gap's[1] almost desperate efforts to rid itself of a large inventory of outdated "excess inventory," also known as "OP" for "overproduction," ████████████ ████████████ Exh. A, 177:11–18.[2] ████████████

████████████ Exh. B, 99:18–24. ████████████

████████████ Exh. A 65:22–66:1.

In 2001, Gap transferred a large volume of OP inventory to a French company, Solka S.A. ("Solka"). Exh. C, 17:3-19:4. Gap sent the inventory to Solka on an open account basis, without requiring immediate payment. *Id.*, 18:6-19:4. After attempting with limited success to liquidate the inventory, Solka was left with approximately 1.7 million pieces stored in Dubai, United Arab Emirates. *Id.*, 20:4-14. Following a change in Gap's management, in 2002, Gap demanded that Solka pay immediately for the remaining inventory. *Id.*, 22:2-22. ████████████ ████████████ Exh. D, 22:17-20. Gap requested that Solka keep the goods until another purchaser could be identified, rather than return them to Gap. Exh. C., 23:6-10.

A.    <u>Solka and Gabana Identify Roots As A Potential Purchaser of the Dubai OP Inventory.</u>

Solka retained Francois Larsen, a Swiss national with an accounting and finance background, to assist with the transaction relating to the OP inventory. Larsen is the principal of Gabana Gulf Distribution ("Gabana") – a shell company registered in the United Kingdom, with its principal place of business in Geneva, Switzerland. Gabana had no employees other than Mr. Larsen and a secretary. *Id.*, 32:25-33-2. Larsen himself had no experience in the garment industry. 33:11-13. When asked whether Gabana had any facilities in the Middle East, Solka's principal, Jacques Fabre, who at one point served as the President of Gabana, responded as follows:

---

[1]    Defendants The Gap, Inc., Gap International Sales, Inc., Banana Republic, LLC, and Old Nayy, LLC are collectively referred to herein as "Gap."

[2]    All Exhibits cited herein are exhibits to the accompanying Declaration of Bradley J. Nash, unless otherwise stated.

1

"A. (Laughs). No. . . . They had an office in Geneva, but that's all." *Id.*, 33:7-10. When asked

whether Mr. Larsen had any expertise selling garments in the Middle East, Mr. Fabre was similarly

unequivocal: "A. (Laughs). We are wasting . . . time. No." *Id.*, 28:1–2.

███████████████████████████████████████████████████████████

███████████████████████████████████ Exh. B, 27:5-8.

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

Exh. E, 47:1-10. ███████████████████ Exh. F, 10:8. Roots' CEO was

Ashraf Abu Issa, a respected retail executive in Qatar. Abu Issa Decl. ¶ 1. ██████████

████████████████████████████████ Exh. E, 47:2-6. Roots was initially unwilling

to purchase such a large volume outdated garments. Abu Issa Decl. ¶¶ 2-3; Exh. F, 142:20–24.

Larsen indicated that if Roots purchased the OP inventory, Gap would grant Roots the right to sell

first-line merchandise in the Middle East under Gap's International Sales Program ("ISP"). Abu

Issa Decl. ¶ 3.

    B.    <u>Gap Offers to Grant Roots The Right to Sell First-Line Gap Merchandise If</u>
<u>Roots Purchases the Dubai OP Inventory For $6 Million.</u>

    Larsen arranged for Al-Thani and Abu Issa to speak by phone with Jim Bell, the director of

Gap's outlet division, who was responsible for disposing of the enormous stock of excess

inventory. During an hour-long call, Bell conveyed directly to Roots Gap's offer to sell the OP

inventory. ██████████████████████████████████████████████████

██████████████████████████████ Exh. E, 44:19, 47:11–48:3; *accord* Exh. F, 130:23–

24; Exh. C, 24:2-3. ████████████████████████████████████

████████████████████████████ Exh. E, 47:20–23.

    Several other negotiation sessions followed, during which Roots and Gap negotiated the

terms of Gap's offer, including (1) the price for the OP merchandise, (2) the terms of the letter of

credit by which Roots would pay for the merchandise; (3) the brands Roots would sell under the

ISP program; (4) the countries that Roots would be allowed to sell in; (5) the environment in which

1   Roots would sell the merchandise (*i.e.*, in multi-brand stores); and (6) the "mechanism" for placing

2   orders. Abu Issa Decl. ¶ 5; Exh. E, 43:23–44:13; 49:20–50:22.

3          The negotiated price, $6 million, exceeded the market value of the OP inventory. Abu Issa

4   Decl. ¶ 5. To induce Roots to make the purchase, Bell presented the ISP program as a tremendous

5   opportunity that, over time, would enable Roots to recoup its substantial investment in the OP

6   inventory. Abu Issa Decl. ¶ 6. According to Bell, Roots would be permitted to sell ISP

7   merchandise both in Roots' own multi-brand stores in Qatar, and in other Arabic-speaking

8   countries in the Middle East and North Africa, subject only to Gap's approval of specific retailers

9   in these countries. *Id.* ¶ 5. Bell said that the ISP rights would also assist Roots in selling the OP

10  inventory, since retailers could be persuaded to purchase the outdated goods if they were also

11  offered in-season merchandise. *Id.* ¶ 6.

12

13                                                        Exh. E, 62:6-12.

14

15                                                  Exh. F, 131:19–132:4; *accord id.* at

16  145:14–21.

17      C.    Gap Proposes That Gabana Serve As An Intermediary, And Executes
               Written Agreements With Gabana To Document Gabana's Role.

18

19          Exh. F, 82:6-10; Exh. E, 127:3–128:6 & Errata Sheet. To address this concern, Gap

20  proposed that it be allowed to perform its obligations through an intermediary, Gabana, such that

21  Gap would sell the OP inventory (and later the ISP merchandise) to Gabana, which would then

22  simultaneously resell the merchandise to Roots. Abu Issa Decl. ¶ 9. Roots consented to this

23  arrangement, but only with the understanding that it would in no way extinguish or modify Gap's

24  promises to Roots. *Id.*

25          On May 12, 2003, Roots and Gabana executed a letter of understanding ("LOU"). Punak

26  Decl., Ex. 13. The LOU discussed the parties' plan to enter into distribution agreements for OP

27  and ISP, which would reflect the content of agreements to be executed by Gap and Gabana. Abu

28

                                                3

1   Issa Decl. ¶ 10.  The LOU, however, was contingent on (1) Roots being satisfied that the Gap-

2   Gabana agreements reflected the terms of the offer Gap had made to Roots, and (2) the merger of

3   Gabana and Roots into one company.  *Id.*; Exh. E 29:17-19, 75:20-22.  Neither contingency

4   occurred, and the written agreements between Gap and Gabana were never executed.  Abu Issa

5   Decl. ¶ 10.

6          On May 13, 2003, Gap executed two written agreements with Gabana to document its role

7   as an intermediary.  The agreements ("Gap-Gabana Agreements") appointed Gabana as a non-

8   exclusive distributor for OP merchandise ("OP Agreement") and ISP merchandise ("ISP

9   Agreement").  Punak Decl., Ex. 14, 15.  Roots was not a party to the Gap-Gabana agreements, and

10  it was never shown a copy of the agreements before they were executed.[3]  Abu Issa Decl. ¶ 12.

11  Gap and Gabana renewed the ISP agreement in September 2004.  ███████████████████

12  ███████████████████████████  Exh. B, 189:18-20.  ██████████████████████

13  ███████████████████████████  Exh. E, 124:15-23.

14         D.     Roots Accepts Gap's Offer – And Establishes A Binding Oral Contract – By
               Making A Payment Toward The OP Inventory, and Bell Reaffirms the Oral
15             Agreement.

16         On May 14, 2003 – the day after the execution of the Gap-Gabana agreements, and after

17  being reassured that the terms of the oral agreement were still in effect – Roots accepted Jim Bell's

18  offer by tendering a $1 million down payment toward the purchase of the OP inventory.  Abu Issa

19  Decl. ¶ 14.  Roots made the down payment by means of a wire transfer to Gabana; Gabana

20  simultaneously transferred the identical amount to Gap.  Exh. G; Exh. H.  Gap was aware of, and

21  indeed requested, this method of payment.  Abu Issa Decl. ¶ 14.  As Gap was aware, Gabana did

22  not make any profit from the sale of the OP inventory to Roots; instead Gabana's role was purely

23  to serve as an intermediary to address Gap's concern about being seen doing business directly with

24

25   _____
          [3]     Roots had no direct participation in the negotiation of the written agreements between
     Gap and Gabana, but Larsen did inform Abu Issa about the negotiation of the provisions of the
26   agreements concerning exclusivity and advertising restrictions.  Abu Issa Decl. ¶ 13.  Abu Issa
     asked Larsen to convey to Gap Roots' comments concerning the content of the written agreements.
27   Although Larsen served as a "messenger" between Gap and Roots, he was not subject to Roots'
     control and had no express or implied authority to bind Roots to any agreement.  *Id.* ¶ 14.  Roots
28   never agreed that Larsen would act as Roots' agent.  *Id.*; Exh. E, 36:25–37:2.

                                                        4

1    a Middle Eastern entity.  *Id.*; Exh. I. █████████████████████████
2    ██████████████

3        Several days after Roots made the down payment on the OP inventory, Larsen sent Abu

4    Issa copies of Gap's OP and ISP agreements with Gabana for the first time.  Abu Issa Decl. ¶ 15;

5    Punak Decl., Exs. 31, 32.  When Abu Issa reviewed the agreement, he noted that certain of the

6    terms differed the terms Roots had negotiated with Gap.  *Id.*  For example, the rights Gap granted

7    to Gabana were non-exclusive, and the agreements contained strict advertising restrictions that Abu

8    Issa believed would hamper efforts to sell the merchandise.  *Id.*  Mr. Abu Issa discussed these

9    concerns with Jim Bell.  *Id.* ¶ 16.  Bell represented that the Gap-Gabana agreements were only

10   "temporary" and that the terms could be improved in the future.  *Id.*  Roots did not execute the

11   back-to-back agreements with Gabana that were contemplated by the LOU, choosing instead to

12   rely on its separate agreement with Gap.  *Id.* ¶ 16; Exh. E, 69:1-21.

13       In the meantime, Bell assured Abu Issa that the oral agreement between Roots and Gap

14   remained in effect.  *Id.*  He further stated that Roots was not bound by the terms of the written

15   agreements, and could rely instead on Gap's oral offer.  *Id.*  In reliance on Bell's representations,

16   Roots paid the remaining $5 million balance of the purchase price by means of back-to-back letters

17   of credit from Roots to Gabana and Gabana to Gap.  Exh. J; Exh. K.  As with the down payment,

18   Gabana served merely as a conduit for Roots' payment to Gap, and made no profit from the

19   transaction.  Abu Issa Decl. ¶ 18.

20       E.    In June 2003, Roots Agrees to Develop a ISP Retail Network in the Middle
             East In Exchange For Gap's Promise To Grant Roots ISP Rights.

21   ████████████████████████████████████████████████████
22   ████████████████████████████████████████████████████
23   █████████████*Id.*, 197:20–22.███████████████████████
24   ████████████████████████████████████████████████████
25   ████████████████████████████████████████████████████
26   █████████████*Id.*, 173:12–174:20.███████████████████
27

28                                        5



*Id.*, 197:16-23.

F.    <u>Gap and Roots Perform In A Manner Consistent With The Terms of the Oral Agreements.</u>

In the two years following Roots' purchase of the OP inventory, Gap and Roots performed in a manner consistent with the oral agreement, demonstrating the parties' intent that Roots would funcation as a distributor of Gap merchandise in the Arabic-speaking countries of the Middle East and North Africa.

Roots, with Gap's approval open two multi-brand stores in Doha, Qatar, which began selling ISP and OP merchandise in 2004.  Although Gap now asserts that Roots resale of ISP merchandise to other retailers contradicts the terms of the Gap-Gabana agreements, Defs. Mem. at 6, 13, it never took that position prior to this litigation.  To the contrary, Gap (i) shipped the entire OP inventory, and later ISP merchandise, to Roots' warehouse in Dubai for distribution in various territories; (ii) approved Roots' resale of OP and ISP merchandise to other approved retailers; and (iii) routinely had discussions with Roots about expanding Roots' ISP sales to retailers in territories outside Qatar.

1.    *Gap Ships The OP Inventory Directly To Roots With Knowledge That Roots Would Re-Sell The Inventory To Retailers in Other Territories.*

Exh. D, 33:22-34:4.

Exh. A, 69:16–18.  In 2003,

Exh. B, 61:3-10; Exh. A, 78: 1-10.  Contemporaneous documents in the record further demonstrate Gap's awareness that Roots would be reselling the OP inventory to retailers located outside of Qatar:

6

1

2

3

- ███████████████████████████████████████████████████████████ Exh. L.

4

5

6

- ███████████████████████████████████████████████████ Exh. M.

7

8

9

10

11

- ███████████████████████████████████████████████████████
Exh. N.

12

13
2.      *Gap Routinely Discusses ISP Distribution Outside Qatar with Roots.*

14
Over the course of the parties' relationship, Gap routinely discussed directly with Roots the

subject of ISP distribution outside of Qatar.  To cite a few examples:

15

16

17

18
- ███████████████████████████████████████████████████████ Exh. O; Exh. B, 122:8-12.

19

20

21

22
- ███████████████████████████████████ Exh. P.

23

24

25
- █████████████ Exh. Q. █████████████████████████ Exh. B, 123:13-16.

26

27

28

7

3.   *Gap Is Aware of And Approves Roots' Resale of ISP Merchandise to The Approved Retailer in UAE.*

███████████████████████████████████████████████████

Exh. A, 138:22–24.[4]  Gap permitted Roots to sell ISP merchandise it purchased through Gabana to an approved retailer in the UAE.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████  Thus, Gap was well aware that Roots was reselling Gap ISP merchandise to A.A. Turki, which in turn resold it to RSH for retail sale in the UAE.  Exh. B, 165:4-9.  Ehab Al Sharif, an executive at A.A. Turki, confirmed the complete transparency to Gap of the relationship between Roots, A.A. Turki and RSH.  Exh. S, 15:8–16:18.

G.   <u>Gap Stalls In Approving New ISP Territories and Retailers, But Continues to Assure Roots That It Will Fulfill Its Contractual Obligation to Permit Roots to Sell First-Line Merchandise.</u>

Roots was ready to proceed with ISP distribution in Lebanon, Saudi Arabia and other markets.  Although Roots' retail operations in Qatar and UAE were successful, Gap failed to permit Roots to enter other markets within the agreed territory. ██████████████████

██████████  Exh. E, 174:18-20.

██████████████████████████████  Exh. A, 183:20; *see also id.* at 180:15–16 ████████

████████  Exh. A, 138:22–24.

8

[REDACTED] Exh. A, 80:13–16. In addition, the ISP program was never intended to generate profits, as Bell had suggested, but rather to protect Gap's international trademarks by conducting a minimal amount of business in foreign countries. [REDACTED] Exh. T, 16:10–22. [REDACTED]

Exh. B, 15:21-24. [REDACTED] Exh. A, 102:4-10; Exh. E, 179:3-10. Had Roots understood the true nature of the program, it would never have agreed to purchase the OP inventory. Abu Issa Decl. ¶ 7.

H.     Gap Changes Its Business Model in the Middle East and Promises to Make Roots Its Frachisee.

In late 2004 or early 2005, Gap informed Roots that it was considering changing its business model in the Middle East by establishing franchisees to operate stand-alone Gap stores. [REDACTED] Exh. F, 41:23–43:20, 61:8-12. [REDACTED] Id., 45:12-16. [REDACTED] Id., 48:20-22, 69:11–76:8.

Although Gap did eventually establish franchises in the Middle East, Roots was not made a franchisee. [REDACTED] Exh. A, 221:22–24.

9

I.    Gap Wrongfully Terminates Roots' Right to Sell First-Line Gap
      Merchandise, And Falsely Promises To Cure The Breaches of Its
      Contractual Obligations To Roots.

On August 10, 2005, Gap terminated the ISP Agreement with Gabana.  Punak Decl., Ex.

24.  Because Gap had thus far provided the ISP merchandise for Roots' retail stores (and those of

its retail partners in the UAE) solely through Gabana, the termination threatened to cut off Roots'

access to the first-line Gap goods necessary to run the stores. ████████████████████

████████████████████████████████████████████████████████████

Exh. E, 16:24–18:25.

## ARGUMENT

Summary judgment is proper only when a review of the record  reveals "no genuine issue

as to any material fact."  Fed. R. Civ. P. 56(c).  "Reasonable doubts as to the existence of material

factual issue are resolved against the moving part[y] and inferences are drawn in the light most

favorable to the non-moving party."  *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir.

2000).  So long as "a fair-minded jury *could* return a verdict for the plaintiff on the evidence

presented," a defendant's summary judgment motion must be denied.  *Anderson v. Liberty Lobby,*

*Inc.* 477 U.S. 242, 252 (1986).

I.    **The Record Supports Roots' First Contract Claim.**

    A.    The Evidence Establishes That Roots and Gap Entered Into A Binding
        Contract on May 14, 2003.

        1.    *The Parties Manifested Their Intent To Be Bound When Gap*
            *Accepted Roots' Down Payment for the OP Inventory.*

The record establishes that Gap and Roots entered into a binding oral contract on May 14,

2003 when Roots tendered, and Gap accepted, payment for the OP inventory.  Gap's argument that

Roots' *negotiations* with Gap in May 2003 did not result in an oral agreement, as "[n]either Roots

nor Gap viewed the conversations . . . as constituting a binding contract" is beside the point.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████Exh. E, 62:1-12 ████████████████████████████████

10

1        ████████████████████████████████████████████ *see also* Exh. F, 131:13–

2    132:4 ████████████████████████████████████████████████

3        ████ , 145:5-12 ███████████████████████████████████████████████████

4    ████████████████████████████ Under California law, "[p]erformance of the conditions of a

5    proposal . . . is an acceptance of the proposal," Cal. Civ. Code § 1584, and gives rise to a binding

6    contract. *See Los Angeles Traction Co v. Wilshire*, 135 Cal. 654, 658-659 (1902) (offeror's

7    promise to perform if the offeree will perform a particular act becomes binding when the offeree,

8    in reliance on such a promise, does the required act). By accepting Roots' payment for the OP

9    inventory, Gap manifested its assent to be bound by the terms of its offer to Roots. *See Snider v.*

10   *Roadway Packaging Systems*, No. C-99-02728 CRB, 2000 U.S. Dist. LEXIS 4688 at *9 (N.D. Cal.

11   Apr. 11, 2000) ("Mutual assent is typically manifested by means of the communication of an offer

12   and an acceptance between the parties.").

13            2.    *The Material Terms of the May 2003 Oral Contract Are Clear.*

14        Gap contends that the May 2003 agreement failed to "address and/or resolve material

15   terms" and is therefore too "indefinite" to constitute a binding agreement. Defs. Mem. at 15. This

16   argument fails because: (1) the May 2003 agreement contained all the material terms; and (2) any

17   arguable "indefiniteness" was cured by the parties' performance.

18        The essential terms of the oral agreement were expressly delineated in Gap's offer to

19   Roots, including: the price Roots would be required to pay for the OP inventory ($6 million); the

20   consideration Roots would receive in exchange for the purchase (*i.e.*, the right to sell first-line ISP

21   merchandise); and the territories to which those rights applied (all the Arabic-speaking countries).

22   Abu Issa Decl. ¶ 5. The cases cited by Gap in which courts found that the alleged agreements

23   failed for lack of definite terms bear no resemblance to the oral agreement between Roots and

24   Gap.[5]

25   _____

26        [5]    For example, the agreements at issue in *Weddington Prods. v. Flick*, 60 Cal. App. 4th 793 (1998), and *Avalon Products, Inc. v. Lentini*, 98 Cal. App. 2d 177 (1950), unlike the oral

27   contract here, *expressly* left material terms subject to future negotiation and agreement. In *Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1493 (D.C. Cir. 1984), the court found that the

28   absence of a duration term rendered an alleged consultancy agreement fatally uncertain. Central to

                                                11

1    Even if certain terms of the agreement remained indefinite following the negotiations, such

2    deficiencies were cured by the parties' performance. "[A]lthough an agreement may be indefinite

3    or uncertain in its inception, subsequent performance by the parties under the agreement will cure

4    this defect and render it enforceable." *Bohman v. Berg*, 54 Cal. 2d 787, 794-795 (1960) (internal

5    citations omitted); *see also* Williston on Contracts § 4:11 (4th Ed.) ("even if the oral agreement

6    prior to the act of performance did not constitute a contract, the subsequent tender of performance

7    would amount to an offer, and the receipt of such performance without objection would operate as

8    an acceptance of the offer"). Thus, Roots' payment of $6 million, Gap's acceptance of the

9    payment and subsequent shipment of the OP Inventory directly to Roots' warehouse, and both

10   parties' two-year course of performance during which both Gap and Roots performed in a matter

11   consistent with the oral agreement (*see supra* at 6-8), clearly establish the existence of an

12   enforceable agreement.

13       B.    <u>Roots Is Not Bound By the Written Agreements Between Gap and Gabana.</u>

14           1.    *Roots' Rights Are Not Derivative of the Gap-Gabana Agreements.*

15   Through selective citations to the record, Gap argues that Roots' rights with respect to Gap

16   merchandise derive from Gap's written agreements with Gabana. Defs. Mem. at 10. Gap simply

17   ignores the extensive testimony demonstrating that Roots traced its rights to a separate oral

18   agreement with Gap.



19

20       Exh. E, 127:5-8.

21       Exh. F, 84:7-9

22       *Id.*, 82:5-6.

23   Although, the parties initially intended to execute a back-to-back written contracts between

24   Gap and Gabana and Gabana and Roots, the LOU between Roots and Gabana was never

25   implement, and Roots never executed a written agreement with Gabana. Abu Issa Decl. ¶ 10.

26

27   the holding, however, was the fact that the plaintiff claimed that he was entitled to be paid by the
     hour, and therefore the total amount of his consultancy fee – which had been the central focus of
     the parties' negotiations – could not be determined without a duration term.

28

12

1    Instead, after receiving assurances from Jim Bell that Gap's oral offer to Roots was in place – *i.e.*,

2    that Roots would receive ISP rights in the Arabic-speaking countries in exchange for purchasing

3    the OP inventory – Roots accepted the offer by making a $1 million down payment toward the

4    purchase of the OP inventory, and later paying the remaining $5 million balance.  Abu Issa Decl. ¶

5    14.  Gap wrests entirely out of context a statement in one of Roots' agreements to the effect that

6    "Roots manages rights granted to Gabana Gulf Distribution . . . by GAP Inc," arguing that this

7    shows Roots understood its rights to be derivative of Gabana.

8

9

10                                              Exh. U, 119:14–120:9.

11              2.    *Larsen Had No Authority To Modify The Terms of Gap's Agreement*
                      *With Roots.*

12
     Gap asserts that Francois Larsen had actual or ostensible authority to modify Gap's

13    agreement with Roots by executing a written agreement between Gap and Gabana.    Neither theory

14    is supported by the record.

15        "Agency is the relationship which results from the manifestation of consent by one person

16    to another that the other shall act on his behalf and subject to his control."  *Van't Rood v. County of*

17    *Santa Clara*, 113 Cal. App. 4th 549, 571 (2003).  There is no evidence in the record that Roots

18    conferred upon Larsen the authority to act on its behalf.  According to Abu Issa, there was "never

19    any agreement that [Larsen] would act as an agent of Roots."  Abu Issa Decl. ¶ 13.  The testimony

20    cited by Gap, Defs. Mem. at 11, at most shows that Larsen occasionally functioned as a

21    "messenger" during the parties' negotiations by conveying information between Roots and Gap.

22    Exh. E, 109:22-23.    However, there is <u>no</u> evidence that Roots ever possessed the right to control

23    Larsen's actions.

24                              *Id.*, 36:16-18.  *Van't Rood*, 113 Cal. App. 4th at 572 ( "[I]n the

25    absence of the essential characteristic of the right to control, there is no true agency. . . .") (internal

26

27

28                                                  13

1    quotations omitted); *see also DeSuza v. Andersack*, 63 Cal. App. 3d 694, 699 (1976) (finding no

2    agency where neither party was "asserting the right to control the other").

3          Nor was Larsen "imbued with ostensible authority," Defs. Mem. at 12, to bind Roots to

4    any agreement that would limit its rights.  In order to establish ostensible authority, the principal

5    must intentionally communicate the existence of an agency relationship to a third person, or

6    negligently cause a third person to believe that there is an agency relationship.  *See Howell v.*

7    *Courtesy Chevrolet*, Inc. 94 Cal. Rptr. 33 (1971).  Gap argues that "Abu Issa was aware in May

8    2003 that Larsen had represented to Gap that Roots' principals . . . were 49% owners in Gabana,"

9    and therefore "Gap had no reason to believe that Larsen lacked authority to enter into written

10   agreements that would affect Roots' rights."  Defs. Mem. at 12.  (emphasis added).  This is

11   incorrect.  Abu Issa testified that he was aware Larsen informed Gap that the ownership of Gabana

12   "would be changed" following a proposed merger with Roots.  But the merger never occurred, and

13   Roots never represented to Gap that it had.  Gap continued to deal independently with Gabana and

14   Roots, recognizing that they were two separate entities.  Abu Issa Decl. ¶ 11.  In any event,

15   *Larsen's* representations to Gap are irrelevant to the question of ostensible agency, as the conduct

16   of the purported agent cannot not establish agency.  *See Mosesian v. Bagdasarian*, 260 Cal. App.

17   2d 361, 367 (1968).[6]

18         C.    The Evidence Shows That Parol Evidence Rule Has No Application In This
     Case.

19         Gap's argument that the evidence of Roots' oral contract is inadmissible under the parol

20   evidence rule fails for three separate reasons: (1) the parol evidence rule is inapplicable under the

21   established facts; (2) there is no inconsistency between the oral contract and the Gap-Gabana

22   agreements as interpreted by Gap; and (3) Gap is estopped from enforcing the Gap-Gabana in a

23   manner that would prejudice Roots' rights.

24         1.    *The Parole Evidence Does Not Apply Because Roots Is Not A Party*
     *to the Gap-Gabana Agreements.*

26   ———————————————

27   [6]  At a minimum, "ostensible authority is for a trier of fact to resolve.... [It] should not ...
     [be] decided by an order granting a summary judgment."  *American Cas. Co. of Reading,*
     *Pennsylvania v. Krieger*, 181 F. 3d 1113 (9th Cir. 1999) (internal quotations omitted).

28

1    Whether and under what circumstances the parol evidence rule can be invoked by or

2    against a non-party is an unresolved question under California law. *See, e.g., Hess v. Ford Motor*

3    *Co.*, 27 Cal. 4th 516, 526 n.2 (2002) (declining to "reach the issue of whether a stranger to the

4    contract may invoke the parol evidence rule.")  Some cases suggest that the rule precludes a non-

5    party from introducing evidence to alter or very the terms of a written agreement.  Roots, however,

6    does not seek to alter, interpret, or enforce the Gap-Gabana Agreements; it brings a claim for

7    breach of a separate oral contract between Roots and Gap.  Gap cannot cite a single case that would

8    permit it to avoid obligations under an oral contract by the simple expedient of entering into a

9    written contract with a third party on the same subject matter.

10    The principal case applying the parol evidence rule to a non-party, *Kern County Water*

11    *Agency v. Belridge Water Storage Dist.*, 18 Cal. App. 4th 77 (1993), is readily distinguishable and

12    does not support the application of the doctrine in this action.  In *Kern County*, a county water

13    agency brought a declaratory relief action to resolve a dispute with its 14 member water districts

14    concerning an amendment to a master water supply contract between the agency and the state,

15    which was incorporated by reference in agreements between the agency and each of the member

16    districts.

17    On the basis of the parol evidence rule, the trial court sustained the objection of two

18    districts to extrinsic evidence offered by the other districts as to the parties' intent with respect to

19    the amendment.  The Court of Appeals affirmed, holding that, although the extrinsic evidence that

20    the two districts sought to exclude technically pertained to contracts between other districts and the

21    agency, "the facts of this case strongly support the power of any member district to invoke the

22    parol evidence rule." *Id.* at 87.  In so finding, the Court noted that the amendment as to which the

23    two districts sought to introduce extrinsic evidence was incorporated by reference into the

24    agreements of all of the member districts.  As a result, "[t]he trial court could not interpret one

25    member district's contract without affecting the contractual rights and obligations of all parties."

26    *Id.*  Here, by contrast, Roots is not a party to the Gap-Gabana agreements; the agreements are not

27

28

15

1    identical to the agreement between Roots and Gap; and admitting evidence of Roots' oral

2    agreement with Gap will not affect the interpretation of the Gap-Gabana agreements.

        2.     *The Parol Evidence Rule Is Inapposite Because The Gap-Gabana*
              *Agreements Do Not Contradict Gap's Oral Agreement With Roots.*

4          The parol evidence rule is inapplicable for the additional reason that Roots' oral contract is

5    not inconsistent with the Gap-Gabana agreements.  Gap's obligations under its oral contracts

6    included permitting Roots to sell first-line Gap apparel in its own retail stores.  Abu Issa Decl. ¶ 5.

7    Gap's termination of the ISP Agreement – and its subsequent failure to provide first-line

8    merchandise to Roots by other means – constituted a breach of this contractual obligation.  Gap

9    does not suggest that this part of Roots' contract claim is in any way inconsistent with the Gap-

10   Gabana agreements.

11         As for Roots' claim that it had the contractual right to resell OP and ISP merchandise

12   outside of Qatar, Gap points to no provision of the Gap-Gabana agreements that expressly

13   prohibited Roots, as an authorized retailer, from reselling such merchandise to other Gap-approved

14   retailers for sale in authorized stores.  Gap's two-year course of performance under the agreements

15   demonstrates that Gap understood Roots' role as a retailer to include not only sales to consumers

16   but also sales to other retailers.  For example,

17   

18   

19                *See supra* at 7; *Nanakuli Paving & Rock Co. v. Shell Oil Co.*, 664 F.2d 772,

20   785 (9th Cir. 1981) ("actual performance of a contract" is "the most relevant evidence of how the

21   parties interpreted the terms of that contract.").

        3.     *Gap Is Estopped From Asserting An Interpretation Of The Gap-*
              *Gabana Agreements that Prejudices Roots' Rights.*

23         Even if the Gap-Gabana contracts could be interpreted in a manner prejudicial to Roots'

24   rights, Gap is estopped from asserting that interpretation.  "Whenever a party has, by his own

25   statement or conduct, intentionally and deliberately led another to believe a particular thing true

26   and to act upon such belief, he is not, in any litigation arising out of such statement or conduct,

27   

28                                            16

1  permitted to contradict it." Cal. Evid. Code § 623. By its conduct and affirmative representations

2  over the course of a two-year business relationship, Gap deliberately induced Roots to expend

3  considerable money and resources in reliance on the promise that Roots was entitled to purchase

4  first-line Gap merchandise from Gap (through Gabana) for re-sale (1) directly to consumers in

5  Roots own retail stores in Qatar and (2) to other Gap-approved retailers in other territories. Thus,

6  even if the Gap-Gabana agreements somehow precluded Roots from re-selling Gap apparel to other

7  retailers – and as explained above, they did not – the doctrine of estoppel would bar Gap from

8  enforcing this prohibition. *See Wagner v. Glendale Adventist Med. Ctr.*, 216 Cal. App. 3d 1379,

9  1388 (1989) ("When one party has, through oral representations and conduct or custom,

10  subsequently behaved in a manner antithetical to one or more terms of an express written contract,

11  he or she has induced the other party to rely on the representations and conduct or custom. In that

12  circumstance, it would be equally inequitable to deny the relying party the benefit of the other

13  party's apparent modification of the written contract.").

14      D.     The Statute of Frauds Does Not Bar Roots Oral Contract Claims.

15      Gap is also estopped from raising a statute of frauds defense to Roots' oral contract claims.

16  Estoppel applies where the defendant induced the plaintiff "seriously to change his position in

17  reliance on the contract," *or* where invalidating the contract would unjustly enrich the defendant.

18  *Monarco v. Lo Greco*, 35 Cal.2d 621, 623 (1950); *see also Allied Grape Growers v. Bronco Wine*

19  *Co.*, 203 Cal. App. 3d 432, 442 (1988) (defendant equitably estopped from invoking statute of

20  limitations to invalidate an oral contract for the sale of grapes). Both elements are satisfied here.

21      Gap argues that Root has suffered no "unconscionable" injury, since "virtually *all* of the

22  alleged acts of reliance on Roots' part occurred after it had received a copy of the Gap-Gabana

23  agreements and had been informed that the agreement did not include all of the terms it had hoped

24  for." Defs. Mem. at 16. Gap ignores the fact that Roots had already paid a $1 million down

25  payment toward the purchase of the OP inventory before it was shown a copy of the Gap-Gabana

26  agreements. Moreover, even after Roots saw the written agreements, Jim Bell confirmed that

27  Gap's oral agreement with Roots remained in place. In reliance on the existence of the oral

28

17

1   agreement, Roots was further induced "seriously to change [its] position" by paying an additional

2   $5 million for the OP, and by proceeding to expend considerable money and resources developing

3   an ISP retail network.  By the same token, Gap was unjustly enriched when it retained these and

4   other benefits Roots bestowed on it, while denying Roots the ISP rights it promised in exchange.

5   II.    **The Record Supports Roots' Second Contract Claim.**

6          The record establishes that Gap and Roots entered into a second oral agreement during a

7   collection presentation in San Francisco in June 2003.  Pursuant to that agreement, Gap promised

8   to grant Roots ISP rights, if Roots would develop an ISP retail network in the Arabic-speaking

9   world. *See supra* at 5-6.  Roots performed under the contract by, *inter alia*, establishing a

10  warehouse, visiting "many countries" to explore potential markets, vetting numerous local retailers,

11  and hiring a large staff.  Exh. E, 197:1-23.

12         Gap argues that this claim, like the first oral contract claim is barred by statute of frauds,

13  and the parol evidence rule, and is "fatally vague."  Each of these arguments fails for the reasons

14  explained above at p. 11-12.  Gap argues that the second oral contract claim lacks adequate

15  consideration because, Gap had already promised to grant Roots ISP rights under the earlier

16  contract in May.  This court previously rejected a similar argument, when it found that there was "a

17  triable issue whether the promise to pay for Gap's OP was intended to serve as consideration for

18  both the contract with Gabana and the contract with Gap."  1/28/2008 Order at 6 n.1.

19  III.   **The Record Supports Roots Claim for Breach of the Covenant of Good Faith and Fair Dealing.**

20         "California law implies a covenant of good faith and fair dealing in every contract,"

21  including Roots' oral contracts with Gap.  *Mundy v. Household Finance Corp.*, 885 F.2d 542, 544

22  (9th Cir. 1989).  Gap breached this implied covenant by, *inter alia*, (1) terminating Roots' ISP

23  rights (and failing to otherwise provide first-line merchandise to Roots for re-sale in the Middle

24  East) before Roots could reasonably have made a return on its substantial investment in the OP

25  inventory; and (2) failing to consider in good faith Roots' proposals to expand its ISP operations in

26  the territories that Gap promised to it.  Exh. V, 111:6–113:1

27

28

18

The record shows that Gap's conduct "unfairly interfered with [Roots'] right to receive the benefits of the contract," establishing a claim for breach of the implied covenant of good faith and fair dealing. *See Oculus Innovative Sciences, Inc. v. Nofil Corp.*, No C 06-01686 SI, 2007 WL 2600746, at *4 (N.D. Cal. Sept. 10, 2007).

## IV. The Record Supports Two Separate Claims for "Unfair" and "Unlawful" Practices Under Cal. Bus. & Prof. Code § 17200.

Gap's assertion that *both* of Roots' UCL claims are derivative of the contract and fraud counts is flatly contradicted by established law. <u>A claim for "unfair" business practices does not require any underlying predicate violation of law</u>. To the contrary, "a practice may be deemed unfair even if not specifically proscribed by some other law." *Blennis v. Hewlett-Packard Co.*, No. C 07-00333 JF, 2008 WL 818526, at *6 (N.D. Cal. Mar. 25, 2008) (citation omitted); *see also Progressive W. Ins. Co. v. Yolo County Superior Court*, 135 Cal. App. 4th 263, 286 (2005) (upholding 17200 claim for "unfair" business practices where complaint did not state a claim for breach of contract, or breach of the implied covenant of good faith and fair dealing).

"The determination of whether a particular business practice is unfair . . . involves an examination of its impact on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer." *Motors, Inc. v. Times Mirror Co.* 102 Cal. App. 3d 735, 740 (1980). The record establishes a basis for the claim: Gap induced Roots to purchase the OP inventory for an above-market price, and to expend money and resources liquidating the inventory and developing a retail network for Gap products in the Middle East, but then cut-off Roots' ability to sell first-line Gap merchandise before it could even recoup its investment. Moreover, Gap had no legitimate business justification for its conduct: Its apparent motivation for was to rid itself of quickly of outdated merchandise that it viewed as a liability.

## V. The Record Supports Roots' Common Law Fraud (Count Six)

The record demonstrates that Gap defrauded Roots by falsely promising to grant it distribution rights in the Middle East with no intent of doing so, and by failing to disclose material facts uniquely within Gap's knowledge concerning the ISP program.

19

1    Under California law, "where a promise is made without [the intention to perform], there is

2    an implied misrepresentation of fact that may be actionable fraud." *See Lazar v. Superior Court*,

3    12 Cal. 4th 631, 638 (1996). The record shows that Gap promised to grant Roots ISP rights in the

4    Middle East, and later promised to make Roots a franchisee in the same territory.[7] *See supra*

5    at 2-3, 9. Gap's own witness have admitted, however, that Gap never intended to grant Roots ISP

6    rights, and never actually considered making Roots Gap's franchise. *See supra* at 9. These

7    promises, which were false when made, are actionable as fraud.

8    Gap argues that any misrepresentations pre-dating the September 1, 2004 ISP Agreement –

9    such as Bell's false promise to grant Roots ISP rights – are barred by the parol evidence rule.

10   Although a party to a contract may not assert a fraud claim based on "prior or contemporaneous

11   statements at variance with the terms of a written integrated agreement," 1/28/08 Order at 7, <u>Roots</u>

12   <u>is not a party to the Gap-Gabana agreements</u>. Accordingly, while Gabana may be barred from

13   asserting fraud claims at variance with the terms of its written agreement with Gap, Roots is not.

14   To hold otherwise would allow any party to avoid liability for fraudulent promises to a party by

15   unilaterally executing a contract on the same subject matter with a different party. Moreover,

16   Gap's fraudulent promises to grant Roots the right to sell first-line Gap merchandise directly to

17   consumers in its own retail stores in Qatar and to Gap-approved retailers in other territories were

18   not inconsistent with the terms of the written agreements between Gap and Gabana. Thus, even if

19   the parol evidence rule did apply, it would not bar Roots' fraud claim.

20   Even if the promise to grant Roots ISP rights had been true, Gap nevertheless defrauded

21   Roots by presenting the program as "a tremendous opportunity for Roots to establish and grow a

22   profitable retail network for Gap merchandise in the Arabic-speaking world." Abu Issa Decl. ¶ 6.

23   Gap's witnesses now concede that Gap actually regarded the program as "commercially

24

25         [7]   Gap's suggestion that the promise to make Roots a franchisee was too "vague" or
     "qualified" to be actionable, and that Roots cannot show detrimental reliance, are incorrect. Defs.
26   Mem. at 21. Al-Thani testified that Young made an unequivocal promise that if Gap switched to a
     franchise model, it would make Roots the franchisee in the same territories where Roots was
27   entitled to distribute ISP. *See supra* at 9. In reliance on that promise, Roots prepared a market
     study, and also traveled extensively in the region to investigate potential markets. *See id.*
28

                                                  20

1    irrelevant." The purpose of ISP was to protect Gap's foreign trademarks, "not to drive revenue or

2    sales." Exh. T, 16:10-22. Gap attempts to avoid liability by arguing that "the failure to disclose a

3    fact does not constitute fraud unless the defendant is legally bound to disclose it." Defs. Mem. at

4    20. However, "nondisclosure or concealment may constitute actionable fraud: . . . [1] when the

5    defendant had exclusive knowledge of material facts not known to the plaintiff . . ., or [2] when the

6    defendant makes partial representations but also suppresses some material facts." *LiMandri v.*

7    *Judkins*, 52 Cal. App. 4th 326, 336 (1997). Because the ISP rights were to be the sole

8    consideration exchanged for Roots' $6 million payment to Gap, the fact that the ISP program was

9    intended for trademark protection, not commercial profit, was highly material. Indeed, had Gap

10   disclosed "the true nature of the ISP program, Roots would never have agreed to pay $6 million for

11   the OP inventory to acquire ISP rights." Abu Issa Decl. ¶ 7. This information was also uniquely

12   within Gap's knowledge. The failure to disclose it was fraudulent.

13        Gap's was also obligated disclose the true purpose of the ISP program because Bell's

14   representations about the ISP program were, on their own, misleading. Bell's failure to disclose

15   "facts which materially qualify those stated" was fraudulent. *Vega v. Jones, Day, Reavis & Pogue*,

16   121 Cal. App. 4th 282, 294 (2004) (internal quotations omitted)

17   VI.    **The Record Supports Roots' Equitable Claims (Counts Seven, Eight, and Nine).**

18        A.    Roots' Equitable Claims Were Timely Filed.

19        Gap fundamentally misconstrues the events that trigger the running of the limitations period

20   for Roots' promissory estoppel and quasi-contract claims. Gap's contention that the promissory

21   estoppel claim is time-barred to the extent it is based on promises made prior to June 25, 2005,

22   Defs. Mem. at 11, incorrectly assumes that a promissory estoppel claim accrues immediately when

23   the promise is made. But a promise is only one element of the claim. The plaintiff must also

24   plead: (1) reasonable and foreseeable reliance on the promise; and (2) a resulting injury. *See J.W.*

25   *Van Hook v. Southern Cal. Workers Alliance, Local 17,* 158 Cal. App. 2d 556, 570 (1958). Roots'

26   promissory estoppel claim did not accrue when Gap *made* its promises, but rather when Gap

27   *breached* the promises, causing injury to Roots. *See Chambers v. Kay*, 106 Cal. Rptr. 2d 702, 719

28

21

1    (citing *Budd v. Nixen,* 6 Cal. 3d 195, 200-201 (1971)) ("Until the defendant's conduct causes

2    damages to the plaintiff, no cause of action has been generated and the period of limitations is not

3    triggered."). Thus, the statute of limitations for Roots' promissory estoppel claim began to run no

4    earlier than August 10, 2005 – the date that Gap wrongfully terminated its ISP agreement with

5    Gabana and ceased providing ISP merchandise to Roots.

6         "[A] suit for breach of an implied contract, which is the essence of a quantum meruit

7    claim," likewise "accrues at the time of the breach." *Kramer v. Thomas*, No. CV 05-8381 AG,

8    2006 WL 4729242, at *14 (C.D. Cal. Sept. 28, 2006). As for the restitution claim, although Gap

9    received various benefits at Roots' expense throughout the course of their business relationship,

10   Gap's obligation to make restitution was not triggered until "the circumstances [were] such that . . .

11   it [was] *unjust* for [Gap] to retain [the benefits]." *McBride v. Boughton*, 123 Cal. App. 4th 379,

12   389 (2004) (emphasis in original). Thus, Root's quantum meruit and quasi-contract/restitution

13   claims likewise did not accrue before Gap cut off Roots' supply of first-line Gap merchandise in

14   August, 2005.

15        All three claims were timely filed within two years of the date of accrual.

16       B.    <u>Gap Is Equitably Estopped From Invoking The Statute of Limitations</u>
             <u>Because It Induced Roots To Refrain From Filing Suit.</u>

17

18        Gap's statute of limitations defense fails on the ground of estoppel. Under California law, a

19   defendant who represents that "actionable damage has been or will be repaired, thus making it

20   unnecessary to sue" is estopped from invoking the statute of limitations. *Lantzy v. Centex Homes*,

21   31 Cal. 4th 363, 383-384 (2003). The record shows that Gap promised that it would compensate

     Roots for its injuries, thus making it unnecessary for Roots to file suit.

22

23

24

25   

26

27

28   161:13–162:4. The record establishes that after Gabana brought its lawsuit, Gap persuaded Roots

22

1    not to file its own suit, by falsely asserting that it would cure Roots injuries by granting it franchise

2    rights. Gap is therefore estopped from invoking the statute of limitations as a bar to Roots'

3    equitable claims.

4          C.      Roots' Promissory Estoppel Claim is Supported by the Record.

5          Gap's assertion that the record fails to establish "clear and unambiguous" promises that

6    Gap made to Roots is untenable. Most notably, Gap promised to grant Roots the right to distribute

7    first-line merchandise in the Arabic-speaking countries – a promise Gap breached when it cut-off

8    Roots' access to ISP merchandise in August 2005.

9          The cases Gap relies on are easily distinguished. In *Aguilar v. Int'l Longshoremen's Union*,

10   966 F.2d 443, 446 (9th Cir. 1992), the court held that a union's representation to applicants that

11   "job experience would be considered did not constitute a clear and definite promise that previous . .

12   . experience would be the determinative factor. . . ." The court's holding that the plaintiffs could

13   not "transform" their "inferences . . . into an enforceable promise," *id.*, has no application to Roots'

14   claim. The defendant's vague promise in *B&O Mfg., Inc. v. Home Depot U.S.A., Inc.*, No. C 07-

15   02864 JSW, 2007 U.S. Dist. LEXIS 83998, at *16-17 (N.D. Cal. Nov. 1, 2007), "to provide

16   substantial quantities of future business" is far less definite and certain than Gap's promise to grant

17   Roots ISP – and later franchise – rights for a specific product in a specified territory.

18          D.      There Are No Written Agreements Covering The Same Subject Matter As
                    Roots' Quasi-Contract and Promissory Estoppel Claims.

19          There is no written contract governing the rights Roots seeks to enforce in this action.

20   Roots was not a party to the Gap-Gabana agreements, and it claims no rights under those

21   agreements. The LOU, signed by Gabana and Roots in May 2003, was never implemented and the

22   Gabana-Roots agreements contemplated by the LOU were never executed.

23

24

25

26

27

28
                                            23

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CONCLUSION

For the reasons stated above, the Court should deny Defendants' motion for summary judgment in its entirety.

COVINGTON & BURLING LLP

By:    /s/ Robert P. Haney
      ROBERT P. HANEY
      BRADLEY J. NASH
      PAMELA SAWHNEY

24