KEKER & VAN NEST, LLP
DARALYN J. DURIE - #169825
CHRISTA M. ANDERSON - #184325
DAN JACKSON - #216091
ROSE DARLING - #243893
REBEKAH PUNAK - #248588
710 Sansome Street
San Francisco, CA  94111-1704
Telephone:  (415) 391-5400
Facsimile:  (415) 397-7188

Attorneys for Defendants
THE GAP, INC., a/k/a, GAP, INC., GAP INTERNATIONAL
SALES, INC., BANANA REPUBLIC, LLC, AND OLD NAVY,
LLC

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ROOTS READY MADE GARMENTS CO. W.L.L.,<br><br>Plaintiff,<br><br>v.<br><br>THE GAP, INC., a/k/a, GAP, INC., GAP INTERNATIONAL SALES, INC., BANANA REPUBLIC, LLC, AND OLD NAVY, LLC<br><br>Defendants. | Case No. C 07-03363 CRB<br><br>**REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION**<br><br>Date:      August 29, 2008<br>Time:     10:00 a.m.<br>Dept:     8<br>Judge:    Honorable Charles R. Breyer<br><br>**Trial Date: October 6, 2008** |

**PUBLIC VERSION**

REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR, IN THE
ALTERNATIVE, SUMMARY ADJUDICATION
CASE NO. C 06-2584 CRB (EDL)

423224.01

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION .................................................................................................. i

II.   ARGUMENT ........................................................................................................1

    A.    Roots' oral contract claims fail as a matter of law...................................1

        1.    Roots is bound by the terms of the written agreements, which
            bar Roots' oral contract claims. ...................................................1

            a.    It is undisputed that Roots understood and agreed that
                the written agreements between Gap and Gabana would
                govern any rights Roots had to sell Gap merchandise....................1

            b.    Roots authorized Larsen to execute written agreements
                governing Roots' alleged rights. ....................................................4

        2.    The parol evidence rule bars Roots' oral contract claims............................6

        3.    There is no evidence of an enforceable oral contract. .................................9

            a.    The evidence shows beyond dispute that the parties
                never intended to enter into a binding oral agreement...................9

            b.    The alleged oral agreement is fatally uncertain. .............................9

        4.    The statute of frauds bars Roots' oral contract claims.............................10

    B.    Roots' second oral contract claim fails for all of the reasons that its
        first claim fails, as well as the fact that, <u>as Roots concedes</u>, there was
        no second oral contract. .............................................................................11

    C.    Roots' claim for breach of the implied covenant fails because there
        was no contract between Roots and Gap and because the implied
        covenant claim is superfluous.................................................................11

    D.    Roots' fraud claim fails.............................................................................11

        1.    Roots' assertion that Gap promised Roots ISP rights with no
            intention of performing cannot support Roots' fraud claim. ....................12

        2.    Roots' assertion that Gap promised Roots franchise rights with
            no intention of performing cannot support Roots' fraud claim. ...............12

        3.    Roots' assertion that Gap failed to disclose its internal view of
            the ISP program cannot support Roots' fraud claim...................................13

    E.    Roots' 17200 claim fails. .........................................................................13

    F.    Roots' quasi-contract claims fail. ............................................................14

III.   CONCLUSION....................................................................................................15

i

423224.01

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*All-Tech Telecom, Inc. v. Amway Corp.,*
174 F.3d 862 (7th Cir. 1999) ...................................................................................14

*B & O Manufacturing, Inc. v. Home Depo U.S.A., Inc.,*
No. C 07-02864-JSW, 2007 U.S. Dist. LEXIS 83998 (N.D. Cal. Nov. 1, 2007) ...................14

*Block v. City of L.A.,*
253 F.3d 410 (9th Cir. 2001) .............................................................................2, 3, 4

*City of Oakland v. Comcast Corp.,*
No. C 06-5380 CW, 2007 U.S. Dist. LEXIS 14512 (N.D. Cal. Feb. 14, 2007)...............14

*GoEngineer, Inc. v. Autodesk, Inc.,*
No. C 00-4595-SI, 2002 U.S. Dist. LEXIS 2540 (N.D. Cal. Feb. 14, 2002) ...................13

*Inamed Corp. v. Kuzmak,*
275 F. Supp. 2d 1100 (C.D. Cal. 2002) ...................................................................4, 5

*MediaNews Group, Inc. v. McCarthey,*
494 F.3d 1254 (10th Cir. 2007) ...........................................................................9, 10

*Okura & Co., Inc. v. Careau Group,*
783 F. Supp. 482 (C.D. Cal. 1991) ...........................................................................12

*Weisberg v. U.S. Department of Justice,*
745 F.2d 1476 (D.C. Cir. 1984) ...............................................................................10

## STATE CASES

*Beck v. America Health Group International,*
211 Cal. App. 3d 1555 (1989) ...................................................................................9

*Cal. Medical Association v. Aetna U. S. Healthcare of Cal.,*
94 Cal. App. 4th 151 (2001) ...................................................................................14

*Guz v. Bechtel National, Inc.,*
24 Cal. 4th 317 (2000) ...........................................................................................11

*Kern County Water Agency v. Belridge Water Storage District,*
18 Cal. App. 4th 77 (1993) ...................................................................................6, 7

*Lantzy v. Centex Homes,*
31 Cal. 4th 363 (2003) ...........................................................................................15

*Navrides v. Zurich Insurance Co.,*
5 Cal. 3d 698 (1971) ...............................................................................................5

*Norcal Mutual Insurance Co. v. Newton,*
84 Cal. App. 4th 64 (2000) ...................................................................................5, 6

ii

REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR, IN THE
ALTERNATIVE, SUMMARY ADJUDICATION
Case No. C 07-03363 CRB

423224.01

1   *Pac. Sw. Development Corp. v. Western P. R. Co.*,
    47 Cal. 2d 62 (1956) ...........................................................................8, 10, 11
2
    *Pacesetter Homes, Inc. v. Brodkin*,
3   5 Cal. App. 3d 206 (1970) .................................................................12

4   *Progressive West Insurance Co. v. Superior Court*,
    135 Cal. App. 4th 263 (2005) .............................................................13
5
    *Robinson & Wilson, Inc. v. Stone*,
6   35 Cal. App. 3d 396 (1973) ................................................................10

7                                **STATUTES**

8   Business & Professions Code Section 17200 ..............................................13

9   Code of Civil Procedure section 1856 ....................................................6

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

iii

423224.01

1

### I.    INTRODUCTION

2      This Court should grant summary judgment in Gap's favor because Roots' claims are

3  barred by written agreements between Gap and Roots' business partner, Gabana Gulf

4  Distribution Ltd. ("Gabana").  Roots admits that it knew that Gap required written agreements

5  and that it authorized Francois Larsen of Gabana to negotiate those agreements on Roots' behalf.

6  Roots is bound by the terms of the written agreements, which are fatal to Roots' claims.

7      The written agreements specify, among other things, that Gabana (not Roots) would

8  purchase and sell excess inventory from Gap; that Gabana (not Roots) would receive ISP

9  distribution rights from Gap; that Gabana would sell merchandise directly to retailers, not sub-

10  distributors; that the distribution rights were terminable at will on 90-days' notice; and that Gap

11  could not be held liable for damages of any kind allegedly resulting from such termination.  The

12  idea that Gap decided to forego those provisions, as well as the extensive trademark protections

13  and other essential terms set forth in the written agreements, and instead to proceed under an

14  inconsistent and fatally uncertain alleged oral agreement with Roots, not only defies common

15  sense but is refuted by the undisputed evidence and Roots' own admissions.

16      Roots' opposition cannot revive its claims.  Roots relies primarily on a new declaration

17  from its former CEO, Ashraf Abu Issa, which states, contrary to his deposition testimony, that a

18  Gap employee agreed to proceed under the alleged oral agreement rather than the written

19  agreements.  But the law is clear that Roots cannot manufacture a genuine dispute of fact by

20  having its witness disagree with himself.  The evidence, including Mr. Abu Issa's own sworn

21  testimony, leaves no doubt that Roots understood and agreed that any rights it had would be

22  governed by the written agreements between Gap and Gabana and that Gap **never** agreed to

23  operate under any alleged oral agreement.

24      For these reasons and others set forth in detail below and in Gap's opening brief, the

25  Court should grant Gap's motion for summary judgment.

26

27

28

i

423224.01

## II.    ARGUMENT

**A.    Roots' oral contract claims fail as a matter of law.**

    **1.    Roots is bound by the terms of the written agreements, which bar Roots' oral contract claims.**

    Roots' claims for breach of alleged oral contracts fail because there is no genuine dispute of fact that Roots' alleged rights with respect to Gap merchandise were governed by the written agreements between Gap and Gabana. There were no separate oral contracts between Gap and Roots. And even if there were, any oral agreement was entirely superseded by the written agreements between Gap and Gabana, which bind Roots because they were admittedly negotiated by Francois Larsen on Roots' behalf.

        **a.    It is undisputed that Roots understood and agreed that the written agreements between Gap and Gabana would govern any rights Roots had to sell Gap merchandise.**

    The testimony, documentary evidence, and pleadings in this case leave no doubt that any rights Roots had to sell Gap merchandise were derivative of and governed by the written agreements between Gap and Gabana. In its attempt to avoid the fatal effect of the written agreements, Roots accuses Gap of "selective citations to the record," and argues that "extensive testimony" shows that Roots "traced its rights to a separate oral agreement with Roots." Opp. at 12. Roots, not Gap, is employing "selective citations." For example, while Roots claims that Roots' owner, Sheikh Faisal Al-Thani, was "unequivocal" that the "contract between Gabana and Gap has nothing to do with us" (*id.*), in fact, when asked whether Roots had any rights under the written ISP contract between Gap and Gabana, Mr. Al-Thani testified that **the written agreements** gave Roots "[d]istribution, the ownership of the ISP's in the whole Middle East, all Arabic-speaking countries" and that Roots, not Gabana, was really getting the rights set forth in the written Gap-Gabana agreements. Declaration of Dan Jackson filed herewith ("Jackson Decl") Ex. A (Al Thani Dep.) at 84:21–86:2; 94:13–95:5.

    Similarly, Roots cites Abu Issa's testimony that "the oral agreement was directly between Gap and Roots" (Opp. at 12), but leaves out his admission, immediately thereafter, that Gap **"wanted to have this in writing, okay, and they wanted to do it through Gabana."** Nash

423224.01

1   Decl. Ex. E at 127:9-10 (emphasis added).

2        In a declaration submitted with Roots' opposition papers, Abu Issa now claims, **for the**

3 **first time**, that Jim Bell of Gap told him that Roots could rely on Gap's alleged oral offer,

4 notwithstanding that the written agreements that Gap required contradicted its terms. *See* Abu

5 Issa Decl. ¶ 17. But Abu Issa "cannot create a genuine issue of material fact to survive summary

6 judgment by contradicting his earlier version of the facts." *Block v. City of L.A.*, 253 F.3d 410,

7 419 n.2 (9th Cir. 2001). At his deposition, Abu Issa admitted that **nobody at Gap ever told him**

8 **that Gap was willing to do business without a written contract**. Ex. 4 at 52:19-23.[1] Abu Issa

9 also testified that "Roots' understanding with Gap required the execution of a contract between

10 Gap and Gabana," that the "written contract that Gap entered into with Gabana was in

11 furtherance of the understanding that Roots had based on its discussions directly with Gap," and

12 that Gap never told Roots that it would not be necessary for Gap and Gabana to enter into a

13 written agreement. *Id.* at 33:18–35:1. When asked whether he understood "that there would

14 need to be a written contract executed with Gap," Abu Issa answered:

15      **Yes**. The normal practice, yes, is to have—you know, after you discuss things
     verbally, you agree on things verbally, to put it in writing. And that's what we
16      wanted, you know. We always had this verbal agreement and verbal contract
     with Gabana, and that's what we wanted to always document. **And that's how**
17      **we always ask Mr. Francois to negotiate the contract with Gap.**

18 *Id.* at 52:6-18 (emphasis added).

19 ████████████████████████

20 ████████████████████████

21 ████████ Ex. 1 at 91:10-13. Abu Issa testified that when he mentioned concerns

22 about the written contracts to Bell, rather than agreeing that the parties would proceed under

23 some prior oral agreement, Abu Issa and Bell instead discussed that "later on we can maybe

24 improve some of those terms" or "negotiate another [agreement] when we go to San Francisco."

25 Ex. 4 at 67:24–71:8. And when asked why the Letter of Understanding ("LOU") between

26 Gabana and Roots states that "Gabana and not Roots had been offered to enter into a new

27 _____

[1] Unless otherwise indicated, exhibit references are to the sealed Declaration of Rebekah Punak
28 filed on July 25, 2008 with Gap's opening brief.

423224.01

1  distribution agreement," Abu Issa testified, **"Because officially that's what happened."** *Id.* at

2  27:13-22.

3       Furthermore, although Abu Issa now claims that the Gabana-Roots LOU was

4  "contingent" on Roots' satisfaction with the Gap-Gabana agreements (Abu Issa Decl. ¶ 10), the

5  LOU says nothing of the kind, as Abu Issa conceded at his deposition. Jackson Decl. Ex. B (Abu

6  Issa Dep.) at 26:10–31:13; Punak Decl. Ex. 13. And Roots' claim that Roots and Gap chose to

7  proceed under an alleged oral agreement and ignore the written agreements between Gap and

8  Gabana on the one hand, and Gabana and Roots on the other, makes no sense in light of the

9  undisputed fact that Roots and Gabana███████████████████████████████████████████

10 ████████████████████████████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████████████████

12 ██████████████████████████████████████████ When asked "Why were Roots and

13 Gabana spending so much time trying to negotiate an ISP Distribution Agreement, if Roots

14 already had rights directly from Gap," Roots employee Naser Beheiry—the individual actually

15 engaged in those negotiations—admitted, "I have no answer for that." Jackson Decl. Ex. C

16 (Beheiry Dep.) at 94:17-21. ████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████████████████████████

18 ██████████████████ When asked what that meant, Mr. Beheiry testified: "That means that Gabana

19 gives Roots the right to manage the ISP program that has been granted by Gap." Ex. 18 at 88:5–

20 89:7. When Bell made clear that requests from Roots would only be considered "under our

21 Distributor Contract with Gabana," and that "it is necessary that we follow the process within

22 that contract," nobody from Roots ever objected or asserted any contractual rights directly

23 between Roots and Gap. Ex. 4 at 100:24–103:4.

24       And while Roots now claims that it believed Gap's alleged contractual obligations to

25 Roots survived Gap's termination of the written agreements with Gabana, its prior admissions

26 refute this assertion. For example, in Roots' initial complaint, it alleged that "Gap wrongfully

27 ended its relationship with Roots **by terminating its distribution agreement with Roots'**

28 **immediate licensor, Gabana Gulf Distribution, Ltd."** Compl. (Doc. 1) ¶ 6. ████████████

3

REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR, IN THE
ALTERNATIVE, SUMMARY ADJUDICATION
Case No. C 07-03363 CRB

423224.01

1 ██████████████████████████████████████████████████

2 ████████████████████████ Jackson Decl. Ex. D (9/10/07 Abu Issa Dep.)

3 at 40:22-25.[2]

4    Thus, the undisputed evidence here shows that Roots understood and agreed that any

5 rights it had with respect to Gap merchandise were not predicated on an oral contract but instead

6 derivative of and governed by the written agreements between Gap and Gabana.

7    **b.    Roots authorized Larsen to execute written agreements governing**
        **Roots' alleged rights.**

8
9    Furthermore, even if an oral contract between Gap and Roots originally existed, it was

10 superseded by the written agreements that Francois Larsen negotiated and executed as Roots'

11 agent. Roots now claims that Larsen was simply a "messenger" in the negotiations, over whom

12 Roots had no control. But it is undisputed that Roots gave Larsen actual authority to negotiate

13 on its behalf. Roots cannot avoid the consequences by claiming after the fact that he acted

14 beyond his authority. For example, in *Inamed Corp. v. Kuzmak*, 275 F. Supp. 2d 1100 (C.D. Cal.

15 2002), the Kuzmaks—like Roots—sought to avoid an agreement by submitting declarations that

16 while the person who executed the agreement was authorized to negotiate on their behalf, he was

17 not authorized to enter into a binding agreement. The court rejected that argument. "If the

18 Kuzmaks took the position that Hunt had authority to negotiate, but not to finalize, a settlement

19 on their behalf, they had an affirmative obligation, in the context of the parties' negotiations, to

20 advise Inamed of this fact." *Id.* at 1119.

21    Here, the undisputed evidence leaves no doubt that Roots gave Larsen actual authority to

22 act as its agent in the negotiations with Gap and never indicated to Gap (or anyone else) that

23 Larsen lacked authority to enter into written agreements that would govern Root's rights. As

24 Roots' 30(b)(6) witness on Roots' contract claims, Abu Issa testified that Roots relied upon

25 Larsen to represent its interests in negotiating the written agreements between Gap and Gabana.

26 Ex. 4 at 35:11–37:17. Because Roots understood that "there would need to be a written contract

27 ─────────────────
[2] At his subsequent deposition, Abu Issa tried to back away from this clear admission, but he
28 cannot create a genuine dispute of fact by contradicting his earlier version of the facts. *Block*,
253 F.3d at 419 n.2.

REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR, IN THE
ALTERNATIVE, SUMMARY ADJUDICATION
Case No. C 07-03363 CRB

423224.01

1  executed with Gap," Roots "always ask[ed] Mr. Francois to negotiate the contract with Gap." *Id.*

2  at 52:4-18. Roots provided Larsen with a letter stating, ███████████████████

3  ███████████████████████████████████████████████████████████

4  ███████████████████████████████████ Ex. 12. Abu Issa confirmed that

5  Roots in fact authorized Larsen to communicate its offer, and when asked "was Mr. Larsen also

6  authorized to serve as the intermediary between Roots and Gap in the subsequent negotiations?"

7  Abu Issa answered, "Exactly." Ex. 4 at 60:2-10. And Abu Issa testified that, as Roots alleged in

8  its original complaint before this Court, Larsen "negotiated with Bell on behalf of Gabana **and**

9  **Roots**." *Id.* at 171:12-18 (emphasis added).

10      Roots never indicated any limitations on Larsen's authority to act on Roots' behalf or to

11  enter into written agreements governing Roots' alleged rights. Even after Abu Issa allegedly

12  became concerned that the written agreements did not contain all of the terms he wanted, he did

13  not disavow Larsen's authority or the agreements but instead chose to proceed in the hopes that

14  "later on we can maybe improve some of those terms." Ex. 4 at 67:24–71:8. And while Roots

15  claims that it was not involved in the negotiation of the September 1, 2004 ISP agreement, it

16  never took any steps to revoke Larsen's authority and, to the contrary, hired Larsen as its CEO in

17  January 2005. *See* First Am. Compl. (Doc. 22) ¶ 72. Thus, as in *Inamed*, Roots is bound by the

18  written agreements that Larsen executed on Roots' behalf. *See Inamed*, 275 F. Supp. 2d at 1119.

19      Moreover, Roots' attempt to retroactively renounce Larsen's authority fails in the face of

20  Roots' admission that, as it has claimed from the inception of this case, Roots was the "main

21  beneficiary" of the written agreements that Larsen executed. Ex. 4 at 53:22–54:4; *see also* First

22  Am. Compl. (Doc. 22) ¶¶ 45, 84-85. As the court held in *Norcal Mutual Insurance Co. v.*

23  *Newton*, 84 Cal. App. 4th 64 (2000), when a principal seeks the benefit of an agent's transaction,

24  it ratifies that transaction, and must accept its burdens along with its benefits. *Id.* This follows

25  from the "elementary rule of agency law that a principal is not allowed to ratify the unauthorized

26  acts of an agent to the extent that they are beneficial, and disavow them to the extent that they are

27  damaging. If a principal ratifies part of a transaction, he is deemed to ratify the whole of it."

28  *Navrides v. Zurich Ins. Co.*, 5 Cal. 3d 698, 704 (1971).

423224.01

1    Here, it is undisputed that Roots sought to benefit from Larsen's actions and the written

2    agreements. *See, e.g.*, Ex. 4 at 53:22–54:4. Indeed, Roots' initial theory before this Court was

3    that it was the third party beneficiary of the written agreements. *See* First Am. Compl. (Doc. 22)

4    ¶¶ 45, 84-85. By attempting to benefit from Larsen's actions and the written agreements, Roots

5    ratified both, and cannot now "pick and choose" the portions of the Gap-Gabana agreements that

6    it wishes to enforce—Roots is bound by the written agreements in their entirety. *Norcal*, 84 Cal.

7    App. 4th at 82.

8    Finally, Roots' argument that Larsen did not even have ostensible authority to bind Roots

9    cannot withstand scrutiny. As the cases on which Roots relies acknowledge, Larsen acted with

10    ostensible authority if Roots led Gap to believe that Larsen had authority to negotiate on Roots'

11    behalf. Opp. at 14. Abu Issa admitted that he knew that Gap wanted to have only one point of

12    contact in the negotiations **and agreed that Larsen would be that person**. Ex. 4 at 37:4-17.

13    Thus, while, as shown above, the undisputed facts show that Larsen had actual authority to bind

14    Roots, he also had ostensible authority given that Roots agreed with Gap that their relationship

15    would be governed by written agreements between Gap and Gabana and that Larsen would

16    negotiate those agreements on Roots' behalf.

17    **2.    The parol evidence rule bars Roots' oral contract claims.**

18    Roots' oral contract claims are barred by the parol evidence rule. Roots argues that the

19    parol evidence rule does not apply because Roots is not a party to the written agreements. But as

20    shown above, Roots is bound by those agreements because it authorized Larsen to execute them

21    on Roots' behalf and agreed that any alleged rights Roots had with respect to Gap merchandise

22    would be governed by those agreements.

23    Furthermore, even if Roots could be characterized as a "stranger" to the Gap-Gabana

24    agreements—and it cannot—the parol evidence rule still applies, as this Court has previously

25    recognized. Prior to 1978, Code of Civil Procedure section 1856 included language limiting its

26    application to contracting parties, and case law interpreted that language as making the parol

27    evidence rule inapplicable in actions involving a stranger to the contract. *Kern County Water*

28    *Agency v. Belridge Water Storage Dist.*, 18 Cal. App. 4th 77, 86 (1993). The limiting language

6

1   was deleted in a 1978 amendment, however, following criticism of the practice of allowing

2   extrinsic evidence contrary to the terms of a written agreement. *Id.* "The deletion was

3   substantive and not merely an oversight." *Id.* Accordingly, the parol evidence rule now

4   precludes the introduction of evidence contradicting the terms of a writing "even though the

5   action is between a party to the contract and a stranger." 2 Witkin, Cal. Evid. 4th (2000) Doc.

6   Evid, § 112, p. 230; *Kern*, 18 Cal. App. 4th at 86.

7        Roots attempts to distinguish *Kern* on the grounds that there, the "strangers" to the

8   contract were parties to other, interrelated contracts, such that the trial court "could not interpret

9   one . . . contract without affecting the rights and obligations of all parties." *Kern*, 18 Cal. App.

10   4th at 87. But the same is true here. Abu Issa has admitted that Gap insisted on the written

11   agreements with Gabana and that those written agreements were "in furtherance" of the alleged

12   oral agreement between Roots and Gap. Ex. 4 at 33:18–35:1. Here, as in *Kern*, therefore, the

13   alleged oral agreement between Roots and Gap is related to—and would contradict—the written

14   agreements between Gap and Gabana.

15        Roots also argues that its alleged oral contracts are consistent with the Gap-Gabana

16   agreements, but this argument is contrary to the undisputed evidence and this Court's prior

17   rulings. The written agreements provide that Gabana, not Roots, would purchase the excess

18   inventory and obtain rights to sell Gap merchandise directly and exclusively to retailers—not to

19   sub-distributors. *See* Ex. 16 § 1(f). The written agreements are also terminable at will on 90-

20   days' notice and waive any damages allegedly resulting from such termination. *See id.* § 9(d),

21   (j).[3] All of these provisions are incompatible with the oral agreement Roots alleges, under which

22   Roots allegedly purchased the excess inventory and obtained ISP distribution rights, the goods

23   flowed from Gabana to Roots in a sub-distribution arrangement, the distribution rights were not

24   terminable at will on 90-days' notice, and Gap is purportedly liable for damages allegedly arising

25   from the termination. *See, e.g.*, Abu Issa Decl. ¶¶ 9, 15; Third Am. Compl. (Doc. 131) ¶¶ 113-

26   125.

27

28

---

[3] Notably, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

423224.01

1    Roots argues that Gap is estopped from asserting the parol evidence rule because Gap

2 allegedly acted in a manner that was antithetical to the terms of the written agreements. But

3 Roots' 30(b)(6) witness admitted that Gap **never** stated that it would do business without a

4 written contract, and that he was well aware of the terms of the written agreements and chose to

5 proceed anyway. Ex. 4 at 52:19-23, 67:24–71:8. These admissions are fatal to Roots' estoppel

6 argument. *See Pac. Sw. Dev. Corp. v. Western P. R. Co.*, 47 Cal. 2d 62, 70 (1956) (no estoppel

7 as a matter of law where plaintiff "failed to secure proper written authorization to protect itself in

8 the transaction," and "assumed the risk of relying upon claimed oral promises of defendant").

9    Furthermore, Roots mischaracterizes the evidence in its effort to show that Gap knew that

10 Roots was acting as a sub-distributor. For example, Roots cites an email from Jon Ehlen for that

11 proposition, but that email shows, to the contrary, that Ehlen understood Abu Issa to be acting on

12 behalf of Gabana. *See* Nash Decl. Ex. R at RTS74845 ("I deal directly with Ashraf and Francois

13 who are Gabana, our distributors"); *see also* Ex. 1 at 87:7-24; Exs. 10-11. Ehlen confirmed at

14 his deposition that he thought Abu Issa was part of "Francois' team," and that it "was always

15 very confusing whose role was what." Jackson Decl. Ex. E (Ehlen Dep.) at 117:9-17, 164:2-24.

16 Roots also argues that the fact that Gap shipped inventory to Roots' warehouse indicates that

17 Gap knew that Roots was acting as a sub-distributor. But both Ehlen and Ron Young testified

18 that they understood—based on what Larsen told them—that Roots operated the warehouse **for**

19 **Gabana**. *See* Jackson Decl. Ex. E (Ehlen Dep.) at 26:6-19; Ex. F (Young Dep.) at 138:20–

20 139:17. Roots cites another email from Ehlen as purported evidence that he "expressly

21 acknowledged" that Roots' role included distributing merchandise to other retailers, but the

22 email says nothing of the kind. To the contrary, Ehlen specifically states, "**we do not recognize**

23 **Roots as a distributor**." Nash Decl. Ex. N (emphasis added). He reiterated that Roots was an

24 approved **retailer** of excess inventory and required to abide by the terms and conditions of the

25 written agreement with Gabana. *Id.*

26    Under these circumstances, Gap is not estopped from asserting the parol evidence rule.

27 To the contrary, Roots is estopped from trying to enforce an alleged oral agreement that is

28

423224.01

1    completely at odds with the written agreements that Roots admits were central to its relationship

2    with Gap.

3        **3.**        **There is no evidence of an enforceable oral contract.**

4            **a.**        **The evidence shows beyond dispute that the parties never intended to enter into a binding oral agreement.**

5          As demonstrated above and in Gap's opening brief, there is no genuine dispute of fact

6    that Roots and Gap never intended to enter into a binding oral agreement independent of the

7    written agreements between Gap and Gabana. The idea that the parties intended instead to rely

8    on an oral agreement of unspecified duration with no protections for Gap's most important

9    assets—its brand image and trademarks—is contrary to the evidence and common sense. *See,*

10    *e.g.,* Ex. 4 at 52:6-18 (Roots understood that a written agreement would be required); *Beck v.*

11    *Am. Health Group Int'l,* 211 Cal. App. 3d 1555, 1562 (1989) ("where it is part of the

12    understanding between the parties that the terms of their contract are to be reduced to writing and

13    signed by the parties, the assent to its terms must be evidenced in the manner agreed upon or it

14    does not become a binding or completed contract").

15          In its opposition, Roots argues that Gap's acceptance of payment for the excess inventory

16    manifested its intent to be bound by the alleged oral contract. But it is undisputed that Gap

17    accepted payment for the excess inventory from **Gabana**, not Roots, consistent with the written

18    Excess Inventory Agreement between Gap and Gabana. *See* Ex. 1 at 17:5-13, 80:17-81:1; Ex.

19    14. Because Gap's acceptance of payment from Gabana is "equally consonant"—to say the

20    least—with the written agreement with Gabana, that performance does not "indicate the

21    existence of a separate oral agreement upon which the parties relied." *MediaNews Group, Inc. v.*

22    *McCarthey,* 494 F.3d 1254, 1264 (10th Cir. 2007).

23            **b.**        **The alleged oral agreement is fatally uncertain.**

24          As Roots' witnesses conceded, the alleged oral agreement between Gap and Roots failed

25    to address numerous material provisions—including, but not limited to, the duration of the

26    alleged agreement and the circumstances under which it could be terminated. *See* Ex. 4 at 48:19-

27    22; Ex. 2 at 143:10-24. Roots argues that these uncertainties were cured by the parties'

28

9

REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR, IN THE
ALTERNATIVE, SUMMARY ADJUDICATION
Case No. C 07-03363 CRB

423224.01

1   performance of the alleged agreement.  But the parties' performance is fully explained by the

2   written agreements between Gap and Gabana; it does not indicate the existence, or define the

3   terms, of an alleged separate oral agreement.  *See MediaNews*, 494 F.3d at 1264.

4       Furthermore, performance of an agreement can only cure uncertainties that are actually

5   explained by the performance.  *See Robinson & Wilson, Inc. v. Stone*, 35 Cal. App. 3d 396, 409-

6   10 (1973).  For example, in *Robinson & Wilson*, the court held that the parties' performance did

7   not cure the contract's uncertainty because there was no performance under the particular

8   provision that was uncertain.  *Id.*  If both the contract and the parties' performance leave

9   essential terms uncertain such that the Court has no basis for ascertaining damages, the

10  uncertainties are fatal to the contract.  *See id.* at 407.

11      Here, the contractual provisions that are absolutely essential to ascertaining any damages

12  are the duration of the alleged agreement, the circumstances under which it could be terminated,

13  and whether damages allegedly arising from termination are waived, as they are in the written

14  agreements.  *See* Ex. 16 § 9(j).  Roots concedes that the parties never reached agreement on these

15  terms in any alleged oral agreement.  Ex. 4 at 48:19-22; Ex. 2 at 143:10-24.  Given the admitted

16  lack of agreement on these crucial terms, the alleged oral agreement is fatally uncertain and

17  unenforceable.  *See, e.g., Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1493 (D.C. Cir.

18  1984) (contract unenforceable because the term of the agreement, upon which the total cost

19  would primarily depend, was left uncertain).

20      **4.    The statute of frauds bars Roots' oral contract claims.**

21      Roots does not deny that the statute of frauds applies to the alleged oral contract between

22  Gap and Roots; it simply asserts that Gap is estopped from raising the defense.  Roots argues that

23  it suffered "unconscionable injury" because it "had already paid a $1 million down payment

24  toward the purchase of the OP inventory before it was shown a copy of the Gap-Gabana

25  agreement."  Opp. at 17.  But Roots' decision to proceed with partial payment before seeing the

26  written agreement—like its decision to pay an additional $5 million thereafter—does not make

27  its alleged injury "unconscionable."  As in *Pacific Southwest Development Corp. v. Western P.

28  R. Co.*, 47 Cal. 2d 62 (1956), there is no estoppel where a party "failed to secure proper written

10

423224.01

1   authorization to protect itself in the transaction," and "assumed the risk of relying upon claimed

2   oral promises of defendant." *Id.* at 70.[4]

3       Thus, the Court should grant summary judgment in Gap's favor on Roots' oral contract

4   claims.

5   **B.     Roots' second oral contract claim fails for all of the reasons that its first claim fails,**
        **as well as the fact that, as Roots concedes, there was no second oral contract.**
6

7       Roots' second claim for breach of contract fails for all of the reasons that its first claim

8   fails, and one more—Roots concedes that it did not enter into any oral agreement with Gap after

9   May 2003. Abu Issa testified unequivocally that Roots had no oral contracts with Gap other than

10  the alleged May 2003 agreement to purchase the excess inventory. Ex. 4 at 168:24-169:5. Roots

11  does not even attempt in its opposition to address, explain, or undo this fatal admission. Thus,

12  Roots' second oral contract claim fails for the additional reason that, as Roots admits, there was

13  no second oral contract.

14  **C.     Roots' claim for breach of the implied covenant fails because there was no contract**
        **between Roots and Gap and because the implied covenant claim is superfluous.**

15      Roots concedes that there is no implied covenant of good faith and fair dealing in the

16  absence of a contract. Because, as demonstrated above, there was no contract between Roots and

17  Gap, Roots' implied covenant claim must fail. Furthermore, the alleged breaches of the

18  covenant Roots asserts in its opposition are merely the alleged breaches of oral contract. Thus,

19  the implied covenant claim is superfluous and should be dismissed in any event. *Guz v. Bechtel*

20  *Nat'l, Inc.*, 24 Cal. 4th 317, 327 (2000) ("where breach of an actual term is alleged, a separate

21  implied covenant claim, based on the same breach, is superfluous").

22  **D.     Roots' fraud claim fails.**

23      In its opposition, Roots purports to base its fraud claim on (1) Gap's alleged promise to

24  grant Roots ISP rights, (2) Gap's alleged promise to make Roots a franchisee, and (3) Gap's

25  purported omission of the relative importance of the ISP program in the context of Gap's

26  _____

27  [4] Roots' claim that its purchase of the OP inventory constituted "unconscionable injury" also
    fails in the face of the evidence that Roots declined to pursue opportunities to sell large quantities
    of the excess inventory **at a profit** because the terms were not sufficiently "favorable." Jackson
28  Decl. Ex. C at 110:14-111:5, 114:1-115:2.

11

1   business as a whole. None of these can support a claim for fraud.

2   **1.    Roots' assertion that Gap promised Roots ISP rights with no intention of**
        **performing cannot support Roots' fraud claim.**
3

4       Roots' claim that Gap promised to grant Roots ISP rights is barred by the parol evidence

5   rule. The written agreements between Gap and Gabana show that Gabana, not Roots, was

6   granted ISP rights. In its opposition, Roots reasserts its argument that the parol evidence rule

7   should not apply, claiming that a party should not be able to avoid liability by "unilaterally"

8   executing a contract on the same subject matter with another party. But Roots cannot claim that

9   Gap's execution of the written agreements with Gabana was "unilateral"—it was exactly what

10  Roots understood and agreed to. The parol evidence rule applies here and bars Roots' fraud

11  claim. Furthermore, a claim for promissory fraud, like a claim for promissory estoppel, must be

12  based on a "clear and unambiguous promise." *See Okura & Co., Inc. v. Careau Group*, 783 F.

13  Supp. 482, 500 (C.D. Cal. 1991). As shown above, Gap's alleged promise to grant Roots ISP

14  rights was not clear and unambiguous because essential terms of the agreement were left

15  unstated. And Roots cannot have reasonably relied on any alleged promise of ISP rights because

16  Roots knew that Gap required that any such rights be memorialized in writing.

17  **2.    Roots' assertion that Gap promised Roots franchise rights with no intention**
        **of performing cannot support Roots' fraud claim.**

18      Roots' claim that Gap promised to make Roots a franchisee also fails because the alleged

19  promise was not clear and unambiguous and any purported reliance was not reasonable. Mr. Al-

20  Thani, Roots' 30(b)(6) representative on the alleged promise of franchise rights, admitted that he

21  and Ron Young were only "talking in general terms": there was no discussion of a franchise fee,

22  how many stores Roots would be required to open, or **any** financial terms, and the very "idea of

23  franchise rights" was subject to unspecified "procedures." Ex. 2 at 47:10-15; 57:15–60:3. Al-

24  Thani did not even consider, for example, whether Roots would be entitled to franchise rights if

25  it breached other contractual obligations. Jackson Decl. Ex. A (Al Thani Dep.) at 65:15-67:13.

26  Roots cannot reasonably have relied on any such discussions, which were "hedged with

27  significant qualifications," *Pacesetter Homes, Inc. v. Brodkin*, 5 Cal. App. 3d 206, 213 (1970),

28  and amount to nothing more than "assurances that the two companies would have an ongoing

12

1    relationship." *GoEngineer, Inc. v. Autodesk, Inc.*, No. C 00-4595-SI, 2002 U.S. Dist. LEXIS

2    2540 (N.D. Cal. Feb. 14, 2002).[5]

3        **3.    Roots' assertion that Gap failed to disclose its internal view of the ISP**
             **program cannot support Roots' fraud claim.**

4

5        Finally, Roots tries to manufacture grounds for its fraud claim by arguing that Gap should

6    have disclosed to Roots that the ISP Program was "commercially irrelevant," but Roots takes

7    that statement entirely out of context.  The witness stated that the program was "commercially

8    irrelevant" in the context of "a $16 billion business" and thus "didn't require a lot of senior

9    management focus."  Nash Decl. Ex. T at 16:10-13.  But the fact that the ISP program was a

10   minor part of **Gap's** overall business is in no way inconsistent with Bell's alleged statement that

11   the ISP program was "a tremendous opportunity" for **Roots**.  Gap's internal view of the relative

12   importance of the ISP program to its own business as a whole is immaterial (not to mention

     obvious) and Gap's alleged failure to disclose it to Roots is not actionable.

13
     **E.    Roots' 17200 claim fails.**

14
         Roots argues that its unfair competition claim under Business & Professions Code

15   Section 17200 should be allowed to go forward even though all of its other claims fail because

16   California courts will allow claims for "unfair" business practices even where there is no breach

17   of contract.  Roots relies for this proposition on *Progressive West Ins. Co. v. Superior Court*, 135

18   Cal. App. 4th 263, 286 (2005), but the court there explicitly based its ruling on the fact that (a)

19   the case was at the demurrer stage, and (b) it was a consumer action, and "[o]ne of the major

20   purposes of section 17200 is to protect consumers from nefarious business practices." *Id.*  Here,

21   by contrast, Roots is a business led by a self-proclaimed sophisticated and "respected retail

22   executive."  Opp. at 2:9.  It entered into a business deal with Gabana knowing full well that any

23   rights it had with respect to Gap merchandise were governed by written agreements between Gap

24   and Gabana.  Roots can cite no case that would stretch the meaning of "unfair" to make it

25   actionable for Gap to exercise its undisputed rights under those written agreements.

26

27   _____
     [5] Furthermore, Roots cannot prove detrimental reliance because it did not take any actions it
28   would not otherwise have taken in reliance on the alleged franchise promise. *See* Ex. 4 at
     192:14-24.

                                             13

423224.01

1    **F.      Roots' quasi-contract claims fail.**

2            Just as the parol evidence rule bars Roots' oral contract claims, it bars Roots' quasi-

3    contract claims for promissory estoppel, quantum meruit and quasi-contract/restitution. *See, e.g.,*

4    *All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 869 (7th Cir. 1999) (Posner, J.) (a claim

5    for promissory estoppel cannot be used "to do an end run around . . . the parol evidence rule");

6    *City of Oakland v. Comcast Corp.*, No. C 06-5380 CW, 2007 U.S. Dist. LEXIS 14512, *12

7    (N.D. Cal. Feb. 14, 2007) ("unjust enrichment cannot be claimed where a written contract covers

8    the same issue"); *Cal. Medical Ass'n v. Aetna U. S. Healthcare of Cal.*, 94 Cal. App. 4th 151,

9    172 (2001) ("as a matter of law, a quasi-contract action for unjust enrichment does not lie where,

10   as here, express binding agreements exist and define the parties' rights"). As demonstrated at

11   length above, the written agreements between Gap and Gabana govern Roots' alleged rights and

12   thus bar its quasi-contract claims.

13           Roots' promissory estoppel claim is also barred because the alleged promises on which it

14   is based—Gap's alleged promise of ISP and franchise rights—are too vague to enforce. Roots

15   admits that numerous essential terms were left unstated. These alleged promises are just as

16   vague as the alleged promise "to provide substantial quantities of future business" held

17   unenforceable in *B & O Mfg., Inc. v. Home Depo U.S.A., Inc.*, No. C 07-02864-JSW, 2007 U.S.

18   Dist. LEXIS 83998, at *16-17 (N.D. Cal. Nov. 1, 2007).

19           Roots' quasi-contractual claims are also time-barred. Roots continues to disagree with

20   this Court in claiming that its quasi-contract claims did not accrue until Gap terminated its ISP

21   agreement with Gabana. But as this Court has twice held, the limitations period for these claims

22   begins to run "immediately upon performance of the service at issue." Oct. 18, 2007 Order at

23   7:16-17 (citing WITKIN, CAL. PROCEDURE: ACTIONS § 508 (4th ed. 1996)); Jan. 28, 2008 Order at

24   10. Roots' 30(b)(6) witness unequivocally testified that Gap did not ask Roots to perform any

25   services after June 25, 2005. Ex. 4 at 196:2-4. Likewise, there is no evidence that Gap made any

26   actionable promise on which Roots detrimentally relied after June 25, 2005. Furthermore, even

27   if the limitations period is measured from the time of breach, as Roots argues, Abu Issa testified

28   that Gap ███████████████████████████████████████████

423224.01

1  ████████████████████████████ Jackson Decl. Ex. D (9/10/07 Abu

2  Issa Dep.) at 108:14-109:25.

3       Finally, Roots misrepresents the evidence in its effort to show that Gap is equitably

4  estopped from asserting the statute of limitations.  Roots argues that Ron Young stated that Gap

5  "would" reach an agreement with Roots because Roots did not file suit against Gap.  Opp. at

6  22:23-24.  But not even Roots' witness claims that Mr. Young stated that Gap "would" reach an

7  agreement with Roots, but that it "could."  Nash Decl. Ex. F at 162:3.  In any event, Mr. Young's

8  alleged statement that Gap could—or even would—do business with Roots because the parties

9  were not at that time in litigation does not support Roots' estoppel argument because it does not

10  "amount to a misrepresentation bearing on the *necessity* of bringing a timely suit."  *Lantzy v.*

11  *Centex Homes*, 31 Cal. 4th 363, 384 (2003) (emphasis in original).  There is an obvious

12  difference between saying "since you didn't sue me, we may be able to work together," and

13  saying "you don't need to sue me on time."

14       The Court should grant Gap's motion for summary adjudication of Roots' quasi-contract

15  claims.

16                  **III.    CONCLUSION**

17       For the foregoing reasons, the Court should grant Gap's motion for summary judgment.

18

19  Dated:  August 15, 2008                   KEKER & VAN NEST, LLP

20

21

22                    By:  /s/ Dan Jackson
                      DAN JACKSON

23                        Attorneys for Defendants
                      GAP, INC., GAP INTERNATIONAL

24                        SALES, INC., BANANA REPUBLIC,
                      LLC, AND OLD NAVY, LLC

25

26

27

28

423224.01