# EXHIBIT C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

- - - - - - - - - - - - - - - - -

ROOTS READY MADE GARMENTS CO. )
W.L.L.                        )
                              )
                  Plaintiff,  )
         v.                   ) Case No.
                              ) C 07 3363 CRB
                              )
THE GAP, INC., a/k/a, GAP, INC., )
GAP INTERNATIONAL SALES, INC.,   )
BANANA REPUBLIC, LLC, AND OLD    )
NAVY, LLC,                       )
                              )
                  Defendants. )

- - - - - - - - - - - - - - - - -

**CERTIFIED COPY**

VIDEOTAPED DEPOSITION OF NASER BEHEIRY

VOLUME I

Tuesday, June 24, 2008

AT:  10:16 a.m.

Taken at:

Hotel Shangri-La
Sheikh Zayed Road
P.O. Box 75880
Dubai
UNITED ARAB EMIRATES

```
 1            BY MS. DURIE:
 2       Q.   Well, this was not the first time that Gap and
 3   Roots had tried to negotiate an ISP Distribution Agreement;
 4   right?
 5       A.   You said "Gap and Roots".
 6       Q.   I am sorry.  This was not the first time that
 7   Roots and Gabana had tried to negotiate an ISP Distribution
 8   Agreement?
 9       A.   Correct.
10       Q.   In fact, that subject had been under
11   discussion since May of 2003; right?
12       A.   Correct.
13       Q.   And during that period of time, Gap -- Gabana
14   and Roots had been unable to agree on the terms of that ISP
15   Distribution Agreement; right?
16       A.   Correct.
17       Q.   Why were Roots and Gabana spending so much
18   time trying to negotiate an ISP Distribution Agreement, if
19   Roots already had rights directly from Gap?
20            MR. HANEY:   Objection to form, lacks foundation.
21       A.   I have no answer for that.
22            BY MS. DURIE:
23       Q.   Can you turn to exhibit 69.
24            (Exhibit 69, previously marked)
25       Q.   Do you recognize exhibit 69 as a letter from
```

```
 1   yourself, on the second page.  Do you see that?
 2        A.   Okay.
 3        Q.   And that refers to the visit of a potential
 4   client for inventory in the warehouse in Dubai.  Do you see
 5   that?
 6        A.   Yes.
 7        Q.   And then there is a reference to "average USD
 8   5.70".  Was that the proposed selling price for the
 9   inventory?
10        A.   Can you repeat the question, please?  I've
11   lost it.
12                    (Question read back)
13        A.   No.  As I have told you, the price was 10.
14        Q.   So it's your recollection that even in
15   October of 2003, the proposed selling price for the
16   inventory was $10 apiece?
17        A.   Yes.
18        Q.   Was Mr. Larsen encouraging Roots to sell the
19   inventory for a cheaper price?
20        A.   As it's evident here, that he is, since he
21   recommended or he offered or he stated 5.7.
22        Q.   Did Roots reject that offer?
23        MR. HANEY:   What offer?
24        BY MS. DURIE:
25        Q.   Well, fair enough.  Did Roots wind up
```

```
 1  consummating this transaction?
 2       A.  I don't believe so, no.
 3       Q.  Why not?
 4       A.  Because the terms are not agreed.  They are
 5  not -- not favorable.
 6       Q.  Is it correct to say that Roots received
 7  an offer to purchase some quantity of the excess inventory
 8  for around $5.70 apiece, and thought that offer was too low
 9  and therefore rejected it?
10       A.  I don't have the -- I don't recollect the
11  whole deal.
12       Also, other factors go into consideration here.
13  How many pieces?  What kind of merchandise he's talking
14  about?  So the deal has to be complete -- viewed in
15  a complete manner.
16       Q.  Is it fair to say that Roots got an offer to
17  buy some portion of the excess inventory and turned it down?
18       A.  Of course, if, you know, the offer is for
19  a small quantity and for a low price, it doesn't make -- and
20  it doesn't make sense, feasible commercial sense, then yes,
21  we have --
22       MR. HANEY:  She's just asking you whether or not
23  you got an offer; whether you know whether you got an offer
24  or not.
25       A.  Yes, we got an offer.
```

1   Q. Do you recognize what has been marked as exhibit 101 as an e-mail exchange between yourself and Mr. Larsen in February of 2004?

4   A. Yes.

5   Q. Mr. Larsen is indicating that he had a buyer who was interested in buying a portion of the excess inventory, and that there was a 10 percent finder's fee going to be associated with the transaction; right?

9   A. Correct.

10  Q. And the selling price would be $7.11 on average per unit?

12  A. Correct.

13  Q. And you responded that the 10 percent finder's fee was too high and it should be brought down to 5 percent; right?

16  A. Correct.

17  Q. Was this transaction consummated?

18  A. I don't believe so.

19  Q. Do you know why not?

20  A. I think it's the same -- you know, exhibit number 100 is -- is the same as exhibit number 101, so --

22  Q. Correct.

23  A. Yes, so ...

24  Q. So with respect to the transaction that's identified in exhibit 101, is it your understanding that

```
 1   an offer to purchase some portion of the excess inventory
 2   was made and rejected?
 3        A.   Yes.
 4        Q.   Were you ever present for any discussions
 5   about the possibility of Roots obtaining any franchise
 6   rights?
 7        A.   No.
 8        Q.   Did anyone from Roots ever tell you that Roots
 9   had been promised any franchise rights?
10        A.   Once I recall that we were in San Francisco.
11   Mr. Ashraf, Ellen Monroe and myself during one of the buying
12   sessions.  And we were having lunch and they were talking
13   about that possibility, and they were just, you know,
14   discussing it.
15        Q.   Other than that one discussion over lunch
16   about the possibility, did anyone from Roots tell you about
17   any conversations or representations that had been made
18   about the franchise rights?
19        A.   No, not to my knowledge.
20        Q.   Was part of your job responsibilities as
21   General Manager of Roots to go on trips to meet with
22   potential retailers?
23        A.   Yes.
24        Q.   How many such trips did you go on?
25        A.   Quite a few.  I went twice to Panama.  I went
```

122

**CERTIFICATE OF COURT REPORTER**

I, ROSE HELEN CLAIRE KAY, an Accredited LiveNote Reporter, hereby certify that the testimony of the witness NASER BEHEIRY in the foregoing transcript, numbered pages 1 through 123, taken on Tuesday, June 24, 2008 was recorded by me in machine shorthand and was thereafter transcribed by me; and that the foregoing transcript is a true and accurate verbatim record of the said testimony.

I further certify that I am not a relative, employee, counsel or financially involved with any of the parties to the within cause, nor am I an employee or relative of any counsel for the parties, nor am I in any way interested in the outcome of the within cause.

Signed: ............ *[signature]*

ROSE HELEN CLAIRE KAY

Dated:    Tuesday, June 24, 2008