United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8        IN THE UNITED STATES DISTRICT COURT

9        FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   ROOTS READY MADE GARMENTS,              No. C 07-03363 CRB

12           Plaintiff,                      **ORDER GRANTING IN PART AND
                                             DENYING IN PART MOTION FOR
13       v.                                  SUMMARY JUDGMENT**

14   GAP INC.,

15           Defendant.
     _____/

16

17       This action arises, like a Phoenix, from the ashes of a failed business relationship

18   between Defendant Gap and Plaintiff Roots Ready Made Garments, a Middle Eastern-

19   clothing distribution company.  Roots Ready alleges that Gap breached an oral contract for

20   the right to sell both outdated and first-line Gap merchandise in the Middle East and other

21   territories.  For the reasons set forth below, Gap's motion for summary judgment is

22   GRANTED IN PART AND DENIED IN PART.

23                                   **BACKGROUND**

24       In 2001, Gap transferred a large inventory of overproduction ("OP") merchandise to

25   Solka S.A., a French company.  See Fabre Depo. 17:3-19:4.  Solka was unable to liquidate

26   the entire inventory and was left with approximately 1.7 million pieces of OP, which Solka

27   stored in Dubai, United Arab Emirates.  Gap sought to identify another distributor that could

28   sell the pieces, and Solka retained Francois Larsen, a Swiss businessman and principal of

1    Gabana Gulf Distribution, to assist in the transaction.

2        Larsen approached Roots Ready, a Qatari-based clothing distributor, as a potential

3    purchaser for Solka's inventory.  See Abu Issa Depo. 47:2-6.  On May 14, 2002, Roots

4    signed an "Exclusive Distribution Agreement" with Gabana, in which Gabana appointed

5    Roots as its exclusive distributor of Gap clothing in select Middle Eastern territories,

6    including Saudi Arabia, Bahrain, and Qatar.  See Punak Decl. Exh. C.  In the May 14

7    agreement, Gabana represented that it managed the exclusive right to sell Gap merchandise

8    in the Middle East, see id., even though at the time, Gabana had merely received a non-

9    exclusive, non-transferable right to sell excess Gap inventory to approved retailers,

10   see Punak Decl. Exh. 6.  In exchange for the right to sell Gap merchandise, Roots agreed to

11   pay Gabana $4 million and devote its best efforts to selling Gap clothing.  See id.

12        Sometime prior to May 13, 2003, Jim Bell, the director of Gap's outlet division, spoke

13   with Roots CEO Ashraf Abu Issa, Roots owner Sheikh Faisal Al-Thani, and Larsen by

14   phone, and Bell expressed his desire to sell the Solka merchandise quickly.  See Abu Issa

15   Depo. 47:11-24.  During the conversation, Bell suggested that in return for selling the 1.7

16   million pieces of OP, Gap would consider granting rights to sell first-line Gap merchandise

17   ("ISP") in certain countries.  See id. 44:5-13, 48:2-10.  The parties did not agree to a final

18   price in the telephone conversation, and at the end of the call, Abu Issa did not believe that

19   the parties had entered into an enforceable contract for Gap merchandise.  See id. 48:19-49:3.

20        Abu Issa and Bell had somewhere between three to five subsequent conversations.

21   See id. 49:4-10.  These conversations covered: (1) the price of the OP merchandise; (2) the

22   terms of the letter of credit by which Roots would pay for the merchandise; (3) the brands

23   that Roots would buy in ISP; (4) the countries Roots would be allowed to sell in; and (5) the

24   mechanism by which Roots would place orders.  See id. 43:23-44:13, 49:16-50:22.

25   However, the parties did not reach agreement on: (1) the duration of the ISP contract; (2) the

26   situations under which the ISP agreement could be terminated; (3) whether Gap could

27   approve proposed retail locations for its ISP merchandise; (4) restrictions on advertising; (5)

28   how prices for ISP merchandise would be set; (6) restrictions on Roots' use of Gap's

2

United States District Court
For the Northern District of California

trademark; or (7) how Roots would pay for the merchandise.  See Al-Thani Depo: 143:10-144:21.  Even after the conversations between Abu Issa and Bell, Abu Issa and Roots still believed that it was not obligated to purchase the OP inventory.  See Abu Issa Depo. 141:9-15.  However, Abu Issa believed that if Roots "execute[d] our payment" on the OP, then they would enter into an agreement with Gap.  See id. 62:6-12.  Abu Issa realized that despite his telephone conversations with Bell, there would still need to be a written contract.  See id. 52:11-18.

Gap had informed Roots that they wanted to have a written agreement in writing, but that they wanted to "do it through Gabana," which was a European entity, "instead of going directly to the Middle East."  Id. 127:9-13.  Abu Issa believed that having the agreement be between Gap and Gabana – as opposed to Gap and Roots – was "legally okay," but from a "business point of view," the deal was between Gap and Roots, "and Gabana was the messenger."  Id. 127:14-17.

As Abu Issa understood it, Roots' oral conversations with Gap required the execution of a contract between Gap and Gabana, and that written contract would be "in furtherance of the understanding that Roots had based on its direct conversations with Gap."  Id. 33:18-34:21.  Abu Issa understood that Gap wanted only one point of contact in contract negotiations, and Abu Issa agreed that Gabana's Larsen would be that person.  See id. 37:9-17.  Abu Issa "ask[ed] Mr. Francois [Larsen] to negotiate the contract with Gap."  See id. 52:11-18.  By letter dated April 22, 2003, Roots authorized Larsen to communicate their offer to Gap.  See Punak Decl. Exh. 12.

Abu Issa participated in the negotiation of a written contract only indirectly, and he relied on Larsen to convey information from him to Gap.  See Abu Issa Depo. 35:19-25.  Abu Issa thus imparted to Larsen his concerns with respect to the negotiation and relied on Larsen to pass on his concerns to Gap.  See id. 36:5-11.  Abu Issa conceded that Larsen negotiated with Gap "on behalf of Gabana and Roots."  Id. 171:12-18.

On May 12, 2003 – on the eve of agreements reached by Gap and Gabana – Gabana and Roots signed a Letter of Understanding ("LOU").  See Punak Decl. Exh. 13.  The LOU

**United States District Court**
For the Northern District of California

1   obligated Gabana and Roots to update their 2002 agreement by "negotiat[ing] and sign in

2   good faith two new distribution agreements, being one for the excess inventory merchandise

3   [OP] and one for the ISP merchandise.  Both agreements will reflect the contents of the

4   agreements signed between Gabana and Gap, Inc."  Id.  In exchange for entering into the ISP

5   agreement with Gabana, Roots agreed to purchase the OP inventory for $8.5 million.  Id.

6        On May 13, Gap executed two written agreements with Gabana: the Excessive

7   Inventory Program Distributor License Agreement and the International Sales Program

8   Distributor License Agreement.  Under the Excess Inventory Agreement, Gabana agreed to

9   purchase the 1.7 million units of OP from Gap for $6 million.  See Punak Decl. Exh. 14 ¶

10  1(a).  Under the Agreement, Gap appointed Gabana as a non-exclusive distributor for the sale

11  of OP merchandise, but obligated Gabana to obtain Gap's written approval before offering

12  OP for sale to any third party.  See id. ¶¶ 1(a), 1(d).  Gap retained the right to terminate the

13  agreement upon written notice without cause upon 90 days prior written notice.  See id. ¶

14  9(d).

15       Gabana's agreement to purchase the excess inventory was a "condition precedent" to

16  the effectiveness of the second contract entered into on May 13, 2003: the ISP Agreement.

17  See id. ¶ 1(a).  Thus, the ISP Agreement, which appointed Gabana as a non-exclusive

18  distributor with the right to sell "first-line" Gap merchandise in certain Middle Eastern

19  countries, only became effective once Gabana met its initial purchase obligation under the

20  Excessive Inventory Program.  See Punak Decl. Exh. 15 ¶ 9(a).

21       Larsen provided Abu Issa with a copy of the agreements one week after they were

22  signed.  See Punak Decl. Exhs. 31, 32.  Abu Issa was displeased by some of the contractual

23  terms but was told by Bell that some of the terms could be improved at a later date.  See Abu

24  Issa Depo. 69:2-17.  On June 18, 2003, Roots arranged for a letter of credit to be opened in

25  Gabana's favor, see Punak Decl. Exh. 26, and the purchase of OP was effectuated by back-

26  to-back letters of credit from Roots to Gabana, and Gabana to Gap, see Nash Decl. Exhs. J,

27  K.

28

1   The 2003 ISP Agreement expired by its own terms on April 30, 2005. See id. ¶ 9(b).

2   However, Gap and Gabana entered into a new ISP Agreement, which superseded the original

3   ISP Agreement, on September 1, 2004. See Punak Decl. Exh. 16. The 2004 ISP Agreement

4   copied the material terms of the original ISP Agreement. All of the agreements contained an

5   integration clause, providing that they "are the only agreements between the parties hereto

6   and their affiliated companies with respect to the subject matter hereof."

7   Pursuant to the parties' agreements, Gabana would buy ISP merchandise directly from

8   Gap, and then resell the merchandise to Roots at a markup for redistribution. See Abu Issa

9   Depo. 119:11-120:5. Gap sent most of the ISP directly to Roots' warehouse in Qatar, where

10  it was then distributed to various markets. See Young Depo. 138:22-24.

11  In late 2004 or early 2005, Gap informed Roots that it was considering changing its

12  business model in the Middle East by establishing franchisees to operate stand-alone Gap

13  stores. Ron Young, manager of Gap's International Department, talked to Roots' owner

14  "about the idea of establishing franchise," and said he would "start the procedures to

15  accomplish that because of [Roots'] success with the ISP." Al-Thani Depo. 47:12-17.

16  Roots' owner testified that Young even "promised" to make Roots a franchisee. See id.

17  41:23-43:20. In reliance on this promise, Roots conducted studies and "started moving

18  within the region in a more expansive way." Id. 48:18-22.

19  On May 12, 2005, Gap notified Gabana that it was terminating the ISP agreement

20  effective August 10. See Punak Decl. Exh. 24. In turn, Gabana sent Roots notification on

21  June 26, 2005 that it was terminating its contract with Roots effective July 27. See Punak

22  Decl. Exh. 25. Roots filed suit against Gap on June 26, 2007. Roots' third amended

23  complaint alleges that Gap breached two oral contracts and the covenant of good faith and

24  fair dealing, committed fraud, violated California's unfair competition law, and is liable on

25  quasi-contract theories. After this Court granted two motions to dismiss, Roots filed a

26  substantially revamped third amended complaint, which turned on the allegation that Roots

27  was not involved in the formation of the contract between Gap and Gabana. Now pending

28  before the Court is Gap's motion for summary judgment on all counts.

5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact issue is "material" only if it could affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A principal purpose of the summary judgment procedure is to isolate and dispose of factually unsupported claims. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The party moving for summary judgment has the burden to show initially the absence of a genuine issue concerning any material fact. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970). This can be done by either producing evidence negating an essential element of the plaintiff's claim, or by showing that plaintiff does not have enough evidence of an essential element to carry its ultimate burden at trial. See Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc., 210 F.3d 1099, 1103 (9th Cir. 2000). Once the moving party has met its initial burden, the burden shifts to the nonmoving party to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). To discharge this burden, the nonmoving party cannot rely on its pleadings, but instead must have evidence showing that there is a genuine issue for trial. See id. at 324.

Special rules of construction apply to evaluating summary judgment motions: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n., 809 F.2d 626, 630 (9th Cir. 1987).

///

**DISCUSSION**

I. May 2003 Oral Contract: Count One

In Count One of Plaintiff's Third Amended Complaint, Roots Ready alleges that they entered into an oral contract with Gap in May of 2003 pursuant to which Roots agreed to purchase the OP inventory in exchange for the right to sell ISP merchandise in its own stores and through retailers in the Middle East.  See TAC ¶ 114.  Roots Ready alleges that Gap breached this agreement by failing to authorize Roots to sell ISP in its stores, failing to approve ISP retailer partners, and terminating Roots' ISP rights without cause.  See id. ¶ 116.  Gap's motion for summary judgment on Count One is GRANTED because the alleged terms of the oral contract contradict the terms of the 2003 written Gap-Gabana contract, which merged all prior oral contracts between Gap and Roots.

"Under California law, a written contract presumptively supersedes all prior or contemporaneous oral agreements concerning the subject matter of the written contract."  In re Ankeny, 184 B.R. 64, 70 (9th Cir. BAP 1995) (citing Cal. Civ. Code § 1625; Cal. Civ. Proc. Code 1856(a)); see also Alameda County Title Ins. Co. v. Panella, 218 Cal. 510, 513-14 (1933) (holding that subject to exceptions not applicable here, "the execution of a contract in writing supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument").  In other words, the law presumes a written contract supersedes all prior or contemporaneous oral agreements and, where the writing is integrated, the presumption cannot be overcome.  See Wagner v. Glendale Adventist Med. Ctr., 216 Cal. App. 3d 1379, 1385 (1989).  The central question in determining whether there has been an integration, and thus whether the parol evidence doctrine prohibits the introduction of extrinsic evidence to contradict the terms of the written instrument, is "whether the parties intended their writing to serve as the exclusive embodiment of their agreement."  Masterson v. Sine, 68 Cal.2d 222, 225 (1968).  The question is one of law for resolution by the court.  See Wagner, 216 Cal. App. 3d at 1386.

Although Roots was not a named party to the 2003 written contract signed by Gap and Gabana, the evidence clearly establishes that Roots intended for the written agreement to

serve as the exclusive embodiment of their agreement with Gap. Roots CEO Abu Issa testified that he understood that despite his conversations with Gap, there would still need to be a written contract to codify their agreement. See Abu Issa Depo. 52:11-18. It is certainly curious that Gap sought to sign the agreement with Gabana rather than Roots – particularly since Roots performed most of the work necessary to distribute Gap's merchandise – but Abu Issa believed the arrangement was "legally okay" because the written contract was really memorializing the agreement between Gap and Roots. See id. 127:14-17.

Roots objects to application of the parol evidence rule on two grounds. First, Roots contends that because it was a stranger to the Gap-Gabana contract, application of parol evidence is inappropriate. In general, the rule excluding parol evidence applies only in controversies between the parties to the instrument, their privies, or persons claiming rights or benefits under the instrument or the relation established thereby. See Corpus Juris Secundum Evidence § 1143. However, in California, the parol evidence rule can be applied to strangers under certain circumstances. In Kern County Water Agency v. Belridge Water Storage District, 18 Cal. App. 4th 77 (1993), the Court of Appeal noted that in 1978, the California legislature deleted language that limited application of the parol evidence rule to parties in interest. The court concluded that the amendment was "intended to change the law," thereby allowing application of the parol evidence rule even where one of the parties to the action was a stranger to the contract. Id. at 86.

Kern County involved a dispute between several water districts – all members of a unifying water agency – over how costs charged by the state of California should be allocated among the various districts. The dispute turned on language contained in a "Master Contract" between the water agency and the state, which had been incorporated by reference into the various contracts between the agency and the individual water district. Some water districts – who preferred one interpretation of the language – sought to rely on extrinsic evidence of the parties' intent. The trial court refused to allow in such evidence, concluding that it was barred by the parol evidence rule. On appeal, the appellants complained that the parol evidence rule was inapposite because the water districts that invoked the parol evidence

**United States District Court**
For the Northern District of California

1   rule were not parties to the agreements being interpreted, that is, the contracts between the

2   agency and <u>other</u> water districts.  The Court of Appeal rebuffed appellants' argument,

3   concluding that application of the parol evidence rule was appropriate under the

4   circumstances.  The court emphasized that because the various contracts between the water

5   districts and the water agency were virtually identical, "each member district has an interest

6   in the contracts between other member districts and [the water agency]."  <u>Id.</u> at 87.  Because

7   the contracts shared identical terms, "[t]he trial court could not interpret one member

8   district's contract without affecting the contractual rights and obligations of all parties.  The

9   overlapping interests of the various districts in the others' contracts is sufficient basis for

10  allowing each to rely on the parol evidence rule when the court is asked to interpret

11  provisions in any of the contracts."  <u>Id.</u>

12       In <u>Kern County</u>, the rule was employed against water districts that were parties to the

13  operative contract and that, therefore, had an opportunity to clarify the meaning of the

14  contract through negotiation.  Just so here, Roots was not absent from the negotiation of the

15  Gap-Gabana contract.  Abu Issa asked Gabana's principal Francois Larsen to negotiate the

16  contract with Gap, and even authorized him by letter to communicate Roots' offer.  As Abu

17  Issa acknowledged, Larsen negotiated with Gap "on behalf of Gabana <u>and Roots</u>."  <u>Id.</u>

18  171:12-18 (emphasis added).  It may be that Roots was displeased with the terms of the

19  contract negotiated by Larsen, but that does not change the fact that Roots intended for the

20  written contract to memorialize its agreement with Gap.[1]

21       Roots' second argument for not applying parol evidence is that the terms of its oral

22  contract with Gap do not contradict the terms of the Gap-Gabana contract.  That contention

_____

24  [1] In a declaration filed after his deposition, Abu Issa contradicts his deposition testimony, stating that Roots did not participate in the negotiation of the written agreement and only allowed Gabana to

25  serve as intermediary on the condition that the written agreement not modify or extinguish any rights awarded orally by Gap.  <u>See</u> Abu Issa Decl. ¶¶ 9, 12.  The Court can only conclude that Abu Issa's deposition – which flatly contradicts his earlier testimony – is a "sham."  <u>See</u> <u>Kennedy v. Allied Mut.</u>

26  <u>Ins. Co.</u>, 952 F.2d 262, 267 (9th Cir. 1991).  Abu Issa's earlier testimony was consistent with Roots' original legal theory that Roots <u>was</u> involved in the negotiation of the 2003 written contract and that its

27  ISP rights were derivative of the rights established by the written agreement.  <u>See,e.g.</u>, Second Amended Complaint ¶¶ 28, 45.  Only when the Court granted Gap's first and second motions to dismiss on the

28  basis of the parol evidence rule did Abu Issa suggest that parol evidence could not be applied because Roots played no part in the negotiation of the written agreement.

has no merit.  Roots' central complaint is that Gap did not allow Roots to sell ISP in its own stores or resell ISP to other retailers.  However, Gap unambiguously retained the right to disapprove of any distribution deal or retail store location.  See ISP Agreement ¶ 1(d).  Roots also alleges that Gap terminated the agreement without cause, but the written agreement allowed for termination without cause where, as here, Gap provided 90-days written notice.  See id. ¶ 9(d).

In sum, because the parties intended for the 2003 written agreements to supercede all prior oral negotiations, Roots is prohibited from introducing extrinsic evidence from the oral negotiations to contradict the terms of the written contracts.  Because Roots' allegations in Count One contradict the express terms of the ISP Gap-Gabana agreement, summary judgment on Count One is granted.

## II. June 2003 Oral Contract: Count Two

In Count Two, Roots alleges that it entered into a second oral contract with Gap in June of 2003, pursuant to which Roots agreed to establish an ISP retail network in the Middle East in exchange for the right to sell ISP through its own stores and other retailers.  See TAC ¶ 121.  Gap allegedly breached this contract by failing to allow Roots to sell ISP in its stores, failing to approve ISP retailer partners, and terminating their agreement without cause.  See id. ¶ 123.  Summary judgment is GRANTED to Gap on Count Two because the contractual terms were "so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained. . . ."  Lettuce Growers v. Union Sugar Co., 45 Cal. 2d 474, 481 (1955).

Count Two is predicated solely on testimony from Abu Issa that in June of 2003, he met with Gap officials who encouraged him to develop an ISP network.  See Abu Issa Depo. 196:20-197:23.  According to Abu Issa, Gap officials told him that their "future is very bright," and that Gap would quickly open up countries for Roots to sell ISP products.  See id. 174:8-17.  Put simply, the promise described by Abu Issa is fatally vague and unactionable.

If a supposed contract does not provide a basis for determining what obligations the parties have agreed to, and therefore does not make possible a determination of whether

those obligations have been breached, then there is no contract.  See Bustamante v. Intuit, Inc., 141 Cal. App. 4th 199, 209 (2006).  If there were a cause of action for breach of encouraging words, Roots might have a claim.  However, the promise to quickly open up countries to ISP – even assuming the statement was a promise – is so indefinite that there is no way for the Court, or for a juror, to conclude whether the obligation has been breached.  Because "[t]he conditions for performance are fatally uncertain," id. at 210, summary judgment is granted to Gap on Count Two.

### III. Breach of Covenant of Good Faith & Fair Dealing: Count Three

In Count Three, Roots alleges that Gap breached the covenant of good faith and fair dealing by terminating its relationship with Roots before Roots could turn a profit and by arbitrarily refusing to approve new retailers and territories.  See TAC ¶¶ 131-32.  Although any breach of a contract also violates the implied covenant of good faith, where breach of an actual term is alleged, a separate implied covenant claim, based on the same breach, is superfluous.  See Guz v. Bechtel Nat. Inc., 24 Cal.4th 317, 327 (2000).  "On the other hand, where an implied covenant claim alleges a breach of obligations beyond the agreement's actual terms, it is invalid."  Id.

Roots' breach of covenant claim is predicated on two alleged obligations that exceed the agreement's actual terms.  Gap did not violate the covenant by terminating the agreement before Roots turned a profit, because Gap was entitled to terminate the agreement at any time and without cause, provided Gap gave 90 days written notice.  Further, Gap retained the right to disapprove retailers and territories, and thus could not violate the covenant of good faith even if they did so arbitrarily.  Accordingly, summary judgment on Count Three is GRANTED.

### IV. Fraud: Count Six

Roots alleges in Count Six that Gap made knowing misrepresentations, including that Gap falsely represented that it would: (1) grant Roots the right to sell ISP in the Middle East; (2) permit Roots to sell ISP merchandise in its stores; and (3) make Roots a franchisee.  See TAC ¶ 147.  Summary judgment is granted to Gap on all allegations of fraud, except for the

1  allegation that Gap promised to make Roots a franchisee.  Roots may proceed on its claim for

2  fraud to the extent it is based on the alleged promise to make Roots a franchisee in the

3  Middle East.

4      To state a cause of action for fraud, the plaintiff must establish: (1) misrepresentation;

5  (2) knowledge of falsity; (3) intent to defraud; (4) justifiable reliance; and (5) resulting

6  damages.  Glen Holly Entertainment, Inc. v. Tektronix, Inc., 100 F. Supp. 2d 1086, 1093

7  (C.D. Cal. 1999).  To be actionable the alleged misrepresentation must ordinarily be an

8  affirmation of past or existing facts; predictions as to future events are deemed opinions, and

9  not actionable by fraud.  See id.  Moreover, the statement must be a specific factual assertion;

10  generalized and vague statements are not actionable as fraud.  See id.

11      Roots alleges that Gap falsely represented that Roots could sell ISP in both May 2003

12  and June 2003.  For the reasons set forth above, Roots cannot predicate its fraud claim on the

13  alleged May 2003 statements to the extent such statements contradict the terms of the written

14  ISP agreement.  See Casa Herrera, Inc. v. Beydoun, 32 Cal.4th 336, 346 (2004) ("[O]ur

15  courts have consistently rejected promissory fraud claims premised on prior or

16  contemporaneous statements at variance with the terms of a written integrated agreement.").

17  Because there is no evidence that Gap violated the terms of the 2003 ISP agreement, Roots'

18  fraud claim based on the May 2003 representations fails.

19      Further, because generalized and vague statements are not actionable as fraud, Roots

20  cannot predicate its claim for fraud on the June 2003 representations.  For the same reasons

21  as set forth above, Gap's vague statement about quickly opening countries up to ISP is not

22  actionable.

23      Roots also alleges that Gap falsely stated that it would allow Roots to expand the ISP

24  business into additional territories.  Roots has not directed to the portion of the record

25  supporting this allegation, and the Court could not locate it.  Accordingly, Roots' claim for

26  fraud as based on Gap's statements about expansion fails.

27      Finally, Roots contends that in early 2005, Gap officials told Roots that they would

28  make Roots a franchisee in the Middle East.  Gap argues that the promise to make Roots a

**United States District Court**
For the Northern District of California

franchisee is fatally vague, but the Court disagrees.  Roots' President Sheikh Faisal Ahmed Al-Thani testified that Gap official Ron Young promised to make Roots a franchisee if Gap moved to a franchise model, which Gap did.  See Al-Thani Depo. 41:23-43:20.  If true, Gap's statement was not a mere assurance that the parties would have an ongoing relationship, see Goengineer, Inc. v. Autodesk, Inc., 2002 WL 243603, *4 (N.D. Cal. Feb. 4, 2002), but a specific and definite promise to bestow a valuable right upon Roots.

Gap also argues that there was no actual reliance on its promise to make Roots a franchisee.  However, Al-Thani testified that Roots expanded a study to analyze possible franchise relationships and sent employees traveling throughout the Middle East to explore possible franchise locations.  See Al-Thani Depo. 69:1-20.  These actions, which Roots contends would not have been taken absent Gap's promise, sufficiently demonstrate that Roots relied on Gap's allegedly false promise.

In sum, summary judgment is granted to Gap on Roots' claim for fraud, except to the extent Roots alleges that Gap fraudulently promised to make them a franchisee.  Roots may proceed to trial on that specific allegation of fraud.

### V. California Unfair Competition Law: Counts Four & Five

In Counts Four and Five, Roots alleges that Gap violated § 17200 of the California Business and Professions Code by engaging in "unfair" and "unlawful" business practices.  Gap's argument that Roots cannot prove any facts to establish a violation of § 17200 is unpersuasive; summary judgment to Gap is DENIED on counts four and five.

With respect to Count Four, California law is unsettled as to what constitutes an "unfair" business practice as between parties that are not direct competitors.  See Puentes v. Wells Fargo Home Mortg., Inc., 160 Cal. App. 4th 638, 646 (2008).  Some courts have concluded that a practice is unfair "if it violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits."  See Smith v. State Farm Mutual Automobile Ins. Co., 93 Cal. App.4th 700, 718-19, 720 n.23 (2001).  Other courts have concluded that even in cases that do not involve direct competitors, the plaintiff must prove conduct "that threatens an incipient violation of

**United States District Court**
For the Northern District of California

1   an antitrust law," see Schnall v. Hertz Corp., 78 Cal. App. 4th 1144, 1166 (2000), or must at

2   least prove a violation of a public policy that is "tethered" to specific constitutional, statutory

3   or regulatory provisions, see Scripps Clinic v. Superior Court, 108 Cal. App. 4th 917, 940

4   (2003).  Because the parties have not briefed the proper scope of § 17200, it would be

5   inappropriate to decide whether Roots has proffered sufficient evidence to support a claim of

6   unfair business practices.

7        Count Five alleges that Gap engaged in an "unlawful" business practice.  The term

8   "unlawful," as used in § 17200 is extensive: "The 'unlawful' practices prohibited by . . .

9   section 17200 are any practices forbidden by law, be it civil or criminal, federal, state, or

10  municipal, statutory, regulatory, or court-made.  It is not necessary that the predicate law

11  provide for private civil enforcement. . . .  [S]ection 17200 'borrows' violations of other laws

12  and treats them as unlawful practices independently actionable."  South Bay Chevrolet v.

13  General Motors Acceptance Corp., 72 Cal. App. 4th 861, 880 (Cal. Ct. App. 1999)

14  (quotations and citations omitted).  At least one other court has held that a claim of common

15  law fraud is actionable as an "unlawful" business practice.  See Diaz v. Allstate Ins. Group,

16  185 F.R.D. 581, 591 (C.D. Cal. 1998).  Because the Court has determined that Roots may

17  proceed on its claim for fraud, summary judgment would be inappropriate on Count Five.

18        VI. Quasi-Contract Claims: Counts Seven, Eight & Nine

19        In Counts Seven through Nine, Roots pleads quasi-contract causes of action for

20  promissory estoppel, quantum meruit, and unjust enrichment.  Summary judgment is

21  GRANTED to Gap except as to the promise to make Roots a franchisee because "an action

22  based on an implied-in-fact or quasi-contract cannot lie where there exists between the

23  parties a valid express contract covering the same subject matter."  Lance Camper Mfg.

24  Corp. v. Republic Indemnity Co., 44 Cal. App. 4th 194, 203 (1996).

25        "When parties have an actual contract covering a subject, a court cannot – not even

26  under the guise of equity jurisprudence – substitute the court's own concepts of fairness

27  regarding that subject in place of the parties' own contract."  California Med. Ass'n, Inc. v.

28  Aetna U.S. Healthcare of California, Inc., 94 Cal. App. 4th 151, 172 (2001).  Gap and Roots

**United States District Court**
For the Northern District of California

1 intended for the 2003 ISP written contract to memorialize the terms of their agreement as to

2 ISP rights.  Thus, Roots cannot maintain quasi-contractual causes of action to the extent such

3 claims depend on promises to grant Roots the right to sell ISP in particular regions.

4      However, the ISP agreement did not contemplate the possibility of a franchise

5 agreement.  Accordingly, Roots is permitted to proceed on Counts Seven through Nine to the

6 extent their claims are premised on Gap's alleged promise to make Roots a franchisee.

7 **CONCLUSION**

8      Gap's motion for summary judgment is GRANTED IN PART AND DENIED IN

9 PART.  Summary judgment is DENIED on Counts Four and Five, and on Counts Six

10 through Nine to the extent such claims are predicated on Gap's promise to make Roots a

11 franchisee.

12      **IT IS SO ORDERED.**

13

14



15 Dated:  August 29, 2008           CHARLES  R. BREYER

                         UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28