RICHARD A. JONES (Bar No. 135248)
(rjones@cov.com)
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111
Telephone: (415) 591-6000
Facsimile: (415) 591-6091

(*Additional Counsel on Signature Page*)

Attorneys for Plaintiff
Roots Ready Made Garments Co. W.L.L.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

ROOTS READY MADE GARMENTS CO. W.L.L.,

Plaintiff,

v.

THE GAP, INC., a/k/a, GAP, INC., GAP INTERNATIONAL SALES, INC., BANANA REPUBLIC, LLC, AND OLD NAVY, LLC,

Defendants.

Case No: C 07 3363 CRB

PLAINTIFF'S TRIAL BRIEF

Date: September 26, 2008
Time: 2:30 p.m.
Place: Courtroom 8, 19th Floor
Judge: Charles R. Breyer

**Trial Date: October 6, 2008**

**PLAINTIFF'S TRIAL BRIEF**

Plaintiff, Roots' Ready Made Garments Co., W.L.L., ("Roots") respectfully submits this trial brief for the Court's consideration.

## I. STATEMENT OF KEY FACTS

### A. Gap Sells The OP Inventory to Roots And Promises In Exchange To Permit Roots To Sell First-Line ISP Merchandise.

This action arises from Defendant Gap, Inc.'s almost desperate efforts to rid itself of a large inventory of outdated merchandise, know as overproduction, or "OP," and to devise a mechanism by which to protect its trademarks in the Middle East with minimal expenditure of resources on its part. In early 2003, Gap offered to sell the OP inventory to Roots for $6 million, promising in exchange to grant Roots the right to sell first-line Gap merchandise in Roots' own retail stores in Qatar, and to retailers in other territories in the Middle East and North Africa, under Gap's International Sales Program ("ISP"). Gap presented the ISP program to Roots as a tremendous opportunity to develop a profitable retail business in the region. In or about May and June 2003, Roots purchased the OP inventory.

Gap proposed that Gabana serve as an intermediary in the transaction between Gap and Roots, such that Gap would sell the OP inventory (and later the ISP merchandise) to Gabana, which would then simultaneously resell the merchandise to Roots. Roots purchased the OP inventory by means of back-to-back wire transfers and letters of credit through which Roots transferred the funds to Gabana and Gabana simultaneously sent the same amount to Gap. Gap then shipped the inventory directly to Roots' warehouse in Dubai. Pursuant to an arrangement devised by Gap, Gap similarly sold first-line merchandise to Gabana, and Gabana simultaneously re-sold all the merchandise – whether intended for distribution in Qatar or elsewhere – to Roots by means of a back-to-back letter of credit. Gap shipped all the ISP merchandise directly to Roots' warehouse, recognizing that Roots would send the goods to its own stores in Qatar, and to retailers in other territories.

### B. Gap's Misrepresents The Purpose Of The ISP Program

Discovery in this action has revealed that during the negotiation of the OP sale, Gap fundamentally misrepresented purpose of the ISP program to Roots. The ISP program was never intended to generate profits sufficient to compensate Roots for its $6 million investment

in the outdated Gap OP inventory. Rather, the program was designed by Gap's legal department to protect Gap's international trademarks by conducting a minimal amount of business in foreign countries. A senior Gap executive described the ISP program as "commercially irrelevant," explaining that the motivation behind the program was always simply to protect Gap's trademarks – not to drive revenue or sales. The director of the ISP program further conceded at his deposition that Gap had no meaningful growth plan for the program, but rather intended to maintain the status quo by providing protection for Gap's trademarks. Gap never disclosed any of these facts to Roots. Had Roots understood the true nature of the program, it would never have agreed to purchase the OP inventory. Nor would it have gone to the expense of setting up its own retail stores in Qatar to sell ISP merchandise.

### C. Gap Denies Roots The Benefit of the Bargain By Failing to Permit Roots to Sell ISP Merchandise

At Gap's request, Roots' representatives traveled throughout the Middle East and North Africa, touring various potential markets and meeting with scores of local retailers. In the Spring of 2004, Roots, with Gap's approval, began selling Gap OP and ISP merchandise through its own retail stores in Qatar, and to another retailer in the UAE. Although these initial stores were successful, Gap began to stall in approving new retailers and territories in which Roots could sell. Gap reassured Roots that it was not reneging on its agreement with Roots, and would soon allow Roots to enter the other Arabic-speaking countries in the region. Gap's 30(b)(6) witness has admitted, however, that Gap never intended to permit Roots to sell ISP merchandise outside of Qatar.

On August 10, 2005, Gap terminated the ISP Agreement with Gabana. Because Gap had provided the ISP merchandise for Roots' retail stores (and those of its retail partners in the UAE) solely through Gabana, the termination effectively cut off Roots' access to the first-line Gap goods necessary to run the stores.

**D. Gap Changes Its Business Model in the Middle East and Promises to Make Roots Its Franchisee.**

In late 2004 or early 2005, Gap informed Roots that it was considering changing its business model in the Middle East by establishing franchises to operate stand-alone Gap stores. Acknowledging the commitment Gap owed Roots, Ron Young, an executive in Gap's international division, promised Sheikh Faisal Al-Thani, a Roots executive, that if Gap began a franchise business in the Arabic-speaking countries, it would appoint Roots as the franchisee in the region. Young was impressed by the success of Roots' ISP operation in Dubai, and believed that a stand-alone Gap store operated by Roots would be still more successful. In reliance on Young's promises, Roots (i) prepared a study of the potential franchise relationship, and (ii) traveled extensively in the region to explore the possibility of various franchise opportunities.

Although Gap did eventually establish franchises in the Middle East, Roots was not made a franchisee. In 2006, Gap appointed Al Tayer Group as franchisee in Kuwait, Oman, Bahrain, Qatar and the United Arab Emirates. In 2007, it appointed Al Hokair as a franchisee for Saudi Arabia. Gap's witnesses have admitted that Gap never actually considered making Roots its franchisee in the Middle East.

## II. ROOTS' CLAIMS

Roots will assert six separate claims at trial: (1) "Unfair" business practices under Cal. Bus. & Prof. Code § 17200; (2) "Unlawful" business practices under Cal. Bus. & Prof. Code § 17200; (3) Fraud; (4) Promissory Estoppel; (5) Quantum Meruit; and (6) Quasi-Contract/Restitution. The fraud and quantum meruit claims will be decided by the jury. The promissory estoppel and quasi-contract/restitution claims, and the claims under Cal. Bus. & Prof. Code § 17200 are equitable in nature and will be decided by the court.

**A. Roots' Claims Under Cal. Bus. & Prof. Code § 17200**

**1. "Unfair" Business Practices**

Gap engaged in "unfair" business practices by, *inter alia*, (1) falsely representing the ISP program as an opportunity to establish and grow a profitable retail operation, and failing to disclose that the purpose of the program was to protect Gap's trademark, not to generate revenue or sales; and (2) falsely leading Roots to believe that it would be permitted to sell ISP

merchandise in its own stores in Qatar and to other retailers in other countries. Gap's conduct induced Roots to purchase the OP inventory, and to expend money and resources to open its own retail stores in Qatar and to develop a retail network for Gap merchandise in other countries in the Middle East.

In determining whether a particular practice is "unfair," California courts weigh "the impact [of the conduct] on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer." *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 718 (2001). Relying on inapposite case law, Gap has argued that the test articulated in *State Farm* does not apply in this case. Rather, Gap incorrectly suggests that a claim for unfair business practices must be "tethered" to a constitutional, statutory or regulatory provision. However, this standard – articulated by the California Supreme Court in *Cel-Tech Communications*, 20 Cal. 4th 163, 186-87 (1999) – "applies only to cases between direct competitors, not all 'commercial' cases." *See Nat'l Rural Telecommc'n v. DIRECTTV, Inc.*, 319 F. Supp. 2d 1059, 1075 (C.D. Cal. 2003) (collecting cases); *accord Knevelbaard Diaries v. Kraft Food, Inc.*, 232 F.3d 979, 994 (9th Cir. 2000) (holding that *Cel-Tech* standard did not apply in action between milk producers and cheese maker); *Pegasus Satellite Television, Inc. v. Direct TV, Inc.*, 318 F. Supp. 2d 968, 978 (C.D. Cal. 2004) (concluding that *Cel-Tech* standard would not apply in action between two businesses if the jury found that they were not competitors).

Although some courts have applied the *Cel-Tech* standard to cases not involving direct competitors, *see, e.g.*, *Scripps Clinic v. Superior Court*, 108 Cal. App. 4th 917, 940 (2003), this approach "does not comport with the broad scope of section 17200." *Camacho v. Automobile Club of So. Cal.*, 142 Cal. App. 4th 1394, 1402 (2006) ("'Tethering' the concept of unfairness to existing positive law undercuts the principle that a practice is prohibited as 'unfair' or 'deceptive,' even if not 'unlawful' or vice versa."). The weight of authority provides that a claim for "unfair" business practices <u>does not require any underlying predicate claim.</u> *See, e.g.*, *Progressive W. Ins. Co. v. Superior Court*, 135 Cal. App. 4th 263, 286 (2005) (upholding 17200 claim for "unfair" business practices notwithstanding the fact that complaint did not state a

claim for breach of contract, or breach of the implied covenant of good faith and fair dealing). To the contrary, "a practice may be deemed unfair even if not specifically proscribed by some other law." *Blennis v. Hewlett-Packard Co.*, 2008 WL 818526, at *6 (N.D. Cal. Mar. 25, 2008); *see also People ex rel. Renne v. Servantes*, 86 Cal. App. 4th 1081, 1095 (2001) (statute "give[s] the court maximum discretion to control whatever new schemes may be contrived, even though they are not yet forbidden by law.").

Gap's conduct constitutes "unfair" business practices under the *State Farm* standard: Gap falsely represented that the ISP program would be an opportunity for Roots to establish and grow a profitable retail operation, and failed to disclose that the purpose of the program was to protect Gap's trademark, not to generate revenue or sales. Gap also falsely led Roots to believe that it would be permitted to sell ISP merchandise in its own stores in Qatar and to other retailers in other countries. Gap's conduct induced Roots to purchase the OP inventory, and to expend money and resources developing a retail network for Gap merchandise in the Middle East. Gap's motives and justifications, moreover, were clearly ill-intentioned: Gap sought to rid itself of a large quantity of outdated merchandise, and to protect its trademarks in the region – misleading Roots into believing that it would benefit from the arrangement so that Gap could accomplish its objectives with little or no expense on its part.

**B. "Unlawful" Business Practices**

Gap also engaged in unlawful business practices under Cal. Bus. & Prof. Code § 17200. In its August 29, 2008 order on Gap's motion for summary judgment, this Court held that a claim for common law fraud is actionable as an "unlawful" business practice under section 17200. *See* 8/29/08 Order at 13. Because Roots will establish two separate claims for fraud, as discussed in Section IV *infra*, Roots will necessarily have a claim for "unlawful" business practices under section 17200.

## III. PLAINTIFF'S QUASI-CONTRACT CLAIMS

### A. Promissory Estoppel, Quantum Meruit, Quasi-Contract/Restitution

*Promissory Estoppel.* In early 2005, Gap made a clear and unambiguous promise to Roots that, if Gap established a franchise business in the Arabic-speaking countries

of the Middle East and North Africa, it would make Roots a Gap franchisee in the region. Roots reasonably and forseeably relied to its detriment on this promise by expending money and resources to prepare a study of the franchise relationship, and traveling extensively in the region to explore potential markets.

*Quantum Meruit*. In reliance on the promise that it would be made a franchisee, Roots performed services for Gap in good faith and with a reasonable expectation of compensation. Because it was not made a franchisee, Roots was never compensated for these services, and is entitled to the reasonable value of the services provided.

*Quasi Contract/Restitution.* Roots conferred benefits on Gap: at Gap's behest, Roots began exploring and developing the franchise opportunity by preparing a study and traveling in the Middle East to explore potential markets. Gap, however, failed to make Roots a franchisee as it had promised. Under these circumstances it would be unjust for Gap to retain the benefits Roots bestowed on it without paying reasonable compensation.

**B. Roots' Equitable Claims Were Timely Filed.**

All of Roots' equitable claims were timely filed within the applicable two-year statute of limitations. *See* Cal. Code Civ. Proc. § 339(1). In asserting that the claims are time-barred, Gap fundamentally misconstrues the events that trigger the running of the limitations period. "[A] statute of limitations begins to run no earlier than upon accrual of the cause of action, which is upon the occurrence of the last essential element." *Chambers v. Kay*, 106 Cal. Rptr. 2d 702, 719 (2001), *aff'd* 29 Cal. 4th 142 (2002); *see also J.W. Van Hook v. Southern Cal. Waiters Alliance*, Local 17, 158 Cal. App. 2d 556, 565 (1958) (claim does not accrue until "the moment when the party owning it is entitled to begin and prosecute an action thereon"). Roots timely filed its promissory estoppel and quasi-contract claims within two years of the date the claims accrued.

Gap has previously suggested that the promissory estoppel claim is time-barred to the extent it is based on promises made prior to June 25, 2005. This argument incorrectly assumes that a promissory estoppel claim accrues immediately when the promise is made. A promise is only one element of the claim. The plaintiff must also show: (1) reasonable and

foreseeable reliance on the promise; and (2) a resulting injury. *See J.W. Van Hook v. Southern Cal. Workers Alliance, Local 17,* 158 Cal. App. 2d 556, 570 (1958). Roots' promissory estoppel claim did not accrue when Gap *made* its promises, but rather when Gap *breached* the promises, causing injury to Roots. *See Chambers v. Kay*, 106 Cal. Rptr. 2d 702, 719 (citing *Budd v. Nixen,* 6 Cal. 3d 195, 200-201 (1971)) ("Until the defendant's conduct causes damages to the plaintiff, no cause of action has been generated and the period of limitations is not triggered."). Thus, the statute of limitations for Roots' promissory estoppel claim began to run until Gap breached its promise to make Roots a franchisee.

"[A] suit for breach of an implied contract, which is the essence of a quantum meruit claim," likewise "accrues at the time of the breach." *Kramer v. Thomas*, No. CV 05-8381 AG, 2006 WL 4729242, at *14 (C.D. Cal. Sept. 28, 2006). As for the restitution claim, although Gap received various benefits at Roots' expense throughout the course of their business relationship, Gap's obligation to make restitution was not triggered until "the circumstances [were] such that . . . it [was] *unjust* for [Gap] to retain [the benefits]." *McBride v. Boughton*, 123 Cal. App. 4th 379, 389 (2004) (emphasis in original). Thus, Root's quantum meruit and quasi-contract/restitution claims likewise did not accrue before Gap cut off Roots' supply of first-line Gap merchandise in August, 2005.

All three claims were timely filed within two years of the date of accrual.

**C. Gap Is Equitably Estopped From Invoking The Statute of Limitations Because It Induced Roots To Refrain From Filing Suit.**

Gap's statute of limitations defense is also fails on the ground of estoppel. Under California law, a defendant who represents that "actionable damage has been or will be repaired, thus making it unnecessary to sue" is estopped from invoking the statute of limitations. *Lantzy v. Centex Homes*, 31 Cal. 4th 363, 383-384 (2003). The record shows that Gap promised that it would compensate Roots for its injuries, thus making it unnecessary for Roots to file suit. Specifically, Roots' owner, Mr. Al-Thani, testified that after Gabana filed suit against Gap, in 2006, Ron Young advised him that because Roots did not file a suit against Gap, Gap would compensate Roots for its losses. Young reiterated his earlier promise to make Roots a franchisee, although in a smaller territory than was previously promised. Thereafter, Roots'

attorney had further discussions with Young regarding Roots' potential suit against Gap. The record establishes that after Gabana brought its lawsuit, Gap persuaded Roots not to file its own suit, by falsely asserting that it would cure Roots injuries by granting it franchise rights. Gap is therefore estopped from invoking the statute of limitations as a bar to Roots' equitable claims.

## IV. PLAINTIFF'S FRAUD CLAIMS

Roots will demonstrate at trial that Gap defrauded Roots in two separate ways: (1) by falsely promising to make Roots a franchisee in the Middle East and North Africa if Gap established a franchise business in this region, and (2) by misrepresenting the purpose and scope of the ISP program and/or failing to disclose material facts uniquely within Gap's knowledge concerning the program.[1]

*False Promise.* Under California law, "where a promise is made without [the intention to perform], there is an implied misrepresentation of fact that may be actionable fraud." *See Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996). Gap's representative, Ron Young, made an unequivocal promise to Roots' principal, Sheikh Faisal Al-Thani, that if Gap switched from a wholesale to a franchise model in the Middle East, it would appoint Roots as the franchisee in the region. In reliance on that promise, Roots prepared a market study, and also traveled extensively in the region to investigate potential markets. Gap's own witness have admitted, however, that Gap never actually considered making Roots Gap's franchise. Gap's promise, which was false when made, is therefore actionable as fraud.

*Misrepresentation and Concealment.* Gap also defrauded Roots by misrepresenting the ISP program as an opportunity for Roots to establish and grow a profitable retail business for Gap merchandise. In reliance on Gap representations, Roots purchased the OP inventory at an above-market price, and established its own multi-brand retail stores in Qatar to sell first-line ISP merchandise. Gap's witnesses have conceded, however, that Gap regarded

---

[1] This Court's August 29, 2008 order granting in part and denying in part Gap's motion for summary judgment ("Summary Judgment Order") does not address Roots' fraud claim based on Gap's misrepresentation and concealment of material facts relating to the ISP program. On September 12, Roots filed a motion for leave to seek reconsideration of the Summary Judgment Order to the extent it fails to address this claim.

the program as "commercially irrelevant," and that the company had no aggressive growth plan for the program. The purpose of ISP was to protect Gap's foreign trademarks, not to generate revenue or sales. Gap never disclosed this information (which was uniquely within Gap's knowledge) to Roots.

"[N]ondisclosure or concealment may constitute actionable fraud: . . . [1] when the defendant had exclusive knowledge of material facts not known to the plaintiff . . ., or [2] when the defendant makes partial representations but also suppresses some material facts." *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 336 (1997). Because participation in the ISP program was to be the primary consideration for Roots' $6 million payment for the OP inventory, the fact that the ISP program was intended for trademark protection, not commercial profit, was highly material. Indeed, had Gap disclosed the true nature of the ISP program, Roots would never have agreed to pay $6 million for the OP inventory to acquire the right to sell ISP merchandise. As this information was both material and uniquely within Gap's knowledge, the failure to disclose it was fraudulent.

Gap was also obligated disclose the true purpose of the ISP program because Gap's representations about the ISP program were, on their own, misleading. Gap's failure to disclose "facts which materially qualify those stated" is also actionable as fraud. *Vega v. Jones, Day, Reavis & Pogue*, 121 Cal. App. 4th 282, 294 (2004) (internal quotations omitted).

Roots' fraud claim based on Gap's misrepresentations concerning the nature of the ISP program are not barred by the parol evidence rule. The parol evidence rule precludes a fraud claim based on "prior or contemporaneous statements at variance with the terms of a written integrated agreement." 8/29/08 Order at 12 (emphasis added). But Gap's fraudulent misrepresentations and concealment of material information concerning the ISP program are in no way inconsistent with the terms of the written agreements between Gap and Gabana. The Gap-Gabana agreements are entirely silent as to the purpose of the ISP program. The parol evidence rule therefore has no application to Roots' fraud claim.

## V. CONCLUSION

In sum, Roots seeks all legal and equitable relief to which it is entitled under its fraud, quasi-contract, and Cal. Bus. & Prof. Code § 17200, claims, including restitution, and compensatory and punitive damages.

Dated: September 19, 2008

___/s/_____________________
RICHARD A. JONES

ROBERT P. HANEY
BRADLEY J. NASH

COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018
Telephone: (212) 841-1000
Facsimile: (212) 841-1010

*Attorneys for Plaintiff Roots Ready Made Garments Co. W.L.L.*