Richard A. Jones (SBN 135248)
rjones@cov.com
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, New York  10018
Telephone:     (212) 841-1000
Facsimile:      (212) 841-1010

Attorneys for Plaintiff
Roots Ready Made Garments Co. WL.L.

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROOTS READY MADE GARMENTS CO. W.L.L.,<br><br>Plaintiff,<br><br>v.<br><br>THE GAP, INC., a/k/a, GAP, INC., GAP INTERNATIONAL SALES, INC., BANANA REPUBLIC, LLC, AND OLD NAVY, LLC,<br><br>Defendants. | Case No.: 07 C 3363 CRB<br><br>PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON ITS EQUITABLE CLAIMS<br><br>Date: September 26, 2008<br>Time: 2:30 p.m.<br>Place: Courtroom 8, 19th Floor<br>Judge: Hon. Charles R. Breyer<br><br>**Trial Date: October 6, 2008** |

Plaintiff Roots Ready Made Garments Co. W.L.L. ("Roots") submits the following Proposed Findings of Fact and Conclusions of Law in connection with its equitable claims: (1) Promissory Estoppel; (2) "Unfair" Business Practices under Cal. Bus. & Prof. Code § 17200; (3) "Unlawful" Business Practices under Cal. Bus. & Prof. Code § 17200; and (4) Quasi-Contract/Restitution.

**I.     Proposed Findings of Fact**

   **A.     The Parties**

   1.     Plaintiff Roots Ready Made Garments Co. W.L.L. ("Roots") is a Qatari company with its principal place of business in Doha, Qatar.

2. Defendant The Gap, Inc. is a Delaware corporation with its principal place of business in San Francisco, California.

3. Defendant Gap International Sales, Inc. is a Delaware corporation with its principal place of business in San Francisco, California.

4. Defendant Banana Republic, LLC is a Delaware limited liability company with its principal place of business in San Francisco, California.

5. Defendant Old Navy, LLC is a Delaware limited liability company with its principal place of business in San Francisco, California.

**B.    Gap Sells The OP Inventory to Roots And Promises In Exchange To Permit Roots To Sell First-Line ISP Merchandise.**

6. In early 2003, Defendant Gap, Inc. needed to rid itself of a large inventory of outdated merchandise, know as overproduction, or "OP."

7. In early 2003, Gap offered to sell the OP inventory to Roots for $6 million, promising in exchange to grant Roots the right to sell first-line Gap merchandise in Roots' own retail stores in Qatar, and to retailers in other territories in the Middle East and North Africa, under Gap's International Sales Program ("ISP").

8. Gap presented the ISP program to Roots as a tremendous opportunity to develop a profitable retail business in the region.   In or about May 2003, Roots agreed to purchase the OP inventory in exchange for the right to sell ISP merchandise.

9. At Gap insistence, Gabana served as an intermediary in the transaction between Gap and Roots, such that Gap would sell the OP inventory (and later the ISP merchandise) to Gabana, which would then simultaneously resell the merchandise to Roots.

10. Roots purchased the OP inventory by means of back-to-back wire transfers and letters of credit through which Roots transferred the funds to Gabana and Gabana simultaneously sent the same amount to Gap.  Gap then shipped the inventory directly to Roots' warehouse in Dubai.

11. Pursuant to an arrangement devised by Gap, Gap similarly sold first-line merchandise to Gabana, and Gabana simultaneously re-sold all the merchandise – whether intended for distribution in Qatar or elsewhere – to Roots by means of a back-to-back letter of

- 2 -

credit. Gap shipped all the ISP merchandise directly to Roots' warehouse, recognizing that Roots would send the goods to its own stores in Qatar, and to retailers in other territories.

### C. Gap's Misrepresents The Purpose Of The ISP Program

12. During the negotiation of the OP sale, Gap fundamentally misrepresented purpose of the ISP program to Roots.

13. The ISP program was never intended to generate profits sufficient to compensate Roots for its $6 million investment in the outdated Gap OP inventory. Rather, the program was designed by Gap's legal department to protect Gap's international trademarks by conducting a minimal amount of business in foreign countries.

14. The ISP program was commercially irrelevant. The motivation behind the program was always simply to protect trademarks – not to drive revenue or sales. Gap had no meaningful growth plan for the program, but rather intended to maintain the status quo by providing protection for Gap's trademarks.

15. Gap never disclosed any of these facts to Roots. Had Roots understood the true nature of the program, it would never have agreed to purchase the OP inventory. Nor would it have gone to the expense of establishing its own retail stores in Qatar to sell ISP merchandise.

### D. Gap Denies Roots The Benefit of the Bargain By Failing to Permit Roots to Sell ISP Merchandise

16. At Gap's request, Roots' representatives traveled throughout the Middle East and North Africa, touring various potential markets and meeting with scores of local retailers. In the Spring of 2004, Roots, with Gap's approval, began selling Gap OP and ISP merchandise through its own retail stores in Qatar, and to another retailer in the UAE.

17. Although these initial stores were successful, Gap began to stall in approving new retailers and territories in which Roots could sell. Gap reassured Roots that it was not reneging on its agreement with Roots, and would soon allow Roots to enter the other Arabic-speaking countries in the region.

18. Contrary to the representations Gap made to induce Roots to purchase the OP inventory, Gap never intended to grant Roots to right to sell ISP merchandise outside of Qatar.

19. On August 10, 2005, Gap terminated the ISP Agreement with Gabana. Because Gap had provided the ISP merchandise for Roots' retail stores (and those of its retail partners in the UAE) solely through Gabana, the termination effectively cut off Roots' access to the first-line Gap goods necessary to run the stores.

**E.    Gap Changes Its Business Model in the Middle East and Promises to Make Roots Its Franchisee.**

20. In late 2004 or early 2005, Gap informed Roots that it was considering changing its business model in the Middle East by establishing franchisees to operate stand-alone Gap stores.

21. Acknowledging the commitment Gap owed Roots, Ron Young, an executive in Gap's international division, promised Sheikh Faisal Al-Thani, a Roots executive, that if Gap began a franchise business in the Arabic-speaking countries, it would appoint Roots as the franchisee in the region. Young was impressed by the success of Roots' ISP operation in Dubai, and believed that a stand-alone Gap store operated by Roots would be still more successful.

22. In reliance on Young's promises, Roots (i) prepared a study of the potential franchise relationship, and (ii) traveled extensively in the region to explore the possibility of various franchise opportunities.

23. Although Gap did eventually establish franchises in the Middle East, Roots was not made a franchisee. In 2006, Gap appointed Al Tayer Group a franchisee in Kuwait, Oman, Bahrain, Qatar and the United Arab Emirates. In 2007, it appointed Al Hokair as a franchisee for Saudi Arabia.

24. Gap never actually considered making Roots its franchisee in the Middle East.

### F. Facts Relating to Roots' Injuries

25. Had Gap granted Roots the franchise rights it promised, Roots would have earned $57,275,116 in net profits from 2006 to 2010.

26. The expected return on Roots' $6 million investment in the OP inventory is $5,661,403.

## II. Conclusions of Law
### A. "Unfair" Business Practices Under Cal. Bus. & Prof. Code § 17200

27. Gap engaged in "unfair" business practices by (1) falsely representing the ISP program as an opportunity to establish and grow a profitable retail operation, and failing to disclose that the purpose of the program was to protect Gap's trademark, not to generate revenue or sales; and (2) falsely leading Roots to believe that it would be permitted to sell ISP merchandise in its own stores in Qatar and to other retailers in other countries.

28. Gap's conduct induced Roots to purchase the OP inventory, and to expend money and resources to open its own retail stores in Qatar and to develop a retail network for Gap merchandise in other countries in the Middle East.

29. In determining whether a particular practice is "unfair," California courts weigh "the impact [of the conduct] on its alleged victim, balanced against the reasons, justifications and motives of the alleged wrongdoer." *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App. 4th 700, 718 (2001).

30. Roots has established a claim for unfair business practices under this standard: Gap falsely represented that the ISP program would be an opportunity for Roots to establish and grow a profitable retail operation, and failed to disclose that the purpose of the program was to protect Gap's trademark, not to generate revenue or sales. Gap also falsely led Roots to believe that it would be permitted to sell ISP merchandise in its own stores in Qatar and to other retailers in other countries.

31. Gap's conduct induced Roots to purchase the OP inventory, and to expend money and resources in developing a retail network for Gap merchandise in the Middle

East. Gap's motives and justifications, moreover, were clearly ill-intentioned: Gap sought to rid itself of a large quantity of outdated merchandise, and to protect its trademarks in the region.

32. As a result of the foregoing, Roots is entitled to restitution in the amount of $11,661,403.

### B. "Unlawful" Business Practices Under Cal. Bus. & Prof. Code § 17200

33. Roots also clearly establishes a claim for unlawful business practices under Cal. Bus. & Prof. Code § 17200. As this Court has pointed out in its order dated August 29, 2008, a claim for common law fraud is actionable as an "unlawful" business practice under § 17200. *See* 8/29/08 Order at 14. Because Roots establishes two separate claims for fraud, Roots necessarily establishes a claim for "unlawful" business practices under § 17200.

34. As a result of the foregoing, Roots is entitled to restitution in the amount of $11,661,403.

### C. Equitable Claims

#### 1. Roots' Equitable Claims Were Timely Filed.

35. Roots Promissory Estoppel and Quasi-Contract/Restitution Claims were timely filed within the applicable two-year statute of limitations. *See* Cal. Code Civ. Proc. § 339(1).

36. "[A] statute of limitations begins to run no earlier than upon accrual of the cause of action, which is upon the occurrence of the last essential element." *Chambers v. Kay*, 106 Cal. Rptr. 2d 702, 719 (2001), *aff'd* 29 Cal. 4th 142 (2002); *see also J.W. Van Hook v. Southern Cal. Waiters Alliance*, Local 17, 158 Cal. App. 2d 556, 565 (1958) (claim does not accrue until "the moment when the party owning it is entitled to begin and prosecute an action thereon").

37. Roots' promissory estoppel claim did not accrue until 2006 when Gap breached its promise to make Roots a franchisee. *See Chambers v. Kay*, 106 Cal. Rptr. 2d 702, 719 (citing *Budd v. Nixen,* 6 Cal. 3d 195, 200-201 (1971) ("Until the defendant's conduct causes damages to the plaintiff, no cause of action has been generated and the period of limitations is not triggered."). Thus, the statute of limitations for Roots' promissory estoppel claim began to run until Gap breached its promise to make Roots a franchisee

- 6 -

38.     As for the quasi-contract/restitution claim, Gap's obligation to make restitution was not triggered until "the circumstances [were] such that . . . it [was] *unjust* for [Gap] to retain [the benefits]." *McBride v. Boughton*, 123 Cal. App. 4th 379, 389 (2004) (emphasis in original). Roots' quasi-contract/restitution claims likewise did not accrue before Gap reneged on its promise to make Roots a franchisee in 2006.

39.     Roots' quantum meruit and quasi-contract/restitution claims were timely filed within two years of the accrual of the claims.

### 2. Gap Is Equitably Estopped From Invoking The Statute of Limitations Because It Induced Roots To Refrain From Filing Suit.

40.     Any statute of limitations defense also fails on the ground of estoppel. Under California law, a defendant who represents that "actionable damage has been or will be repaired, thus making it unnecessary to sue" is estopped from invoking the statute of limitations. *Lantzy v. Centex Homes*, 31 Cal. 4th 363, 383-384 (2003).

41.     Gap promised that it would compensate Roots for its injuries, thus making it unnecessary for Roots to file suit. Specifically, Roots' owner, Mr. Al-Thani, testified that after Gabana filed suit against Gap, in 2006, Ron Young advised him that because Roots did not file a suit against Gap, Gap would compensate Roots for its losses. Young reiterated his earlier promise to make Roots a franchisee, although in a smaller territory than was previously promised.

42.     Thereafter, Roots' attorney had further discussions with Young regarding Roots' potential suit against Gap. After Gabana brought its lawsuit, Gap persuaded Roots not to file its own suit, by falsely asserting that it would cure Roots injuries by granting it franchise rights. Gap is therefore estopped from invoking the statute of limitations as a bar to Roots' equitable claims.

### 3. Promissory Estoppel

43.     "Promissory estoppel applies whenever a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance would result in an "injustice" if the promise were not enforced." *Lange v. TIG Ins. Co.*, 68 Cal. App. 4th 1179, 1185 (1998)

(internal quotations omitted).  "To be binding, the promise must be clear and unambiguous." *Id.*

44. In early 2005, Gap made a clear and unambiguous promise to Roots that, if Gap established a franchise business in the Arabic-speaking countries of the Middle East and North Africa, it would make Roots a Gap franchisee in the region.  Roots reasonably and forseeably relied to its detriment on this promise by expending money and resources to prepare a study of the franchise relationship, and traveling extensively in the region to explore potential markets.

45. As a result of the foregoing, Roots is entitled to recover lost profits in the amount of $57,275,116.

### 4. Quasi-Contract/Restitution

46. The essential elements of a claim of restitution are "receipt of a benefit and unjust retention of the benefit at the expense of another." *Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000).  Roots conferred benefits upon Gap in reliance on Gap's promise to make Roots a franchisee in the Middle East.  At Gap's behest, Roots began exploring and developing the franchise opportunity by preparing a study and traveling extensively in the region to explore potential markets.  Gap, however, failed to make Roots a franchisee as it had promised.

47. As a result of the foregoing, Roots is entitled to recover the value of its services and expenditures.

Dated: September 19, 2008

                                        Respectfully submitted,

                                        COVINGTON & BURLING

                                        By _____/s/_____
                                              RICHARD A. JONES

                                        Attorneys for Plaintiff Roots Ready Made Garments Co. W.L.L.

ROOTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON ITS EQUITABLE CLAIMS
CASE NO.: C 07 3363 CRB